## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| SEADRILL LIMITED, *et al.*,[1] | ) Case No. 17-60079 (DRJ) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |

## DECLARATION OF MARK MORRIS, CHIEF FINANCIAL OFFICER OF SEADRILL LIMITED, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Mark Morris, hereby declare under penalty of perjury:

1.      I am the Chief Financial Officer of Seadrill Limited.  Seadrill Limited is a publicly traded exempted company organized under the laws of Bermuda and a debtor and debtor in possession in the above-captioned cases of Seadrill Limited and 85 of its direct and indirect subsidiaries as debtors and debtors in possession (collectively, the "Debtors," and together with Seadrill Limited's direct and indirect non-Debtor subsidiaries and affiliates, collectively, "Seadrill").   Prepetition, Seadrill Limited's common shares traded on the New York Stock Exchange (the "NYSE") and the Oslo Stock Exchange (the "OSE").  I have served as Seadrill Limited's Chief Financial Officer since September 2015.  Before joining Seadrill Limited, I was Chief Financial Officer of Rolls-Royce Group plc., where I worked for 28 years in various positions.

---

[1]     Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/Seadrill.  The location of Debtor Seadrill Americas Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 11025 Equity Drive, Suite 150, Houston, Texas 75201.

2.      I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration to assist the Court and parties in interest in understanding the circumstances that resulted in the commencement of these chapter 11 cases, and in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date").

3.      The statements in this Declaration are based upon my personal knowledge, information obtained from other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.

## I.      Introduction.

4.      The Debtors have commenced these chapter 11 cases with a clear path to a value-maximizing exit.  The foundation of the Debtors' restructuring, and the product of nearly two years of negotiations, is an extremely valuable agreement (the "Bank Deal") with more than 97 percent of the lenders (the "Bank Lenders") under the Debtors' 12 secured bank facilities (the "Bank Facilities") that will extend maturities by approximately five years (on average), eliminate near-term amortization obligations, and provide additional covenant relief.  The Debtors believe the Bank Deal will provide sufficient time to bridge their businesses to a market recovery. From the start of negotiations, the Bank Lenders have been consistent that a precondition to implementing the Bank Deal would be the Debtors securing a sufficient new capital commitment to fund their business through the downturn and provide additional support for the re-profiled Bank Facilities.

5.      Starting nearly a year ago, the Debtors launched a capital raise process seeking at least $1 billion in new financing.  After nearly six months of marketing efforts and negotiations,

the Debtors received a joint proposal from affiliates of Hemen Holding Ltd. ("Hemen"), Seadrill Limited's largest shareholder and a leading investor in the offshore space, and Centerbridge Credit Partners L.P. ("Centerbridge") that contemplated a $1 billion investment.   The proposal subsequently developed into a $1.06 billion commitment (the "Capital Commitment") backed not only by Hemen and Centerbridge, but also by a syndicate of additional investors (the "Syndication Parties," together with Hemen and Centerbridge, the "Commitment Parties").   The Syndication Parties hold approximately 30 percent of the Debtors' approximately $2.3 billion in outstanding unsecured bonds (the "Unsecured Bonds").   The Commitment Parties (i.e., including Hemen and Centerbridge) hold approximately 40 percent of the Unsecured Bonds.   The Commitment Parties and the Bank Lenders agree that a substantial capital injection is key to a successful restructuring.

6.      The terms of the Debtors' restructuring are laid out in a Restructuring Support and Lock-Up Agreement, dated as of September 12, 2017, a copy of which is attached to this declaration as **Exhibit A** (including all schedules and exhibits thereto, the "Restructuring Support Agreement").   In addition to the Bank Deal and supporting Capital Commitment, the Restructuring Support Agreement contemplates equitizing the Unsecured Bonds and re-casting the Debtors' corporate structure into a new "IHCo"/"RigCo"/"NSNCo" holding structure that will support the Bank Deal and the securities to be issued to the Commitment Parties.   Further, the focus of the Debtors' restructuring is financial as opposed to operational.   The Restructuring Support Agreement will leave the Debtors' operational obligations to their employees, customers, and trade vendors largely unimpaired.   The Debtors believe that the restructuring contemplated by the Restructuring Support Agreement maximizes value and will position them to capitalize on their highly-skilled employee base, strong customer relationships, and modern rig fleet when the market recovers from its current down cycle.

7.      Seadrill was formed in 2005.  Since then, it has grown into one of the world's largest offshore drilling contractors and now serves customers around the globe.  Seadrill's customers (typically referred to as "operators") include super-major and major oil and gas companies, state-owned national oil companies, and local independent offshore exploration and production companies.  As of the Petition Date, the Debtors are liable for more than $8 billion in aggregate funded-debt obligations, including:

- $5.7 billion of aggregate obligations outstanding under the 12 Bank Facilities (each with a discrete collateral package—primarily non-overlapping combinations of the Debtors' drilling rigs and related earnings); and

- $2.3 billion of aggregate obligations outstanding under the six series of Unsecured Bonds.

8.      Offshore drillers like Seadrill depend on "upstream" capital expenditures to fuel continued growth and success.  During the recent down cycle in the oil and gas market, which has now lasted more than three years, a number of large upstream oil and natural gas exploration and production companies, servicing companies, and operators have been forced to seek chapter 11 protection or resort to another in-court process.  Even super-major oil and gas companies have aggressively scaled back capital expenditures.  As a result, the distress in the upstream sector has spread to upstream service providers and other ancillary businesses, including offshore drilling companies like Seadrill.

9.      In response to deteriorating market conditions, in November 2014, Seadrill Limited suspended dividends to its shareholders.  In early 2015, Seadrill began discussions with the Bank Lenders, which resulted in limited covenant relief under the Bank Facilities pursuant to amendments consummated in May 2015.  These initial amendments were not viewed as part of a broader restructuring initiative.  While the Debtors' cash position has been strong since suspending dividends, as market conditions remained depressed, it became clear that it would be difficult to

refinance Seadrill's maturing funded-debt obligations without a broader restructuring.  In October 2015, Seadrill commenced discussions with a "coordinating committee" that included each of the 12 administrative agent banks under the Bank Facilities (the "Bank CoCom").

10.     Following these discussions, in April 2016, Seadrill executed further amendments and waiver agreements (collectively, the "R1 Agreement") with respect to the Bank Facilities that resulted in additional covenant relief and extended the maturities of certain of the Bank Facilities. As part of the R1 Agreement, the parties established April 30, 2017 as the "long stop" date by which Seadrill was to implement a broader restructuring.  Seadrill and the requisite Bank Lenders subsequently agreed to extend the long stop date and relevant maturities on two occasions to allow discussions to progress, with the final long stop date being set September 12, 2017.

11.     In addition to negotiating the Bank Deal and Capital Commitment, Seadrill took steps to ring-fence key sources of value in its structure and proactively address major contingent liabilities.  On an enterprise-wide basis, Seadrill has:

- more than $15 billion in funded-debt obligations (including the Debtors' $8 billion in funded debt);

- approximately $4 billion in contingent liabilities under 14 contracts for the construction of new rigs (or "newbuilds"), the purchase obligations under which span several years; and

- approximately $1.1 billion in long-term capital lease obligations under three sale/leaseback agreements with subsidiaries of Ship Finance International Limited ("SFL"), an entity 36-percent owned by Hemen.

12.     These obligations total more than $20 billion.  In the months preceding the Petition Date, the Debtors consummated a series of transactions to ring-fence their non-majority owned affiliates, referred to as the "Non-Consolidated Entities" (described below).  Failure to ring-fence the Non-Consolidated Entities would have led to cross-defaults triggered by a Seadrill Limited chapter 11 filing that could have destroyed a great deal of value.  The ring-fencing transactions

5

ultimately reduced the number of Seadrill entities requiring chapter 11 protection and eliminated the need to restructure approximately $7 billion of Seadrill's $15 billion in funded-debt obligations, leaving only the Debtors' $8 billion in funded debt subject to these chapter 11 cases. In addition to their funded debt obligations, the Debtors commenced these cases to restructure four of Seadrill's 14 newbuild contracts[2] (implicating approximately $1.8 billion of Seadrill's approximately $4 billion in newbuild obligations) and the $1.1 billion in SFL lease obligations. Ahead of the Petition Date, the Debtors reached a resolution with SFL, embodied in the Restructuring Support Agreement, to restructure the three SFL lease agreements in a manner broadly consistent with the Bank Deal.  While the Debtors were unable to reach a comprehensive resolution with their newbuild counterparties prepetition, they anticipate continuing discussions postpetition in hopes of securing further delivery deferrals or implementing another resolution.

13.    After nearly two years of negotiations with the Bank Lenders and a nearly year-long capital raise process, the Debtors, more than 97 percent of the Bank Lenders (including 100% of the Bank Lenders under 10 of the 12 Bank Facilities), the Commitment Parties, and SFL agreed to the consensual restructuring transaction set forth in the Restructuring Support Agreement, including the $1.06 billion Capital Commitment embodied in an Investment Agreement, dated as of September 12, 2017, attached to the Restructuring Support Agreement as Exhibit B (the "Investment Agreement").  The fact that the Debtors were negotiating with the Commitment Parties and other stakeholders has been disclosed a number of times dating back to late 2016. Therefore, all holders of Unsecured Bonds have had the opportunity to participate in negotiations. All holders of Unsecured Bonds that have become restricted have signed the Restructuring Support

---

[2]    As described below, 10 of the 14 Seadrill newbuild contracting entities (other than Seadrill Limtied) are not Debtors.

