IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

|  |  |  |
|---|---|---|
| In re: | ) <br> ) | Chapter 11 |
| SEADRILL LIMITED, *et al.*,[1] | ) <br> ) | Case No. 17-60079 (DRJ) |
|  | ) |  |
| Debtors. | ) <br> ) | (Joint Administration Requested) |

**DECLARATION OF DAVID R. HILTY,
MANAGING DIRECTOR OF HOULIHAN LOKEY INC.,
IN SUPPORT OF CHAPTER 11 PETITIONS AND THE JOINT CHAPTER 11 PLAN
OF REORGANIZATION OF SEADRILL LIMITED AND ITS DEBTOR AFFILIATES**

I, David R. Hilty, hereby declare under penalty of perjury as follows:

1.  I am a Managing Director and Co-Head of the Financial Restructuring Group of Houlihan Lokey Inc. ("Houlihan Lokey"), a financial advisory and investment banking firm. Houlihan Lokey has been engaged as an investment banker to Seadrill Limited and certain of its direct and indirect subsidiaries as debtors and debtors in possession (collectively, the "Debtors") since February 2016.

2.  I have been employed by Houlihan Lokey for more than 25 years and have advised companies, secured lenders, noteholders, and other creditor groups in out-of-court restructurings and chapter 11 reorganizations. Additionally, I have been involved in financial restructurings of several European- and Latin American-based companies advising both debtors and creditors,

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/Seadrill. The location of Debtor Seadrill Americas, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 11025 Equity Drive, Suite 150, Houston, Texas 75201.

KE 47429086

including designing and structuring out-of-court exchange offers and "pre-arranged" reorganizations in the United States and local European and Latin American jurisdictions.

3. I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the background and context of the Debtors' prepetition negotiations leading to the restructuring support agreement (the "Restructuring Support Agreement"), the Debtors' extensive marketing and capital-raising efforts to date, and the Debtors' planned postpetition marketing efforts pursuant to the procedures attached to this Declaration as **Exhibit A** (the "Marketing Procedures"). I also submit this Declaration in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date"), filed contemporaneously herewith.

4. The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, or information that I have received from the Debtors' employees or advisors, from employees of Houlihan Lokey working directly with me or under my supervision, direction, or control, or from the Debtors' books and records maintained in the ordinary course of their business. If called as a witness, I would testify competently to the facts set forth in this Declaration.

**Background**[2]

5. As discussed in greater detail in the Morris Declaration, the oil and gas industry has experienced a prolonged downturn over the past three years, resulting in a significant decrease in upstream oil and gas capital expenditures. These reductions have caused substantial distress to

---

[2] The circumstances leading to the Debtors' chapter 11 filings are more fully set forth in the *Declaration of Mark Morris, Chief Financial Officer of Seadrill Limited, in Support of Chapter 11 Petitions and First Day Motions*, filed contemporaneously herewith (the "Morris Declaration").

2

offshore drilling companies like the Debtors, which count on new drilling contracts from their customers to succeed.  As of the Petition Date, the Debtors were obligated for approximately $5.7 billion outstanding under 12 senior secured credit facilities (collectively, the "Bank Facilities") and approximately $2.3 billion outstanding under six issuances of unsecured bonds (the "Unsecured Bonds").  As market conditions remained depressed, it became clear that it would be difficult, if not impossible, to refinance the Debtors' maturing funded-debt obligations.

6. Despite the market challenges, after nearly two years of negotiations, the Debtors have achieved significant consensus in favor of a restructuring, embodied in the Restructuring Support Agreement, which will position the Debtors' enterprise to capitalize when the market rebounds.  The foundation of this restructuring is an extremely valuable agreement (the "Bank Deal") with approximately 97 percent of the lenders (the "Bank Lenders") under the Bank Facilities (including 100 percent of the Bank Lenders in ten of the twelve facilities) that will extend maturities by an average of 5 years, eliminate near term amortization obligations, and provide significant covenant relief.  From the start, the Bank Deal has been premised on the Debtors securing a new capital injection of at least $1 billion.  After nearly a year of marketing efforts and negotiations, the Debtors secured a $1.06 billion commitment (the "Capital Commitment") backed by an affiliate of Hemen Holdings Ltd. ("Hemen"), Seadrill Limited's largest shareholder and a prominent investor in the offshore space, certain affiliates of Centerbridge Credit Partners L.P. (collectively, "Centerbridge"), and a syndicate of additional financial institutions (collectively, the "Commitment Parties"), in the form of $860 million in new secured notes and a $200 million direct equity investment.  Collectively, the Commitment Parties hold approximately 40% of the Unsecured Bonds.  The Restructuring Support Agreement also contemplates the conversion into equity of all of the Unsecured Bonds and other unsecured claims and the consensual restructuring

of approximately $1.1 billion in long-term capital-lease obligations related to sale/leaseback agreements with Ship Finance International Limited.

