# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SEADRILL LIMITED, *et al.*[1] | ) | Case No. 17-60079 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

## DEBTORS' EMERGENCY MOTION
### FOR ENTRY OF INTERIM AND FINAL ORDERS
### (I) AUTHORIZING USE OF CASH COLLATERAL, (II) GRANTING
### ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY,
### (IV) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF

> **THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**
>
> **EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. A HEARING WILL BE HELD ON THIS MATTER ON SEPTEMBER 13, 2017, AT 2:45 P.M. (CT) BEFORE THE HONORABLE DAVID R. JONES, 515 RUSK STREET, COURTROOM 400, HOUSTON, TX, 77002.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (this "Motion"): [2]

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/Seadrill. The location of Debtor Seadrill Americas, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 11025 Equity Drive, Suite 150, Houston, Texas 75201.

[2] The facts and circumstances supporting this Motion are set forth in the *Declaration of Mark Morris, Chief Financial Officer of Seadrill Limited, in Support of the Chapter 11 Petitions and First Day Motions* (the

## Relief Requested

1.      The Debtors seek entry of an interim order substantially in the form attached hereto as **Exhibit A** (the "Interim Order")[3] and a final order (the "Final Order,"[4] and together with the Interim Order, the "Orders"), (a) authorizing the Debtors to use Cash Collateral, (b) granting adequate protection to the Prepetition Facility Secured Parties, (c) authorizing the Debtors to use the Danske Guarantee Facility, (d) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Orders, and (e) granting related relief.

2.      In addition, the Debtors request that the Court schedule the final hearing within approximately 21 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

## Jurisdiction and Venue

3.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "Amended Standing Order"). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties,

---

"Morris Declaration") and the *Declaration of Edgar W. Mosley II, Managing Director of Alvarez & Marsal, in Support of the Chapter 11 Petitions and First Day Motions* (together with the Morris Declaration, the "First Day Declarations"), filed contemporaneously herewith and incorporated by reference herein.

[3]    Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Interim Order.

[4]    The Debtors will file the form of Final Order prior to the final hearing.

cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, and 9014, and rules 4001-1, 4002-1, and 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Local Rules"), and the *United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases* (the "Complex Case Procedures").

## Background

6. Seadrill Limited, together with its Debtor and managed non-Debtor affiliates, is a leading offshore drilling company for the oil and gas industry with more than 4,780 employees and active operations in 22 countries worldwide. The Debtors' primary business is the provision of offshore drilling services required for the exploration and production of oil and gas resources in shallow-, mid-, deep-, and ultra-deepwater areas, and in benign and harsh environments offshore. The Debtors and their managed non-Debtor affiliates own or lease a fleet of 51 rigs, including 27 floaters (drillships or semi-submersibles), 21 jack-ups and 3 tender rigs. A significant portion of the Debtors' fleet is operational and under contract with major oil companies like Exxon Mobil, Statoil, Total, and Petróleo Brasileiro S.A. The Debtors are headquartered in Hamilton, Bermuda, with corporate services provided from offices located in the United States (Houston, Texas), the United Kingdom, Dubai, Norway, Mexico, and Brazil. They also have significant assets and operations across the United States, Europe, Asia, the Middle East, Africa, and North and South America. Seadrill Limited, together with its Debtor affiliates and managed non-Debtor affiliates, reported approximately $3.2 billion of EBITDA on

operating revenues of approximately $5.1 billion for 2016.  As of the date hereof (the "Petition Date"), the funded debt obligations of Seadrill Limited and its Debtor affiliates and managed non-Debtor affiliates totaled $13.4 billion, while the Debtors' funded debt obligations totaled approximately $8.0 billion.

7.      As set forth in the Morris Declaration, over the course of the past three years, the Debtors' businesses have been affected by a sustained downturn in the oil and gas industry.  In response, the Debtors negotiated and commenced these chapter 11 cases to implement a series of restructuring transactions, set forth in that certain restructuring support agreement, dated September 12, 2017, (the "Restructuring Support Agreement"), that will: (a) re-profile the Debtors' secured funded debt obligations to eliminate near-term amortization obligations and extend maturities; (b) reduce overall leverage through equitizing the Debtors' unsecured bonds; (c) result in a $1.06 billion new capital injection; and (d) reorganize the Seadrill corporate structure to support the re-profiled secured credit facilities and new capital injection.

8.      Importantly, the restructuring contemplated by the Restructuring Support Agreement is financial in nature and not operational.  The Debtors' obligations to their employees, customers, and trade vendors will be largely unaffected by these chapter 11 proceedings.  The Restructuring Support Agreement is a significant achievement for the Debtors in the face of unprecedented commodity price declines and sustained, depressed operating conditions.  Given the Debtors' core strengths, including their modern fleet, highly-skilled workforce, global reach, and successful operating and safety track record, the Debtors are confident they can efficiently implement the restructuring set forth in the Restructuring Support Agreement and not only weather the industry storm, but succeed upon emergence from these chapter 11 cases.

9.      In addition to its wholly-owned and majority-owned subsidiaries, Seadrill Limited owns non-majority interests in four other offshore drilling and services companies (collectively, and together with their respective subsidiaries the "Non-Consolidated Entities").  The Non-Consolidated Entities (which are not Debtors in these chapter 11 cases) are: (a) Seadrill Partners LLC, a publicly-traded Marshall Islands limited liability company that owns eleven offshore drilling rigs; (b) SeaMex Limited, a 50-50 joint venture between Seadrill Limited and Fintech Advisory Inc. that owns five high-specification jack-up rigs in the Gulf of Mexico; (c) Seabras Sapura, a 50-50 joint venture between Seadrill Limited and Sapura Energy Berhad (f/k/a SapuraKencana Petroleum Berhad) that operates six pipe-laying service vessels off the coast of Brazil; and (d) Archer Limited, a publicly-traded Bermuda exempted company that specializes in global drilling and well services.

10.      Seadrill Limited historically guaranteed certain of the Non-Consolidated Entities' funded-debt obligations.  As part of the extensive negotiations leading up to these chapter 11 cases, the Debtors have executed a series of transactions to ring-fence the Non-Consolidated Entities from a Seadrill Limited chapter 11 filing.  As discussed in detail in the Morris Declaration, the Debtors anticipate that the Non-Consolidated Entity groups will be largely unaffected by these chapter 11 cases.  The relief requested herein applies solely to the Debtors except where specifically noted otherwise.  As further detailed herein, the relief requested that relates to the Non-Consolidated Entities is intended to allow the Debtors to continue their ongoing operating relationships with the Non-Consolidated Entities, which will preserve and maximize the going concern value of Seadrill Limited's interests in the Non-Consolidated Entities for the benefit of all stakeholders.

11.     On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

### Preliminary Statement

12.     The Debtors commenced these chapter 11 cases with over $1 billion in cash and are seeking relief hereunder to utilize this cash together with postpetition receipts from operations to prosecute these chapter 11 cases and operate their businesses on a postpetition basis.  As detailed in the Cash Management Motion,[5] the Debtors have $300 million deposited into an unpledged bank account that the secured lenders have agreed for purposes of the Orders does not constitute Cash Collateral (as defined in the Interim Order, the "Administrative Cash").  The Debtors propose to use the Administrative Cash to fund the administrative expenses associated with prosecuting these chapter 11 cases, largely comprised of professionals' fees and expenses as well as the fees of the Court and the U.S. Trustee's office.

13.     As detailed in the Cash Management Motion, the vast majority of the Debtors' remaining cash is held, or will be deposited into, earnings accounts pledged for the benefit of the Debtors' secured lenders.  Pursuant to the relief requested in the Orders and in exchange for the proposed adequate protection package detailed herein, the Debtors will use Cash Collateral to

---

[5] The *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions and (II) Granting Related Relief* filed contemporaneously herewith.

fund all operating expenses associated with Debtors' businesses, consistent with an agreed Budget. *Importantly, the secured lenders also support the first day relief requested contemporaneously herewith, which will be funded exclusively from Cash Collateral.* To the extent the Administrative Cash is insufficient to fund the administration of these chapter 11 cases, the secured lenders have agreed to allow the use of Cash Collateral to satisfy these claims by agreeing to a carve-out from the secured lenders' collateral as described in greater detail below.

14.    In return, the Debtors have agreed to an adequate protection package that generally includes:

- replacement and adequate protection liens and superpriority administrative claims for any diminution in value of the secured lenders' collateral;

- monthly cash interest payments at the applicable non-default contract rate;

- payment of the secured lenders' professional fees and expenses; and

- certain reporting and budgeting obligations.

15.    There are several important aspects of the proposed adequate package to highlight. First, the secured lenders have agreed that any expenditure of cash consistent with the approved Cash Collateral budget will not constitute diminution in value. Further, the secured lenders have agreed to limit their adequate protection liens and superpriority administrative claims to their respective borrowers and obligors. In other words, because the credit facilities do not have overlapping collateral, the respective adequate protection liens and superpriority claims are limited to the Debtor entities that are borrowers and obligors under each respective facility.

16.    The ultimate parent of each of the Debtors, Seadrill Limited, is a borrower or obligor under each of the Debtors' secured facilities. Seadrill Limited owns various assets that the Debtors believe are unencumbered. Under the Interim Order, the Debtors propose to grant

7

adequate protection liens and superpriority claims against the obligors under each of the prepetition secured facilities, but limited to the extent of any diminution in the value of the collateral owned by each respective borrower or obligor.

17.     Under the Final Order, the Debtors propose to grant adequate protection liens and superpriority claims against each borrower and obligor under a prepetition secured facility to the extent of any diminution in the value of collateral owned by any such borrower or obligor under the applicable facility, which, for each of the prepetition secured facilities, would include unencumbered assets at Seadrill Limited, in addition to any unencumbered assets owned by any other obligor under each respective facility.  To be clear, even under the Final Order, each secured lender would have recourse solely against the borrowers and obligors under its particular secured credit facility.

18.     Notably, the Orders, and the adequate protection package proposed therein, are a component of the overall consensus reached and memorialized in the Restructuring Support Agreement.  Indeed, the Interim Order is an exhibit to the Restructuring Support Agreement and the Orders themselves, including certain provisions within the Orders, are conditional on ongoing effectiveness of the Restructuring Support Agreement.

19.     The Debtors do not seek debtor-in-possession financing. As such, the Debtors' access to Cash Collateral during these chapter 11 cases is critical to their restructuring efforts. To continue to safely operate their businesses, the Debtors require access to cash held in Earnings Accounts to fund ordinary course rig operations, long-term rig maintenance, payroll obligations, and payment of mobilization costs.  Inability to access Cash Collateral would threaten the Debtors' ability to meet their existing customer contract obligations, generate revenue, and pay their employees.

20.     Continued and uninterrupted access to Cash Collateral will allow the Debtors to continue operating their businesses in the ordinary course, including pursuing new drilling contractual (*i.e.*, customer) opportunities, to the benefit of the Debtors' estates and their stakeholders.  The ultimate terms of the adequate protection package and the Interim Order are reflective of the extensive and arms' length negotiations involved.