Agreement.  The Debtors will continue to encourage holders of Unsecured Bonds to support the proposed restructuring.  The Restructuring Support Agreement is broadly supported across the Bank Lender group, with percentage support under each of the 12 Bank Facilities breaking down as follows:

| Bank Facilities *(in US$ millions)* | Principal | % Party to RSA |
|---|---|---|
| $400 million facility due 2017 | 135 | 100% |
| $450 million facility due 2017 | 265 | 100% |
| $300 million facility due 2018 | 144 | 100% |
| $1.50 billion facility due 2019 | 1,125 | 100% |
| $1.35 billion facility due 2019 | 945 | 100% |
| $950 million facility due 2019 | 566 | 100% |
| $450 million facility due 2020 | 122 | 100% |
| $440 million facility due 2017 | 64 | 100% |
| $1.45 billion facility due 2018 | 322 | 100% |
| $2.00 billion facility due 2017 | 908 | 100% |
| $360 million facility due 2018 | 210 | 87% |
| $1.75 billion facility due 2018 | 875 | 86% |
| **Total Bank Facilities** | **$5,681 million** | |

14.    In addition to addressing the Debtors' capital structure, the transactions contemplated by the Restructuring Support Agreement will preserve Seadrill's valuable relationships with the Bank Lenders, which finance a substantial portion of the worldwide rig fleet. The transactions also will preserve Seadrill's valuable relationship with its largest shareholder, Hemen, which is affiliated with one of the largest oil tanker and shipping groups in the world. Finally, the broad consensus embodied in the Restructuring Support Agreement will ensure that the Debtors' chapter 11 cases proceed in an efficient, cost-effective manner.

15.    The Restructuring Support Agreement and Investment Agreement require the Debtors to meet certain key milestones, including:

- entry of an order approving the adequacy of the Debtors' disclosure statement within approximately five months following the Petition Date;

- entry of an order confirming the Debtors' chapter 11 plan within approximately nine months following the Petition Date; and

- the effective date of the Debtors' chapter 11 plan occurring within approximately two months after confirmation of the Debtors' chapter 11 plan.

16. The length of the commitment period under the Investment Agreement (nine months from the Petition Date) was a key point of negotiation in the months preceding the Petition Date, and the Debtors were ultimately able to extract a significantly longer commitment period than initially proposed. Viewed in light of the size of the Capital Commitment and the volatile market backdrop, the Debtors view the nine-month commitment as substantial and an important asset of their estates. Further, the fact that the Debtors negotiated the Bank Deal, the Capital Commitment, the SFL resolution, and the Non-Consolidated Entities ring-fencing transactions before entering chapter 11, and are proposing to leave trade claims largely unimpaired, greatly reduces the complexity of these chapter 11 cases. The Debtors believe they can confirm a plan of reorganization and emerge from chapter 11 within the prescribed time periods, thereby preserving the value inherent in the Capital Commitment, without prejudicing the rights of any parties in interest.[3]

17. Additionally, the Investment Agreement commitment period gives the Debtors more than sufficient time to market test the terms of the Capital Commitment. The Debtors have already conducted a robust prepetition negotiation and capital marketing process, very much in the public eye, that lasted for nearly a year. The Debtors further negotiated for a 90-day "go shop" period (measured from the Petition Date) under the Investment Agreement and intend to re-double their efforts during that period to ensure that the Capital Commitment represents the best available

---

[3]   The Debtors filed *Debtors' Emergency Motion for Entry of an Order Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Disclosure Statement and Plan Confirmation* (the "Scheduling Motion") requesting certain dates and deadlines in connection with approval of the Debtors' disclosure statement and confirmation of the Debtors' chapter 11 plan.

terms.[4]   The Restructuring Support Agreement provides the Debtors substantial flexibility to pursue a higher or better proposal, should one arise, pursuant to an unqualified "fiduciary out" that empowers the Debtors to terminate without a break-up or termination fee.

18.     The Restructuring Support Agreement is a significant achievement in the face of historic commodity price declines and sustained, depressed operating conditions.  Given the Debtors' core strengths, including their highly-skilled workforce, modern fleet, global reach, and successful operating and safety track record, the Debtors are confident they can efficiently implement the restructuring set forth in the Restructuring Support Agreement to ensure their long-term viability and success.

19.     To familiarize the Court with the Debtors, their businesses, and the circumstances leading to these chapter 11 cases, I have organized this declaration as follows:

- **Part II** provides a general overview of the offshore sector and the Debtors' business operations and corporate structure;

- **Part III** describes the Debtors' prepetition capital structure;

- **Part IV** describes the circumstances leading to the commencement of these chapter 11 cases; and

- **Part V** describes the Restructuring Support Agreement, including the significant restructuring transactions contemplated thereby and the proposed timeline for these chapter 11 cases.

## II.    Background.

### A.    Seadrill's Fleet.

20.     The worldwide offshore fleet consists of approximately 820 drilling rigs.  Seadrill and its affiliates own or lease 51 drilling rigs, which represents more than six percent of the world fleet.  The Debtors own or lease 32 drilling rigs, including 7 drillships, 12 semi-submersible rigs,

---

[4]   Further information about the Debtors' prepetition marketing efforts and contemplated postpetition marketing efforts is set forth in the Hilty Declaration.

and 13 jack-up rigs.  A drillship or semi-submersible rig is often referred to as a "floater."  Seadrill

has also contracted for the construction and delivery of 14 newbuild rigs (including 4 drillships, 2

semi-submersible rigs, and 8 jack-up rigs) that are in varying stages of completion in shipyards

located in Southeast Asia.  Four of Seadrill's 14 newbuild contracts are with Debtor entities.

21.    ***Jack-Up Rigs.***  Jack-up rigs are self-elevating barges with usually three or four legs

that extend or "jack" downward to the sea floor to lift the drilling platform out of the water.  When

drilling is complete, the legs are retracted and the entire drilling unit is transported (via tug boat or

heavy lift boat) to a new drilling site.  The graphic below depicts a jack-up rig in drilling position.



22.    Jack-up rigs are the most common type of offshore rig.  Modern jack-up rigs are

capable of operating in up to 500 feet of water.  The Debtors own or lease 13 jack-up rigs[5] (7 of

which are currently under contract), while their non-Debtor affiliates own an additional 8 jack-up

---

[5]    Of the Debtors' 13 jack-up rigs, 3 are qualified for harsh environment drilling.

rigs.  A summary of the year built, location, and contract status of the Debtors' jack-up rigs is set forth below.

| Rig | Year | Location | Contract |
|---|---|---|---|
| *West Epsilon* | 1993 | Norway | *stacked*[6] |
| *West Prospero* | 2007 | Malaysia | *stacked* |
| *West Vigilant* | 2008 | Malaysia | *stacked* |
| *West Ariel* | 2008 | Republic of Congo | February 2018 |
| *West Freedom* | 2009 | Venezuela | *stacked* |
| *West Cressida* | 2009 | Malaysia | September 2017 |
| *West Callisto* | 2010 | Saudi Arabia | November 2018 |
| *West Leda* | 2010 | Malaysia | *stacked* |
| *West Elara* | 2011 | Norway | September 2027 |
| *West Castor* | 2013 | Mexico | December 2019 |
| *West Telesto* | 2013 | Malaysia | December 2017 |
| *West Tucana* | 2013 | Sharjah | *stacked* |
| *West Linus* | 2014 | Norway | December 2028 |

23.     ***Semi-Submersible Rigs.***     Unlike jack-up rigs, semi-submersible rigs are not anchored to the sea floor by legs.  Instead, semi-submersible rigs sit atop columns connected to massive pontoons.  While a semi-submersible rig is being towed or moving under the power of its own thrusters, sea water is pumped out of the pontoons so that the entire rig floats above the water. When in position to drill, sea water is pumped into the pontoons so they sit below the water line, leaving only the drilling platform positioned above the wave line.  This configuration makes for a stable platform for drilling.  Since they do not have legs to anchor them to the sea floor, modern semi-submersible rigs are dynamically positioned—*i.e.*, held in place by a series of propellers or thrusters lining the outside of the rig that receive positioning information from satellites—or held

---

[6]     As described in greater detail below, when a drilling rig is not under contract, it may be "stacked" or stored in a non-operating state until the rig owner is able to secure a contract for that rig.

in place by mooring lines that extend to the sea floor. The graphic below depicts a semi-submersible rig.



24.    Modern semi-submersible rigs are capable of drilling in up to 12,000 feet of water. The Debtors own or lease 12 semi-submersible rigs[7] (3 of which are currently under contract), while their non-Debtor affiliates own an additional 4 semi-submersible rigs. A summary of the year built, location, and contract status of the Debtors' semi-submersible rigs is set forth below.

| Rig | Year | Location | Contract |
|---|---|---|---|
| *West Alpha* | 1986 | Norway | *stacked* |
| *West Venture* | 2000 | Norway | *stacked* |
| *West Phoenix* | 2008 | UK | November 2017 |
| *West Hercules* | 2008 | Norway | *stacked* |
| *West Taurus* | 2008 | Spain | *stacked* |
| *West Eminence* | 2009 | Spain | *stacked* |
| *West Orion* | 2010 | Malaysia | *stacked* |
| *West Pegasus* | 2011 | Spain | *stacked* |
| *West Eclipse* | 2011 | Angola | June 2018 |
| *Sevan Driller* | 2009 | Malaysia | *stacked* |
| *Sevan Brasil* | 2012 | Brazil | July 2018 |
| *Sevan Louisiana* | 2013 | USA | *stacked* |

---

[7]    Of the Debtors' 12 semi-submersible rigs, 6 are qualified for harsh environment drilling.

25.     ***Drillships***.  The most distinctive feature of a drillship versus a semi-submersible or jack-up rig is its ship-like design.  Modern drillships place the drilling rig in the middle of the ship with an opening through the hull called a "moon pool" to accommodate the drilling equipment.  Like semi-submersible rigs, modern drillships are dynamically positioned.  Unlike jack-up and semi-submersible rigs, drillships are self-propelled and, due to their ship-like design, highly mobile.  Repositioning to a new drill site located across the Atlantic Ocean may take a drillship only a matter of weeks, while it would take substantially longer to transport a jack-up or semi-submersible rig the same distance.  The graphic below depicts a drillship.



26.     Modern dynamically positioned drillships are generally capable of drilling in 10,000–12,000 feet of water.  The Debtors own 7 drillships (5 of which are currently under contract), while their non-Debtor affiliates own an additional 4 drillships.  A summary of the year built, location, and contract status of the Debtors' drillships is set forth below.

| Unit | Year | Location | Contract |
|---|---|---|---|
| *West Navigator* | 2000 | Norway | *stacked* |
| *West Gemini* | 2010 | Angola | October 2017 |
| *West Tellus* | 2013 | Brazil | October 2019 |
| *West Neptune* | 2014 | USA | November 2018 |
| *West Jupiter* | 2014 | Nigeria | December 2019 |
| *West Saturn* | 2014 | Brazil | *stacked* |

| Unit | Year | Location | Contract |
|------|------|----------|----------|
| *West Carina* | 2015 | Brazil | June 2018 |

27.     Modern offshore drilling rigs are massive structures—the size of several football fields, with room to accommodate crews of more than 100 individuals.  Due to their sheer size and the complexity of the technology necessary to construct and operate a modern offshore drilling rig, construction generally takes several years and the finished product may cost more than $200 million for a jack-up rig, more than $400 million for a semi-submersible rig, and more than $500 million for a drillship.  Offshore drilling rigs are long-lived assets.  The average rig age of Seadrill's major competitors' fleets is well above 10 years, even 20 years in some instances. Seadrill maintains a comparatively young fleet—the average age of Seadrill's floaters (*i.e.*, drillships and semi-submersible rigs) is 8 years, while the average age of their jack-up rigs is only 7 years.