7. In addition to negotiating the Restructuring Support Agreement, in the months preceding the Petition Date, the Debtors consummated a series of transactions to ring-fence their non-majority owned subsidiaries, referred to as the "Non-Consolidated Entities." Failure to ring-fence the Non-Consolidated Entities would have led to cross-defaults triggered by a Seadrill Limited chapter 11 filing that could have destroyed substantial value. The ring-fencing transactions ultimately reduced the number of Seadrill entities requiring chapter 11 protection and eliminated the need to restructure the Non-Consolidated Entities' funded-debt obligations. Because of these prepetition efforts, the Debtors will be able to restructure their liabilities, while still large in size, in a much more straightforward manner in chapter 11 than they otherwise would have been able to do.

8. The Debtors conducted a robust prepetition negotiation and capital marketing process, very much in the public eye, that lasted for nearly a year. The Debtors' efforts over the past two years have resulted in a negotiated resolution that will recapitalize the Debtors while preserving value in several of the Debtors' investments. The Debtors further negotiated for a 90-day "go shop" period (measured from the Petition Date) under the Investment Agreement (discussed below) and intend to re-double their efforts during that period to ensure that the Capital Commitment represents the best available terms. The Restructuring Support Agreement provides the Debtors substantial flexibility to pursue a higher or better proposal, should one arise, pursuant to an unqualified "fiduciary out" that empowers the Debtors to terminate without a break-up or termination fee. Thus, absent a higher or otherwise better proposal, at the conclusion of the 90-

day go-shop period, the Debtors can be certain that the Restructuring Support Agreement, including the Capital Commitment, embodies the value-maximizing alternative.

### Initial Restructuring Negotiations

9. As described in the Morris Declaration, in early 2015, Seadrill Limited began discussions with certain of the Bank Lenders, which ultimately resulted in limited covenant relief under the Bank Facilities pursuant to amendments executed in May 2015. These initial amendments were not viewed, at the time, as part of a broader restructuring initiative. As the market downturn persisted, broader discussions continued with a "coordinating committee" that included each of the 12 administrative-agent banks under the Bank Facilities (the "Bank CoCom"). As a result of discussions with the Bank CoCom, in April 2016, certain Debtors executed a "round one" set of amendments and waiver agreements (collectively, the "R1 Agreement") with respect to the Bank Facilities that provided additional covenant relief and extended the maturities of certain of the Bank Facilities. As part of the R1 Agreement, the parties established April 30, 2017, as the "long-stop" date by which Seadrill Limited was to implement a broader restructuring.

10. While the Debtors believed it was important to engage with all parties in interest, it was clear that the Debtors would primarily need to secure a consensual restructuring with the Bank Lenders. In addition to the Bank Lenders having security over a substantial portion of the Debtors' assets and holding more than 70 percent of the Debtors' total funded-debt obligations, several of the Bank Facilities had impending maturities. As the discussions with the Bank CoCom progressed in mid-to late-2016, the Debtors and the Bank CoCom agreed that a feasible restructuring transaction would require a substantial investment, which, according to the Debtors' projections, would require approximately $1 billion in new capital. Accordingly, in late 2016, the Debtors launched a comprehensive capital raise marketing process.

**Initial Capital Raise Marketing Efforts**

11.     The Bank CoCom and numerous prospective investors that the Debtors and their advisors reached out to in connection with their capital raise process initially indicated their preference for a Hemen-backed investment.  Hemen maintaining its relationship with Seadrill Limited significantly benefits the Debtors' business.  Hemen is affiliated with John Fredriksen, who holds a number of interests in the offshore space through Hemen and other investment vehicles.  As such, Hemen has developed critical relationships with several of the Debtors' stakeholders, including the Bank Lenders, shipyards, and numerous other vendors and customers, and the Debtors routinely benefit from Hemen's extensive relationships in negotiations and business. Initially, however, Hemen suggested that the Debtors first seek to raise capital in the market, potentially without Hemen's explicit backing but with their willingness to invest on market terms.