21.     For these reasons and those detailed herein and in the First Day Declarations, the Debtors believe that the relief proposed in the Orders will maximize the value of the Debtors' estates and reflects a sound exercise of the Debtors' business judgment.  Accordingly, the Debtors respectfully request that the Court approve the entry of the Orders.

**Concise Statement of the Material Terms of the Interim Order
Pursuant to Bankruptcy Rule 4001 and the United States Bankruptcy Court
for the Southern District of Texas Procedures for Complex Chapter 11 Cases**

22.     Pursuant to Bankruptcy Rule 4001(b), the Debtors submit the following concise statement of the material terms of the Interim Order, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the Complex Case Procedures:[6]

| Summary of Material Terms | | Location |
|---|---|---|
| **Parties with an Interest in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(i) | The lenders party to the Prepetition Facilities and their respective agents thereunder (including any successors thereto). | Annex A |
| **Purposes for Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | To avoid immediate and irreparable harm to their businesses, the Debtors request access to Cash Collateral to fund the operation of their businesses in the ordinary course postpetition, as well as the administrative costs of these chapter 11 cases, as necessary. | ¶ G |
| **Budget**<br><br>Bankruptcy Rule | The Debtors are authorized to use Cash Collateral from the Petition Date until the Termination Date, subject to the Orders and the adequate protection granted to the Prepetition Facility Secured Parties, and in accordance with the Budget | ¶ 2 |

---

[6]   Any summary of any terms of the Interim Order in this Motion is qualified in its entirety by reference to the provisions of the Interim Order.  The Interim Order will control in the event of any inconsistency between this Motion and the Interim Order.

9

| Summary of Material Terms | | Location |
|---|---|---|
| 4001(b)(1)(B)(ii) | and the permitted percentage variance defined therein.<br><br>For the avoidance of doubt, the Debtors shall <u>first</u> use Administrative Cash to pay the fees and expenses of Professional Persons and any ordinary course professionals retained by Court order and, to the extent the Administrative Cash is insufficient pay such fees and expenses, the Debtors may thereafter use Cash Collateral for purposes of satisfying such claims, in each case in accordance with the terms of the Orders. | |
| **Termination Date/Remedies**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii) | Authorization to use Cash Collateral shall automatically terminate (except for payment of the Carve-Out) on the date which is the earlier to occur of:<br><br>• June 12, 2018; and<br><br>• seven (7) business days from the date on which written notice of the occurrence of a Termination Event is given (which may be done electronically) by the CoCom to counsel to the Debtors, the U.S. Trustee, and counsel to any Committee appointed in the Cases; <u>provided</u> that, if a hearing to consider relief from the automatic stay, any other appropriate relief in connection with delivery of the Termination Notice, or continued use of Cash Collateral is requested to be heard within such seven (7) business day period but is scheduled for a later date by the Court, the Termination Notice Period shall be automatically extended to the date of such hearing.<br><br>Upon and after the delivery of the Termination Notice, the Debtors and each of the Prepetition Facility Agents and the CoCom consent to a hearing on an expedited basis to consider whether the automatic stay may be lifted so that the Prepetition Facility Secured Parties may exercise any and all of their respective rights and remedies in respect of the Adequate Protection Collateral.<br><br>During the Termination Notice Period, the Debtors' right to use Cash Collateral pursuant to the Interim Order shall be limited to payment of:<br><br>• any expenses set forth in the Budget that were incurred prior to, and remain unpaid as of, the Termination Notice Date; and<br><br>• any other critical business-related expenses necessary to operate the Debtors' businesses or preserve the Prepetition Collateral. | ¶ 4 |
| **Termination Events**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii) | Unless waived in writing by the CoCom, the occurrence and continuance of any of the following events shall constitute a Termination Event entitling a Prepetition Facility Agent or the CoCom to issue a Termination Notice to the Debtors:<br><br>• the Interim Order shall cease to be in full force and effect for any reason;<br><br>• any of these Chapter 11 Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code, a chapter 11 trustee or examiner with expanded powers pursuant to section 1106(b) of the Bankruptcy Code shall be appointed in any of the Chapter 11 Cases or the Court shall abstain from hearing any of these Chapter 11 Cases, or any of the Debtors shall file a motion or other pleading with the Court seeking any of the foregoing relief;<br><br>• the Final Order shall not have been entered by this Court on or before 45 days following entry of the Interim Order, unless an extension is | ¶ 3 |

10

| Summary of Material Terms | Location |
|---|---|
| otherwise agreed to in writing by the CoCom; | |

- an order shall have been entered (or any of the Debtors shall seek an order) reversing, amending, supplementing, extending, staying, vacating, or otherwise modifying the Interim Order without the prior written consent of the CoCom;

- the Debtors shall file or the Court shall grant any application, motion or borrowing request seeking to: (i) incur indebtedness from any party secured by a lien on, or otherwise having a claim against or recourse to, as the case may be, the Debtors, the Prepetition Collateral or the Adequate Protection Collateral, unless such liens or claims are junior and subordinated in all respects to the Prepetition Liens, the Prepetition Facility Obligations, the Adequate Protection Liens and the Adequate Protection Superpriority Claims without the consent the CoCom; or (ii) use Cash Collateral on a nonconsensual basis;

- the Court shall grant any application by any party seeking payment of any claim on a superpriority administrative claim basis *pari passu*, or senior, to the Adequate Protection Superpriority Claims without the consent of the CoCom;

- the entry of an order by this Court or any other court having jurisdiction to do so granting relief from or modifying the automatic stay applicable under section 362 of the Bankruptcy Code to allow a holder or holders of any lien or security interest to foreclose or otherwise realize upon their liens or security interests in respect of a Rig;

- the Debtors' exclusive right to file and solicit acceptance of a plan of reorganization is terminated or terminates, unless such exclusivity expires after the Debtors have filed a plan of reorganization with the Court that is in form and substance satisfactory to the Prepetition Facility Secured Parties (for the avoidance of doubt, the RSA Plan shall be considered in a form and substance satisfactory to the Prepetition Facility Secured Parties), and are proceeding in good faith toward confirmation and consummation of such plan;

- any Debtor breaches any material covenant or undertaking (after any applicable cure period) in any of the Prepetition Facility Documents relating to the insurance, operation, management and maintenance of any drilling rig that constitutes Prepetition Collateral (each, a "Rig"), including without limitation a breach in connection with expropriation, arrest, detention, capture, condemnation, confiscation, requisition, purchase, seizure, or forfeiture of, or any taking of title to, the applicable Rig;

- the entry of an order by this Court or any other court having jurisdiction to do so (i) authorizing the sale of all or substantially all of a Debtor's assets, or (ii) authorizing any other sale or disposition of any of the Prepetition Collateral outside the ordinary course of business without the prior written consent of the CoCom;

- any Debtor shall make any material payment (including "adequate protection" payments) on or in respect of any prepetition indebtedness other than in accordance with the Budget or otherwise pursuant to this Interim Order or any other interim or final order entered with respect to the Debtors' "first day" motions (so long as such motions and orders are in form and substance reasonably acceptable to the CoCom);

| Summary of Material Terms | | Location |
|---|---|---|
| | • subject to a five (5) day grace period, the Debtors shall fail to make any Adequate Protection Payment when due;<br><br>• the entry of an order of this Court avoiding, disgorging, or requiring repayment of any portion of the Adequate Protection Payments made by the Debtors;<br><br>• the entry of an order of this Court approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation or disposition of any Prepetition Collateral;<br><br>• the Adequate Protection Liens or the Adequate Protection Superpriority Claims granted to the Prepetition Facility Secured Parties shall cease to be valid, perfected and enforceable in all respects, or any Debtor shall assert the invalidity, non-perfection or unenforceability of any of the Adequate Protections Liens or the invalidity or unenforceability of the Adequate Protection Superpriority Claims;<br><br>• any Debtor shall seek, or shall support (in any such case by way of, *inter alia,* any motion or other pleading filed with this Court or any other writing to another party-in-interest executed by or on behalf of any Debtor) any other person's motion, to disallow or subordinate in whole or in part any Prepetition Facility Secured Party's claim in respect of Prepetition Facility Obligations or to challenge the validity, enforceability, perfection or priority of the liens in favor of any Prepetition Facility Secured Party (including, without limitation, any Prepetition Liens);<br><br>• the termination of the prepetition restructuring support agreement entered into by the Debtors and certain consenting creditors dated on or about September 12, 2017 (as amended, restated, supplemented or otherwise modified in accordance with its terms, the "Restructuring Support Agreement"), subject to the tail period, if applicable, set forth in Section 13.09 of the Restructuring Support Agreement;<br><br>• the Debtors shall fail to adhere to the Budget (subject to the Permitted Variance); provided that it shall not constitute a Termination Event if the Debtors exceed the Permitted Variance by no more than $25,000,000 for a period of two weeks, so long as the Debtors are back in compliance with the Budget (subject to the Permitted Variance) within three weeks of the initial date of the noncompliance; or<br><br>• the Debtors shall fail to comply with any other provision of the Interim Order in a material respect. | |
| **Adequate Protection**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | The Debtors will provide the Prepetition Facility Secured Parties with adequate protection which includes:<br><br>• Adequate Protection Liens. Solely to the extent of, and in an aggregate amount equal to, any diminution in value of any Prepetition Facility Secured Party's interests in its respective Prepetition Collateral, including on a dollar-for-dollar basis in respect of any Cash Collateral, from and after the Petition Date, arising from the imposition and enforcement of the automatic stay and the Debtors' use, sale or lease of such Prepetition Collateral, including any Cash Collateral (any such diminution, a "Diminution in Value"), and in each case subject and subordinate to the Carve-Out, each Prepetition Facility Secured Party (or the applicable Prepetition Facility | ¶ 5 |

| Summary of Material Terms | Location |
|---|---|

Agent on its behalf) will be granted the following security interests and liens (collectively, the "Adequate Protection Liens"):

- pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected, non-avoidable first priority replacement liens on, and security interests in, the Adequate Protection Collateral of each borrower and obligor under the applicable Prepetition Facility under which such Prepetition Facility Secured Party is a party that is not subject to (x) valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date or (y) valid and non-avoidable liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code

- pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected non-avoidable senior priming replacement liens on, and security interest in, all other Adequate Protection Collateral of each borrower and obligor under the applicable Prepetition Facility under which such Prepetition Facility Secured Party is a party, which replacement liens and security interests shall be (x) junior to the Prepetition Liens, and any (1) valid, perfected and non-avoidable liens in existence as of the Petition Date and (2) valid and non-avoidable liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which in each case are senior in priority to the Prepetition Liens and are permitted by the terms of the Prepetition Facility Documents and (y) senior to all other liens on and security interests of any third parties that were junior to the Prepetition Liens as of the Petition Date;