28.     All else equal, operators prefer modern rigs.  Rigs that incorporate the latest technological advances are generally more efficient, able to drill deeper and in more challenging environments, and less susceptible to downtime.  Further, as rigs age, the cost of modernizing or maintaining the required class certification[8] may become prohibitive when faced with sustained, low utilization rates.  With utilization rates in the offshore sector at the lowest level in decades and a substantial backlog of state-of-the-art rigs set to come to market in the near term, many drilling contractors have elected to scrap aging rigs instead of spending the capital to maintain class certification or modernize.  With its modern fleet, Seadrill enjoys relatively high utilization rates and is well positioned to capitalize on any market improvement.

---

[8]     Every offshore drilling unit is a registered marine vessel and must be "classed" by a classification society. The classification society certifies that the drilling unit is "in-class." This certification signifies that the drilling unit has been built and maintained in accordance with the rules of the classification society and complies with applicable rules and regulations of the drilling unit's country of registry and the international conventions of which that country is a member.

## B.     Seadrill's Operations.

29.     Seadrill contracts with vendors and customers across the globe to provide drilling services, in both benign and harsh operating environments from shallow to ultra-deepwater.  The Debtors' largest customers include Petroleo Brasileiro S.A., or "Petrobras," (the Brazilian national oil company), Total S.A. Group, ExxonMobil Corp., LLOG Exploration Company, and Statoil ASA.  As illustrated by the graphic below, Seadrill's assets are concentrated in the key offshore oilfields around the world.



30.     The Debtors' current contract backlog is approximately $2.8 billion.  Backlog is a function of utilization and dayrates and will generally increase in a recovering market.  As of the Petition Date, 17 of the Debtors' 32 rigs are not under contract and have either been warm or cold stacked.  Warm stacked rigs maintain a significant number of crew and are kept fully operational and ready for deployment.  Cold stacked rigs are stored in a harbor, shipyard, or other designated offshore area and the majority of the crew is dismissed or reassigned to another rig.  The Debtors' warm stacked floaters cost them approximately $50,000 per rig per day while cold-stacked floaters cost them approximately $10,000 per rig per day.  There is no material difference in the costs for warm stacked and cold stacked jack-up rigs.

31.     The Debtors employ approximately 3,760 highly-skilled individuals across 22 countries and five continents to operate their drilling rigs and perform various other corporate functions.  The skills and knowledge of Seadrill's employee base are essential to preserving operational stability, safety, and efficiency, which are in turn necessary to maximize value over the course of these chapter 11 cases.

### C.     Seadrill's Corporate History and Structure.

32.     Seadrill Limited was formed on May 10, 2005 as a Bermuda exempted company. John Fredriksen, who holds a number of interests in the offshore space through Hemen and other investment vehicles, has served as chairman of Seadrill Limited's board of directors since its inception.  At the time of its formation, Seadrill acquired a fleet of three jack-up rigs pursuant to a purchase and subscription agreement with entities affiliated with Hemen.  Today, Hemen owns an approximately 24-percent ownership interest in Seadrill Limited.  During the years following its formation, Seadrill capitalized on strong demand for offshore drilling equipment and services, driven by a favorable oil pricing environment, by actively expanding its fleet, geographic footprint, and technical capabilities through both strategic acquisitions and organic growth.  By the end of 2013, Seadrill had grown into one of the world's premier offshore drilling contractors.

33.     Seadrill's current corporate structure reflects its history of expansion through strategic investments, acquisitions, partnerships, and project-style financing.  Seadrill has historically arranged its secured bank financing to fund specific projects such as the acquisition of new rigs, and used the rigs and related earnings as the collateral for that financing.  Seadrill has also acquired both controlling and non-controlling interests in previously unrelated corporate groups and consolidated them into the broader Seadrill enterprise.

34.     The majority of the rig-owning entities that are obligors under the Bank Facilities are organized as wholly-owned subsidiaries of Seadrill Limited (the "Seadrill Subsidiary

Entities"). Historically, Seadrill Limited also guaranteed the obligations of certain of its non-wholly owned subsidiaries (and their respective subsidiaries), a number of which are majority-owned by Seadrill Limited and consolidated with the Seadrill Subsidiary Entities for accounting and reporting purposes. In general, Seadrill Limited's non-wholly owned subsidiaries and their respective subsidiaries are organized into several groups, each of which is described below.

35.     Seadrill Limited also directly or indirectly owns substantial, but non-majority, interests in four other offshore drilling and services companies (*i.e.*, the Non-Consolidated Entities) that form their own respective corporate groups within the Seadrill enterprise and are not Debtors in these chapter 11 cases. Seadrill Limited and 85 of its direct and indirect subsidiaries are Debtors in these chapter 11 cases. Each Debtor entity has assets, property, or other interests located in the United States by among other things: (a) owning equity interests in United States-incorporated entities; (b) owning a bank account with a positive cash balance at a United States-based financial institution; (c) maintaining certain residual interests, including in retainer amounts paid to United States-based professionals; (d) being party to contracts governed by law in the United States, including the Restructuring Support Agreement and the Investment Agreement (each of which is governed by New York law); and (e) owning certain other assets, property, or interests located in the United States. The Debtor entity Seadrill Americas, Inc., a 100 percent-owned subsidiary of Seadrill Limited, leases office space, maintains a significant employee base, and owns substantial assets in Houston, Texas that collectively serve as the headquarters of Seadrill's North American operations.

36.     A  graphic  depicting  a  simplified  version  of  Seadrill's  corporate  structure  and identifying  which  entities  are  Debtors  is  set  forth  below.    Seadrill's  complete  corporate organization chart is attached hereto as **Exhibit B**.



### 1.     Consolidated Entities.

37.     Seadrill Limited, the Seadrill Subsidiary Entities, and the Seadrill corporate groups that  are  majority-owned  by  Seadrill  Limited  are  collectively  referred  to  as  the  "Consolidated Entities" and operate as a single, integrated enterprise under a common management team.

38.     ***Seadrill Limited and the Seadrill Subsidiary Entities (Debtor Group)***.  Seadrill Limited and its wholly-owned subsidiaries own and operate 22 of the Debtors' 32 rigs.  Seadrill Limited  is  an  obligor  (as  either  borrow  or  guarantor)  under  approximately  $7.6  billion  of  the Consolidated  Entities'  $8  billion  in  funded-debt  obligations—$413  million  of  Debtor  North Atlantic Drilling Limited Unsecured Bond obligations are not guaranteed by Seadrill Limited.

39.     ***North Atlantic Drilling Limited (Debtor Group).*** North Atlantic Drilling Limited ("NADL,"  and  together  with  its  direct  and  indirect  subsidiaries,  collectively,  the  "NADL

Entities"), a Bermuda exempted company, is a 70.4-percent owned subsidiary of Seadrill Limited. Seadrill Limited formed NADL in February 2011 to reorganize the Company's harsh environment activities under a single sub-holding company.  Shortly after its formation in April 2011, NADL purchased six harsh-environment drilling rigs from Seadrill Limited, which were financed by a $2 billion senior secured loan facility guaranteed by Seadrill Limited and certain of the other NADL Entities.  The NADL Entities now own and operate seven rigs.  The NADL entities are direct obligors under approximately $1.5 billion of the Consolidated Entities' funded-debt obligations, including approximately $908 million under one of the Bank Facilities (the entirety of which is guaranteed by Seadrill Limited) and approximately $579 million in NADL-issued Unsecured Bonds (approximately $166 million of which is guaranteed by Seadrill Limited). NADL completed an initial public offering in February 2014.  The 29.6 percent of NADL common stock not owned by Seadrill Limited is publicly listed and trades on the NYSE under the ticker symbol "NADL."

40.  ***Sevan Drilling Limited (Debtor Group).***  Sevan Drilling Limited ("Sevan," and together with its direct and indirect subsidiaries, collectively, the "Sevan Entities"), a Bermuda exempted company, is a 50.1-percent owned subsidiary of Seadrill Limited.  The Sevan Entities focus on offshore drilling in the ultra-deepwater segment.  Sevan was formed in May 2006 by Sevan Marine ASA, a Norwegian limited liability company not affiliated with Seadrill.  Seadrill Limited initially acquired 28.52 percent of Sevan's outstanding common shares for $65 million in November 2011, becoming Sevan's largest shareholder in the process.  In July 2013, Seadrill Limited completed a series of share acquisitions and other transactions that made it Sevan's

controlling shareholder.  The Sevan Entities' three semi-submersible drilling rigs employ an innovative cylindrical-hull design known as the "Sevan design" that is depicted below.



The Sevan entities are direct obligors under approximately $875 million of the Consolidated Entities' funded-debt obligations under one of the Bank Facilities (which is guaranteed by Seadrill Limited).  The 49.9 percent of Sevan common stock not owned by Seadrill Limited is publicly listed and trades on the OSE under the ticker symbol "SEVDR."

41.    ***Asia Offshore Drilling Limited (Non-Debtor Group).***  Non-Debtor Asia Offshore Drilling Limited ("AOD," and together with its three non-Debtor subsidiaries, collectively, the "AOD Entities"), a Bermuda exempted company, is a 66.2-percent owned subsidiary of Seadrill Limited.  The AOD Entities own three high-specification jack-up rigs, all of which are currently under contract.  Debtor Seadrill G.C.C. Operations Ltd. ("Seadrill GCC") operates each of the AOD Entities' rigs and pays the applicable AOD Entities a bareboat charter for each of the rigs. AOD is a passive investment vehicle—the AOD Entities own rigs but they do not have employees or independent operations.  AOD was formed in late 2010 by Mermaid Maritime Public Company Limited ("Mermaid"), a Thai company that is not affiliated with Seadrill Limited.  In July 2011,

Seadrill participated in a private placement whereby Seadrill Limited obtained 33.75 percent of AOD's outstanding common stock and subsequently completed a series of transactions that resulted in Seadrill Limited becoming AOD's controlling shareholder. The AOD Entities are direct obligors under approximately $210 million of the Consolidated Entities' funded-debt obligations under one of the Bank Facilities (the "AOD Facility"). Mermaid continues to privately hold the remaining 33.8 percent of AOD common stock.