12.     In October 2016, Houlihan Lokey began canvassing the market on behalf of the Debtors to find viable and interested investors, seek and evaluate investment proposals, and ensure the Debtors fully scoped the market for capital-raising opportunities.  Morgan Stanley, which the Debtors retained in December 2015 to advise on potential financing and exchange-offer transactions and interface with European-based stakeholders and potential investors, assisted with these efforts.

13.     Houlihan Lokey and Morgan Stanley worked closely with the Debtors and their other advisors to develop a fulsome list of parties that would potentially have interest in investing in the Debtors' restructuring.  The Debtors, with the assistance of their advisors, identified and vetted a range of potential investors, ranging from potential private equity partners, institutional bond investment funds, and hedge funds.  Such parties were identified based on strategic fit, financial capability, knowledge of the industry from prior investments in the industry or related

fields, and communications leading up to the marketing process. In identifying parties, Houlihan Lokey and Morgan Stanley focused on finding potential investors that (a) could invest a substantial amount of capital, (b) would be comfortable with a transaction to be effectuated through a broader, complex restructuring, and (c) were actively investing in the oil field drilling or services space or willing to do so.

14. In October 2016, Houlihan Lokey and Morgan Stanley reached out to an initial fifteen potential investors to market the investment opportunity and provided those parties with a brief overview of the Debtors' circumstances and restructuring needs. Ten of these potential investors expressed interest in continuing the discussions. Over the course of October and November 2016, the Debtors negotiated nondisclosure agreements ("NDAs") with these parties. After these parties executed the respective NDAs, Houlihan Lokey and Morgan Stanley provided further details on the Debtors' ongoing restructuring efforts as well as access to confidential diligence materials through a virtual data room. This data room included 1,356 documents, totaling more than 25,000 pages, and provided information regarding the Debtors' business and financial condition, including:

- the Debtors' financial performance and financial projections;
- the Debtors' relationships with key suppliers, vendors, landlords, and other business partners;
- the Debtors' various contingent liabilities, non-operating assets, and the Non-Consolidated Entities;
- the Debtors' capital structure;
- the Debtors' key employees, including salary details; and
- ongoing and potential litigation and claims against the Debtors.

15. Through November and December 2016, the Debtors arranged several in-person meetings in London between the potential investors that had executed NDAs and the Debtors'

management and advisors. After these meetings, if a potential investor continued to demonstrate interest, Houlihan Lokey and Morgan Stanley requested that the potential investor make an economic proposal. Houlihan Lokey and Morgan Stanley conducted numerous follow-up discussions over the following months regarding, among other things, the Debtors' financial projections, business plan, diligence materials, and general updates on process and the Debtors' overall restructuring efforts. During this time, the Debtors received six indications of interest from these potential investors.

16. While Houlihan Lokey and Morgan Stanley were working to find and engage with potential investors, the Bank CoCom continued to signal a willingness to reach a consensual, comprehensive restructuring deal—although one still predicated on a capital injection of at least $1 billion, backed by Hemen. On October 13, 2016, after significant negotiations, the Bank CoCom reached an agreement with the Debtors on an initial framework for a comprehensive recapitalization that would ultimately develop into the Bank Deal. Even though this initial framework remained premised on Hemen's eventual involvement in a capital injection, Hemen remained unwilling to propose an investment.

### Further Capital Raise Marketing Efforts

17. By January 2017, the Debtors and their advisors began requesting that parties who had demonstrated an interest in an investment submit formal proposals. If the potential investor's proposal met the certain criteria, Houlihan Lokey and Morgan Stanley provided the potential investor with access to management for further diligence and negotiations. During these discussions and negotiations, all potential investors indicated that any feasible deal would necessarily include Hemen in some capacity due to its substantial involvement in the industry and relationships with key stakeholders.

18. In February 2017, to more fully canvass the market for potential investors, Houlihan Lokey and Morgan Stanley reached out to an additional 29 parties. Three of these additional parties executed NDAs and were provided access to confidential diligence materials through the virtual data room. In total, Houlihan Lokey and Morgan Stanley contacted a group of 44 parties, 13 of which executed NDAs, and received 6 indications of interest.