- Adequate Protection Superpriority Claims.  To the extent of, and in an aggregate amount equal to, any Diminution in Value in respect of the Prepetition Collateral securing its respective Prepetition Facility, and subject only to the Carve-Out, each Prepetition Facility Secured Party will be granted an allowed superpriority administrative expense claim against each borrower and obligor under the applicable Prepetition Facility under which such Prepetition Facility Secured Party is a party (collectively, the "Adequate Protection Superpriority Claims"), which Adequate Protection Superpriority Claims shall, subject to the Carve-Out, have priority over any and all administrative expenses, adequate protection claims and other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under the Bankruptcy Code;

- Scope of the Adequate Protection Liens and Adequate Protection Superpriority Claims.  Notwithstanding anything to the contrary in the Interim Order, solely prior to the entry of the Final Order, (i) the Adequate Protection Liens granted to each Prepetition Facility Secured Party in the Interim Order shall be limited to (x) Adequate Protection Collateral consisting of such Prepetition Facility Secured Party's Prepetition Collateral and (y) any other Adequate Protection Collateral owned by a borrower or obligor under the applicable Prepetition Facility but only to the extent of the

| Summary of Material Terms | Location |
|---|---|

Diminution in Value of the collateral owned by such borrower or obligor; and (ii) the Adequate Protection Superpriority Claims granted to each Prepetition Facility Secured Party hereunder (x) shall be limited to claims against the borrowers and obligors under the applicable Prepetition Facility under which such Prepetition Facility Secured Party is a party and (y) shall be limited to the extent of the Diminution in Value of the collateral owned by such borrower or obligor;

- Status of the Adequate Protection Liens and Adequate Protection Superpriority Claims. The Adequate Protection Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any lien or security interest arising after the Petition Date, subject only to the Carve-Out, or (ii) except as expressly set forth in clauses (i) or (ii) of paragraph 5(a) of the Interim Order, subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise. The Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Facility Agents for the benefit of the Prepetition Facility Secured Parties and not in substitution therefor. Notwithstanding anything to the contrary in the Interim Order, (i) if the Plan (as defined in the Restructuring Support Agreement, the "RSA Plan") is confirmed in accordance with the terms of the Restructuring Support Agreement, any Adequate Protection Liens and Adequate Protection Superpriority Claims granted to any Prepetition Facility Secured Lender (or the applicable Prepetition Facility Agent on its behalf) will be deemed satisfied (including for purposes of satisfying section 1129(a)(9) of the Bankruptcy Code) by the treatment provided to such Prepetition Facility Secured Parties under the RSA Plan or (ii) in the case of any plan of reorganization or liquidation other than the RSA Plan (such plan, a "Non-RSA Plan"), the Adequate Protection Liens and Adequate Protection Superpriority Claims granted to any Prepetition Facility Secured Lender (or the applicable Prepetition Facility Agent on its behalf) shall be, under such Non-RSA Plan, either (1) paid in full in cash or (2) provided with any other treatment that has been accepted by the Prepetition Facility Secured Parties holding claims under the applicable Prepetition Facility under which such Prepetition Facility Secured Lender is a party in numbers and amounts sufficient to satisfy the requirements of section 1126(c) of the Bankruptcy Code, so long as such treatment complies with the requirements of section 1129(b) of the Bankruptcy Code (it being agreed that, if all requirements of section 1129(b) are satisfied, then in such case the requirements of section 1129(a)(9) may be deemed satisfied by treatment other than payment in full in cash). Solely for purposes of the consensual use of Cash Collateral in accordance with the Interim Order and solely with respect to Adequate Protection Superpriority Claims and Adequate Protection Liens shall not include any expenditure or transfer of Cash Collateral consistent with the Budget and the Cash Management Order during the period from the Petition Date until the earlier of (x) the effective date of the RSA Plan and (y) the Termination Date. Notwithstanding anything to the contrary herein, each Prepetition Facility Secured Party is hereby granted and shall have replacement liens in all postpetition revenues deposited into Earnings Accounts (as defined in the Cash Management Order) owned by each borrower and obligor under the applicable Prepetition

Case 17-60079   Document 8   Filed in TXSB on 09/12/17   Page 15 of 51

| Summary of Material Terms | Location |
|---|---|

Facility under which such Prepetition Facility Secured Party is a party;

- Adequate Protection Payments. The Prepetition Facility Agents (on behalf of the respective Prepetition Facility Secured Parties) shall each receive from the Debtors (using reasonable efforts where practicable to pay the following payments from Earnings Accounts (as defined in the Cash Management Order)) (i) within five (5) business days following the entry of this Interim Order, cash payment of all accrued and unpaid interest (whether accrued prior to or after the Petition Date) on the applicable Prepetition Facility Obligations at the non-default rates provided for in the respective Prepetition Facility Documents (it being understood that interest shall accrue at the default rate to the fullest extent permitted under the Bankruptcy Code, with all rights to object thereto fully preserved), and all accrued and unpaid fees and costs (whether accrued prior to or after the Petition Date) owing to the Prepetition Facility Secured Parties under the respective Prepetition Facility Documents, and (ii) on the last business day of each month thereafter, cash payment of all accrued and unpaid interest, at the applicable non-default rates provided in the respective Prepetition Facility Documents (it being understood that interest shall accrue at the default rate to the fullest extent permitted under the Bankruptcy Code, with all rights to object thereto fully preserved; provided, that the difference between the applicable non-default and default interest rate shall be waived pursuant to, and on the effective date of, the RSA Plan), and any fees and costs due and payable under the respective Prepetition Facilities, including, without limitation, any accrued fees owing to the Prepetition Facility Secured Parties under the respective Prepetition Facility Documents; provided that, solely in the event that a Non-RSA Plan is confirmed under section 1129 of the Bankruptcy Code and there is a final determination that any Prepetition Facility Secured Parties were undersecured as of the Petition Date, payments received by such Prepetition Facility Secured Parties pursuant to this paragraph 5(f) may be recharacterized and applied as payments of principal attributable to the applicable Prepetition Facility;

- ECA Payments. The Debtors shall pay all interest, premiums and/or other fees (whether incurred prior to or after the Petition Date) due and payable to any Seadrill ECA (as defined in the Restructuring Support Agreement) under, and in accordance with, such Seadrill ECA's respective Seadrill ECA Guarantee (as defined in the Restructuring Support Agreement);

- Fees and Expenses. The Debtors shall pay in full, in cash and in immediately available funds all reasonable and documented fees, costs and expenses (whether incurred prior to, on or after the Petition Date), without duplication, of (i) the Prepetition Facility Agents and (ii) the Committee of Coordinators appointed under and as defined in that certain appointment letter dated April 20, 2016 among Seadrill Limited and each member thereof, as amended, restated, supplemented, or otherwise modified from time to time (the "CoCom"), on the terms set forth in each work fee letter entered into between any Debtor and each member of the CoCom (the "CoCom Work Fee Letters"), including all reasonable and documented professional and advisory fees, costs and expenses of their legal, financial and other professionals, including White & Case LLP, Advokatfirmaet BA-HR and Lazard Frères & Co. LLC (which, for the avoidance of doubt, includes the monthly fee, transaction (or similar back-ended) fee and any expenses owed to Lazard Frères & Co. LLC in accordance with the terms of

15

| Summary of Material Terms | | Location |
|---|---|---|
| | its retention agreement), and including any other local, foreign or regulatory counsel as may at any time be necessary (collectively, the "Prepetition Facility Professionals"), (x) promptly upon entry of the Interim Order in the full amounts set forth in any outstanding invoices from the Prepetition Facility Agents and Prepetition Facility Professionals received by the Debtors at least five (5) business days prior to the entry of this Interim Order and outstanding amounts owed to the CoCom outstanding under the CoCom Work Fee Letters (as invoiced to the Debtors) and (y) thereafter, within ten (10) business days after (A) the presentment of any such invoices to the Debtors and the U.S. Trustee (which shall include reasonable supporting detail in the form of standard detailed invoices, which may be redacted to protect privileged, confidential, or commercially or strategically sensitive information) or (B) in the case of the CoCom fees owed to the CoCom under the CoCom Work Fee Letters, such payments coming due pursuant to the terms of the CoCom Work Fee Letters, as invoiced to the Debtors (the payment obligations set forth in this paragraph 5(h), together with the payment obligations set forth in paragraphs 5(f) and 5(g) of the Interim Order, the "Adequate Protection Payments").   The Prepetition Facility Agents, the CoCom and the Prepetition Facility Professionals shall not be required to comply with the U.S. Trustee fee guidelines or file any fee applications with the Court, but shall provide copies of their invoices as set forth above to the U.S. Trustee; <br><br> • Reporting.  The Debtors shall provide additional reporting to the Prepetition Facility Agents and the CoCom; and <br><br> • Access to Records.  The Debtors shall permit representatives, agents and employees of the Prepetition Facility Agents and the CoCom (i) to have access to and inspect the Debtors' properties, (ii) to examine the Debtors' books and records, and (iii) to discuss (no less than once per calendar month) the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors. | |
| **Carve Out** <br><br> Bankruptcy Rule 4001(b)(1)(B)(iii) | The Interim Order provides a "Carve Out" of certain statutory fees, allowed professional fees of the Debtors and any Committee appointed in the Chapter 11 Cases pursuant to section 1103 of the Bankruptcy Code, and a Post-Carve Out Notice Cap, all as detailed in the Interim Order. | ¶ 7 |
| **Waiver/Modification of Automatic Stay** <br><br> Bankruptcy Rule 4001(b)(1)(B)(iii) | As set forth more fully in the Interim Order, the automatic stay imposed under section 362(a) of the Bankruptcy Code is modified as necessary to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to:  (a) permit the Debtors to grant the Adequate Protection Liens and incur the Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as may be needed to assure the perfection and priority of the Adequate Protection Liens; (c) permit the Debtors to incur all liabilities and obligations under the terms of the Interim Order; (d) authorize the Debtors to pay, and the respective Prepetition Facility Agents to retain and apply, any payments made in accordance with the terms of the Interim Order; (e) permit the Prepetition Facility Secured Parties, upon occurrence of the Termination Date, to terminate the use of Cash Collateral; and (f) permit the Debtors to perform and comply with all obligations under the Deepwater Share Pledge. | ¶ 26 |
| **Stipulations of the Debtors** <br><br> Complex Case | The Interim Order contains certain stipulations by the Debtors, among other things, to: | Annex B |