42. Debtors Seadrill Limited and Seadrill GCC guarantee the obligations under the AOD Facility. The four AOD Entities are also obligors under the AOD Facility, but are not Debtors. Approximately 87% of the Bank Lenders under the AOD Facility have executed the Restructuring Support Agreement, which contains an agreement to forbear from exercising remedies against the AOD Entities as a result of Seadrill Limited's and Seadrill GCC's chapter 11 filings. In light of the Bank Lender forbearance and the simple nature of the AOD Entities' capital structure and operations, Seadrill determined to pursue a restructuring of the AOD Entities' debt obligations without commencing chapter 11 cases for the AOD Entities at this time. The Debtors will continue discussions with the AOD Entities' stakeholders, including the AOD Facility Bank Lenders not party to the Restructuring Support Agreement and Mermaid in hopes of reaching a consensual resolution of a restructuring of the AOD Entities.

### 2. Non-Consolidated Entities (Non-Debtor Groups).

43. In addition to its wholly-owned subsidiaries and majority investments in NADL, Sevan, and AOD, Seadrill Limited owns non-majority interests in four other offshore drilling and services companies that, together with their respective subsidiaries, form the Non-Consolidated Entities. Certain of the Non-Consolidated Entities share common management with the Consolidated Entities. Others are independently managed. Each Non-Consolidated Entity corporate group has its own capital structure. The Non-Consolidated Entities' funded-debt

obligations historically benefited from a Seadrill Limited guarantee or contained cross-default provisions tied, among other things, to a Seadrill limited chapter 11 filing.  Before the Petition Date, the Debtors, the Non-Consolidated Entities, and certain of their respective secured bank lenders, took steps to eliminate these guarantees and cross-defaults, thereby ring-fencing the Non-Consolidated Entities and obviating the need for any of them to commence chapter 11 cases.  The Non-Consolidated Entity ring-fencing transactions greatly benefit the Debtors' estates by reducing the scope and complexity of these chapter 11 cases and maximizing the value of Seadrill Limited's interests in the Non-Consolidated Entities.

44.     ***Seadrill Partners LLC.***  Seadrill Limited indirectly owns a 46.6-percent ownership interest in non-Debtor Seadrill Partners LLC ("Seadrill Partners," and together with its subsidiaries, collectively, the "Seadrill Partners Entities"), a Marshall Islands limited liability company.  The Seadrill Partners Entities collectively own 11 offshore drilling rigs, including four semi-submersible rigs, four drillships, and three tender rigs.  Seadrill Partners was formed in June 2012 as a wholly-owned subsidiary of Seadrill Limited.   In October 2012, Seadrill Partners completed an initial public offering of its common units, which trade on the NYSE under the ticker symbol "SDLP."   The 53.4 percent of Seadrill Partners' common units not owned by Seadrill Limited is publicly held.  In connection with Seadrill Partners' initial public offering, certain Seadrill Partners Entities entered into a management and services agreement with Seadrill Management Limited ("Seadrill Management"), a wholly-owned subsidiary of Seadrill Limited that also manages the Consolidated Entities.  Under this agreement, Seadrill Management performs substantially all Seadrill Partners management and administrative functions.

45.     Seadrill Partners functions as a master limited partnership.  It focuses on acquiring through "drop down" transactions modern vessels from Seadrill Limited that are under long-term

contracts and distributing a significant portion of the cash flows generated by such vessels to Seadrill Partners unitholders, including Seadrill Limited, via dividend-like distributions. This financing arrangement allows Seadrill Limited to access additional capital from investors that have less appetite for risk than those who invest in Seadrill Limited. As of the Petition Date, certain of the Seadrill Partners Entities are obligated under more than $3.6 billion in funded-debt obligations, which include:

- approximately $2.9 billion outstanding under a secured "Term Loan B" credit facility due February 2021;

- approximately $340 million outstanding under a $1.45 billion secured credit facility originally due February 2018 (and extended to October 2020);

- approximately $280 million outstanding under a $420 million secured credit facility originally due January 2018 (and extended to July 2020); and

- approximately $93 million outstanding under a $119.1 million secured credit facility originally due December 2017 (and extended to June 2020).

46.    Historically, each of the foregoing credit facilities, other than the Term Loan B credit facility, crossed over the Seadrill Limited and Seadrill Partners corporate groups—*i.e.*, entities from both groups were obligors. To eliminate the facility crossover and related cross-defaults upon a Seadrill Limited chapter 11 filing, the Seadrill Partners Entities, and the Seadrill Partners Entities' bank lenders negotiated and executed a transaction in the months immediately preceding the Petition Date that "split" the non-Term Loan B credit facilities. Pursuant to this transaction, all Seadrill Limited guarantees of Seadrill Partners Entities obligations were released, and the relevant credit facilities were allocated among the Seadrill Limited group obligors and Seadrill Partners group obligors, respectively.[9]   The transaction also included a maturity extension

---

[9]    While Seadrill Limited will continue to be obligated under certain operations-related performance guarantees in favor of certain Seadrill Partners Entities, such obligations will be unaffected by these chapter 11 cases.

of two and one-half years for the non-Term Loan B facilities, an aggregate $150 million prepayment of those credit facilities ($100 million on closing, $25 million six months after closing, and $25 million 12 months after closing), and certain covenant relief.  Seadrill anticipates that the Seadrill Partners Entities' funded-debt obligations and business operations will be largely unaffected by these chapter 11 cases.

47.     ***SeaMex Limited.***  Seadrill Limited indirectly owns a 50 percent interest in non-Debtor SeaMex Limited ("SeaMex," and together with its direct and indirect subsidiaries, collectively, the "SeaMex Entities"), a Bermuda exempted company, pursuant to a joint venture with funds controlled by Fintech Advisory Inc. ("Fintech"), a Delaware corporation that is also one of the Commitment Parties.  Fintech continues to hold the remaining 50 percent ownership interest in SeaMex.  SeaMex's fleet consists of five high-specification jack-up rigs purchased from Seadrill Limited in March 2015.  As with the Seadrill Partners Entities, Seadrill Management performs substantially all of the SeaMex Entities' management and administrative functions pursuant to a management and services agreement.  As of the Petition Date, the SeaMex Entities are obligated under approximately $640 million in funded-debt obligations, which consists of amounts outstanding under a $750 million secured credit facility due September 2019.

48.     To avoid cross-defaults in the SeaMex credit facility tied to a Seadrill Limited chapter 11 filing, the Debtors, the SeaMex Entities, and the SeaMex Entities' secured bank lenders negotiated an amendment to the SeaMex Entities' credit facility in the months preceding the Petition Date to remove certain potential events of default related to a Seadrill Limited chapter 11 filing, remove certain change of control provisions, and implement certain other revisions.  The SeaMex bank facility had been previously amended in a manner that allowed the pre-existing

Seadrill Limited guarantee to lapse. Seadrill anticipates the SeaMex Entities' funded-debt obligations and business operations will be largely unaffected by these chapter 11 proceedings.

49. **_Seabras Sapura._** In May 2012, Seadrill and Malaysian oilfield services company SapuraKencana Petroleum Berhad (now known as Sapura Energy Berhad) ("Sapura"), through certain of their respective subsidiaries, entered into a joint venture known as Seabras Sapura to own and operate offshore oil and gas service vessels in Brazil. In connection with this joint venture, Seadrill holds 50-percent ownership interests in an Austrian limited liability company Seabras Sapura Holding GmbH ("Seabras Holding") and a Brazilian limited liability company Seabras Sapura Participacoes Ltda. ("Seabras Participacoes"). Sapura owns the remaining 50 percent of each entity. Through their respective subsidiaries, Seabras Holding and Seabras Participacoes (collectively with such subsidiaries, "Seabras") own and operate six pipe-laying support vessels, all of which are operating off the coast of Brazil. Sapura subsidiaries are the managers of the jointly owned entities under the relevant agreements, though the Seabras Sapura joint venture is generally self-managed (*i.e.*, Seadrill Management does not provide management services).

50. As of the Petition Date, certain Seabras entities are obligated under approximately $1.2 billion in funded-debt obligations, which include:

- approximately $400 million outstanding under a senior secured credit facility (the "PLSV I Facility") due May 2024, secured by two pipe-laying support vessels (the *Sapura Diamante* and the *Sapura Topazio*);

- approximately $690 million outstanding under a senior secured credit facility (the "PLSV II Facility") due June 2026, secured by three additional pipe-laying support vessels (the *Sapura Jade*, the *Sapura Onix*, and the *Sapura Rubi*);

- approximately $170 million outstanding under a senior secured credit facility due 2032, secured by one pipe-laying support vessel (the *Sapura Esmeralda*); and

- approximately $20 million under a senior secured credit facility due 2020, which benefits from a standby letter of credit that is secured by one pipe-laying support vessel (the *Sapura Esmeralda*).

51.     Both Seadrill Limited and Sapura issued limited guarantees of the PLSV I Facility and PLSV II Facility debt. Before the Petition Date, to preserve and maximize the value of Seadrill's investment in Seabras, Seadrill successfully negotiated with Seabras, Sapura, and the lenders under the two facilities a waiver of up to six months of certain potential defaults arising out of Seadrill Limited's chapter 11 filing. Accordingly, Seadrill anticipates that Seabras's funded-debt obligations and business operations will be largely unaffected by the commencement of these chapter 11 cases. Seadrill will continue to engage in discussions with all parties regarding a comprehensive solution to ring-fence Seabras from Seadrill Limited's restructuring.