19. The Debtors have continued—and, as discussed below, will continue on a postpetition basis—to engage with all parties that have expressed an interest in funding a capital injection. Since initially contacting potential investors in October 2016, the Debtors and their advisors have continued to discuss alternative transactions with potential investors and update the list of potential investors and approach those investors in hopes of obtaining the best proposal for the Debtors' estates.

## Hemen/Centerbridge Proposal

20. In early February 2017, Hemen and Centerbridge began discussions regarding a potential joint proposal for the capital injection required to implement the restructuring of the Debtors' balance sheet. Centerbridge signed an NDA with the Debtors for this purpose and, shortly thereafter, Hemen and Centerbridge began working together in structuring a formal bid.

21. Prior to the Debtors receiving a proposal from Hemen and Centerbridge, the Bank CoCom sent the Debtors the outline for an alternative transaction in the event the Debtors were unable to obtain an investment acceptable to the Bank Lenders. The Bank CoCom made it clear, however, that this proposal was only in the event that an investment could not be obtained and that they strongly believed a form of the Bank Deal, with an investment involving Hemen, still provided the best path forward. The Bank CoCom did not provide sufficient detail on this standalone proposal for the Debtors to fully analyze it.

22. On March 3, 2017, the Debtors received a proposal from Hemen and Centerbridge that contemplated $1 billion in new capital. Over the following months, the Debtors engaged in arm's-length, extensive negotiations over the terms of the Hemen/Centerbridge proposal, extracting a number of concessions in the process, while continuing to talk to third parties regarding potentially providing capital on terms more favorable then the Hemen/Centerbridge proposal.

23. During this time period and into the summer of 2017, the offshore-drilling industry remained weak, with the market outlook uncertain, the price of oil returning to a lower position, and the general sentiment that a recovery in the industry might take longer than expected. To provide additional time to reach a value-maximizing agreement, and now with Hemen formally proposing to participate in an investment, the Bank Lenders agreed to further extend certain impending Bank Facility maturity dates and the long-stop date to July 31, 2017. The requisite Bank Lenders subsequently agreed to further extensions of the long-stop date to September 12, 2017 and applicable Bank Facility maturities to September 14, 2017.

24. To secure their commitment, Hemen and Centerbridge requested significant additional modifications to the terms of the Bank Deal, including an additional year of amortization deferrals, additional maturity extensions, and additional financial and operational covenant flexibility. These Bank Deal modifications as a whole were of substantial benefit to the Debtors, representing another way in which Hemen and Centerbridge's involvement has maximized value for the Debtors' estates. Indeed, the modified Bank Deal as incorporated in the Restructuring Support Agreement accounts for more than $575 million[3] in additional value to the Debtors'

---

[3] This estimate assumes a market rate of 8 percent and the Bank Deal remains outstanding through (i) each new maturity date or (ii) through the first new maturity date of the Bank Deal

estates relative to market rates for comparable financing. The Debtors, Hemen and Centerbridge, and the Bank CoCom finalized an agreement on these modifications in August 2017.

25. Hemen and Centerbridge also requested that the Debtors seek out other investors to agree to sign on to the Investment Agreement to reduce the investment exposure of Hemen and Centerbridge, given the prolonged downturn in the offshore-drilling industry. Accordingly, Seadrill Limited and its advisors, in consultation with Hemen and Centerbridge and their advisors, initiated a syndication process.

26. On August 5, 2017, a syndication package was sent to all remaining investors who were still under NDAs with Seadrill Limited and were continuing to express an interest in potentially investing in a transaction, as well as certain holders of Unsecured Bonds. On August 14, 2017, seven of the nine parties approached submitted requests for allocations, some including certain conditions and requirements. The other two parties declined to participate in the investment.

**Restructuring Support Agreement**

27. In August 2017, in parallel with the Hemen/Centerbridge proposal syndication process, the Debtors, Hemen, and Centerbridge engaged in discussions with certain holders of Unsecured Bonds regarding their participation in the syndication. As a result of these discussions, Hemen and Centerbridge reached agreement with such holders on a proposal that would increase the capital commitment to a $1.06 billion investment and allow such holders to participate alongside Hemen and Centerbridge. Collectively, the Commitment Parties hold approximately 40 percent of the Unsecured Bonds. The $1.06 billion capital commitment embodied in the Restructuring Support Agreement is the best proposal available to the Debtors as of the Petition Date and, despite a nearly year-long capital-raising process, is also the only actionable proposal on the table.