| Summary of Material Terms | | Location |
|---|---|---|
| Procedures, Ex. B | • the amount of the claims of the Prepetition Secured Parties as of the Petition Date;<br><br>• the validity and priority of the liens and security interests securing the Debtors' prepetition secured indebtedness; and<br><br>• the lack of a basis to challenge or avoid the validity, enforceability, priority, or perfection of the liens and security interests securing the the Debtors' prepetition secured indebtedness. | |
| **Binding Effect of the Debtors' Stipulations on Third Parties**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii); Complex case Procedures, Ex. B | The stipulations, admissions, agreements, releases and waivers contained in the Orders are and shall be binding upon the Debtors and any of the Debtors' successors, including, without limitation, any chapter 7 or chapter 11 trustee, responsible person, examiner with expanded powers, or other estate representative and all parties-in-interest and all of their successors-in-interest and assigns, including, without limitation, any Committee, unless, and solely to the extent that, a party-in-interest with requisite standing (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so) (i) has timely filed the proper pleadings, and timely commenced the appropriate proceedings under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in paragraph [12] of the Interim Order), challenging the Stipulations regarding: (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of any Prepetition Facility Agent or other Prepetition Facility Secured Party; or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Facility Obligations, by no later than sixty (60) calendar days from the date of entry of the Final Order, as such date may be extended in the sole discretion of the applicable Prepetition Facility Agents and any applicable individual Prepetition Facility Secured Party that is the subject of a Challenge and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding, and any such judgment has become final and is not subject to any further review or appeal. | ¶ 11 |
| **506(c) Waiver**<br><br>Complex Case Procedures, Ex. B | Subject to the entry of the Final Order, no costs or expenses of administration that have been or may be incurred in any of the Chapter 11 Cases or any Successor Cases at any time shall be charged against any Prepetition Facility Secured Party, any of their respective claims, any Prepetition Facility Obligations, any Adequate Protection Liens, any Adequate Protection Superpriority Claims, any Prepetition Liens or any Prepetition Collateral, including any Cash Collateral, pursuant to sections 506(c) or 105(a) of the Bankruptcy Code, or otherwise, without the prior written consent of the affected Prepetition Facility Agent.  Nothing contained in the Interim Order shall be deemed a consent by any Prepetition Facility Secured Party to any charge, lien, assessment or claim against, or in respect of, the Prepetition Collateral, including Cash Collateral, under section 506(c) or 105(a) of the Bankruptcy Code, or otherwise.  Notwithstanding anything to contrary in the Interim Order, if the Final Order is terminated, the Debtors reserve their rights to assert section 506(c) of the Bankruptcy Code solely with respect to costs and expenses incurred following the date of the termination of the Final Order, and the Prepetition Facility Secured Parties reserve their rights to contest any such assertion. | ¶ 18 |
| **Provisions Affecting Consideration of the** | Subject to entry of a Final Order, the Prepetition Facility Agents and the other Prepetition Facility Secured Parties shall not be subject to the equitable doctrine | ¶¶ 15,16 |

| Summary of Material Terms | | Location |
|---|---|---|
| **Equities of the Case under Section 552(b)(1)**<br><br>Bankruptcy Rule 4001(c)(I)(B)(i) | of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral or Adequate Protection Collateral, as the case may be, and proceeds shall be received and applied in accordance with the Interim Order and the Prepetition Facility Documents notwithstanding any other agreement or provision to the contrary.<br><br>The Prepetition Facility Agents and the other Prepetition Facility Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, including, for the avoidance of doubt, in respect of postpetition revenues and payments in connection with any Prepetition Collateral, including postpetition payments under drilling contracts in effect on and after the Petition Date and, upon entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the Prepetition Facility Agents or the Prepetition Facility Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral. | |
| **Danske Guarantee Facility** | The Debtors seek authority to obtain postpetition access to the Danske Guarantee Facility. The Debtors seek authority to grant Danske Bank a *pari passu* lien on the Danske Guarantee Facility Collateral pursuant to section 364 of the Bankruptcy Code. | ¶ 27 |

## **Statement Regarding Significant Provisions**

23.     The Interim Order contains certain of the provisions (the "Significant Provisions")[7] identified on Exhibit B to the Complex Case Procedures as summarized in the Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral attached as **Exhibit B**, as set forth below:

  a.     ***Cross Collateralization.***     The Orders do not provide for cross-collateralization. The Interim Order provides for adequate protection liens and superpriority claims against the borrower and obligors under each prepetition secured facility, but limited to the extent of any diminution in value of any collateral owned by such borrower or obligor. The Final Order provides for adequate protection liens and superpriority claims against the borrower and obligors under each prepetition secured facility

---

[7]    Significant Provisions refer to those provisions that: (a) grant cross-collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors; (b) deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(b) of the Bankruptcy Code; (c) bind the bankruptcy estates or any parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured creditor; (d) waive or limit the estate's rights under section 506(c) of the Bankruptcy Code; (e) grant prepetition secured creditors liens on the debtor's claims and causes of action arising under chapter 5 of the Bankruptcy Code; (f) impose deadlines for the filing of a plan or disclosure statement; and (g) grant an administrative claim.

to the extent of any diminution in value of any collateral owned by any borrower or obligor under such facility.  *See* Interim Order ¶ 5(d).

b.  ***Validity, Perfection, and Amount of Prepetition Liens.***  The Debtors acknowledge, agree, admit, and stipulate to various matters, including, the validity, perfection, and priority of the liens securing the obligations owing to the Bank Facility lenders.  *See* Interim Order annex B.  The stipulations set forth in Annex B of the Interim Order are binding on the Debtors and any successors thereto. *See id.* at ¶ 11. Parties in interest have 60 days from the entry of the Final Order to investigate the stipulations set forth in Annex B to the Interim Order (subject to extensions as may be agreed by the applicable Prepetition Facility Agents and any applicable individual Prepetition Facility Secured Party). *See id.*

c.  ***506(c) Waiver***.  Subject to the entry of the Final Order, no costs or expenses of administration that have been or may be incurred in any of these chapter 11 cases or and successor case at any time shall be charged against any Prepetition Facility Secured Party, any of their respective claims, any Prepetition Facility Obligations, any Adequate Protection Liens, any Adequate Protection Superpriority Claims, any Prepetition Liens or any Prepetition Collateral, including any Cash Collateral, pursuant to sections 506(c) or 105(a) of the Bankruptcy Code, or otherwise, without the prior written consent of the affected Prepetition Facility Agent.  If the Final Order is terminated, the Debtors reserve their rights to assert section 506(c) of the Bankruptcy Code solely with respect to costs and expenses incurred following the date of the termination of the Final Order.

d.  ***Liens on Avoidance Actions.***  Subject only to entry of the Final Order, the Adequate Protection Liens shall attach to any proceeds or property recovered in respect of any Avoidance Actions.  *See* Interim Order ¶ 5.

e.  ***Provisions Deeming Prepetition Debt to be Post Petition Debt.***  The Orders do not deem prepetition secured debt to be postpetition debt.

f.  ***Provisions Imposing Plan or Disclosure Statement Filing Deadlines.***  The Debtors have agreed to obtain an order approving their disclosure statement by 150 days after the Petition Date, confirm their chapter 11 plan by 220 days after the Petition Date, and have their chapter 11 plan go effective by 330 days after the Petition Date, each as milestones under the Restructuring Support Agreement and the Investment Agreement (as defined in the Restructuring Support Agreement).  The termination of the Restructuring Support Agreement is a termination event under the Orders.

g.  ***Provisions Granting Administrative Claims.***  The Orders provide for allowed, superpriority administrative claims pursuant to section 503(b) and 507(b) of the Bankruptcy Code (subject to the Carve-Out), with

priority in payment over any and all unsecured claims and administrative expense claims against Debtors, which administrative claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtors including, subject to entry of the Final Order only, the proceeds or property recovered in respect of any applicable Avoidance Actions. *See* Interim Order ¶ 5. As described above, the administrative claims may only be asserted against the borrowers and obligors under the credit facility that suffers diminution in value.

24. The explanation for the inclusion of the foregoing Significant Provisions, as required by Complex Case Procedure 4(C)(vi), which is made applicable by Local Rule 1075-1, is that such Significant Provisions are appropriate to adequately protect the Bank Facility lenders' interests in their collateral, including Cash Collateral. As set forth herein, granting the relief requested pursuant to the Orders is critical to the continued safe operation of the Debtors' businesses and will maximize the value of the Debtors' estates for all parties in interest.

25. In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases. Accordingly, the Significant Provisions in the Orders should be approved.

### The Debtors' Prepetition Secured Indebtedness

26. As of the Petition Date, the Debtors were liable for approximately $8.0 billion in aggregate funded-debt obligations. These obligations arise under the twelve Bank Facilities and the six Unsecured Bond issuances. The table below summarizes the Debtors' prepetition capital structure, with near-term maturing obligations indicated in red.

| Bank Facilities *(in US$ millions)* | Principal |
|---|---|
| ***Seadrill Limited Facilities*** | |
| $400 million facility due 2017 — *Jack-Up Facility* | 135 |
| $450 million facility due 2017 — *West Eminence Facility* | 265 |
| $300 million facility due 2018 | 144 |
| $1.50 billion facility due 2019 | 1,125 |
| $1.35 billion facility due 2019 | 945 |
| $950 million facility due 2019 | 566 |

20

| | |
|---|---|
| $450 million facility due 2020 | 122 |
| $440 million facility due 2017 — *Split Facility* | 64 |
| $1.45 billion facility due 2018 — *Split Facility* | 322 |
| ***NADL Facility (Seadrill Limited Guaranteed)*** | |
| $2.00 billion facility due 2017 — *NADL Facility* | 908 |
| ***AOD Facility (Seadrill Limited Guaranteed)[8]*** | |
| $360 million facility due 2018 | 210 |
| ***Sevan Facility (Seadrill Limited Guaranteed)*** | |
| $1.75 billion facility due 2018 | 875 |
| **Total Bank Facilities** | **$5,681 million** |

| | |
|---|---|
| **Unsecured Bonds** *(in US$ millions—Net of Seadrill Holdings)* | |
| ***Seadrill Limited Bonds*** | |
| $1.00 billion bond due 2017 — *Maturing Bonds* | 843 |
| NOK 1.80 billion bond due 2018 | 211 |
| SEK 1.50 billion bond due 2019 | 168 |
| $500 million bond due 2020 | 479 |
| ***NADL Bonds*** | |
| NOK 1.50 billion bond due 2018 — *Seadrill Limited Guaranteed* | 166 |
| $600 million bond due 2019 | 413 |
| **Total Unsecured Bonds** | **$2,280 million** |

| | |
|---|---|
| **Danske Guarantee Facility** | |
| Outstanding Obligations | $60 million |
| **Total Obligations Outstanding** | **$8,021 million** |

## A.    The Bank Facilities.

27.    The Debtors generally incurred the obligations under the Bank Facilities described below to finance corporate acquisitions or the construction or acquisition of new rigs. The facilities are secured by, among other things, (a) a first priority, perfected mortgage in one or more of the Debtors' drilling rigs, (b) guarantees from the applicable rig-owning entities, and (c) a first-priority security interest in the rig-owning entities' Earning Accounts.  No financial

---

[8]    Debtors Seadrill Limited and Seadrill GCC Operations Ltd. are guarantors under the AOD Facility.  The borrowers and the remaining guarantor are not debtors pursuant to the forbearance set forth in the restructuring support agreement.

institution possesses a blanket lien over the Debtors' entire fleet.  Instead, the secured credit facilities are secured by non-overlapping subsets of the Debtors' rigs.