52.     ***Archer Limited.***     Seadrill Limited owns a 15.7-percent equity interest in non-Debtor Archer Limited ("Archer"), a Bermuda exempted company that specializes in global drilling and well services.  In September 2007, Seadrill spun off its well services division by establishing an independent well services company, Seawell Limited ("Seawell"), and completing a $50 million private placement of 20 million shares of Seawell.  In February 2011, Seawell completed a merger with Allis-Chambers Energy, Inc., and the combined company was renamed Archer Limited.  The 84.3 percent of Archer common shares not owned by Seadrill Limited are publicly traded on the OSE under the ticker symbol "ARCHER."  Archer is self-managed.  As of the Petition Date, Archer's funded debt obligations included:

- approximately $628 million outstanding under a $750 million secured credit facility due September 2020; and

- approximately $45 million outstanding under a subordinated, convertible facility (for which Seadrill Limited is the lender) due 2021.

53.     In the months preceding the Petition Date, the Debtors, Archer, and Archer's secured bank lenders negotiated—as part of a broader Archer refinancing that resulted in its current

26

capital structure—a release of pre-existing Seadrill Limited guarantees and a reduction in the Seadrill Limited-funded subordinated loans (under which approximately $146 million was previously outstanding) to the current $45 million outstanding.  As part of the transaction, Seadrill Limited also paid a fee in an amount equal to approximately ten percent (approximately $28 million) of the aggregate, contingent guaranteed liabilities and agreed that the subordinated loans would be convertible to Archer equity at a pre-agreed price.  Archer consummated its broader financial restructuring through a Bermuda scheme of arrangement and parallel chapter 15 proceeding filed in the U.S. Bankruptcy Court for the Southern District of Texas, through which Seadrill Limited's previous 39.9-percent equity ownership interest in Archer was diluted to its current 15.7-percent holding.  Seadrill anticipates that Archer's funded-debt obligations and business operations will be largely unaffected by these chapter 11 cases.

### 3.     Ship Finance International Limited.

54.     SFL is 36-percent owned by Hemen, with the remaining common shares being held publicly and trading on the NYSE under the ticker symbol "SFL."  Certain of the Debtors are party to three sale/leaseback agreements with SFL subsidiaries.  As of the Petition Date, approximately $1.1 billion in aggregate obligations remained outstanding under the SFL lease agreements, all of which is guaranteed by Seadrill Limited.  Each SFL lease contains a purchase obligation/put option in favor of SFL at the end of a specified term.

55.     Beginning in late 2016, as part of their broader restructuring negotiations, the Debtors commenced discussions with SFL regarding a consensual restructuring of the SFL leases. The Debtors submitted an initial proposal to SFL in October 2016.  SFL responded with a counter-proposal with respect to two of the three SFL leases in November 2016.  The Debtors and SFL then exchanged a series of proposals and engaged in lengthy discussions, beginning in mid-2017,

that ultimately resulted in a consensual resolution that is embodied in the Restructuring Support Agreement

56.     Pursuant to the SFL resolution built into the Restructuring Support Agreement, each of the three existing SFL lease agreements will be amended to provide for a 29 percent deferral of lease payments for a period of five years.  Deferred amounts will be paid as part of the deferred charter payments until the applicable purchase obligation/put option date under each lease.  The purchase obligation/put option date and amount will be adjusted under each lease such that the all-in internal rate of return under each lease is reduced from the implied contractual level to 6 percent.  The revised SFL leases will be broadly economically consistent with the Bank Deal, recognizing that leases and funded debt are different financial instruments.  The independent members of the Seadrill Limited board of directors considered and approved the SFL resolution in connection with approving the Debtors' entry into the Restructuring Support Agreement.  SFL will otherwise be unaffected by these chapter 11 cases.

**III.     Seadrill's Capital Structure.**

57.     As of the Petition Date, the Debtors were liable for approximately $8 billion in aggregate funded-debt obligations.  These obligations arise under the 12 Bank Facilities and the six Unsecured Bond issuances.  Seadrill Limited is an obligor under each of the 12 Bank Facilities, as either a borrower or guarantor.  The table below summarizes the Debtors' prepetition capital structure, with near-term maturing obligations indicated in red.

| Bank Facilities *(in US$ millions)* | Principal |
|---|---|
| *Seadrill Limited Facilities* | |
| $400 million facility due 2017 — *Jack-Up Facility* | 135 |
| $450 million facility due 2017 — *West Eminence Facility* | 265 |
| $300 million facility due 2018 | 144 |
| $1.50 billion facility due 2019 | 1,125 |
| $1.35 billion facility due 2019 | 945 |

| | |
|---|---|
| $950 million facility due 2019 | 566 |
| $450 million facility due 2020 | 122 |
| $440 million facility due 2017 — *Split Facility* | 64 |
| $1.45 billion facility due 2018 — *Split Facility* | 322 |
| ***NADL Facility (Seadrill Limited Guaranteed)*** | |
| $2.00 billion facility due 2017 — *NADL Facility* | 908 |
| ***AOD Facility (Seadrill Limited Guaranteed)*** | |
| $360 million facility due 2018 | 210 |
| ***Sevan Facility (Seadrill Limited Guaranteed)*** | |
| $1.75 billion facility due 2018 | 875 |
| **Total Bank Facilities** | **$5,681 million** |

| | |
|---|---|
| **Unsecured Bonds** *(in US$ millions—Net of Seadrill Holdings)* | |
| ***Seadrill Limited Bonds*** | |
| $1.00 billion bond due 2017 — *Maturing Bonds* | 843 |
| NOK 1.80 billion bond due 2018 | 211 |
| SEK 1.50 billion bond due 2019 | 168 |
| $500 million bond due 2020 | 479 |
| ***NADL Bonds*** | |
| NOK 1.50 billion bond due 2018 — *Seadrill Limited Guaranteed* | 166 |
| $600 million bond due 2019 | 413 |
| **Total Unsecured Bonds** | **$2,280 million** |

| | |
|---|---|
| **Danske Guarantee Facility** | |
| Outstanding Obligations | $60 million |

| | |
|---|---|
| **Total Obligations Outstanding** | **$8,021 million** |

## A.    The Bank Facilities.

58.    The Debtors generally incurred the obligations under the Bank Facilities described below to finance corporate acquisitions or the construction or acquisition of new rigs.  The facilities are secured by, among other things, (a) a first priority, perfected mortgage in one or more of the Debtors' drilling rigs, (b) guarantees from the applicable rig-owning entities, and (c) first-priority security interests in the rig-owning entities' earnings accounts.  No financial institution possesses

a blanket lien over the Debtors' entire fleet.  Instead, the secured credit facilities are secured by non-overlapping subsets of the Debtors' rigs.

> ### 1.    Seadrill Limited Facilities.

59.    ***$400 million facility due 2017 ("<u>Jack-Up Facility</u>").***  On December 8, 2011, Seadrill Limited entered into that certain Senior Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain of Seadrill Limited's wholly-owned Debtor subsidiaries as guarantors, Nordea Bank Norge ASA, as agent, and the lender parties thereto.  On April 28, 2016, the parties executed an amendment extending the maturity of the Jack-Up Facility from December 8, 2016 to May 31, 2017.  On April 26, 2017, the parties executed an amendment to further extend the maturity of the Jack-Up Facility to August 31, 2017.  On August 11, 2017, the parties executed a final amendment to extend the maturity of the Jack-Up Facility to September 14, 2017.  Collateral securing the Jack-Up Facility includes four jack-up rigs owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

60.    ***$450 million facility due 2017 ("<u>West Eminence Facility</u>").***  On December 13, 2013, certain of the Debtors entered into that certain Senior Secured Credit Facility Agreement, by and among Debtor Seadrill Eminence Ltd., as borrower, Seadrill Limited and one wholly-owned Debtor subsidiary of Seadrill Limited, as guarantors, Danske Bank A/S, as agent, and the lender parties thereto.  On April 28, 2016, the parties executed an agreement extending the maturity date of the *West Eminence* Facility from June 20, 2016 to December 31, 2016.  On November 22, 2016 and April 26, 2017, the parties executed additional agreements further extending the maturity, ultimately to August 15, 2017.  On August 14, 2017, because the Debtors' and the requisite Bank Lenders could not reach a consensual resolution to further extend the maturity of the *West Eminence* Facility (due to a single holdout lender), the Debtors sought and a court of

competent jurisdiction in Bermuda entered an order approving a scheme of arrangement that effectuated an extension of the maturity of the *West Eminence* Facility to September 14, 2017. Collateral securing the *West Eminence* Facility includes one semi-submersible drilling rig—the *West Eminence*—owned by a Debtor subsidiary of Seadrill Limited, assignment of certain earnings accounts, and a pledge of the common equity shares of Debtor and rig-owning entity Seadrill Eminence Ltd.

61.     ***$300 million facility due 2018.***   On July 16, 2013, Seadrill Limited entered into that certain Senior Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain wholly-owned Debtor subsidiaries of Seadrill Limited as guarantors, DNB Bank ASA, as agent, and the lender parties thereto.   The $300 million facility matures in July 2018. Collateral securing the $300 million facility includes two jack-up rigs owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

62.     ***$1.50 billion facility due 2019.***   On July 30, 2014, certain of the Debtors entered into that certain Senior Secured Credit Facility Agreement, by and among Debtors Seadrill Saturn Ltd., Seadrill Jupiter Ltd., and Seadrill Neptune Hungary Kft., as borrowers, Seadrill Limited and certain wholly-owned Debtor subsidiaries of Seadrill Limited as guarantors, Nordea Bank AB, London Branch, as agent, and the lender parties thereto.   The $1.50 billion facility matures in August 2019.   Collateral securing the facility includes three drillships owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

63.     ***$1.35 billion facility due 2019.***   On August 26, 2014, Seadrill Limited entered into that certain Senior Secured Credit Facility Agreement, by and among Seadrill Limited, as

31

borrower, certain wholly-owned Debtor subsidiaries of Seadrill Limited as guarantors, DNB Bank ASA, as agent, and the lender parties thereto.  The $1.35 billion facility matures in August 2019. Collateral securing the facility includes one drillship and two semi-submersible drilling rigs owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

64.     ***$950 million facility due 2019.***  On January 26, 2015, Seadrill Limited entered into that certain Senior Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain wholly-owned Debtor subsidiaries of Seadrill Limited as guarantors, Nordea Bank AB, London Branch, as agent, and the lender parties thereto.  The $950 million facility matures in January 2020.  Collateral securing the facility includes one drillship and one semi-submersible drilling rig owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

65.     ***$450 million facility due 2020.***  On August 26, 2015, Seadrill Limited entered into that certain Senior Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain wholly-owned Debtor subsidiaries of Seadrill Limited as guarantors, Nordea Bank AB, as administrative agent, and the lender parties thereto.  The $450 million facility matures in August 2020.  Collateral securing the facility includes six jack-up rigs owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

**2.      Seadrill Limited Split Facilities.**

66.     As described above, on August 16, 2017, the Debtors and the Seadrill Partners Entities executed a transaction to address three credit facilities that previously crossed over the Seadrill Limited and Seadrill Partners capital structures.  Pursuant to that transaction, the

obligations under two facilities were split between the applicable Seadrill Limited and Seadrill Partners obligors.