28. On September 12, 2017, the Debtors, the Commitment Parties, approximately 97 percent of the Bank Lenders under the Bank Facilities (including 100 percent of the Bank Lenders in ten of the twelve facilities), and SFL executed the Restructuring Support Agreement, the culmination of extensive, hard-fought negotiations with the Bank CoCom, Hemen and Centerbridge and the other Commitment Parties, and multiple other Parties in Interest. The Restructuring Support Agreement is to be effectuated through a series of integrated agreements among sophisticated parties, including an investment agreement, attached as Exhibit B to the Restructuring Support Agreement (the "Investment Agreement").

29. Importantly, the Investment Agreement and Restructuring Support Agreement permit the Debtors to consider any alternative proposals received from signing until plan confirmation and provide the Debtors substantial flexibility to pursue a higher or better proposal, should one arise, through an unqualified "fiduciary out" that empowers the Debtors to terminate to pursue a higher or better offer without a breakup or termination fee. In addition to the unlimited "window-shop" period, the Investment Agreement and Restructuring Support Agreement permit the Debtors to actively solicit alternative proposals during a "go-shop" period that runs from signing until 90 days after the Petition Date. During this go-shop period, the Debtors intend to market test the Restructuring Support Agreement to determine whether its terms and conditions remain the best available under the circumstances and maximize value for the Debtors' estates.

30. The Investment Agreement has received support from a substantial majority of the Debtors' secured creditors and holders of a significant portion of the Debtors' unsecured debt, creating and clearing a path toward confirmation of a chapter 11 plan that maximizes value for all parties in interest. The capital committed under the Restructuring Support Agreement is critical to support the Debtors' business plan and negotiations with the Bank Lenders regarding value-

maximizing credit-facility amendments. The lack of such an investment would jeopardize the Debtors' continued viability in what is already a complex restructuring.

31. The extensive negotiations among the parties to date have resulted in improved key provisions for the Debtors, including, among other things: a longer commitment period; an additional $60 million of new capital for a total capital raise of $1.06 billion; a backstopped offering of some of the new debt and equity investment to unsecured creditors pursuant to a rights offering contemplated by the Plan; and a 90-day go-shop period, which will allow the Debtors to openly market the investment opportunity in accordance with the agreed-upon Marketing Procedures to ensure that the Restructuring Support Agreement is the best offer available.

32. Accordingly, I believe that, having undertaken significant marketing efforts to date and spending substantial time and energy negotiating with the Commitment Parties and other potential investors and stakeholders, the Debtors are now prepared to move forward with a postpetition marketing process that will culminate in a value-maximizing restructuring transaction that includes the best terms available to the Debtors.

### Anticipated Postpetition Marketing Process

33. As part of the Debtors' efforts to solicit alternative proposals, the Debtors intend to continue their marketing process seeking alternative proposals from financial and strategic parties. Due to operational risks, the Debtors did not reach out to certain strategic parties, many of whom are significant market competitors, during the prepetition marketing process. However, to explore every viable alternative, the Debtors and their advisors will reach out to such strategic parties that have been identified as potential investors during a robust postpetition marketing process. This process is more fully detailed in the Marketing Procedures, attached hereto as **Exhibit A**.

34. Similar to the prepetition process, the Debtors and their advisors will identify potential interested parties, including those solicited prepetition (collectively, the "Potential

Interested Parties"). Houlihan Lokey will distribute sanitized and publicly available information to the Potential Interested Parties, which will describe the transactions.

35. The Debtors intend to conduct the postpetition marketing process as a two-step process, consisting of Phase I and Phase II, as described below. As part of Phase I, each Potential Interested Party (collectively, the "Phase I Parties") will receive access to public information regarding the restructuring, the Debtors' projections, as well as further information as the Debtors deem appropriate.

36. The Debtors will then request each Phase I Party to submit a preliminary, written, non-binding offer (an "Indicative Offer") for an alternative investment proposal. The Debtors will evaluate Indicative Offers in consultation with its advisors, and, in their sole discretion, the Debtors may select a limited number of Phase I Parties to participate in Phase II (such parties, collectively, the "Phase II Parties").

37. Phase II Parties will have the opportunity to execute an NDA to receive confidential information and other information that is not publicly available to complete additional diligence to facilitate preparation of final offers. The Company will request the Phase II Parties to provide final offers by a certain date, after which the company will evaluate any alternative investments and determine whether any are higher or otherwise better than the terms of the Investment Agreement.