### 1. Seadrill Limited Facilities.

28.     ***$400 Million Nordea Senior Secured Facility.***  Seadrill Limited (Bermuda), as borrower, the lenders party thereto from time to time (the "$400 Million Nordea Facility Lenders"), and Nordea Bank Norge ASA, as agent (the "$400 Million Nordea Facility Agent" and, together with the $400 Million Nordea Facility Lenders, the "$400 Million Nordea Facility Secured Parties"), are parties to that certain Senior Secured Credit Facility Agreement, dated as of December 8, 2011 (as amended, restated, supplemented and/or modified through the Petition Date, the "$400 Million Nordea Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $400 Million Nordea Facility Credit Agreement, the "$400 Million Nordea Facility Loan Documents").

29.     The $400 Million Nordea Facility Credit Agreement provided for a $200 Term Loan Facility and $200 million Revolving Facility (each as defined in the $400 Million Nordea Facility Credit Agreement).  Seadrill GCC Operations Ltd. (Bermuda), Seadrill UK Ltd. (England), Seadrill Callisto Ltd. (Bermuda), Seadrill Indonesia Ltd. (Bermuda), Seadrill Triton Ltd. (Bermuda), Seadrill Cressida Ltd. (Bermuda), Seadrill Far East Limited (Hong Kong) have each provided, pursuant to clause 18 of the $400 Million Nordea Facility Credit Agreement, an unconditional joint and several guaranty of the of the obligations thereunder.

30.     Pursuant to the $400 Million Nordea Facility Loan Documents, the $400 Million Nordea Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *West Leda*, *West Cressida*, *West Callisto* and *West Triton*, (b) assignments of earnings, earnings accounts and insurance policies with respect to *West Leda*, *West Cressida*, *West Callisto*

and *West Triton* and (c) share charges over shares of each drilling unit owner (collectively, the "$400 Million Nordea Facility Collateral").

31.     ***$450 Million Eminence Senior Secured Facility.***     Seadrill Eminence Ltd. (Bermuda), as borrower, the lenders party thereto from time to time (the "$450 Million Eminence Facility Lenders"), and Danske Bank A/S, as agent (the "$450 Million Eminence Facility Agent", and together with the $450 Million Eminence Facility Lenders, the "$450 Million Eminence Facility Secured Parties"), are parties to that certain Senior Secured Credit Facility Agreement, dated as of December 13, 2013 (as amended, restated, supplemented and/or modified through the Petition Date, the "$450 Million Eminence Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $450 Million Eminence Facility Credit Agreement, the "$450 Million Eminence Facility Loan Documents").

32.     The $450 Million Eminence Facility Credit Agreement provided for a $450 million Senior Secured Facility (as defined in the $450 Million Eminence Facility Credit Agreement).   Seadrill Limited (Bermuda) and Seadrill Offshore AS (Norway) have each provided, pursuant to clause 18 of the $450 Million Eminence Facility Credit Agreement, an unconditional joint and several guaranty of the Guarantee Obligations (as defined in the $450 Million Eminence Facility Credit Agreement).

33.     Pursuant to the $450 Million Eminence Facility Loan Documents, the $450 Million Eminence Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rig *West Eminence*, (b) assignments of earnings, earnings accounts and insurance policies with respect to *West Eminence* and (c) and a share charge over shares of Seadrill Eminence Ltd. (collectively, the "$450 Million Eminence Facility Collateral").

34.     ***$300 Million DNB Senior Secured Facility.***     Seadrill Limited (Bermuda), as borrower, the lenders party thereto from time to time (the "$300 Million DNB Facility Lenders") and DNB Bank ASA, as agent (the "$300 Million DNB Facility Agent" and, together with the $300 Million DNB Facility Lenders, the "$300 Million DNB Facility Secured Parties"), are parties to that certain Senior Secured Credit Facility Agreement, dated as of July 16, 2013 (as amended, restated, supplemented and/or modified through the Petition Date, the "$300 Million DNB Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $300 Million DNB Facility Credit Agreement, the "$300 Million DNB Facility Loan Documents").

35.     The $300 Million DNB Facility Credit Agreement provided for the $60 million Eksportkreditt GIEK Facility, $90 million Eksportkreditt Commercial Facility, $90 million DNB Liv GIEK Facility and $60 million Contract Facility (each as defined in the $300 Million DNB Facility Credit Agreement).  Seadrill UK Ltd. (England), Seadrill Castor Ltd. (Bermuda) and Seadrill Tucana Ltd. (Bermuda) have each provided, pursuant to clause 20 of the $300 Million DNB Facility Credit Agreement, an unconditional joint and several guaranty of the of the Guarantee Obligations (as defined in the $300 Million DNB Facility Credit Agreement).

36.     Pursuant to the $300 Million DNB Facility Loan Documents, the $300 Million DNB Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *West Castor* and *West Tucana*, (b) assignments of earnings, earnings accounts, and insurance policies with respect to *West Castor* and *West Tucana* and (c) share charges over shares of each drilling unit owner (collectively, the "$300 Million DNB Facility Collateral").

37.     ***$1.5 Billion ECA II Senior Secured Facility.***     Seadrill Saturn Ltd. (Bermuda), Seadrill Neptune Hungary Kft (Hungary) and Seadrill Jupiter Ltd (Bermuda), as borrowers, the

lenders party thereto from time to time (the "$1.50 Billion ECA II Facility Lenders"), DNB Bank ASA, HSBC Bank plc, ING Bank N.V. and Nordea Bank Norge ASA, as bookrunners, Nordea Bank Finland Plc, London Branch, as global coordinator, facility agent, security agent and ECA agent (the "$1.50 Billion ECA II Facility Agent" and, together with the $1.50 Billion ECA II Facility Lenders, the "$1.50 Billion ECA II Facility Secured Parties"), HSBC Bank plc and DNB Bank ASA, as ECA coordinators, and ING Bank N.V., as commercial lenders coordinator and documentation agent, are parties to that certain Senior Secured Credit Facility Agreement, dated as of July 30, 2014 (as amended, restated, supplemented and/or modified through the Petition Date, the "$1.50 Billion ECA II Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $1.50 Billion ECA II Facility Credit Agreement, the "$1.50 Billion ECA II Facility Loan Documents").

38.     The $1.50 Billion ECA II Facility Credit Agreement provided for the $400 million GIEK Facility, $220 million KEXIM Facility, $180 million KEXIM Guarantee Facility, $400 million K-Sure Facility and $300 million Commercial Facility (each as defined in the $1.50 Billion ECA II Facility Credit Agreement).   Seadrill Limited (Bermuda), Seadrill Gulf Operations Neptune LLC (USA) (Delaware), Seadrill Nigeria Operations Limited (Nigeria) and Seadrill Offshore Nigeria Limited (Nigeria) have each provided, pursuant to clause 18 of the $1.50 Billion ECA II Facility Credit Agreement, an unconditional joint and several guaranty of the of the Guarantee Obligations (as defined in the $1.50 Billion ECA II Facility Credit Agreement).

39.     Pursuant to the $1.50 Billion ECA II Facility Loan Documents, the $1.50 Billion ECA II Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *West Neptune*, *West Jupiter* and *West Saturn*, (b) assignments of earnings, earnings

accounts, charterparties and insurance policies with respect to *West Neptune*, *West Jupiter* and *West Saturn* and (c) share charges over shares of each borrower and intra-group charterer (collectively, the "$1.50 Billion ECA II Facility Collateral").

40.     ***$1.350 Billion 4 UDW Senior Secured Facility.***   Seadrill Limited (Bermuda), as borrower, the lenders party thereto from time to time (the "$1.35 Billion 4 UDW Facility Lenders"), and DNB Bank ASA, as bookrunner, facility agent and security agent (the "$1.35 Billion 4 UDW Facility Agent", and together with the $1.35 Billion 4 UDW Facility Lenders, the "$1.35 Billion 4 UDW Facility Secured Parties"), are parties to that certain Senior Secured Credit Facility Agreement, dated as of August 26, 2014 (as amended, restated, supplemented and/or modified through the Petition Date, the "$1.35 Billion 4 UDW Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $1.35 Billion 4 UDW Facility Credit Agreement, the "$1.35 Billion 4 UDW Facility Loan Documents").

41.     The $1.35 Billion 4 UDW Facility Credit Agreement provided for a $675 million Term Loan Facility and $675 million Revolving Facility (each as defined in the $1.35 Billion 4 UDW Facility Credit Agreement).  Seadrill Offshore AS (Norway), Seadrill Pegasus (S) Pte. Ltd. (Singapore), Seadrill Gemini Ltd. (Bermuda), Seadrill Orion Ltd. (Bermuda),  and Sea Dragon de Mexico S. de R.L. de C.V. (Mexico) have each provided, pursuant to clause 18 of the $1.35 Billion 4 UDW Facility Credit Agreement, an unconditional joint and several guaranty of the Guaranteed Obligations (as defined in the $1.35 Billion 4 UDW Facility Credit Agreement).

42.     Pursuant to the $1.35 Billion 4 UDW Facility Credit Loan Documents, the $1.35 Billion 4 UDW Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *West Pegasus*, *West Gemini*, and *West Orion*, (b) assignments of earnings,

earnings accounts, charterparties, and insurance policies with respect to *West Pegasus*, *West Gemini* and *West Orion*, (c) floating liens over all rights and movable assets of Sea Dragon de Mexico S. de R.L. de C.V. (Mexico) and (d) share charges or equity interest pledges over the shares in each drilling unit owner and intra-group charterer (collectively, the "$1.35 Billion 4 UDW Facility Collateral").

43.     ***$950 Million Eclipse/Carina Senior Secured Facility.***     Seadrill Limited (Bermuda), as borrower, the lenders party thereto from time to time (the "$950 Million Eclipse/Carina Facility Lenders"), Eksportkreditt Norge ASA, as GIEK lender and Nordea Bank AB, London Branch, as bookrunner, coordinator, facility agent and security agent (the "$950 Million Eclipse/Carina Facility Agent" and, together with the $950 Million Eclipse/Carina Facility Lenders, the "$950 Million Eclipse/Carina Facility Secured Parties"), are parties to that certain Senior Secured Credit Facility Agreement, dated as of January 26, 2015 (as amended, restated, supplemented and/or modified through the Petition Date, the "$950 Million Eclipse/Carina Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $950 Million Eclipse/Carina Facility Credit Agreement, the "$950 Million Eclipse/Carina Facility Loan Documents").

44.     The $950 Million Eclipse/Carina Facility Credit Agreement provided for the $190 million Carina ECA Facility, $60 million Carina Term Loan Facility, $250 million Carina Revolving Facility, $225 million Eclipse Term Loan Facility and $225 million Eclipse Revolving Facility (each as defined in the $950 Million Eclipse/Carina Facility Credit Agreement).  Seadrill Offshore AS (Norway), Seadrill Carina Ltd. (Bermuda) and Seadrill Eclipse Ltd. (Bermuda) have each provided, pursuant to clause 18 of the $950 Million Eclipse/Carina Facility Credit Agreement, an unconditional joint and several guaranty of the

Guarantee Obligations (as defined in the $950 Million Eclipse/Carina Facility Credit Agreement).