67.     ***$440 million facility due 2017.***   On December 4, 2012, Seadrill Limited entered into that certain Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain of Seadrill Limited's Debtor subsidiaries, certain non-Debtor subsidiaries of Seadrill Partners, as guarantors, Citibank Europe plc, UK branch, as agent, and the lender parties thereto. Pursuant to a transaction closing on August 16, 2017, the $440 million facility was amended and restated to effectuate the split between the Seadrill Limited and Seadrill Partners corporate groups, resulting in only a portion of the obligations remaining outstanding as to Seadrill Limited and its obligor, wholly-owned subsidiaries.  Collateral securing the Debtors' obligations under the split facility includes one jack-up rig owned by a Debtor subsidiary of Seadrill Limited, assignment of certain earnings accounts, and a pledge of the common equity shares of Debtor and rig-owning entity Seadrill Telesto Ltd.

68.     ***$1.45 billion facility due 2018.***   On March 20, 2013, certain of the Debtors entered into that certain Senior Secured Credit Facility Agreement, by and among Debtor Seadrill Tellus Ltd. and non-Debtor Seadrill Vela Hungary Kft. ("Seadrill Vela Hungary"), as borrowers, Seadrill Limited, one Debtor subsidiary of Seadrill Limited and certain non-Debtor subsidiaries of Seadrill Partners, as guarantors, ING Bank N.V., as agent, and the lenders party thereto.  Pursuant to a transaction closing on August 16, 2017, the $1.45 billion facility was amended and restated to effectuate the split between the Seadrill Limited and Seadrill Partners corporate groups, resulting in only a portion of the obligations remaining outstanding as to Seadrill Limited and its obligor, wholly-owned subsidiaries.  Collateral securing the Debtors' obligations under the split facility includes one drillship owned by Seadrill Tellus Ltd., a Debtor subsidiary of Seadrill Limited,

assignment of certain earnings accounts, and a pledge of the common equity shares of Debtor and rig-owning entity Seadrill Tellus Ltd.

### 3.    NADL Facility (Seadrill Limited Guaranteed).

69.    ***$2.00 billion facility due 2018 ("NADL Facility").***   On April 15, 2011, NADL entered into that certain Senior Secured Credit Facility Agreement, by and among NADL, as borrower, Seadrill Limited and certain subsidiaries of NADL, as guarantors, DNB Bank ASA, as agent, and the agents and lenders party thereto.  As described below, on April 28, 2016, the parties executed an agreement extending the maturity of the NADL Facility from April 15, 2017 to June 30, 2017.  On April 26, 2017, the parties executed an amendment to further extend the maturity to September 14, 2017.  Collateral securing the NADL Facility includes three semi-submersible drilling rigs, two jack-ups, and one drillship owned by Debtor subsidiaries of NADL, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

### 4.    AOD Facility (Seadrill Limited Guaranteed).

70.    ***$360 million facility due 2018.***   On April 9, 2013, three Debtor subsidiaries of AOD (collectively, the "AOD Borrower Subsidiaries") entered into that certain Senior Secured Credit Facility Agreement, by and among the AOD Borrower Subsidiaries, as borrowers, Seadrill Limited, one Debtor subsidiary of Seadrill Limited, and AOD, as guarantors, ABN AMRO Bank N.V., as agent, and the other agents and lenders party thereto.  The AOD Facility matures in April 2018.  Collateral securing the facility includes three jack-up rigs owned by Debtor subsidiaries of AOD, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.  As described herein, the AOD Borrower Subsidiaries did not commence chapter 11 cases, but certain Debtors, including Seadrill Limited, are obligors under the AOD facility.

### 5.      Sevan Facility (Seadrill Limited Guaranteed).

71.      ***$1.75 billion facility due 2018.***  On September 30, 2013, certain Debtor subsidiaries of Sevan (collectively, the "<u>Sevan Borrower Subsidiaries</u>") entered into that certain Senior Secured Facility Agreement, by and among the Sevan Borrower Subsidiaries, as borrowers, Seadrill Limited and certain subsidiaries of Sevan, as guarantors, ING Bank N.V., as agent, and the lenders party thereto.  The Sevan Facility matures in October 2018.  Collateral securing the facility includes three ultra-deepwater Sevan design cylindrical-hull semi-submersible rigs owned by Debtor subsidiaries of Sevan, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

### B.      Unsecured Bonds.

72.      The Debtors are also obligated under the following six issuances of Unsecured Bonds—four issued by Seadrill Limited and two issued by NADL (only one of which is guaranteed by Seadrill Limited).

### 1.      Seadrill Limited Unsecured Bonds.

73.      ***$1.00 billion bond due 2017 ("<u>Maturing Bonds</u>").***  On September 14, 2012, Seadrill Limited issued $1.0 billion of 5.625% senior unsecured notes due September 2017.  The notes are governed by that certain indenture, dated September 14, 2012, among Seadrill Limited, as issuer, and Deutsche Bank Trust Company Americas, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the notes.

74.      ***NOK 1.80 billion bond due 2018.***  On March 12, 2013, Seadrill Limited issued NOK 1.8 billion of senior unsecured notes due March 2018.  The notes are governed by that certain bond agreement, dated March 11, 2013, among Seadrill Limited, as issuer, and Norsk Tillitsmann ASA, as indenture trustee.   No other Debtor entity guarantees or is otherwise obligated under the notes.

75.    *SEK 1.50 billion bond due 2019.*  On March 18, 2014, Seadrill Limited issued SEK 1.5 billion of senior unsecured notes due March 2019.  The notes are governed by that certain bond agreement, dated March 17, 2014, among Seadrill Limited, as issuer, and Norsk Tillitsmann ASA, as indenture trustee.   No other Debtor entity guarantees or is otherwise obligated under the notes.

76.    *$500 million bond due 2020.*  On September 25, 2013, Seadrill Limited issued $500 million of 6.125% senior unsecured notes due September 2020.  The notes are governed by that certain indenture, dated September 25, 2013, among Seadrill Limited, as issuer, and Deutsche Bank Trust Company Americas, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the notes.

### 2.    NADL Unsecured Bonds.

77.    *NOK 1.5 billion bond due 2018.*   On October 30, 2013, NADL issued NOK 1.5 billion of senior unsecured notes due October 2018.  The notes are governed by that certain bond agreement, dated October 30, 2013, among NADL, as issuer, and Norsk Tillitsmann ASA, as indenture trustee, as amended by that certain First Amendment and Restatement Agreement, dated February 13, 2015, among NADL, as issuer, and Nordic Trustee ASA, as indenture trustee. The obligations under the notes are unsecured and are fully and unconditionally guaranteed on a senior unsecured basis by Seadrill Limited pursuant to that certain On Demand Guarantee, dated February 13, 2015, among Seadrill Limited, as guarantor, and Nordic Trustee ASA as bond trustee.

78.    *$600 million bond due 2019.*  On January 31, 2014, NADL issued $600 million of 6.25% senior unsecured notes due January 2019.  The notes are governed by that certain indenture, dated January 31, 2014, among NADL, as issuer, and Deutsche Bank Trust Company Americas, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the notes.

C.     **Danske Guarantee Facility.**

79.     Seadrill Limited maintains a guarantee facility with Danske Bank A/S ("Danske"),
pursuant to which Danske provides certain operations-related credit support to third parties.
Pursuant to the Danske Guarantee Facility, Seadrill Limited may request that Danske guarantee
obligations to third parties, or issue letters of credit and other similar instruments, up to an
aggregate amount of $90 million.   These instruments generally secure obligations under the
Debtors' customer contracts, as well as obligations in connection with the Debtors' bids on new
drilling contracts.   As of the Petition Date, there are approximately $60 million in obligations
outstanding under the Danske guarantee facility.   In most cases, the Debtors' customers require
these performance guarantees in the ordinary course of business as a prerequisite to entering into
new customer contracts.[10]

D.     **Publicly-Traded Common Stock.**

80.     *Seadrill Limited.*  Seadrill Limited is a publicly-held Bermuda exempted company
listed on the NYSE and the OSE under the symbol "SDRL."   Seadrill Limited common shares
have traded on the OSE since November 2005, and on the NYSE since April 2010.   As of the
Petition Date, Seadrill Limited's nonaffiliated public float represented 75.8 percent of total shares
outstanding, and Seadrill Limited's principal shareholder, Hemen, held 24.2 percent of Seadrill
Limited's outstanding common shares.

81.     *NADL.*  NADL is a publicly-held Bermuda exempted company listed on the NYSE
and the Norwegian over-the-counter exchange under the symbol "NADL."   NADL common shares

---

[10]    Pursuant to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (IV) Granting Related Relief* filed contemporaneously herewith, the Debtors are seeking relief that will facilitate continued access to availability under the Danske guarantee facility on a postpetition basis.

have traded on the NYSE since January 2014. As of the Petition Date, Seadrill owned approximately 70.4 percent of NADL's outstanding common shares.

82.     ***Sevan.*** Sevan is a publicly-held Bermuda exempted company listed on the OSE under the symbol "SEVDR." Sevan common shares have traded on the OSE since June 2015. As of the Petition Date, Seadrill owned approximately 50.1 percent of Sevan's outstanding common shares.

## IV.     Circumstances Leading to These Chapter 11 Cases.

### A.     Market Decline and Industry-Specific Challenges.

83.     Approximately three years ago, the oil and gas industry entered what has become a sustained down cycle that was brought on by low commodities prices. Seadrill has not been immune to the effects of the market decline. The graphic below highlights the link between Seadrill's success and commodity pricing conditions by comparing the declines in the trading price from mid-2014 to today of (a) crude oil, (b) Seadrill Limited, NADL, and Sevan common stock, and (c) certain of the Unsecured Bonds (with and without a Seadrill Limited guarantee).