## Commitment Fees

38. In exchange for the $1.06 billion capital commitment subject to an unqualified fiduciary out and extensive market test, the Debtors agreed to the fees contemplated by the Investment Agreement (collectively, the "Commitment Fees"), which I believe were necessary to induce Hemen, Centerbridge, and the other Commitment Parties to enter into the Investment Agreement. The Commitment Fees with respect to the new secured notes portion of the Capital

Commitment are: (a) cash in an amount equal to five percent of the $860 million commitment, paid to the applicable Commitment Parties prepetition, when the Investment Agreement became effective; and (b) cash in an amount equal to one percent of the new secured notes portion of the Capital Commitment, payable to all purchasers of new secured notes at closing. The Commitment Fees with respect to the equity portion of the Capital Commitment is cash in an amount equal to five percent of the $200 million commitment, paid prepetition to the applicable Commitment Parties when the Investment Agreement became effective.[4]

39. Below is a chart summarizing similar fees in recent chapter 11 proceedings.

| Chapter 11 Case | Commitment Size ($Mil) | Fee |
|---|---|---|
| *Bonanaza Creek Energy, Inc.*, No. 17-10015 (KJC) (Bankr. D. Del. Apr. 7, 2017) [Docket No. 498] | 200 | 6.00% |
| *Peabody Energy*, No. 16-42529 (Bankr. E.D. Mo. Jan. 27, 2017) [Docket No. 2333] | 1,500 | 8.00% |
| *Ultra Petroleum Corp.*, No. 16-32202 (Bankr. S.D. Tex. Jan. 19, 2017) [Docket No. 996] | 580 | 6.00%[5] |
| *Linn Energy, LLC*, No. 16-60040 (Bankr. S.D. Tex. Dec. 21, 2016) (Berry Petroleum) [Docket No. 1398] | 335 | 7.00% |
| *CJ Holding Co.*, No. 16-33590 (Bankr. S.D. Tex. Dec. 16, 2016) [Docket No. 1057] | 200 | 5.00% |
| *Linn Energy, LLC*, No. 16-60040 (Bankr. S.D. Tex. Nov. 14, 2016) (Linn Energy) [Docket No. 1179] | 530 | 4.00% |

---

[4] In addition, pursuant to the Investment Agreement and after confirmation of the Plan, an affiliate of Hemen will receive 5 percent of the equity in reorganized Seadrill Limited on a post-dilution basis as a structuring fee, and certain of the other Commitment Parties will receive their pro rata share, relative to each member's percentage of the equity portion of the Capital Commitment, of 0.5 percent of the equity in reorganized Seadrill Limited on a pre-dilution basis as a structuring fee.

[5] If the rights offering did not occur "for any reason other than by the Debtors due to the failure of any Commitment Party to complete the Rights Offering in violation of the Backstop Commitment Agreement[,]" then the commitment parties would receive a 4 percent, rather than 6 percent, fee.

15

| Chapter 11 Case | Commitment Size ($Mil) | Fee |
|---|---|---|
| *MPM Silicones, LLC*, No. 14-22503 (Bankr. S.D.N.Y. June 23, 2014) (Momentive) [Docket No. 509] | 600 | 5.00% |
| | **Average** | **5.86%** |

40. Based on my experience, I believe the Commitment Fees are consistent with fees in comparable restructuring transactions, particularly with the long length of the commitment period in this situation and in this industry, and they are fair and reasonable under the circumstances.

## Conclusion

41. I believe the Debtors have conducted an open and thorough marketing process thus far and will continue to conduct such a process, ensuring that value has been maximized for all stakeholders.  This process, which remains subject to higher or otherwise better offers, has ensured that proposals received accurately reflect the state of the market and provides an opportunity for interested parties to express their interest and submit a proposal if they wish to do so.  At this time, I believe that the fully documented Restructuring Support Agreement, as effectuated by the Investment Agreement, represents the highest and best offer that is available to the Debtors and maximizes value for all stakeholders.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty and perjury that the foregoing is correct and true to the best of my knowledge, information, and belief.

Dated: September 12, 2017

_____
David R. Hilty
Managing Director
Houlihan Lokey Capital, Inc.

*Proposed Investment Banker to the Debtors*