45.     Pursuant to the $950 Million Eclipse/Carina Facility Loan Documents, the $950 Million Eclipse/Carina Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *West Carina* and *West Eclipse*, (b) assignments of earnings, earnings accounts and insurance policies with respect to *West Carina* and *West Eclipse* and (c) share charges over shares of each drilling unit owner (collectively, the "$950 Million Eclipse/Carina Facility Collateral").

46.     ***$450 Million Jackup Senior Secured Facility.***  Seadrill Limited (Bermuda), as borrower, the lenders party thereto from time to time (the "$450 Million Jackup Facility Lenders") and Nordea Bank AB, London Branch, as bookrunner and agent (the "$450 Million Jackup Facility Agent" and, together with the $450 Million Jackup Facility Lenders, the "$450 Million Jackup Facility Secured Parties") are parties to that certain Senior Secured Credit Facility Agreement, dated as of August 26, 2015 (as amended, restated, supplemented and/or modified through the Petition Date, the "$450 Million Jackup Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $450 Million Jackup Facility Credit Agreement, the "$450 Million Jackup Facility Loan Documents").

47.     The $450 Million Jackup Facility Credit Agreement provided for the $225 million Term Loan Facility and $225 million Revolving Facility (each as defined in the $450 Million Jackup Facility Credit Agreement).   Seadrill Freedom Ltd. (Bermuda), Scorpion Rigs Ltd. (Bermuda), Scorpion Vigilant Ltd. (Bermuda), Scorpion Resolute Ltd. (Bermuda), Seadrill Prospero Ltd. (Bermuda), Seadrill Abu Dhabi Operations Ltd. (Bermuda), Seadrill Ariel Ltd.

(Liberia), Seadrill Jack Up I BV (Netherlands), Seadrill Jack Up II BV, Seadrill Labuan Ltd. (Labuan) and Seadrill Offshore Malaysia Sdn. Bhd. have each provided, pursuant to clause 18 of the $450 Million Jackup Facility Credit Agreement, an unconditional joint and several guaranty of the of the Guarantee Obligations (as defined in the $450 Million Jackup Facility Credit Agreement).

48.      Pursuant to the $450 Million Jackup Facility Loan Documents, the $450 Million Jackup Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *West Freedom, West Ariel*, *West Prospero*, *West Mischief*, *West Vigilant* and *West Resolute*, (b) assignments of earnings, earnings accounts and insurance policies with respect to *West Freedom, West Ariel*, *West Prospero*, *West Mischief*, *West Vigilant* and *West Resolute* and (c) share charges or equity interest pledges over the shares of each drilling unit owner and intra-group charterer (collectively, the "$450 Million Jackup Facility Collateral").

### 2.      Seadrill Limited Split Facilities.

49.      ***$440 Million China ECA Senior Secured Facility.***  Seadrill Limited (Bermuda), as borrower, the lenders party thereto from time to time (the "$440 Million China ECA Facility Lenders"), The Export-Import Bank of China and Citibank, N.A., London Branch, as bookrunners and mandated lead arrangers, Citibank Europe plc, UK Branch, as facility agent (the "$440 Million China ECA Facility Agent", and together with the $440 Million China ECA Facility Lenders, the "$440 Million China ECA Facility Secured Parties"), and Citibank N.A., London Branch, as security agent, are parties to that certain Secured Credit Facility Agreement, dated as of December 4, 2012 (as amended, restated, supplemented and/or modified through the Petition Date, the "$440 Million China ECA Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $440 Million China ECA Facility Credit Agreement, the "$440 Million China ECA Facility Loan Documents").

50.     The $440 Million China ECA Facility Credit Agreement provided for a $308 million CEXIM Facility and $132 million Commercial Facility (each as defined in the $440 Million China ECA Facility Credit Agreement).  Seadrill UK Ltd. (England) and Seadrill Telesto Ltd. (Bermuda) have each provided, pursuant to clause 18 of the $440 Million China ECA Facility Credit Agreement, an unconditional joint and several guaranty of the Guarantee Obligations (as defined in the $440 Million China ECA Facility Credit Agreement).

51.     Pursuant to the $440 Million China ECA Facility Loan Documents, the $440 Million China ECA Facility Secured Parties were granted (a) a first priority lien on, and security interest in, the Rig *West Telesto*, (b) assignments of earnings, earnings accounts, charterparties and insurance policies with respect to *West Telesto* and (c) and a share charge over the shares of the drilling unit owner.  The $440 Million China ECA Facility Secured Parties also benefit from (a) second priority liens on and security interests in Rigs *T-15* and *T-16* and (b) assignment of earnings, earnings accounts, charterparties and insurance policies with respect to Rigs *T-15* and *T-16* (collectively, the "$440 Million China ECA Facility Collateral").

52.     ***US $1,450,000,000 Tellus Senior Secured Credit Facility.***  Seadrill Tellus Ltd. (Bermuda), as borrower, the lenders party thereto from time to time (the "Tellus Credit Facility Lenders"), ING Bank N.V., as facility agent, security agent, documentation agent, commercial coordinator commercial and bookrunner  (the "Tellus Credit Facility Agent", and together with the Tellus Credit Facility Lenders, the "Tellus Credit Facility Secured Parties") and HSBC Bank plc, as ECA Coordinator and ECA bookrunner are parties to that certain Senior Secured Credit Facility Agreement, dated as of March 20, 2013 as set out in Schedule 2 (Amended and Restated Tellus Facility Agreement) of the Third Amendment and Restated Agreement, dated 16 August 2017 between, amongst others, Seadrill Tellus Ltd. And Seadrill Vela Hungary Kft, as

borrowers, and ING Bank N.V., as agent (as amended, restated, supplemented and/or modified through the Petition Date, the "Tellus Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the Tellus Credit Agreement, the "Tellus Facility Loan Documents").

53.     The Tellus Credit Agreement provided for the $67,666,666.67 Commercial Facility, $191,666,666.67 GIEK Lender Facility, $112,000,000 KEXIM Facility and $112,000,000 K-sure Facility (each as defined in the Tellus Credit Agreement).  Seadrill Limited (Bermuda), Seadrill Tellus Ltd. (Bermuda) and Seadrill Offshore AS have each provided, pursuant to clause 18 of the Tellus Credit Agreement, an unconditional joint and several guaranty of the Guarantee Obligations (as defined in the Tellus Credit Agreement).

54.     Pursuant to the Tellus Facility Loan Documents, the Tellus Credit Facility Secured Parties were granted (a) a first priority lien on, and security interest in, the Rig *West Tellus*, (b) assignment of earnings, earnings accounts, charterparties and insurance policies with respect to *West Tellus* and (c) a share charge over shares of the borrower (collectively, the "Tellus Credit Facility Collateral").

### 3.     NADL Facility (Seadrill Limited Guaranteed).

55.     ***$2 Billion NADL Senior Secured Facility.***     North Atlantic Drilling Ltd. (Bermuda), as borrower, the lenders party thereto from time to time (the "$2 Billion NADL Facility Lenders") and DNB Bank ASA, as agent (the "$2 Billion NADL Facility Agent" and, together with the $2 Billion NADL Facility Lenders, the "$2 Billion NADL Facility Secured Parties") are parties to that certain Senior Secured Credit Facility Agreement, dated as of April 15, 2011 (as amended, restated, supplemented and/or modified through the Petition Date, the "$2.0 Billion NADL Facility Credit Agreement" and, together with each of the Finance

Documents and Security Documents, each as defined in the $2.0 Billion NADL Facility Credit Agreement, the "$2.0 Billion NADL Facility Loan Documents").

56.     The $2.0 Billion NADL Facility Credit Agreement provided for the $1 billion Term Loan Facility and $1 billion Revolving Facility (each as defined in the $2.0 Billion NADL Facility Credit Agreement).  Seadrill Limited, North Atlantic Alpha Ltd. (Bermuda), North Atlantic Norway Ltd., Norwegian branch (Norway), North Atlantic Elara Ltd (Bermuda), North Atlantic Epsilon Ltd. (Bermuda), North Atlantic Navigator Ltd. (Bermuda), North Atlantic Venture Ltd. (Bermuda), North Atlantic Phoenix Ltd. (Bermuda) and North Atlantic Drilling UK Ltd (Scotland) have each provided, pursuant to clause 18 of the $2.0 Billion NADL Facility Credit Agreement, unconditional joint and several Guarantees (as defined in the $2.0 Billion NADL Facility Credit Agreement).

57.     Pursuant to the $2.0 Billion NADL Facility Loan Documents, the $2.0 Billion NADL Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *West Alpha*, *West Elara*, *West Epsilon*, *West Navigator*, *West Phoenix* and *West Venture*, (b) assignments of earnings, earnings accounts, charterparties and insurance policies with respect to *West Alpha*, *West Elara*, *West Epsilon*, *West Navigator*, *West Phoenix* and *West Venture* and (c) share charges over shares of each drilling owner (collectively, the "$2.0 Billion NADL Facility Collateral").

### 4.     AOD Facility (Seadrill Limited Guaranteed).

58.     ***$360 Million AOD Senior Secured Facility.***  Asia Offshore Rig 1 Limited (Bermuda), Asia Offshore Rig 2 Limited (Bermuda) and Asia Offshore Rig 3 Limited (Bermuda), as borrowers, the lenders party thereto from time to time (the "$360 Million AOD Facility Lenders"), and ABN AMRO Bank, N.V., Oslo Branch, as agent, coordinating bank and bookrunner (the "$360 Million AOD Facility Agent" and, together with the $360 Million AOD

Facility Lenders, the "$360 Million AOD Facility Secured Parties") are parties to that certain Senior Secured Credit Facility Agreement, dated as of April 9, 2013 (as amended, restated, supplemented and/or modified through the Petition Date, the "$360 Million AOD Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $360 Million AOD Facility Credit Agreement, the "$360 Million AOD Facility Loan Documents").

59.     The $360 Million AOD Facility Credit Agreement provided for three senior secured term loan tranches of up to $120 million each.  Seadrill Limited (Bermuda), Seadrill GCC Operations Ltd. (Bermuda) and Asia Offshore Drilling Limited (Bermuda) have each provided, pursuant to clause 18 of the $360 Million AOD Facility Credit Agreement, an unconditional joint and several guaranty of the Guarantee Obligations (as defined in the $360 Million AOD Facility Credit Agreement).

60.     Pursuant to the $360 Million AOD Facility Loan Documents, the $360 Million AOD Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *AOD I*, *AOD II* and *AOD III*, (b) assignments of earnings, earnings accounts and insurance policies with respect to *AOD I*, *AOD II* and *AOD III* and (c) share charges over shares of each borrower (collectively, the "$360 Million AOD Facility Collateral").