84.     Oil prices peaked in mid-2014 at more than $115 per barrel before declining to less than $30 per barrel by early 2016.  The combination of low oil prices and reduced capital expenditures by the oil majors in the areas of upstream development and exploration has led to an oversupply of rigs, which in turn has reduced dayrates and rig utilization rates and lowered revenues for offshore drilling contractors.  Offshore drilling requires a higher initial capital expenditure than for onshore projects generally, but has a correspondingly longer period for return on investment.  In more volatile environment, the oil majors are more reluctant to invest in projects that have high upfront capital expense.

**B.     Reducing Costs and Managing Liabilities.**

85.     In response to deteriorating market conditions, the Debtors have implemented various initiatives to reduce costs and increase efficiency.  Since the end of 2014, Seadrill has reduced its employee headcount from approximately 9,500 employees to approximately 4,780 employees enterprise wide.  Seadrill also decreased rig and operating costs from $1.61 billion in 2015 to $1.02 billion in 2016 (including by stacking certain rigs), and general and administrative expenses from $248 million in 2015 to $234 million in 2016.  Moreover, Seadrill Limited suspended dividends to its common shareholders in November 2014.  In part due to these efforts, as of the Petition Date, the Debtors have more than $1 billion in cash.  As described in greater detail in the Mosley Declaration, the Debtors intend to fund these chapter 11 cases with the consensual use of cash collateral, without the need for debtor-in-possession financing.

86.     The Debtors also have taken steps to address contingent liabilities related to their newbuild contracts.  Newbuild contract purchase obligations typically span several years and come due as the shipyard completes construction and delivers the newbuild rigs.  The Debtors, however, successfully negotiated a number of newbuild deferrals and other relief with the shipyards.  Hemen has close business relationships with substantially all of the Debtors' shipyards, which has helped

the Debtors manage these multi-billion dollar obligations.  The Debtors will continue to be able to leverage this relationship as long as Hemen remains a significant Seadrill Limited stakeholder.

87.     Four of Seadrill's 14 newbuild contracts, implicating approximately $1.8 billion in obligations, are with Debtor entities.  The purchase obligations under each of these contracts are coming due in the near term.  In light of market conditions and continued low utilization rates, the Debtors are seeking to further defer these purchase obligations.  But, the Debtors were unable to reach such a resolution prepetition with the applicable shipyard counterparties.  Further, the counterparty to two of the Debtor newbuild contracts provided notice regarding arbitration proceedings and the Debtors' obligations thereunder.  The Debtors remain in active negotiations with this newbuild counterparty.  While the Debtors may seek to reject newbuild contracts if they are unable to reach satisfactory commercial resolutions, their preference is for a consensual resolution with the counterparties.

**C.      Creditor Negotiations, Bank Deal, Capital Commitment, and the Chapter 11 Filing.**

88.     In May 2015, Seadrill executed certain amendments providing for limited covenant relief under the Bank Facilities.  As the market downturn continued, Seadrill determined that it would require a more comprehensive solution to bridge to a market recovery and began to focus on negotiating a transaction that would provide for at least a five-year liquidity runway, consistent with its business plan.  Seadrill thereafter commenced discussions with the Bank CoCom regarding a broader restructuring, which ultimately led to the R1 Agreement.

89.     As part of the R1 Agreement, the parties agreed to the initial April 30, 2017 long stop date by which Seadrill was to implement a comprehensive restructuring either in the form of an out-of-court refinancing or a transaction to be implemented through an in-court process.  But the parties were unable to reach agreement with respect to a consensual restructuring by the April

30, 2017 long stop date.  Instead, they agreed to further extend the maturities of the *West Eminence* Facility (to August 15, 2017), the Jack-Up Facility (to August 31, 2017), and NADL Facility (to September 14, 2017), as well as extend the long stop date to July 31, 2017.  The parties ultimately agreed to an additional, final extension of the long stop date (to September 12, 2017) and the maturities of the *West Eminence* Facility and the Jack-Up Facility (both to September 14, 2017, coinciding with the NADL Facility maturity).[11]

90.     Further Bank CoCom discussions—made possible by more than a year of Bank Facility extensions starting with the R1 Agreement—proved successful.  Beginning in September 2016, the Debtors and the Bank Lenders began to coalesce around what would become the foundation of the Debtors' restructuring—the Bank Deal.  As part of the agreement, the Bank Lenders required that the Debtors secure a new capital investment of at least $1 billion to support the business.  Subsequently, the Debtors launched a marking process to raise new capital, seeking at least $1 billion.

91.     By December 2016, the Debtors had received indications of interest from six potential investors—all of whom indicated that any deal would need to include Hemen.  However, Hemen suggested that the Debtors first seek to raise capital in the market to ensure arm's-length market terms.  By early 2017, however, the Debtors concluded successful capital raise required the direct involvement of Hemen.

92.     After further discussions, in March 2017, Hemen and Centerbridge submitted a proposal that would develop into the Capital Commitment.  Other than being a holder of Unsecured

---

[11]     As described above, on August 14, 2017, because the Debtors and the requisite Bank Lenders could not reach a consensual resolution to further extend the maturity of the *West Eminence* Facility (due to a single holdout lender), the Debtors sought and a court of competent jurisdiction in Bermuda entered an order approving a scheme of arrangement that effectuated an extension the maturity of the $450 million *West Eminence* Facility to September 14, 2017.

Bonds, Centerbridge had no prior affiliation with Hemen or Seadrill—thus, Centerbridge acted as an initial market check of the terms of the Capital Commitment.  Hemen's decision to back the Capital Commitment gave the Debtors the leverage to negotiate a better Bank Lender on the grounds that the Bank Deal valued having Hemen as part of the deal.  Many of the Bank Lenders have significant long-term relationships with Hemen and told Seadrill the necessary level of concessions and flexibility were conditioned on Hemen's involvement in Seadrill post-restructuring.

93.     Seadrill's negotiations with Hemen and Centerbridge developed in parallel with a Capital Commitment syndication process, pursued by the Debtors after Hemen and Centerbridge expressed a desire for additional co-investors, which ultimately brought the Syndication Parties into the fold.  Hemen is a world-renowned leader in the offshore drilling and shipping markets and Hemen's participation in the Capital Commitment helped validate the investment opportunity and attracted others to participate. After engaging in extensive discussions with the Debtors, Hemen, and Centerbridge, the parties reached a resolution under which Hemen and Centerbridge would syndicate a portion of the Capital Commitment to the Syndication Parties.  From the Debtors' perspective, the core economic terms from the Hemen/Centerbridge proposal remained largely unchanged.  With the Commitment Parties holding approximately 40 percent of the Unsecured Bonds, the Debtors believe it should help reduce the risk of future litigation with the other holders of Unsecured Bonds.

94.     During the eighteen months of negotiations leading up to the Petition Date, the board of directors of Seadrill Limited (the "Board")—including a subcommittee of the Board formed to consider restructuring-related matters—met on a number of occasions to consider various restructuring proposals, maturity extensions, and certain other matters, including the Non-

Consolidated Entity ring-fencing transactions described above.   In January 2017, to fill two vacancies of retiring Board members, the Board appointed two fully independent directors (collectively, the "Independent Directors"), each of whom had prior restructuring experience the Board recognized would benefit Seadrill's ongoing negotiations.   The Independent Directors separately considered certain of the restructuring transactions, including the Non-Consolidated Entity ring-fencing transactions and any related-party transactions like the Hemen-backed Capital Commitment.   On September 7, 2017, the Board unanimously approved the Debtors' entry into the Restructuring Support Agreement.   On September 12, 2017, more than 97 percent of the Bank Lenders, the Commitment Parties, and subsidiaries of SFL executed the Restructuring Support Agreement.   In accordance with the terms of the Restructuring Support Agreement, on the Petition Date, the Debtors commenced these chapter 11 cases, as well as the parallel Bermuda insolvency proceedings of Seadrill Limited, NADL, and Sevan described below.

## V.   The Restructuring Support Agreement.

### A.   Restructuring Transactions.

95.   The Restructuring Support Agreement provides a clear path to a value maximizing restructuring transaction and emergence from these chapter 11 cases.   The Restructuring Support Agreement contemplates a multi-faceted transaction that will: (a) re-profile the Bank Facility obligations to eliminate near-term amortization obligations and extend maturities; (b) equitize the Unsecured Bonds; (c) result in a $1.06 billion new capital injection; (d) leave employee, customer, and ordinary trade claims largely unimpaired; and (e) reorganize the Seadrill corporate structure to support the re-profiled Bank Facilities and new capital injection.   The Restructuring Support Agreement represents the only actionable proposal and sets a floor for the forthcoming "go-shop" marketing period, during which the Debtors may secure a better proposal.   Either outcome will allow Seadrill to succeed as a restructured company after emergence from these chapter 11 cases.

96.    ***Corporate Reorganization.***    To support the Bank Deal and Capital Commitment, Seadrill will execute a corporate reorganization that will result in a new IHCo/RigCo/NSNCo holding structure.   Seadrill will move its rig-owning entities under the new RigCo holding company structure and the rigs and the earnings from operation of the rigs will continue to serve as collateral under the re-profiled Bank Facilities.   The RigCo entity will issue guarantees of the re-profiled Bank Facility obligations and security over the shares in RigCo will also be granted in favor of all Bank Lenders, effectively cross-collateralizing the Bank Facility obligations across all of the rig-owning entities (*i.e.*, the Bank Lenders will maintain first priority liens on their own, unique collateral packages and will share in cross-collateralization at the RigCo level across all Bank Facilities).   Further, to facilitate the Capital Commitment, among other things, the Debtors will form NSNCo to issue certain new secured notes (the "NSNs") and hold, among other things, the Debtors' interests in the Non-Consolidated Entities, certain non-rig owning Debtor entities, and certain other NSNs collateral.   Both RigCo and NSNCo will be organized beneath another new intermediate holding company structure, or "IHCo."   IHCo will be a direct subsidiary of reorganized Seadrill Limited.   A simplified graphic of the corporate reorganization is set forth below.