### 5.     Sevan Facility (Seadrill Limited Guaranteed).

61.     ***$1.75 Billion Sevan Senior Secured Facility.***  Sevan Brasil Ltd. (Bermuda), Sevan Driller Ltd. (Bermuda), Sevan Drilling Rig VI Pte. Ltd. (Singapore) and Sevan Louisiana Hungary Kft (Hungary), as borrowers, the lenders party thereto from time to time (the "$1.75 Billion Sevan Facility Lenders") and ING Bank N.V., as agent, GIEK agent and coordinator (the "$1.75 Billion Sevan Facility Agent" and, together with the $1.75 Billion Sevan Facility Lenders, the "$1.75 Billion Sevan Facility Secured Parties") are parties to that certain Senior

Secured Credit Facility Agreement, dated as of September 30, 2013 (as amended, restated, supplemented and/or modified through the Petition Date, the "$1.75 Billion Sevan Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $1.75 Billion Sevan Facility Credit Agreement, the "$1.75 Billion Sevan Facility Loan Documents").

62.     The $1.75 Billion Sevan Facility Credit Agreement provided for Commercial Facilities and GIEK Facilities (each as defined in the $1.75 Billion Sevan Facility Credit Agreement).  Seadrill Limited (Bermuda), Sevan Drilling Rig II AS (Norway), Sevan Drilling Limited (Scotland), Sevan Drilling North America LLC (Texas), Sevan Brasil Ltd. (Bermuda), Sevan Driller Ltd. (Bermuda) and Sevan Louisiana Hungary Kft. (Hungary) have each provided, pursuant to clause 18 of the $1.75 Billion Sevan Facility Credit Agreement, an unconditional joint and several guaranty of the Guarantee Obligations (as defined in the $1.75 Billion Sevan Facility Credit Agreement).

63.     Pursuant to the $1.75 Billion Sevan Facility Loan Documents, the $1.75 Billion Sevan Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *Sevan Brazil*, *Sevan Driller, Sevan Louisiana and Sevan Developer*, (b) assignments of earnings, earnings accounts, charterparties and insurance policies with respect to *Sevan Brazil*, *Sevan Driller, Sevan Louisiana and Sevan Developer* and (c) share charges or equity interest pledges over the shares of the borrowers and intra-group charterers (collectively, the "$1.75 Billion Sevan Facility Collateral").

**B.     Unsecured Bonds.**

64.     The Debtors are also obligated under the following six issuances of Unsecured Bonds—four issued by Seadrill Limited and two issued by NADL (only one of which is guaranteed by Seadrill Limited).

34

1.      **Seadrill Limited Unsecured Bonds.**

65.     ***$1.00 billion bond due 2017 ("Maturing Bonds").***   On September 14, 2012, Seadrill Limited issued $1.0 billion of 5.625% senior unsecured notes due September 2017.  The notes are governed by that certain indenture, dated September 14, 2012, among Seadrill Limited, as issuer, and Deutsche Bank Trust Company Americas, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the notes.

66.     ***NOK 1.80 billion (approx. $233 million) bond due 2018.***   On March 12, 2013, Seadrill issued NOK 1.8 billion of senior unsecured notes due March 2018.  The notes are governed by that certain bond agreement, dated March 11, 2013, among Seadrill Limited, as issuer, and Norsk Tillitsmann ASA, as indenture trustee.   No other Debtor entity guarantees or is otherwise obligated under the notes.

67.     ***SEK 1.50 billion (approx. $192 million) bond due 2019.***   On March 18, 2014, Seadrill Limited issued SEK 1.5 billion of senior unsecured notes due March 2019.  The notes are governed by that certain bond agreement, dated March 17, 2014, among Seadrill Limited, as issuer, and Norsk Tillitsmann ASA, as indenture trustee.   No other Debtor entity guarantees or is otherwise obligated under the notes.

68.     ***$500 million bond due 2020.***   On September 25, 2013, Seadrill Limited issued $500 million of 6.125% senior unsecured notes due September 2020.  The notes are governed by that certain indenture, dated September 25, 2013, among Seadrill Limited, as issuer, and Deutsche Bank Trust Company Americas, as indenture trustee.   No other Debtor entity guarantees or is otherwise obligated under the notes.

2.      **NADL Unsecured Bonds.**

69.     ***NOK 1.5 billion (approx. $194 million) bond due 2018.***   On October 30, 2013, NADL issued NOK 1.5 billion of senior unsecured notes due October 2018.  The notes are

governed by that certain bond agreement, dated October 30, 2013, among NADL, as issuer, and Norsk Tillitsmann ASA, as indenture trustee, as amended by that certain First Amendment and Restatement Agreement, dated February 13, 2015, among NADL, as issuer, and Nordic Trustee ASA, as indenture trustee.  The obligations under the notes are unsecured and are fully and unconditionally guaranteed on a senior unsecured basis by Seadrill Limited pursuant to that certain On Demand Guarantee, dated February 13, 2015, among Seadrill Limited, as guarantor, and Nordic Trustee ASA as bond trustee.

70.    ***$600 million bond due 2019.***  On January 31, 2014, NADL issued $600 million of 6.25% senior unsecured notes due January 2019.  The notes are governed by that certain indenture, dated January 31, 2014, among NADL, as issuer, and Deutsche Bank Trust Company Americas, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the notes.

71.    ***$90 Million Danske Facility***.  Seadrill Limited (Bermuda), as customer, and Danske Bank, Norwegian branch, as bank ("Danske"), are parties to that certain Group Cash Management Agreement, dated as of March 6, 2013 (as amended, restated, supplemented and/or modified through the Petition Date, the "Danske Cash Management Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the Danske Cash Management Agreement, the "Danske Facility Loan Documents").

72.    Pursuant to the Danske Facility Loan Documents, Danske was granted (a) a first priority pledge over Seadrill's shares in North Atlantic Drilling Ltd. and in Archer Limited, Bermuda, with Bermuda registration number 40612, registered in a Norwegian securities account held with Danske and (b) a first priority security interest in the Danske Collateral Account (as defined in the Cash Management Order) (collectively, the "Danske Facility Collateral").

### The Debtors' Immediate Need for Cash

73.     The Debtors have historically used cash on hand and cash flow from operations to fund rig operating costs, rig maintenance, mobilization costs, capital expenditures, and for other working capital and general corporate purposes.  As set forth in the First Day Declarations and described herein, the Debtors require immediate access to Cash Collateral.

74.     Using Cash Collateral to fund the continued operation of the Debtors' businesses will facilitate the preservation of the Prepetition Secured Parties' Collateral while maximizing the value of the Debtors' enterprise to the benefit of all stakeholders.  In exchange for the use of Cash Collateral, and following a series of hard fought and arm's length negotiations, the Debtors and the Prepetition Secured Parties have agreed upon the terms of adequate protection to protect the Prepetition Secured Parties' collateral during the pendency of these chapter 11 cases, which is described in great detail above.  The Debtors anticipate that cash on hand and revenue earned from postpetition operations will be sufficient to fund all payments contemplated by the Debtors' first day motions and the Debtors' postpetition operating and restructuring-related expenses.

75.     Absent entry of the Orders, the Debtors would be unable to generate revenue, operate their businesses, or pay the thousands of individuals who report to work each day.  Indeed, without access to sufficient cash, the Debtors would potentially have to suspend operations, materially damaging the Debtors' business reputation and relationships with their customers and potentially triggering termination rights under the Debtors' drilling contracts, which are the primary source of income for the businesses.  Further, there can be no guarantee that if the Debtors were to temporarily suspend operations that such operations could be resumed once the Debtors' access to cash was restored.  In the current hypercompetitive off-shore drilling market and with the abundance of idle rigs in the worldwide fleet, such a result would be disastrous for the Debtors' businesses and materially harm the Debtors' efforts to reorganize and

preserve the value of their estates for their constituents.  For these reasons, entry of the Orders is in the best interests of the Debtors, their creditors, and all other parties in interest.

### Entry into the Danske Guarantee Facility

76.     As described above, Danske Bank has issued approximately $60 million of obligations under the Danske Guarantee Facility secured by the Danske Guarantee Facility Collateral.  These secured obligations will remain prepetition claims; however, under the Orders, the Debtors have waived the automatic stay to allow Danske Bank access to the cash collateral underlying the secured claims in the event of a default (other than the defaults subject to section 365 of the Bankruptcy Code).

77.     To facilitate continued access to the approximately $30 in remaining availability under the Danske Guarantee Facility, the Interim Order provides that such postpetition obligations will be conferred administrative expense status.  The Debtors contemplate that under their proposed chapter 11 plan, both the prepetition and postpetition obligations conferred under the Danske Guarantee Facility will be encapsulated in a new amended and restated guarantee facility.

78.     Access to the Danske Guarantee Facility is critical to the Debtors' continued business operations.  The Debtors use the Danske Guarantee Facility as financing for the issuance of performance guarantees that secure obligations under certain of the Debtors' customer contracts and as well as obligations in connection with the Debtors' bids on new drilling contracts. These performance guarantees take the form of guarantee or bid bonds and are analogous to letters of credit or other similar instruments.  In most cases, the Debtors' customers require these performance guarantees in the ordinary course of business as a prerequisite to entering into new customer contracts.

79.     The Debtors anticipate that customers will require the Debtors to provide new guarantees in connection with new postpetition customer contracts.  Thus, without continued access to the remaining availability under the Danske Guarantee Facility, the Debtors may be unable to attract, seek, and enter into new customer contracts.  The failure to execute postpetition customer contracts would jeopardize the Debtors' commercial future and potentially destroy value in these chapter 11 cases.

80.     As a result, it is critical to the Debtors' businesses that they have access to the remaining availability under the Danske Bank Guarantee Facility to ensure that the Debtors are able to enter into new customer contracts in the ordinary course of business.  This will, in turn, maximize value for all of the Debtors' stakeholders, including the Bank Facility lenders.  For these reasons, granting this relief is in the best interests of the Debtors, their creditors and all other parties in interest.

## Basis for Relief

## I.     The Use of Cash Collateral is Warranted and Should be Approved.

81.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code,[9] which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the

---

[9]     Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

estate in the ordinary course of business without notice or a hearing.

82.     11 U.S.C. § 363(c)(1).  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

83.     It is essential to the Debtors' businesses and successful reorganization that they have sufficient funds to operate their businesses, including funding the continued operation of their rigs in the ordinary course pursuant to their performance obligations under current and future customer contracts.  Absent the use of Cash Collateral, the Debtors would not have sufficient working capital to satisfy ordinary operating costs associated with their rigs, nor would they be able to make payments to employees, vendors, or suppliers.

84.     Importantly, the Prepetition Facility Secured Parties have consented to the Debtors' use of Cash Collateral in exchange for the negotiated adequate protection provided for in the Orders.  The Debtors respectfully submit that they have satisfied the standards of section 363(c)(2) of the Bankruptcy Code, the use of Cash Collateral is in the best interests of the Debtors' estates, and the Orders should be approved.

## II.     The Debtors' Proposed Grant of Adequate Protection to Use Cash Collateral is Appropriate.

85.     Section 363(c)(2) of the Bankruptcy Code provides that, absent consent, a debtor may use cash collateral where "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2)(A)-(B).  Section 363(e) of the Bankruptcy Code requires that the debtor adequately protect the secured creditors' interest in property to be used by a debtor against any diminution in value of such interest resulting from the debtor's use of the property during the chapter 11 proceedings.