97.     ***Bank Deal.*** The core terms of the Bank Deal are:  (a) an average ***five year maturity***

***extension*** under the Bank Facilities; (b) the ***elimination of amortization*** obligations from the

Petition Date through December 31, 2019 (with amortization payment to commence January 1,

2020); and (c) a ***three and one-half year financial covenant holiday*** (until the financial quarter

ending March 31, 2021) subject to a $650 million RigCo minimum liquidity requirement, which

ratchets down over time, and (d) certain deletions or permanent waivers of  financial covenants.

As part of the consideration for these valuable concessions, each of the Bank Facilities will benefit

from, amongst other things, the RigCo guarantee and security over RigCo shares described above.

The Debtors' projected post-emergence funded-debt payment obligations, taking into account the benefits of the Bank Deal, are illustrated below.



98.    ***Capital Commitment.***    The Capital Commitment will be in the form of a $200 million direct equity investment and a $860 million issuance of NSNs.  In return for the $200 million equity investment, the applicable Commitment Parties will receive their respective portions of 25 percent of the new common equity in reorganized Seadrill Limited.  The NSNs will mature seven years after their issuance and will carry an interest rate of 12 percent—with 8 percent paid "in kind" and 4 percent paid in cash.  Purchasers of the NSNs will also receive an aggregate of 57.5 percent of the new equity in New Seadrill on terms set forth in the Investment Agreement. Participation in the $1.06 billion Capital Commitment will be allocated among the Debtors' stakeholders as follows:

| Stakeholder | Allocation | Form of Allocation |
|---|---|---|
| *New Secured Notes Investment* | | |
| Hemen/Centerbridge | $440 million | Direct Investment |

| Stakeholder | Allocation | Form of Allocation |
|---|---|---|
| Syndication Parties | $335 million | Direct Investment |
| Holders of General Unsecured Claims, with Note Rights | $85 million | Rights Offering (Backstopped by Certain of the Commitment Parties) |
| *Direct Equity Investment* | | |
| Hemen/Centerbridge | $125 million | Direct Investment |
| Certain Syndication Parties | $50 million | Direct Investment |
| Holders of General Unsecured Claims, with Equity Rights | $25 million | Rights Offering (Backstopped by Hemen) |

99.     In addition to Seadrill Limited's interests in the Non-Consolidated Entities, Seadrill will transfer certain unencumbered assets to NSNCo to support the NSNs and security will be granted over those assets where practicable.  Finally, the NSNs will benefit from, amongst other things:  (a) first-ranking guarantees from IHCo and all other subsidiaries of Seadrill Limited that do not sit below IHCo (subject to exceptions); (b) a Seadrill Limited guarantee ranking *pari passu* with guarantees granted in favor of the re-profiled Bank Facilities; and (c) a second-ranking guarantee from RigCo.

100.     ***Unsecured Bond Equitization.***  Based on analysis by the Debtors' advisors, the value of the Debtors' estates does not support a significant recovery for holders of Unsecured Bonds under a chapter 11 plan.  However, the Restructuring Support Agreement provides for the prospect of a better recovery through the equitization of the Unsecured Bonds.  Specifically, the Restructuring Support Agreement provides that, to the extent holders of unsecured claims at Seadrill Limited, NADL, and Sevan (which includes holders of Unsecured Bonds) vote as a class to accept the Debtors' chapter 11 plan, such holders will receive their pro rata share of 15 percent of the new equity in reorganized Seadrill Limited, plus their pro rata share of subscription rights

to participate in up to (a) $85 million of the NSNs portion of the Capital Commitment and (b) $25 million of the equity portion of the Capital Commitment.

101.   ***Equity Extinguishment***.  Under the Restructuring Support Agreement, so long as holders of unsecured claims at Seadrill Limited vote as a class to accept the Debtors' chapter 11 plan, holders of existing equity interests in Seadrill Limited will receive their pro rata share of 2 percent of the new equity in reorganized Seadrill Limited.  On the effective date of the Debtors' chapter 11 plan, the existing equity interests in Seadrill Limited will be extinguished.  The existing equity interests in NADL and Sevan will be extinguished on the effective date of the Debtors' chapter 11 plan and holders of such equity interest will receive no recovery.

102.   Assuming all stakeholders receive maximum available recoveries under the Debtors' chapter 11 plan, reorganized Seadrill Limited's pro forma equity ownership will as reflected below.

| Stakeholder | Ownership of Seadrill Limited | Fully Diluted |
| --- | --- | --- |
| New Secured Notes | ▪ 57.5% pre dilution | |
| New Equity | ▪ 25% pre dilution | |
| Unsecured Claims | ▪ 15% pre dilution | |
| Existing Equity | ▪ 2% pre dilution | |
| Structuring Fee | ▪ 0.5% of equity pre dilution | |
| Structuring Fee to Hemen | ▪ 5% of equity post dilution | |



Fully Diluted: 0.5% Structuring Fee; 5.0% Structuring Fee (Hemen); 1.9% Existing Equity; 14.3% Unsecured Claims; 23.8% New Equity; 54.6% New Secured Notes

103.   Notably, certain fees under the Investment Agreement will be paid in equity interests in reorganized Seadrill Limited.  The Debtors have determined that the fees under the

Investment Agreement are reasonable under the circumstances and within market for financings of this size and complexity with an extended commitment period.

### B.    The Bermuda Proceedings.

104.    To implement the foregoing restructuring, in parallel with these chapter 11 cases, contemporaneously with the Debtors' commencing these chapter 11 cases, Seadrill Limited, NADL, and Sevan (collectively, the "Bermuda Debtors") commenced liquidation proceedings (the "Bermuda Proceedings") pursuant to sections 161 and 170 of the Bermuda Companies Act 1981 by presenting "winding up" petitions to the Bermuda Court.  Upon the application of the Bermuda Debtors, the Bermuda Court will be requested to appoint joint "provisional liquidators" for each of the Bermuda Debtors with respect to the restructuring of those companies in these chapter 11 cases.  The joint provisional liquidators will act as officers of the Bermuda Court, and will be required under the order to report to the Bermuda Court from time to time on the progress of the Bermuda Debtors' chapter 11 proceedings.  The Bermuda Debtors' application will also seek to limit the joint provisional liquidators' powers such that the Bermuda Debtors' management team and boards of directors will remain in control of the Bermuda Debtors' day-to-day operations and these chapter 11 cases and the joint provisional liquidators will have the power to oversee the process, including the review of documents.  Upon the appointment of join provisional liquidators in respect of each of the Bermuda Debtors, a statutory stay of proceedings in Bermuda against those three entities or their assets will automatically arise.  On the "return date" for the Bermuda petitions—similar to a "second day" hearing in a chapter 11 proceeding—the Bermuda Debtors will seek to postpone their petitions for a specified period, while the Debtors administer these chapter 11 cases.

105.    After the effective date of the Debtors' chapter 11 plan, to effectuate the issuance of new equity by reorganized Seadrill Limited and certain other restructuring transactions, the

Debtors will seek a winding up order from the Bermuda Court and the joint provisional liquidators will assume full powers in respect of the Bermuda Debtors and proceed with the formal liquidation and dissolution of the Bermuda Debtors in accordance with Bermuda law.  The common equity holders of the Bermuda Debtors will not receive a distribution or otherwise retain any value given that those entities have no assets as a result of the implementation of the Debtors' chapter 11 plan (other than as set forth above).  On or before the effective date of the Debtors' chapter 11 plan, the Debtors will form "new" (*i.e.*, reorganized) Seadrill Limited, NADL, and Sevan to hold the assets of "old" Seadrill Limited, NADL, and Sevan and otherwise reside in their respective positions in the new IHCo/RigCo/NSNCo holding structuring described above.

> ### C.      Proposed Confirmation Timeline.

106.      The Investment Agreement requires that the Debtors secure confirmation of a chapter 11 plan within nine months after the Petition Date and emerge from chapter 11 within two months after confirmation.  Thus, to ensure that the Debtors and their stakeholders will benefit from the Capital Commitment and, more broadly, the Restructuring Support Agreement, the Debtors intend to proceed at a steady pace through these chapter 11 cases.  As described above, the nine-month commitment period under the Investment Agreement is reasonable under the circumstances.  Further, the Debtors completed substantial work prepetition in the form of the Bank Deal, Capital Commitment, SFL resolution, and Non-Consolidated Entities ring-fencing that will greatly reduce the complexity of these chapter 11 cases.

107.      Contemporaneously herewith, the Debtors filed a chapter 11 plan and related disclosure statement, as well as the Scheduling Motion.  Specifically, the Debtors propose the following schedule (including applicable Restructuring Support Agreement and Investment Agreement milestones):

| Event | Date | T+ |
|---|---|---|
| Petition Date | September 12, 2017 | T+0 |
| *Expiration of Go-Shop Period* | *December 11, 2017* | *T+90* |
| Disclosure Statement Objection Deadline | December 29, 2017 | T+108 |
| Disclosure Statement Hearing | January 10, 2018 | T+120 |
| Deadline to Distribute Solicitation Packages | January 17, 2018 | T+127 |
| *Disclosure Statement Order Milestone* | *February 9, 2018* | *T+150* |
| Plan Voting Deadline | March 9, 2018 | T+178 |
| Plan Confirmation Objection Deadline | March 9, 2018 | T+178 |
| Plan Confirmation Hearing | March 26, 2018 | T+195 |
| *Targeted Plan Effective Date[12]* | *May 10, 2018* | *T+240* |
| *Confirmation Milestone* | *June 9, 2018* | *T+270* |
| *Effective Date Milestone* | *August 8, 2018* | *T+330* |

108.     The Debtors are poised to achieve an extraordinary result.  The Restructuring Support Agreement represents the successful culmination of nearly two years of restructuring efforts and a significant compromise and commitment to the Debtors' future by the Bank Lenders, Hemen, Centerbridge, the other Commitment Parties, and SFL.   The Restructuring Support Agreement also gives the Debtors the best opportunity to withstand the current adverse market conditions.  Given the level of support among the Debtors' financial stakeholders, the fact that the Debtors' operational stakeholders will be largely unaffected, and the challenging market backdrop, it is important to proceed efficiently to confirmation.

*[Remainder of page intentionally left blank.]*

---

[12]     If the effective date of the Debtors' chapter 11 plan does not occur on or prior to 240 days after the Petition Date, interest will begin to accrue on the NSNs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  September 12, 2017

Mark Morris
Chief Financial Officer
Seadrill Limited