40

86.     Generally, what constitutes sufficient adequate protection is decided on a case-by-case basis.  *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992).  By adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.  *See In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).  Adequate protection can come in various forms, including the payment of adequate protection fees, payment of interest, and granting of replacement liens.

87.     As described above, the Debtors propose to provide the Prepetition Facility Secured Parties with an adequate protection package that sufficiently protects their collateral during the pendency of the chapter 11 cases, and is consented to by the Prepetition Facility Secured Parties.  As detailed herein, the adequate protection package includes the grant of adequate protection liens and superpriority claims, payment of ongoing interest, payment of the Prepetition Facility Secured Parties professionals' fees and expenses, providing ongoing reporting, and adhering to certain budgeting obligations.  This is a robust adequate protection package and provides more than sufficient protection for the Prepetition Facility Secured Parties' collateral.  Courts generally have authorized the use of cash collateral where the continued use of the cash collateral will preserve the value of the secured creditors' collateral.  *See, e.g.*, *In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that debtor's use of cash collateral from shopping center to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor).

88.     For the reasons detailed herein and in the First Day Declarations, the Debtors submit that the adequate protection proposed for the benefit of the Prepetition Facility Secured Parties is necessary and appropriate and satisfies the standards under section 363(c)(2) of the Bankruptcy Code.  Courts in this district have granted similar relief in other recent chapter 11 cases.  *See*, *e.g.*, *In re Memorial Production Partners LP*, No. 17-30262 (MI) (Bankr. S.D. Tex. Jan. 17, 2017); *In re LINN Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 13, 2016); *In re Midstates Petrol. Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 15, 2016); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014); *In re ATP Oil and Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 17, 2012); *In re MPF Holdings US LLC*, No. 08-36084 (JB) (Bankr. S.D. Tex. Feb. 18, 2009).[10]

## III.     The Scope of the Carve Out is Appropriate.

89.     The proposed adequate protection is subject to the Carve Out contained in the Orders.  Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve Out protects against administrative insolvency during the course of these chapter 11 cases

---

[10]     Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion.  Copies of these orders are available upon request of the Debtors' counsel.

by ensuring that assets remain for the payment of the Clerk of the Court or U.S. Trustee fees and professional fees of the Debtors and a statutory committee.

## IV.     The Debtors Should Be Authorized to Access the Danske Guarantee Facility.

90.     The Court should authorize the Debtors, as an exercise of sound business judgment, to use the Danske Guarantee Facility on a postpetition basis.  Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See*, *e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

91.     Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

92.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

93.     As set forth in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor and Incur Obligations Under Customer Contracts and (B) Obtain New Customer Contracts and (II) Granting Related Relief*, the Debtors anticipate that customers will require the Debtors to provide new guarantees in connection with new postpetition customer contracts.  Thus, without Danske Guarantee Facility, the Debtors may be unable to attract, seek, and enter into new customer contracts.  The failure to execute postpetition customer contracts would jeopardize the Debtors' commercial future and potentially destroy value in these chapter 11 cases.  Accordingly, the Court should authorize the Debtors' access to the Danske Guarantee Facility on a postpetition basis as it is a reasonable exercise of the Debtors' business judgment.

94.     Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Consent by the applicable secured creditors obviates the need to show adequate protection.  *See, e.g.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those

[undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  The Debtors propose to grant Danske Bank a *pari passu* lien on the Danske Guarantee Facility Collateral for all obligations incurred under the Danske Guarantee Facility on a postpetition basis and confer administrative expenses status to any postpetition obligations issued thereunder.  Danske Bank has consented to this arrangement on the terms set forth in the Order.  This arrangement essentially results in a bifurcation of the Danske Guarantee Facility in a manner that allows the Debtors to continue to issue critical performance guarantees, while protecting the rights of Danske Bank, the Debtors' primary cash management bank and an institution with which the Debtors have a long-standing relationship.  Accordingly, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

**V.      The Automatic Stay Should Be Modified on a Limited Basis.**

95.      The proposed Orders provide that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified as necessary to effectuate the terms and provisions of the Interim Order.  The Interim Order further provides that the automatic stay is modified and vacated to the extent necessary to:  (a) permit the Debtors to grant the Adequate Protection Liens and incur the Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as may be needed to assure the perfection and priority of the liens granted in the Interim Order; (c) permit the Debtors to incur all liabilities and obligations under the terms of this Interim Order; (d) authorize the Debtors to pay, and the respective Prepetition Facility Agents to retain and apply, any payments made in accordance with the terms of the Interim Order.

96.      The Debtors have determined, in an exercise of their business judgment that such stay modification is appropriate under the circumstances, in the context of a negotiated, consensual cash collateral order.  Further, stay modifications of this kind are ordinary, and are

reasonable and fair under the circumstances of these chapter 11 cases.  Courts in this district have granted similar relief in other recent chapter 11 cases.  *See*, *e.g.*, *In re Memorial Production Partners LP*, No. 17-30262 (MI) (Bankr. S.D. Tex. Jan. 17, 2017); *In re LINN Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 13, 2016); *In re Midstates Petrol. Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 15, 2016); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014); *In re ATP Oil and Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 17, 2012); *In re MPF Holdings US LLC*, No. 08-36084 (JB) (Bankr. S.D. Tex. Feb. 18, 2009).

## VI.    Interim Relief Should be Granted.

97.    Bankruptcy Rule 4001(b) and (c) provide that a final hearing on a motion to use Cash Collateral or to obtain credit may not be commenced earlier than 14 days after service of such motion.  The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such 14-day period and to authorize the use of cash collateral and postpetition credit where, as here, such relief is necessary to avoid immediate and irreparable harm to the debtor's estate.  *See* Bankruptcy Rule 4001(b)(2). Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).

98.    Pending the final hearing, the Debtors require immediate access to Cash Collateral and the Danske Guarantee Facility.  The Debtors' use of Cash Collateral is necessary to satisfy the day-to-day working capital needs of the Debtors' business operations.  Without use of the Cash Collateral, the Debtors will be unable to fund their payroll or operate their rigs pursuant to the terms of their existing customer contracts.  The Debtors will also not be able to

pay their vendors, and their vendors may cease providing goods and services to the Debtors on credit.  Similarly, the Debtors require use of the Danske Guarantee Facility to issue obligations in connection with entry into new customer contracts.  The Debtors' ability to finance their operations through Cash Collateral and enter into new customer contracts is vital to the confidence of the Debtors' employees, suppliers, and customers and to the preservation and maintenance of the value of the Debtors' estates.  The Debtors, therefore, seek immediate authority to use the Cash Collateral and the Danske Guarantee Facility as set forth in this Motion and in the Interim Order to prevent immediate and irreparable harm to the Debtors' estates pending the final hearing pursuant to Bankruptcy Rule 4001(b) and (c).

99.    In light of the foregoing, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 4001(b) and (c) to support immediate access to Cash Collateral and the Danske Guarantee Facility pending the entry of the Final Order, and respectfully request that the Court grant the relief requested herein and authorize the immediate use of the Case Collateral pursuant to the terms and conditions set forth in the Interim Order.

### Emergency Consideration

100.    Pursuant to Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  Accordingly, the Debtors submit

47

that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

101.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

102.    Nothing contained herein is intended or should be construed as (a) an admission as to the validity or priority of any claim or lien against the Debtors, (b) a waiver of the Debtors' rights to subsequently dispute such claim or lien on any grounds, (c) a promise or requirement to pay any prepetition claim, (d) an implication or admission that any particular claim is of a type specified or defined in the Motion or this Interim Order, (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

### Notice

103.    Notice of the hearing on the relief requested in the Motion has been provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Local Rules, and is sufficient under the circumstances. Without limiting the forgoing, due notice was afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including (a) the Office of the United States Trustee for the Southern District of Texas; (b) entities listed as holding the 50 largest unsecured claims against the Debtors (on a

consolidated basis); (c) the agents for each of the Debtors' secured credit facilities; (d) the Committee of Coordinators appointed under and as defined in that certain appointment letter dated April 20, 2016, among Seadrill Limited and each member thereof, as amended, restated, supplemented, or otherwise modified from time to time (the "Bank CoCom"); (e) the indenture trustee for each of the Debtors' unsecured notes; (f) the commitment parties under that certain Investment Agreement dated September 12, 2017, among Seadrill Limited and the commitment parties thereto (the "Commitment Parties"); (g) counsel to the parties referenced in clauses (c) to (f); (h) the Office of the United States Attorney for the Southern District of Texas; (i) the state attorneys general for states in which the Debtors conduct business; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.


[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Victoria, Texas
September 12, 2017

/s/ *Jennifer F. Wertz*

| | |
|---|---|
| **JACKSON WALKER L.L.P.** | **KIRKLAND & ELLIS LLP** |
| Patricia B. Tomasco (TX Bar No. 01797600) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Matthew D. Cavenaugh (TX Bar No. 24062656) | Anna G. Rotman, P.C. (TX Bar No. 24099361) |
| 1401 McKinney Street, Suite 1900 | Brian E. Schartz (TX Bar No. 24046761) |
| Houston, Texas 77010 | 609 Main Street |
| Telephone:     (713) 752-4284 | Houston, Texas 77002 |
| Facsimile:     (713) 308-4184 | Telephone:     (713) 836-3600 |
| Email:          ptomasco@jw.com | Facsimile:     (713) 836-3601 |
|                     mcavenaugh@jw.com | Email:          anna.rotman@kirkland.com |
| | brian.schartz@kirkland.com |

-and-                                                                              -and-

Jennifer F. Wertz (TX Bar No. 24072822)                 James H.M. Sprayregen, P.C.
100 Congress Avenue, Suite 1100                          (*pro hac* vice admission pending)
Austin, Texas 78701                                              Anup Sathy, P.C. (*pro hac* vice admission pending)
Telephone:     (512) 236-2247                               Ross M. Kwasteniet, P.C. (*pro hac* vice admission pending)
Facsimile:     (512) 391-2147                                Adam C. Paul (*pro hac* vice admission pending)
Email:          jwertz@jw.com                                 300 North LaSalle Street
                                                                          Chicago, Illinois 60654
-and-                                                                 Telephone:     (312) 862-2000
                                                                          Facsimile:     (312) 862-2200
Rachel Biblo Block (TX Bar No. 24097382)               Email:          james.sprayregen@kirkland.com
2323 Ross Avenue, Suite 600                                                     anup.sathy@kirkland.com
Dallas, Texas 75201                                                               ross.kwasteniet@kirkland.com
Telephone:     (214) 953-6070                                                  adam.paul@kirkland.com
Facsimile:     (214) 661-6810
Email:          rblock@jw.com                                 *Proposed Co-Counsel to the Debtors*
                                                                          *and Debtors in Possession*
*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

      I certify that on September 12, 2017, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                        */s/ Jennifer F. Wertz*
                                         Jennifer F. Wertz