# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SEADRILL LIMITED, *et al.*,[1] | ) Case No. 17-60079 (DRJ) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DISCLOSURE STATEMENT RELATING TO THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SEADRILL LIMITED AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**JACKSON WALKER L.L.P.**
Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 19010
Houston, Texas 77010
Telephone:     (713) 752-4284
Facsimile:     (713) 308-4184
Email:     ptomasco@jw.com
     mcavenaugh@jw.com

-and-

Jennifer F. Wertz (TX Bar No. 24072822)
100 Congress Avenue, Suite 1100
Austin, Texas 78701
Telephone:     (512) 236-2247
Facsimile:     (512) 391-2147
Email:     jwertz@jw.com

-and-

Rachel Biblo Block (TX Bar No. 24097382)
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone:     (214) 953-6070
Facsimile:     (214) 661-6810
Email:     rblock@jw.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anna G. Rotman, P.C. (TX Bar No. 24099361)
Brian E. Schartz (TX Bar No. 24046761)
609 Main Street
Houston, Texas 77002
Telephone:     (713) 836-3600
Facsimile:     (713) 836-3601
Email:     anna.rotman@kirkland.com
     brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C.
(*pro hac* vice admission pending)
Anup Sathy, P.C. (*pro hac* vice admission pending)
Ross M. Kwasteniet, P.C. (*pro hac* vice admission pending)
Adam C. Paul (*pro hac* vice admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:     james.sprayregen@kirkland.com
     anup.sathy@kirkland.com
     ross.kwasteniet@kirkland.com
     adam.paul@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

---

[1]   Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/Seadrill.  The location of Debtor Seadrill Americas, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 11025 Equity Drive, Suite 150, Houston, Texas 75201.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[2]

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS ENTITLED TO VOTE FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF SEADRILL LIMITED AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS, CERTAIN HOLDERS OF CLAIMS, AND CERTAIN COMMITMENT PARTIES THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF APPROXIMATELY 97 PERCENT OF THE CLAIMS ARISING UNDER THE BANK FACILITIES AND HOLDERS OF MORE THAN 40 PERCENT OF THE UNSECURED BONDS. THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY

---

[2] Capitalized terms used but not defined in this disclaimer shall have the meaning ascribed to them elsewhere in this Disclosure Statement.

DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RSA.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VIII, ENTITLED "RISK FACTORS," WHICH BEGINS ON PAGE 50, BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

UPON CONFIRMATION OF THE PLAN, CERTAIN (BUT NOT ALL) OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.  OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS.  TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;
- TECHNOLOGY;
- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;
- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;
- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;
- OIL AND NATURAL GAS PRICES AND THE OVERALL HEALTH OF THE OIL AND NATURAL GAS INDUSTRY;
- FUTURE DEMAND FOR OFFSHORE DRILLING SERVICES;
- THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES;
- AVAILABILITY AND TERMS OF CAPITAL;
- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;
- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;
- COSTS OF CONDUCTING THE DEBTORS' OTHER OPERATIONS;
- GENERAL ECONOMIC AND BUSINESS CONDITIONS;
- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;
- ENVIRONMENTAL LIABILITIES;
- COUNTERPARTY CREDIT RISK;
- THE OUTCOME OF PENDING AND FUTURE LITIGATION;
- GOVERNMENTAL REGULATION AND TAXATION OF THE OIL AND NATURAL GAS INDUSTRY;
- DEVELOPMENTS IN OIL-PRODUCING AND NATURAL GAS-PRODUCING COUNTRIES;
- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;
- PLANS, OBJECTIVES, AND EXPECTATIONS;
- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;
- RISKS IN CONNECTION WITH ACQUISITIONS;
- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS; AND
- THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION OR PRICE PRESSURE BY CUSTOMERS; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ........................................................................................................1

II.     PRELIMINARY STATEMENT ................................................................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        PLAN ..........................................................................................................................5

        A.    What is chapter 11? ...........................................................................................5
        B.    Why are the Debtors sending me this Disclosure Statement? ............................5
        C.    Am I entitled to vote on the Plan? .....................................................................6
        D.    What will I receive from the Debtors if the Plan is consummated? ...................8
        E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim or a
              Priority Tax Claim? .........................................................................................15
        F.    Are any regulatory approvals required to consummate the Plan? ....................16
        G.    What happens to my recovery if the Plan is not confirmed or does not go effective? ..................17
        H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
              Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
              "Consummation?" .............................................................................................17
        I.    Is there potential litigation related to the Plan? ..............................................17
        J.    Will the final amount of Allowed Unsecured Claims affect the recovery of holders of
              Allowed Unsecured Claims under the Plan? ...................................................17
        K.    How will the preservation of the Causes of Action impact my recovery under the Plan? .............18
        L.    Will there be releases and exculpation granted to parties in interest as part of the Plan? .............19
        M.    What is the deadline to vote on the Plan? .......................................................21
        N.    How do I vote for or against the Plan? ............................................................21
        O.    Why is the Bankruptcy Court holding a Confirmation Hearing? .....................21
        P.    When is the Confirmation Hearing set to occur? ............................................21
        Q.    What is the purpose of the Confirmation Hearing? ..........................................22
        R.    What is the effect of the Plan on the Debtors' ongoing businesses? ...............22
        S.    What are the Notes Rights Offering and the Equity Rights Offerings? ...........22
        T.    Who do I contact if I have additional questions with respect to this Disclosure Statement
              or the Plan? .....................................................................................................22
        U.    Do the Debtors recommend voting in favor of the Plan? .................................23
        V.    Who Supports the Plan? ..................................................................................23

IV.     THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN ................................23

        A.    Restructuring Support Agreement ...................................................................23
        B.    The Plan ..........................................................................................................27

V.      THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ..........30

        A.    Seadrill's Corporate History ...........................................................................30
        B.    Seadrill's Operations ......................................................................................36
        C.    The Debtor's Prepetition Capital Structure .....................................................38

VI.     EVENTS LEADING TO THE CHAPTER 11 FILINGS ......................................................43

        A.    Market Decline and Industry-Specific Challenges ..........................................43
        B.    Proactive Approach to Addressing Liquidity Constraints ................................44
        C.    Creditor Negotiations, Bank Deal, Capital Raise Process, and Chapter 11 Filing ....................45
        D.    Independent Investigation ................................................................................46
        E.    Bermuda Proceedings .....................................................................................46

| VII. | MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES | 47 |
|---|---|---|
| | A. Corporate Structure upon Emergence | 47 |
| | B. Expected Timetable of the Chapter 11 Cases | 47 |
| | C. First Day Relief | 47 |
| | D. Other Procedural and Administrative Motions | 48 |
| | E. Schedules and Statements | 48 |
| | F. [Appointment of Official Committee] | 48 |
| | G. Litigation Matters | 48 |
| | H. Postpetition Marketing Process | 49 |
| VIII. | RISK FACTORS | 50 |
| | A. Bankruptcy Law Considerations | 50 |
| | B. Risks Related to Recoveries under the Plan | 54 |
| | C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses | 56 |
| IX. | SOLICITATION AND VOTING PROCEDURES | 61 |
| | A. Holders of Claims Entitled to Vote on the Plan | 62 |
| | B. Voting Record Date | 62 |
| | C. Voting on the Plan | 62 |
| | D. Ballots Not Counted | 63 |
| X. | RIGHTS OFFERING PROCEDURES | 63 |
| XI. | CONFIRMATION OF THE PLAN | 64 |
| | A. Requirements for Confirmation of the Plan | 64 |
| | B. Best Interests of Creditors/Liquidation Analysis | 64 |
| | C. Feasibility | 65 |
| | D. Acceptance by Impaired Classes | 65 |
| | E. Confirmation without Acceptance by All Impaired Classes | 66 |
| | F. Valuation of the Debtors | 66 |
| XII. | CERTAIN SECURITIES LAW MATTERS | 67 |
| | A. Issuance of Securities under the Plan | 67 |
| | B. Subsequent Transfers of Securities Issued under the Plan | 67 |
| XIII. | CERTAIN UNITED STATES FEDERAL INCOME TAX AND BERMUDA TAX CONSEQUENCES OF THE PLAN | 68 |
| | A. Introduction | 68 |
| | B. Certain U.S. Federal Income Tax Consequences to the Debtors | 70 |
| | C. Bermuda Tax Consequences to the Debtors | 72 |
| | D. Certain U.S. Federal Income Tax Consequences to the Holders of Certain Claims | 72 |
| | E. Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims | 84 |
| | F. Information Reporting and Back-up Withholding | 84 |
| | G. FATCA | 85 |
| XIV. | RECOMMENDATION | 86 |

**EXHIBITS**

EXHIBIT A     Plan of Reorganization

EXHIBIT B     Restructuring Support and Lock-Up Agreement

EXHIBIT C     Corporate Organization Chart

EXHIBIT D     Disclosure Statement Order

EXHIBIT E     Rights Offering Procedures

EXHIBIT F     Liquidation Analysis

EXHIBIT G     Financial Projections

EXHIBIT H     Valuation Analysis

## I.      INTRODUCTION

Seadrill Limited and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors," and together with Seadrill Limited's direct and indirect non-Debtor subsidiaries and affiliates, collectively, "Seadrill"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of Reorganization of Seadrill Limited and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated [●] (the "Plan").[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS, CERTAIN HOLDERS OF CLAIMS, AND CERTAIN COMMITMENT PARTIES THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF APPROXIMATELY 97 PERCENT OF THE CLAIMS ARISING UNDER THE BANK FACILITIES (AS DEFINED BELOW) AND HOLDERS OF MORE THAN 40 PERCENT OF THE UNSECURED BONDS (AS DEFINED BELOW), SUPPORT CONFIRMATION OF THE PLAN AND THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.     PRELIMINARY STATEMENT

Seadrill was formed in 2005.  Since then, it has grown into one of the world's largest offshore drilling contractors and now serves customers around the globe.  Seadrill's customers (typically referred to as "operators") include super-major and major oil and gas companies, state-owned national oil companies, and comparatively smaller, local independent offshore exploration and production companies.  The Debtors' fleet, which makes up the substantial majority of the enterprise-wide Seadrill fleet, consists of 32 offshore drilling units, including 7 drillships, 12 semi-submersible rigs, and 13 jack-up rigs.  Seadrill has also contracted for the construction and delivery of 14 additional offshore drilling units (including 4 drillships, 2 semi-submersible rigs, and 8 jack-up rigs) that are in varying stages of completion in shipyards located in Southeast Asia.  Four of Seadrill's newbuild contracts are with Debtor entities.  In simple terms, the Debtors' business is to contract their 32 rigs for a specified period of time (often spanning several years) at a contracted-for daily rate or "dayrate."

As of the Petition Date, the Debtors are liable for more than $8 billion in aggregate funded-debt obligations, including:  (a) obligations under 12 Seadrill Limited backed, secured bank-funded credit facilities (the "Bank Facilities," and the lenders thereunder, the "Bank Lenders") with an aggregate principal amount outstanding of approximately $5.7 billion (each with a discrete collateral package— primarily non-overlapping combinations of the Debtors' offshore drilling rigs), the administrative agent banks for which form the Bank CoCom (described below); and (b) six series of unsecured bonds (the "Unsecured Bonds") with an aggregate principal amount outstanding of approximately $2.3 billion.  Additionally, the Debtors are liable for an aggregate of approximately (a) $1.8 billion in contingent

---

[1]     Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern**.

liabilities under 4 newbuild contracts and (b) $1.1 billion in capital lease obligations under three sale/leaseback agreements with certain of SFL's subsidiaries.

For the last three years, oil and natural gas prices have been in a down cycle.  Offshore drillers like Seadrill depend on "upstream" capital expenditures to fuel continued growth and success.  During this down cycle, a number of large upstream oil and natural gas exploration and production companies, servicing companies, and operators have been forced to seek chapter 11 protection.  Even the super-major oil and gas companies that have avoided restructurings have aggressively scaled back exploration and production-related capital expenditures.  As a result, the distress in the upstream sector has spread to service providers and other ancillary businesses that depend on upstream capital expenditures for their revenues, including offshore drilling companies like Seadrill.  The graphic below highlights the link between Seadrill's success and commodity pricing conditions by comparing the declines in the trading price from mid-2014 to today of (a) crude oil, (b) Seadrill Limited, NADL, and Sevan common shares, and (c) certain of the Unsecured Bonds (with and without a Seadrill Limited guarantee).



Oil prices peaked in mid-2014 at more than $115 per barrel before declining to less than $30 per barrel by early 2016.  While oil prices have recovered modestly since early 2016, they have hovered near or below breakeven pricing for offshore drilling projects.  During that same period, Seadrill Limited's common share trading price fell to a fraction of mid-2014 highs.

As an initial response to deteriorating market conditions, in November 2014, Seadrill Limited decided to suspend dividends to shareholders.  In early 2015, Seadrill began discussions with the Bank Lenders, which resulted in limited covenant relief under its secured bank-funded facilities pursuant to amendments executed in May 2015.  While the Debtors' cash position has been strong since Seadrill Limited suspended dividends, it became clear that maturing funded-debt obligations would be difficult, if not impossible, to refinance and could cause an enterprise-wide liquidity squeeze if not addressed proactively.  Thus, beginning in late 2015 and into early 2016, Seadrill continued broader discussions with a "coordinating committee" (the "Bank CoCom") that included each of the administrative agent banks under the Bank Facilities.

As a result of discussions with the Bank CoCom, in April 2016, Seadrill executed amendments and waiver agreements (collectively, the "R1 Agreement") with respect to the Bank Facilities that resulted in additional covenant relief and extended the maturities of certain of the Bank Facilities.  As part of the R1 Agreement, the parties established April 30, 2017 as the "long stop" date by which Seadrill was to implement a broader restructuring.  In March and April 2017, Seadrill and the requisite Bank Lenders again agreed to extend the maturities of certain of the Bank Facilities and also agreed to extend the long stop date to July 31, 2017.  The requisite Bank Lenders subsequently agreed to a further, final extension of the long stop date to September 12, 2017 and applicable Bank Facility maturities to September 14, 2017.[2]

Seadrill took full advantage of the time provided by the foregoing maturity extensions to explore a number of strategic alternatives.  The key focus at the outset of negotiations with the Bank Lenders was to secure at least a five-year liquidity runway to bridge to a broader market recovery.  This runway, embodied in the Bank Deal (described below), forms the foundation of the Debtors' restructuring.  While the Bank Lenders expressed a willingness to enter into a transaction to extend maturities and reduce near-term amortization obligations as part of a broader restructuring, they insisted that the transaction be supported by a capital injection of at least $1 billion to ensure that Seadrill has sufficient liquidity to weather the economic storm and, in part, to serve as credit support for the restructured Bank Facility obligations.

Thus, beginning in September 2016, the Debtors launched a capital raise process seeking at least $1 billion in new financing.  After nearly six months of marketing efforts and negotiations, the Debtors received a joint proposal from Hemen Holding Ltd. ("Hemen"), Seadrill Limited's largest shareholder and a leading investor in the offshore space, and Centerbridge Credit Partners L.P. ("Centerbridge") that contemplated a $1 billion investment.  Over time, that proposal developed into a $1.06 billion commitment (the "Capital Commitment") backed not only by Hemen and Centerbridge, but also by a syndicate of additional investors (together with Hemen and Centerbridge, the "Commitment Parties").  The Syndication Parties hold approximately 30 percent of the Debtors' approximately $2.3 billion in outstanding unsecured bonds (the "Unsecured Bonds").  The Commitment Parties (i.e., including Hemen and Centerbridge) hold approximately 40 percent of the Unsecured Bonds.  Thus, while the Bank Deal serves as the foundation of the Debtors' restructuring, the opportunity to participate in the Capital Commitment has served as an important building block for consensus.

The continued investment of Hemen was critical to the success of the Debtors' fund raising goals.  **First**, the Bank CoCom refused to waive change-of-control default provisions in the Bank Facility credit agreements tied to Hemen's level of ownership of Seadrill Limited.  Many of the Bank Lenders have significant long-term relationships with Hemen and told Seadrill the necessary level of concessions and flexibility were conditioned on Hemen's involvement in Seadrill post-restructuring.  **Second**, many of the third parties Seadrill spoke to said they would only be interested in investing in the Debtors' recapitalization if Hemen was an anchor investor.  Hemen is a world-renowned leader in the offshore drilling and shipping markets and Hemen's participation in the Capital Commitment (described below) helped validate the investment opportunity and attracted others to participate.  Initially, however, Hemen was resistant to the idea of being the lead investor, preferring to let other investors set market-clearing terms.  After further discussions and a request from the Debtors to submit a proposal, in March 2017, Hemen (partnering with Centerbridge) submitted a proposal.  This proposal ultimately developed into the Capital Commitment

On the heels of this resolution, after nearly two years of negotiations, the Debtors, approximately 97 percent of the Bank Lenders, the Commitment Parties, and SFL (and certain of SFL's subsidiaries)

---

[2]   As described below, on August 14, 2017, because the Debtors' and the requisite Bank Lenders could not reach a consensual resolution to further extend the maturity of the maturing *West Eminence* Facility (due to a single Bank Lender), the Debtors sought and a court of competent jurisdiction in Bermuda entered an order approving a scheme of arrangement that effectuated an extension the maturity of the maturing *West Eminence* Facility to September 14, 2017.

agreed to the consensual restructuring transaction set forth in the Restructuring Support Agreement. Together, the Commitment Parties party hold more than 40 percent of the Unsecured Bonds. Importantly, the fact that the Debtors were negotiating with the Commitment Parties has been disclosed numerous times dating back to 2016 and other bondholders had the opportunity to execute nondisclosure agreements for purposes of taking on nonpublic information and participating in negotiations. The Debtors are hopeful that many more holders of the Unsecured Bonds will join the Restructuring Support Agreement as well.

The Restructuring Support Agreement, a copy of which is attached hereto as **Exhibit B** and incorporated herein by reference, contemplates a series of transformative restructuring transactions that will:

- eliminate near-term amortization obligations and extend maturities under the Debtors' secured bank facilities by approximately five years, on average (the "Bank Deal");

- equitize $2.3 billion in unsecured bond obligations;

- facilitate a $1.06 billion capital injection backed by the Commitment Parties, which will take the form of $860 million in new secured notes (the "NSNs") and a $200 million direct equity investment;

- leave employee, customer, and ordinary trade Claims largely Unimpaired; and

- re-cast the Debtors' corporate structure into a new "IHCo"/"RigCo"/"NSNCo" holding structure that will support both the Bank Deal and the Capital Commitment.

In addition to addressing the Debtor's capital structure, the transactions contemplated by the Restructuring Support Agreement will preserve Seadrill's valuable relationships with the Bank Lenders, which collectively represent a substantial portion of the worldwide rig financing market. The transactions also will preserve Seadrill's valuable relationship with Hemen, which is Seadrill's largest shareholder, is affiliated with one of the largest oil tanker and shipping groups in the world, and is critical to Bank Lender consent to a restructuring. Finally, the broad consensus embodied in the Restructuring Support Agreement will ensure that the Chapter 11 Cases proceed in an efficient, cost-effective manner. In accordance with the Restructuring Support Agreement, on the Petition Date, the Debtors commenced these chapter 11 cases.

In addition to the recapitalization contemplated by the Restructuring Support Agreement, the Debtors negotiated a series of transactions in the months preceding the Petition Date to limit the effects of the Chapter 11 Cases on certain of the Debtors' non-Debtor Affiliates, including cross-defaults that would otherwise have been triggered upon a Seadrill Limited chapter 11 filing, thereby limiting the number of Seadrill entities filing for chapter 11 protection. Seadrill Limited owns substantial, but non-controlling, interests in a number of entities described below as "Non-Consolidated Entities." Seadrill Limited's ownership interests in the Non-Consolidated Entities collectively form a key enterprise value driver and failure to insulate the Non-Consolidated Entities from the effects of the Chapter 11 Cases could have led to cross-defaults that could have destroyed a great deal of that value. Each of the Non-Consolidated Entities, as well as the applicable prepetition insulating transaction, are described in greater detail in Article V.A(ii) of this Disclosure Statement, entitled "Non-Consolidated Entities and Description of Insulating Transactions," which begins on page 32.

To capture the full benefit of the compromises embodied in the Restructuring Support Agreement, and to avoid losing the Capital Commitment, the Debtors must move through chapter 11 at a steady pace. The investment agreement governing the Capital Commitment (the "Investment Agreement") has two key milestones:

4

- entry of an order confirming the Debtors' chapter 11 plan within nine months following the Petition Date; and

- the effective date of the Debtors' chapter 11 plan occurring within two months following the confirmation of the Plan.

These milestones allow the Debtors more than sufficient time to market test the terms of the Capital Commitment to determine whether they are the best available under the circumstances.[3]  The Debtors negotiated an unqualified, 90-day "go shop" period (measured from the Petition Date) under the Investment Agreement to allow this value-maximizing marketing process to occur.   The Debtors' postpetition marketing process is described in greater detail in Article VII.H of this Disclosure Statement, entitled "Postpetition Marketing Process," which begins on page 49.   The Debtors intend to complete the postpetition marketing process and then move promptly to approval of this Disclosure Statement and confirmation of the Plan.

The formulation of the Restructuring Support Agreement and Plan is a significant achievement for the Debtors in the face of historic commodity price declines and a depressed operating environment.  The Debtors strongly believe that the Plan is in the best interests of the Debtors' estates, and represents the best available alternative.   Given the Debtors' core strengths, including their modern fleet, highly-skilled workforce, global reach, and successful operating and safety track record, the Debtors are confident they can efficiently implement the restructuring set forth in the Restructuring Support Agreement to ensure their long-term viability and success.  For these reasons, the Debtors strongly recommend that holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.   Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure

---

[3]   The Investment Agreement further requires that the Debtors secure entry of an order approving this Disclosure Statement within five months after the Petition Date.

statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

      C.     **Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold.  Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| | *Other Claims* | | |
| A1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| A2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| A3 | Intercompany Claims | Impaired/ Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| | *Claims against Seadrill Limited* | | |
| B1-a | $1.5B Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-b | $483MM Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-c | $450MM Eminence Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-d | $1.35B Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-e | $950MM Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-f | $450MM Nordea Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-g | $440MM Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-h | $400MM Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-i | $300MM Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B2 | Guarantee Facility Claims against Seadrill Limited | Impaired | Entitled to Vote |

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| B3 | General Unsecured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B4 | Seadrill Limited 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| B5 | Interests in Seadrill Limited | Impaired | Not Entitled to Vote (Deemed to Reject) |
| *Claims against Other Seadrill Debtors* | | | |
| C1-a | $1.5B Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-b | $483MM Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-c | $450MM Eminence Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-d | $1.35B Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-e | $950MM Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-f | $450MM Nordea Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-g | $440MM Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-h | $400MM Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-i | $300MM Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-j | Prepetition AOD Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C2 | General Unsecured Claims against Other Seadrill Debtors | Unimpaired | Not Entitled to Voted (Deemed to Accept) |
| C3 | Interests in Other Seadrill Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| *Claims against NADL* | | | |
| D1 | Secured Credit Agreement Claim against NADL | Impaired | Entitled to Vote |
| D2 | NADL Revolving Loan Claim | Impaired | Entitled to Vote |
| D3 | General Unsecured Claims against NADL | Impaired | Entitled to Vote |
| D4 | NADL 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| D5 | Interests in NADL | Impaired | Not Entitled to Vote (Deemed to Reject) |

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| *Claims against Other NADL Debtors* | | | |
| E1 | Credit Agreement Claims against Other NADL Debtors | Impaired | Entitled to Vote |
| E2 | General Unsecured Claims against Other NADL Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| E3 | Interests in Other NADL Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| *Claims against Sevan* | | | |
| F1 | Secured Credit Agreement Claims against Sevan | Impaired | Entitled to Vote |
| F2 | Sevan Second Lien Claim | Impaired | Entitled to Vote |
| F3 | General Unsecured Claims against Sevan | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| F4 | Sevan 510(b) Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| F5 | Interests in Sevan | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| *Claims against Other Sevan Debtors* | | | |
| G1 | Credit Agreement Claims against Other Sevan Debtors | Impaired | Entitled to Vote |
| G2 | General Unsecured Claims against Other Sevan Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| G3 | Interests in Other Sevan Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

**D.     What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.  As used in describing the treatment of holders of Interests in Classes B5. D5, and F5, "extinguished" means extinguishment of the economic interests pursuant to Bermuda law; the shares representing such Interests will not themselves be extinguished under Bermuda law.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[4]**

---

[4]     The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed (as defined in the Plan ) as well as other factors related to the Debtors' business operations and general economic conditions.

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | *Other Claims* | | |
| A1 | Other Secured Claims | Each holder of an Allowed Other Secured Claim shall receive as determined by the Debtors or the Reorganized Debtors, as applicable: (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | [●] | [●] |
| A2 | Other Priority Claims | Each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim. | [●] | [●] |
| A3 | Intercompany Claims | Intercompany Claims shall be, at the election of the applicable Debtor, be (a) Reinstated or (b) released. | [●] | [●] |
| | | *Claims against Seadrill Limited* | | |
| B1-a | $1.5B Credit Agreement Secured Claims against Seadrill Limited | Each holder of an Allowed Class B1-a Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $1.5B Credit Agreement in principal amount equal to the amount of its Allowed Class B1-a Claims. | [●] | [●] |
| B1-b | $483MM Credit Agreement Secured Claims against Seadrill Limited | Each holder of an Allowed Class B1-b Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $483MM Credit Agreement in a principal amount equal to its Allowed Class B1-b Claims. | [●] | [●] |
| B1-c | $450MM Eminence Credit Agreement Secured Claims against Seadrill Limited | Each holder of an Allowed Class B1-c Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $450M Eminence Credit Agreement in a principal amount equal to the amount of its Allow class B1-c Claims. | [●] | [●] |
| B1-d | $1.35B Credit Agreement Secured Claims against Seadrill Limited | Each holder of an Allowed Class B1-d Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $1.35B Credit Agreement in a principal amount equal to the amount of its Allow class B1-d Claims. | [●] | [●] |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| B1-e | $950MM Credit Agreement Secured Claims against Seadrill Limited | Each holder of an Allowed Class B1-e Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $950MM Credit Agreement in a principal amount equal to the amount of its Allow class B1-e Claims. | [●] | [●] |
| B1-f | $450MM Nordea Credit Agreement Secured Claims against Seadrill Limited | Each holder of an Allowed Class B1-f Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $450MM Nordea Credit Agreement in a principal amount equal to the amount of its Allow class B1-f Claims. | [●] | [●] |
| B1-g | $440MM Credit Agreement Secured Claims against Seadrill Limited | Each holder of an Allowed Class B1-g Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $440MM Credit Agreement in a principal amount equal to the amount of its Allow class B1-g Claims. | [●] | [●] |
| B1-h | $400MM Credit Agreement Secured Claims against Seadrill Limited | Each holder of an Allowed Class B1-h Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $400MM Credit Agreement in a principal amount equal to the amount of its Allow class B1-h Claims. | [●] | [●] |
| B1-i | $300MM Credit Agreement Secured Claims against Seadrill Limited | Each holder of an Allowed Class B1-i Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $300MM Credit Agreement in a principal amount equal to the amount of its Allow class B1-i Claims. | [●] | [●] |
| B2 | Guarantee Facility Claim against Seadrill Limited | Each holder of an Allowed Guarantee Facility Claim against Seadrill Limited shall receive their Pro Rata share of participation in the Amended Guarantee Facility. | [●] | [●] |
| B3 | General Unsecured Claims against Seadrill Limited | • **If Class B3 votes to accept the Plan**, each holder of an Allowed General Unsecured Claim against Seadrill Limited (including Allowed Seadrill Limited Unsecured Note Claims, Seadrill Limited Interest Rate Swap Claims, and Seadrill Limited Currency Swap Claims) shall receive: (1) 100 percent of its Pro Rata share (measured by reference to the Unsecured Pool Denominator) of the Unsecured Pool Equity and, (2) if such holder is an Eligible Holder it shall also receive 100 percent of its Pro Rata share of (A) the Note Rights and (B) the Equity Rights; *provided*, *however*, that the Commitment Parties have agreed not to receive the Note Rights and Equity Rights on account of their General Unsecured Claims against Seadrill | [●] | [●] |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | • **If Class B3 votes to reject the Plan**, each holder of an Allowed General Unsecured Claim against Seadrill Limited shall receive the Liquidation Recovery, unless otherwise ordered by the Bankruptcy Court.<br><br>*provided, however*, that the holders of Credit Agreement Unsecured Claims against Seadrill Limited have agreed to forgo their right to receive their Pro Rata share of any recovery on account of General Unsecured Claims against Seadrill Limited; *provided further*, that, for the avoidance of doubt, holders of Credit Agreement Unsecured Claims against Seadrill Limited shall be entitled to vote to accept or reject the Plan on account of such Claims. | | |
| B4 | Seadrill Limited 510(b) Claims | • **If Class B3 votes to accept the Plan**, each holder of an Allowed Seadrill Limited 510(b) Claim shall receive its Pro Rata share of the Equity Recovery.<br><br>• **If Class B3 votes to reject the plan**, each holder of an Allowed Seadrill Limited 510(b) Claim will be extinguished and shall not receive or retain any distribution, property, or other value on account of their Seadrill Limited 510(b) Claims. | $[•] | N/A |
| B5 | Interests in Seadrill Limited | All Interests in Seadrill Limited will be extinguished in accordance with the Description of the Transaction Steps and:<br><br>• **If Class B3 votes to accept the Plan**, each holder of an Allowed Interest in Seadrill Limited shall receive its Pro Rata share of the Equity Recovery.<br><br>• **if Class B3 votes to reject the plan**, each holder of an Allowed Interest in Seadrill Limited shall not receive or retain any distribution, property, or other value on account of its Interest in Seadrill Limited. | N/A | N/A |
| | | *Claims against Other Seadrill Debtors* | | |
| C1-a | $1.5B Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-a Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $1.5B Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-a Claim less (ii) the principal amount of its participation received on account of its Class B1-a Claim, if any. | [•] | [•] |
| C1-b | $483MM Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-b Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $483MM Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-b Claim less (ii) the principal amount of its participation received on account | [•] | [•] |

11

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | of its Class B1-b Claims, if any. | | |
| C1-c | $450MM Eminence Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-c Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $450MM Eminence Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-c Claim less (ii) the principal amount of its participation received on account of its Class B1-c Claims, if any. | [●] | [●] |
| C1-d | $1.35B Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-d Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $1.35B Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-d Claim less (ii) the principal amount of its participation received on account of its Class B1-d Claims, if any. | [●] | [●] |
| C1-e | $950MM Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-e Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $950MM Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-e Claim less (ii) the principal amount of its participation received on account of its Class B1-e Claims, if any. | [●] | [●] |
| C1-f | $450MM Nordea Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-f Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $450MM Nordea Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-f Claim less (ii) the principal amount of its participation received on account of its Class B1-f Claims, if any. | [●] | [●] |
| C1-g | $440MM Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-g Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $440MM Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-g Claim less (ii) the principal amount of its participation received on account of its Class B1-g Claims, if any. | [●] | [●] |
| C1-h | $400MM Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-h Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $400MM Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-h Claim less (ii) the principal amount of its participation received on account of its Class B1-h Claims, if any. | [●] | [●] |
| C1-i | $300MM Credit Agreement | Each holder of an Allowed Class C1-i Claim shall receive its Pro Rata share of participation in the Amended Credit | [●] | [●] |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | Claims against Other Seadrill Debtors | Facility entered into pursuant to the Amended $300MM Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-i Claim less (ii) the principal amount of its participation received on account of its Class B1-i Claims, if any. | | |
| C1-j | Prepetition AOD Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-j Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended AOD Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-j Claim | [●] | [●] |
| C2 | General Unsecured Claims Against Other Seadrill Debtors | Each holder of an Allowed General Unsecured Claim against an Other Seadrill Debtor shall, at the election of the applicable Debtor, be (a) Reinstated or (b) paid in full in Cash. | [●] | 100% |
| C3 | Interests in Other Seadrill Debtors | Each holder of an Allowed Interest in an Other Seadrill Debtor shall be Reinstated. | N/A | 100% |
| | | *Claims against NADL* | | |
| D1 | Credit Agreement Claim against NADL | Each holder of an Allowed Class D1 Claim shall receive its Pro Rata participation in the Amended Credit Facility entered into pursuant to the Amended NADL Credit Agreement in principal amount equal to the amount of its Allowed Class D1 Claims. | [●] | [●] |
| D2 | NADL Revolving Loan Claim | The holder of the NADL Revolving Loan Claim shall, at the election of the applicable Debtor, be (a) Reinstated or (b) released | [●] | 100%/0% |
| D3 | General Unsecured Claims against NADL | • **If Class D3 votes to accept the Plan**, each holder of an Allowed General Unsecured Claim against NADL (including NADL Guaranteed Unsecured Claims and NADL Non-Guaranteed Unsecured Note Claims) shall receive: (1) 70 percent of its Pro Rata share (measured by reference to the Unsecured Pool Denominator) of the Unsecured Pool Equity and, (2) if such holder is an Eligible Holder it shall also receive 70 percent of its Pro Rata share of (A) the Note Rights and (B) the Equity Rights; *provided*, *however*, that the Commitment Parties have agreed not to receive the Note Rights and Equity Rights on account of their General Unsecured Claims against NADL.<br><br>• **If Class D3 votes to reject the Plan**, each holder of an Allowed General Unsecured Claim against NADL shall receive the Liquidation Recovery, unless otherwise ordered by the Bankruptcy Court. | [●] | [●] |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | *provided, however*, that the holders of Credit Agreement Unsecured Claims against NADL have agreed to forgo their right to receive their Pro Rata share of any recovery on account of General Unsecured Claims against NADL; *provided, further*, that, for the avoidance of doubt, holders of Credit Agreement Unsecured Claims shall be entitled to vote to accept or reject the Plan on account of such Claims. | | |
| D4 | NADL 510(b) Claims | Each holder of an Allowed NADL 510(b) Claims will be extinguished and shall not receive or retain any distribution, property, or other value on account of their Seadrill Limited 510(b) Claims. | [●] | N/A |
| D5 | Interests in NADL | Each Interest in NADL will be extinguished in accordance with the Description of the Transaction Steps and each holder of such Interest in NADL shall not receive or retain any distribution, property, or other value on account of its Interest in NADL. | N/A | 0% |
| | | *Claims against Other NADL Debtors* | | |
| E1 | Credit Agreement Claims against Other NADL Debtors | On the Plan Effective Date, each holder of an allowed Credit Agreement Claim against an Other NADL Debtor shall receive its pro rata participation in the Amended Credit Facility entered into pursuant to the Amended NADL Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class E1 Claim less (ii) the principal amount of its participation received on account of its Class D1 Claims, if any. | [●] | [●] |
| E2 | General Unsecured Claims against Other NADL Debtors | On the Plan Effective Date, each holder of an allowed General Unsecured Claim against an Other NADL Debtor shall, at the election of the applicable Debtor, be (a) Reinstated or (b) paid in full in Cash. | [●] | 100% |
| E3 | Interests in Other NADL Debtors | On the Plan Effective Date, each allowed Interest in an Other NADL Debtor shall be Reinstated. | N/A | 100% |
| | | *Claims against Sevan* | | |
| F1 | Credit Agreement Claims against Sevan | Each holder of an Allowed Class F1 Claim shall receive its Pro Rata participation in the Amended Sevan Credit Facility. | [●] | [●] |
| F2 | Sevan Second Lien Claim | All Sevan Second Lien Claims shall, at the election of the applicable Debtor, be (a) Reinstated or (b) released | [●] | 100%/0% |
| F3 | General Unsecured Claims against Sevan | • **If Class F3 votes to accept the Plan**, each holder of an Allowed General Unsecured Claim against Sevan shall receive: (1) 70 percent of its Pro Rata share (measured by reference to the Unsecured Pool Denominator) of the Unsecured Pool Equity and, (2) if | [●] | [●] |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | such holder is an Eligible Holder it shall also receive 70 percent of its Pro Rata share of (A) the Note Rights and (B) the Equity Rights; *provided*, *however*, that the Commitment Parties have agreed not to receive the Note Rights and Equity Rights on account of their General Unsecured Claims against Sevan.<br><br>• **If Class F3 votes to reject the Plan**, each holder of an Allowed General Unsecured Claim against Sevan shall receive the Liquidation Recovery, unless otherwise ordered by the Bankruptcy Court.<br><br>*provided*, *however*, that the holders of Credit Agreement Unsecured Claims against Sevan have agreed to forgo their right to receive their Pro Rata share of any recovery on account of General Unsecured Claims against Sevan; *provided*, *further*, that, for the avoidance of doubt, holders of Credit Agreement Unsecured Claims against Sevan shall be entitled to vote to accept or reject the Plan on account of such Claims. | | |
| F4 | Sevan 510(b) Claims | Each holder of an Allowed Sevan 510(b) Claim will be extinguished and shall not receive or retain any distribution, property, or other value on account of their Sevan 510(b) Claims. | [●] | N/A |
| F5 | Interests in Sevan | Each holder of an Interest in Sevan will be extinguished and shall not receive or retain any distribution, property, or other value on account of its Interest in Sevan. | N/A | 0% |
| | | *Claims against Other Sevan Debtors* | | |
| G1 | Sevan Credit Agreement Subsidiary Claims | Each holder of an Allowed Class G1 Claim shall receive its Pro Rata participation in the Amended Sevan Credit Facility. | [●] | [●] |
| G2 | General Unsecured Claims against Other Sevan Debtors | Each holder of an Allowed General Unsecured Claim against an Other Sevan Debtor shall, at the election of the applicable Debtor, be (a) Reinstated or (b) paid in full in Cash. | [●] | 100% |
| G3 | Interests in Other Sevan Debtors | Each Allowed Interest in an Other Sevan Debtor shall be Reinstated. | N/A | 100% |

**E.     What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article III of the Plan.

### 1.  Administrative Claims

Administrative Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein. Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in Article II.A of the Plan, and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date, holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors and the requesting party no later than 60 days after the Effective Date.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

### 2.  Priority Tax Claims

Priority Tax Claims will be satisfied as set forth in Article II.C of the Plan, as summarized herein. Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

### F.    Are any regulatory approvals required to consummate the Plan?

There are no known U.S. regulatory approvals that are required to consummate the Plan.  However, to the extent such any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

16

**G.    What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 64, and the Liquidation Analysis attached hereto as **Exhibit F**.

**H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article XI of this Disclosure Statement, entitled "Confirmation of the Plan," which begins on page 63, for a discussion of the conditions precedent to consummation of the Plan.

**I.    Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation.  *See* Article VIII.C.24 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases," which begins on page 61.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article VIII.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan," which begins on page 50.

**J.    Will the final amount of Allowed Unsecured Claims affect the recovery of holders of Allowed Unsecured Claims under the Plan?**

The Debtors' estimate of aggregate Allowed General Unsecured Claims against Debtors Seadrill Limited, NADL, and Sevan is approximately $[●] million to $[●] million.  The Debtors estimate that holders of General Unsecured Claims against Debtors Seadrill Limited, NADL, and Sevan will receive a recovery of approximately [●] percent to [●] percent. The Debtors' estimate of aggregate Allowed General Unsecured Claims against Debtors other than Seadrill Limited, NADL, and Sevan is approximately $[●] million to $[●] million.  General Unsecured Claims against Debtors other than Seadrill Limited, NADL, and Sevan will be paid in full in cash on the Effective Date or Reinstated—thus, such claims are unimpaired and not entitled to vote to accept or reject the Plan.  Although the Debtors' estimate of Allowed General Unsecured Claims is generally the result of the Debtors' and their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material.  The projected amount of General Unsecured Claims set forth herein is subject to change.

17

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to holders of General Unsecured Claims against Seadrill Limited, NADL, and Sevan could change as well, and such changes could be material.

Finally, the Debtors, or any official committees appointed in the Chapter 11 Cases, may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change.  These changes could affect recoveries to holders of General Unsecured Claims against Seadrill Limited and NADL, and such changes could be material.

### K.  How will the preservation of the Causes of Action impact my recovery under the Plan?

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the following:  (a) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date; and (b) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

**L.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the other parties to the Restructuring Support Agreement in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT FILE AN OBJECTION WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

**1.      Releases by the Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Seadrill Entities, the Seadrill Entities' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Investment Agreement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

2.   **Releases by Holders of Claims and Interests.**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Seadrill Entities, the Seadrill Entities' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Investment Agreement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the Investment Agreement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

3.   **Exculpation**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

4.   **Injunction**

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching,

20

collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

     **5.    Release of Liens.**

Except with respect to the Liens securing (a) Other Secured Claims (depending on the treatment of such Claims), or (b) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and its successors and assigns.

**M.    What is the deadline to vote on the Plan?**

The Voting Deadline is [●], at [●] p.m. (prevailing Central Time).

**N.    How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot or a master ballot including your vote is **actually received** by the Debtors' solicitation agent, Prime Clerk LLC (the "Solicitation Agent") **on or before the Voting Deadline,** *i.e.* **[●], at [●] p.m. prevailing Central Time**. *See* Article IX of this Disclosure Statement, entitled "SOLICITATION AND VOTING PROCEDURES," which begins on page 61 for more information.

**O.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**P.    When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for [●], at [●] a.m. (prevailing Central Time). The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than [●], at [●] p.m. (prevailing Central Time) in accordance with the notice of the Confirmation

Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit D** and incorporated herein by reference.

> **Q.     What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

> **R.     What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will not be forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect, (2) all conditions to Consummation have been satisfied or waived (*see* Article IX of the Plan), and (3) the Debtors, with the consent of the Required Supporting Creditors, declare the Plan effective.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

> **S.     What are the Notes Rights Offering and the Equity Rights Offerings?**

The holders of General Unsecured Claims against Seadrill Limited, NADL, and Sevan that are Eligible Holders have an opportunity to collectively invest up to $85 million to acquire New Secured Notes and New Seadrill Common Shares through the Notes Rights Offering and up to $25 million to acquire New Seadrill Common Shares through the Equity Rights Offerings.  The procedures for participating in the Notes Rights Offering and Equity Rights Offerings are set forth in the Rights Offering Procedures and described in Article X of this Disclosure Statement, entitled "Rights Offering Procedures," which begins on page 63.

> **T.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Prime Clerk LLC, via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Seadrill Limited
> c/o Prime Clerk LLC
> 830 3rd Avenue, 3rd Floor
> New York, NY 10022
>
> *By electronic mail at:*
> [●]

*By telephone (toll free) at:*
(844) 276-3026 (U.S. and Canada)
(917) 962-8497 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at http://cases.primeclerk.com/Seadrill (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy/ (for a fee).

### U. Do the Debtors recommend voting in favor of the Plan?

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result from any other available alternative. The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

### V. Who Supports the Plan?

The Plan is supported by the Debtors and the Commitment Parties, as set forth in the following chart:

| Commitment Parties | Support (expressed as an approximate percentage of the total principal amount of claims outstanding) |
| --- | --- |
| Debtors | N/A |
| Holders of Credit Agreement Claims | 97% |
| Holders of Unsecured Bonds | 40% |
| Holders of Interests in Seadrill Limited | 24%[5] |

## IV. THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN

### A. Restructuring Support Agreement

On September 12, 2017, the Debtors, holders of approximately 97 percent of Claims arising under the Bank Facilities, the Commitment Parties, and SFL (and certain of SFL's subsidiaries) entered into the Restructuring Support Agreement. Since executing the Restructuring Support Agreement, the Debtors have further documented the terms of the prearranged restructuring contemplated thereby, including the Plan.[6] The restructuring transactions contemplated by the Plan will (a) re-profile the Bank Facility obligations to eliminate near-term amortization obligations and extend maturities; (b) reduce overall leverage through

---

[5]   Inclusive solely of 100 percent of Hemen's Interest in Seadrill Limited.

[6]   The key terms of the Plan are discussed in greater detail in Section V.B of this Disclosure Statement, entitled "The Plan," immediately following this section.

equitizing the Unsecured Bonds; (c) result in a $1.06 billion new capital injection (as set forth in the Investment Agreement); (d) leave employee, customer, and ordinary trade Claims largely Unimpaired; and (e) reorganize the Seadrill corporate structure to support the re-profiled Bank Facilities and new capital injection.  Each of the major restructuring transactions contemplated by the Restructuring Support Agreement is described in greater detail below.  The Debtors believe that the transactions contemplated by the Restructuring Support Agreement are the best available restructuring terms and will allow Seadrill to succeed as a restructured company after emergence from these chapter 11 case and will afford meaningful runway to allow the market to recover.

*Corporate Reorganization.*  To support the Bank Deal and Capital Commitment, Seadrill will execute a corporate reorganization that will ultimately result in a new holding company and a new IHCo/RigCo/NSNCo holding structure.  Seadrill will move its rig-owning entities under the new RigCo holding company structure and the rigs and the earnings from operation of the rigs will continue to serve as collateral under the re-profiled Bank Facilities.  The RigCo entity will also issue guarantees of the re-profiled Bank Facility obligations and security of the shares of RigCo will also be granted in favour of all Bank Lenders, effectively cross-collateralizing the Bank Facility obligations across all of the rig-owning entities (*i.e.*, the Bank Lenders will maintain first priority liens on their own, unique collateral packages and will share in cross-collateralization of the RigCo level across all Bank Facilities).  Further, to facilitate the Capital Commitment, among other things, the Debtors will form the NSNCo holding company to issue the NSNs and hold, among other things, the Debtors' interests in the Non-Consolidated Entities, certain non-rig owning Debtor entities, and certain other NSNs collateral.  Both RigCo and NSNCo will be organized beneath another new intermediate holding company structure, or "IHCo," which will also issue certain guarantees.  IHCo will be a direct subsidiary of New Seadrill.  A simplified graphic of the corporate reorganization is set forth below.



*Bank Deal.*  If they can obtain a five-year runway to weather this historic downturn, the Debtors believe their business can support the proposed leverage at emergence from the Chapter 11 Cases over the long term.  The foundation of the financial restructuring contemplated by the Restructuring Support Agreement is the Bank Deal, the core terms of which are:  (a) an on average five-year maturity extension under the Bank Facilities; (b) the elimination of amortization obligations from the Petition Date through December 31, 2019 (with amortization obligations reinstated on a modified basis thereafter); (c) a financial covenant holiday until 2021 subject to a $650 million RigCo minimum liquidity requirement, which ratchets

24

down over time; and (d) certain financial covenant waivers.  As part of the consideration for these valuable concessions, each of the Bank Facilities will benefit from, among other things, the RigCo guarantee and security over RigCo shares described above.



*Capital Commitment.*  The Restructuring Support Agreement further contemplates the Capital Commitment, which will be in the form of a $200 million direct equity investment and a $860 million NSNs investment.  In return for the $200 million equity investment, the investors will receive their respective portions of 25 percent of the new common equity in New Seadrill on terms set forth in the Investment Agreement.  The NSNs will mature seven years after their issuance and will carry an interest rate of 12 percent—with 8 percent paid "in kind" and 4 percent paid in cash.  Purchasers of the NSNs will also receive an aggregate of 57.5 percent of the new equity in New Seadrill on terms set forth in the Investment Agreement.  Participation in the $1.06 billion Capital Commitment will be allocated among the Debtors' stakeholders as follows:

| Stakeholder | Allocation | Form of Allocation |
|---|---|---|
| *New Secured Notes Investment* | | |
| Hemen/Centerbridge | $440 million | Direct Investment |
| Other Commitment Parties | $335 million | Direct Investment |
| Holders of General Unsecured Claims, with Note Rights | $85 million | Rights Offering (Backstopped by certain of the Commitment Parties) |
| *Direct Equity Investment* | | |
| Hemen/Centerbridge | $125 million | Direct Investment |
| Certain Other Commitment Parties | $50 million | Direct Investment |

| Stakeholder | Allocation | Form of Allocation |
|---|---|---|
| Holders of General Unsecured Claims, with Equity Rights | $25 million | Rights Offering (Backstopped by Hemen) |

In addition to Seadrill Limited's interests in the Non-Consolidated Entities, Seadrill will transfer certain unencumbered assets to NSNCo to support the NSNs and security will be granted over these assets where practicable.  Finally, the NSNs will benefit from:  (a) first-ranking guarantees from IHCo and all other subsidiaries of Seadrill Limited that do not sit below IHCo (subject to exceptions); (b) a Seadrill Limited guarantee ranking *pari passu* with the re-profiled Bank Facilities; (c) a first-ranking pledge over all deposit and security accounts and all cash balances held by NSNCo; and (d) a second-ranking guarantee from RigCo.

**Unsecured Bond Equitization.**  The Bank Deal and the Capital Commitment are contingent in part upon the Debtors' commitment to reduce overall leverage and ensure a clean liquidity runway during the course of the Bank Deal amortization deferral period.  Accordingly, the Restructuring Support Agreement provides that, to the extent holders of unsecured claims at Seadrill Limited, NADL, and Sevan (Classes B3, D3, and F3) vote as a class to accept the Debtors' chapter 11 plan, such holders will receive their pro rata share of 15 percent of the new equity in New Seadrill, plus, if such holders are Eligible Holders, their pro rata share of subscription rights to participate in up to (a) $85 million of the NSNs portion of the Capital Commitment and (b) $25 million of the equity portion of the Capital Commitment.[7]

**Equity Cancellation**.  Under the Restructuring Support Agreement, so long as holders of unsecured claims at Seadrill Limited (Class B3) vote as a class to accept the Plan, holders of common equity Interests in Seadrill Limited will receive their pro rata share of 2 percent of the New Seadrill Common Shares.  On the Effective date, the value in the existing Interests in Seadrill Limited, NADL and Sevan will be extinguished; a holder of such Interests shall not receive or retain any distribution, property, or other value on account of its Interest.

Taking into account the allocation of New Seadrill Common Shares under the Plan and pursuant to the Capital Commitment, as well as certain fees paid in New Seadrill Common Shares under the Capital Commitment, New Seadrill's *pro forma* equity ownership will be as set forth below.  The Debtors have determined that the fees paid in the form of new equity under the Capital Commitment are reasonable under the circumstances and within market for financings of this size and complexity with an extended commitment period.

---

[7]  For the avoidance of doubt, holders of NADL-issued Unsecured Bonds that are not guaranteed by Seadrill Limited will receive a recovery equal to 70 percent of the recovery provided under the Debtors' chapter 11 plan to holders of Seadrill Limited-guaranteed Unsecured Bonds.

| Stakeholder | Ownership of Seadrill Limited | Fully Diluted |
|---|---|---|
| New Secured Notes | • 57.5% pre dilution | |
| New Equity | • 25% pre dilution | |
| Unsecured Claims | • 15% pre dilution | |
| Existing Equity | • 2% pre dilution | |
| Structuring Fee | • 0.5% of equity pre dilution | |
| Structuring Fee to Hemen | • 5% of equity post dilution | |



The Plan represents a significant step in the Debtors' restructuring process, which has been underway for almost two years.  The Restructuring Support Agreement, together with the Investment Agreement, will allow the Debtors to proceed expeditiously through chapter 11 to a successful emergence.

**B.     The Plan**

The Plan contemplates the following key terms, among others described herein and therein:

**1.     Issuance and Distribution of the New Shares**

The issuance of the New Shares shall be authorized without the need for any further corporate action and without any further action by the holders of any Claims or Interests.  On the Effective Date, applicable holders of Claims and Interests shall receive the New Shares in exchange for their respective claims as set forth under Article III.B of the Plan.  On the Effective Date:

- New Seadrill will issue 25 percent of the New Seadrill Common Shares, plus any Excess New Seadrill Common Shares, subject to dilution by the Employee Incentive Plan and the Primary Structuring Fee, in exchange for $200 million in Cash substantially on the terms set forth in the Investment Agreement.

- New Seadrill will issue 57.5 percent of the New Seadrill Common Shares to the purchasers of the New Secured Notes on a Pro Rata basis in accordance with the amount of New Secured Notes issued to such purchasers, subject to dilution by the Employee Incentive Plan and Primary Structuring Fee on the terms set forth in the Investment Agreement.

- New Seadrill will issue 5 percent of the New Seadrill Common Shares to Hemen on account of the Primary Structuring Fee, subject to dilution by the Employee Incentive Plan, and 0.5 percent of the New Seadrill Common Shares to the Select Commitment Parties on a Pro Rata basis in accordance with each Select Commitment Party's respective equity commitment percentage, subject to dilution  by the Employee Incentive Plan and the Primary Structuring Fee, in each case as set forth in the Investment Agreement.

27

- 100 percent of the New NADL Common Shares and 100 percent of the New Sevan Common Shares shall be issued to the Reorganized Debtors in accordance with the Description of Transaction Steps.

All of the New Shares issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the New Shares under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  On or as soon as reasonably practicable after the Effective Date, New Seadrill shall cause the New Seadrill Common Shares to be registered under Section 12 of the Securities Exchange Act.

For the avoidance of doubt, any claimant's acceptance of New Shares shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

### 2.  Issuance and Distribution of New NADL Common Shares and New Sevan Common Shares

On the Effective Date, 100% of the New NADL Common Shares and New Sevan Common Shares shall be issued to the Reorganized Debtors in accordance with the Description of Transaction Steps.  For administrative convenience, the holders of Credit Agreement Claims against NADL and the Other NADL Debtors and Sevan and the Other Sevan Debtors have agreed to accept participation in the Amended NADL Credit Facility and Amended Sevan Credit Facility, as applicable, in lieu of any entitlement to receive the New NADL Common Shares and New Sevan Shares and consent to the issuance of such shares to the Reorganized Debtors in accordance with the Description of Transaction Steps.

### 3.  Issuance and Distribution of New Secured Notes

On the Effective Date, NSNCo will issue the New Secured Notes in exchange for $860 million in Cash, substantially on the terms set forth in the Investment Agreement and New Secured Notes Indenture.  Pursuant to the Investment Agreement, the applicable Commitment Parties shall commit to purchase the full $860 million in principal amount of the New Secured Notes.

### 4.  Rights Offerings

If the requisite votes set forth in the Plan are obtained, the Reorganized Debtors shall consummate the Equity Rights Offering and the Notes Rights Offering in accordance with the Rights Offering Procedures.  Holders of the Equity Rights shall receive the opportunity to purchase up to $25 million of the New Seadrill Common Shares on a Pro Rata basis in accordance with the Plan and Rights Offering Procedures.  Holders of the Note Rights shall receive the opportunity to purchase up to $85 million in principal amount of the New Secured Notes on a Pro Rata basis in accordance with the Plan and Rights Offering Procedures.

If Class B3, Class D3, and Class F3 vote to reject the Plan, the Debtors shall not be obligated to conduct or consummate the Equity Rights Offering or the Notes Rights Offering, and the Equity Rights and Notes Rights shall be null and void ab initio and of no force and effect and the Excess New Seadrill Common Shares and New Secured Notes will be distributed to the Commitment Parties on a Pro Rata basis based on their respective allocations in accordance with the Investment Agreement.

The Rights Offering Procedures will be authorized pursuant to the Disclosure Statement Order, a form of which is attached as **<u>Exhibit E</u>** to this Disclosure Statement.

5.  **Amended SFL Charters**

Certain of the Debtors or Reorganized Debtors, as applicable, shall enter into the Amended SFL Charters on the Effective Date, on terms set forth in the RSA and included in the Plan Supplement.

Confirmation shall be deemed approval of the Amended SFL Charters (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Bankruptcy Court previously, and the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to issue the Amended SFL Charters without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors may deem to be necessary to consummate the Amended SFL Charters.

6.  **Use of Proceeds**

Proceeds from the issuance of the New Secured Notes and Equity Placement, as applicable, will be used, among other things, to fund certain distributions under the Plan, the Debtors' operations, and administration of the Chapter 11 Cases, as well as for general corporate purposes.

7.  **Amended Guarantee Facility**

The Debtors or Reorganized Debtors, as applicable, shall enter into the Amended Guarantee Facility on the Effective Date, on terms set forth in the RSA and included in the Plan Supplement.

Confirmation shall be deemed approval of the Amended Guarantee Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the relevant Debtors or Reorganized Debtors in connection therewith), to the extent not approved by the Bankruptcy Court previously, and the relevant Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to issue the Amended Guarantee Facility without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors may deem to be necessary to consummate such Amended Guarantee Facility.

8.  **General Settlement of Claims and Interests**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, which distributions and other benefits will be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual and legal rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim.

The Plan will be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the

Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

Pursuant to Rule 408 of the Federal Rules of Evidence, the Plan, this Disclosure Statement, the Restructuring Support Agreement (and any exhibits or supplements relating to the foregoing), the Investment Agreement, and all negotiations relating thereto will not be admissible into evidence in any proceeding unless and until the Plan is consummated, and then only in accordance with the Plan. In the event the Plan is not consummated, provisions of the Plan, this Disclosure Statement, the Restructuring Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto will not be binding or probative.

### 9. Releases

The Plan contains certain releases (as described more fully in Article III.L of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?," which begins on page 19), including mutual releases among the Debtors, Reorganized Debtors, and certain of their key stakeholders. Additionally, all holders of Claims or Interests that do not file an objection with the Bankruptcy Court in the Chapter 11 Cases that expressly objects to the inclusion of such holder as Releasing Party under the provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties.

## V.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.   Seadrill's Corporate History

Seadrill Limited was formed on May 10, 2005 as a Bermuda exempted company. John Fredriksen, who holds a number of interests in the offshore space through Hemen and other investment vehicles, founded Seadrill and has served as chairman of Seadrill Limited's board of directors since its inception. At the time of its formation, Seadrill acquired a fleet of three jack-up rigs pursuant to a purchase and subscription agreement with entities affiliated with Hemen. Today, Hemen holds an approximately 24-percent ownership interest in Seadrill Limited. During the years following its formation, Seadrill capitalized on strong demand for offshore drilling equipment and services, driven by a favorable oil pricing environment, by actively expanding its fleet, geographic footprint, and technical capabilities through both strategic acquisitions and organic growth. By the end of 2013, Seadrill had grown into one of the world's premier offshore drilling contractors.

The majority of the rig-owning entities that are obligors under the Bank Facilities are organized as wholly-owned subsidiaries of Seadrill Limited (the "Seadrill Subsidiary Entities"). Historically, Seadrill Limited also guaranteed the obligations of certain of its non-wholly owned subsidiaries (and their respective subsidiaries), a number of which are majority-owned by Seadrill Limited and consolidated with the Seadrill Subsidiary Entities for accounting and reporting purposes. In general, Seadrill Limited's non-wholly owned subsidiaries and their respective subsidiaries are organized into several groups, each of which is described below. Seadrill Limited and 85 of its direct and indirect subsidiaries, not including any of the Non-Consolidated Entities, are Debtors in these chapter 11 cases

Seadrill Limited also directly or indirectly owns substantial, but non-majority, interests in four other offshore drilling and services companies that form their own respective corporate groups within the Seadrill enterprise and are not Debtors in these chapter 11 cases. A graphic depicting a simplified version of Seadrill's corporate structure and identifying which entities are Debtors is set forth below. Seadrill's complete corporate organization chart is attached hereto as **Exhibit B**.



**(i)    Consolidated Entities**

Seadrill Limited, the Seadrill Subsidiary Entities, and the Seadrill corporate groups that are majority-owned by Seadrill Limited are collectively referred to as the "Consolidated Entities" because they are consolidated for accounting and reporting purposes.  The Consolidated Entities operate as a single, integrated enterprise under a common management team, and the value of each Consolidated Entity group is reflected in the value of the broader Seadrill enterprise.  Seadrill Limited is an obligor (as either borrower or guarantor) under all $8 billion of the Consolidated Entities' funded-debt obligations with the exception of $413 million of Debtor North Atlantic Drilling Limited Unsecured Bond obligations.

***Seadrill Limited and the Seadrill Subsidiary Entities (Debtor Group).***  Seadrill Limited and its wholly-owned subsidiaries own and operate 22 rigs (i.e., the substantial majority of the Debtors' fleet), including six drillships, six semi-submersible rigs, and 10 jack-up rigs.  As described in greater detail below, Seadrill Limited and the Seadrill Subsidiary Entities are obligors under approximately $7.6 billion of the Consolidated Entities' funded-debt obligations, including approximately $5.7 billion under certain of the Bank Facilities and approximately $1.9 billion in Seadrill Limited-issued Unsecured Bonds.

***North Atlantic Drilling Limited (Debtor Group).***  Debtor North Atlantic Drilling Limited ("NADL," and together with its direct and indirect subsidiaries, collectively, the "NADL Entities"), a Bermuda exempted company, is a 70.4-percent owned subsidiary of Seadrill Limited.  The NADL Entities focus exclusively on harsh environment offshore drilling operations in the North Atlantic Ocean.  Seadrill Limited formed NADL in February 2011 to reorganize Seadrill's harsh environment activities under a single sub-holding company.  Shortly after its formation in April 2011, NADL purchased six harsh-environment drilling rigs from Seadrill Limited, which were financed by a $2 billion senior secured loan facility guaranteed by Seadrill Limited and certain of the other NADL Entities.  As of the Petition Date, the NADL Entities own and operate seven rigs, consisting of three semi submersibles, three jack up rigs, and one drillship.  As described in greater detail below, the NADL entities are direct obligors under approximately $1.5 billion of the Consolidated Entities' funded-debt obligations, including approximately $908 million under one of the Bank Facilities (which is guaranteed by Seadrill Limited) and approximately $579 million in NADL-issued Unsecured Bonds (approximately $166 million of which is guaranteed by Seadrill Limited).  NADL completed an initial public offering in February 2014.  The 29.6 percent of NADL

common shares not owned by Seadrill Limited is publicly listed and trades on the NYSE under the ticker symbol "NADL."

*Sevan Drilling Limited (Debtor Group)*. Debtor Sevan Drilling Limited ("Sevan," and together with its direct and indirect subsidiaries, collectively, the "Sevan Entities"), a Bermuda exempted company, is a 50.1-percent owned subsidiary of Seadrill Limited. The Sevan Entities focus on offshore drilling in the ultra-deepwater segment. Sevan was formed in May 2006 by Sevan Marine ASA, a Norwegian limited liability company not affiliated with Seadrill. Seadrill Limited initially acquired 28.52 percent of Sevan's outstanding common shares for $65 million in November 2011, becoming Sevan's largest shareholder in the process. In July 2013, Seadrill Limited completed a series of share acquisitions and other transactions that made it Sevan's controlling shareholder. The Sevan Entities' three semi-submersible drilling rigs employ an innovative cylindrical-hull design known as the "Sevan design." As described in greater detail below, the Sevan entities are direct obligors under approximately $875 million of the Consolidated Entities' funded-debt obligations under one of the Bank Facilities (which is guaranteed by Seadrill Limited). The 49.9 percent of Sevan common shares not owned by Seadrill Limited is publicly listed and trades on the OSE under the ticker symbol "SEVDR."

*Asia Offshore Drilling Limited (Non-Debtor Group)*. Non-Debtor Asia Offshore Drilling Limited ("AOD," and together with its three non-Debtor subsidiaries, collectively, the "AOD Entities"), a Bermuda exempted company, is a 66.2-percent owned subsidiary of Seadrill Limited. The AOD Entities own three high-specification jack-up rigs, all of which are currently under contract. Debtor Seadrill G.C.C. Operations Ltd. ("Seadrill GCC") operates each of the AOD Entities' rigs and pays the application AOD Entities a bareboat charter for each of the rigs. The AOD Entities only own rigs—they do not have their own employees or operations. AOD was formed in late 2010 by Mermaid Maritime Public Company Limited ("Mermaid"), a Thai company that is not affiliated with Seadrill Limited. In July 2011, Seadrill participated in a private placement whereby Seadrill Limited obtained 33.75 percent of AOD's outstanding common stock and subsequently completed a series of transactions that resulted in Seadrill Limited becoming AOD's controlling shareholder. The AOD entities are direct obligors under approximately $210 million of the Consolidated Entities' funded-debt obligations under one of the Bank Facilities (the "AOD Facility"). Mermaid continues to privately hold the remaining 33.8 percent of AOD common stock.

Debtors Seadrill Limited and Seadrill GCC guarantee the obligations under the AOD Facility. The four AOD entities are also obligors under the AOD Facility, but are not Debtors. Approximately 87 percent of the Bank Lenders under the AOD Facility have executed the Restructuring Support Agreement, which contains an agreement to forbear from exercising remedies against the AOD Entities as a result of Seadrill Limited's and Seadrill GCC's chapter 11 filings. In light of the Bank Lender forbearance and the simple nature of the AOD Entities' capital structure and operations, Seadrill determined to pursue a restructuring of the AOD Entities' debt obligations without commencing chapter 11 cases for the AOD Entities at this time. The Debtors will continue discussions with the AOD Entities' stakeholders, including the AOD Facility Bank Lenders not party to the Restructuring Support Agreement and Mermaid in hopes of reaching a consensual resolution of a restructuring of the AOD Entities.

### (ii)    Non-Consolidated Entities and Description of Insulating Transactions

In addition to its wholly-owned subsidiaries and majority investments in NADL, Sevan, and AOD, Seadrill Limited owns non-majority interests in four other offshore drilling and services companies that, together with their respective subsidiaries, are referred to as the "Non-Consolidated Entities." Certain of the Non-Consolidated Entities share common management with the Consolidated Entities. Others are independently managed. Each Non-Consolidated Entity corporate group has its own capital structure. Seadrill Limited historically guaranteed certain of the Non-Consolidated Entities' funded-debt obligations. Thus, a Seadrill Limited chapter 11 filing would have triggered a default in each Non-Consolidated Entity

corporate group. Before the Petition Date, the Debtors, the Non-Consolidated Entities, and certain of their respective secured bank lenders, however, took significant steps to insulate the Non-Consolidated Entities from a Seadrill Limited chapter 11 filing. The Non-Consolidated Entity groups now will be largely unaffected by these chapter 11 cases. The Non-Consolidated Entity insulating transactions significantly benefit the Debtors' estates by reducing the scope and complexity of these chapter 11 cases and preserving and maximizing the going concern value of Seadrill Limited's interests in the Non-Consolidated Entities.

*Seadrill Partners LLC (Non-Debtor Group).* Seadrill Limited indirectly owns a 46.6-percent ownership interest in non-Debtor Seadrill Partners LLC ("Seadrill Partners," and together with its subsidiaries, collectively, the "Seadrill Partners Entities"), a Marshall Islands limited liability company. The Seadrill Partners Entities own 11 offshore drilling rigs, including four semi-submersible rigs, four drillships, and three tender rigs. Seadrill Partners was formed in June 2012 as a wholly-owned subsidiary of Seadrill Limited. In October 2012, Seadrill Partners completed an initial public offering of its common units, which trade on the NYSE under the ticker symbol "SDLP." The 53.4 percent of Seadrill Partners' common units not owned by Seadrill Limited is publicly held. In connection with Seadrill Partners' initial public offering, certain Seadrill Partners Entities entered into a management and services agreement with Seadrill Management Limited ("Seadrill Management"), a wholly owned subsidiary of Seadrill Limited that also manages the Consolidated Entities. Under this agreement, Seadrill Management performs substantially all Seadrill Partners management and administrative functions.

As of the Petition Date, certain of the Seadrill Partners Entities are obligated under more than $3.6 billion in funded-debt obligations, which include:

- approximately $2.9 billion outstanding under a secured, bank-funded "Term Loan B" credit facility due February 2021;

- approximately $340 million outstanding under a $1.45 billion secured, bank-funded credit facility originally due February 2018 (and extended to October 2020);

- approximately $280 million outstanding under a $420 million secured, bank-funded credit facility originally due January 2018 (and extended to July 2020); and

- approximately $93 million outstanding under a $119.1 million secured, bank-funded credit facility originally due December 2017 (and extended to June 2020).

Historically, each of the foregoing credit facilities, other than the Term Loan B credit facility, crossed over the Seadrill Limited and Seadrill Partners corporate groups. Seadrill Limited or certain of its wholly-owned subsidiaries were either a primary obligor or guarantor under the facilities. Where Seadrill Limited or its subsidiaries were primary obligors, Seadrill Subsidiary Entity-owned collateral (*i.e.*, rigs) secured the obligations under the facilities. To avoid cross-defaults and insulate the Seadrill Partners Entities from a Seadrill Limited chapter 11 filing, the Debtors, the Seadrill Partners Entities, and the Seadrill Partners Entities' bank lenders negotiated and executed a transaction in the months immediately preceding the Petition Date that effectively "split" the non-Term Loan B facilities. Pursuant to this transaction, all Seadrill Limited guarantees and security granted by certain Seadrill Subsidiary Entities were released with respect to obligations of Seadrill Partners Entities, and the facilities were allocated among the Seadrill Limited and Seadrill Partners groups as appropriate. The transaction also included a maturity extension of two and one half years for the non-Term Loan B facilities, an aggregate $150 million pay down of those facilities ($100 million on closing, $25 million six months after closing, and $25 million 12 months after closing), and certain covenant relief. As currently structured, Seadrill anticipates that the Seadrill Partners Entities' funded-debt obligations and business operations will be largely unaffected by these chapter 11 cases.

33

**SeaMex Limited (Non-Debtor Group).**  Seadrill Limited indirectly owns a 50 percent ownership interest in non-Debtor SeaMex Limited ("SeaMex," and together with its direct and indirect subsidiaries, collectively, the "SeaMex Entities"), a Bermuda exempted company, pursuant to a joint venture with funds controlled by Fintech Advisory Inc. ("Fintech"), a Delaware corporation that is also one of the Commitment Parties.  Fintech continues to hold the remaining 50 percent ownership interest in SeaMex.  SeaMex's fleet consists of five high-specification jack-up rigs purchased from Seadrill Limited in March 2015 for $1.08 billion.  As with the Seadrill Partners Entities, Seadrill Management performs substantially all of the SeaMex Entities' management and administrative functions pursuant to a management and services agreement.  As of the Petition Date, the SeaMex Entities are obligated under approximately $640 million in funded-debt obligations, which consists of amounts outstanding under a $750 million secured, bank-funded credit facility due September 2019.

To avoid cross-defaults, and to insulate the SeaMex Entities from a Seadrill Limited chapter 11 filing, the Debtors, the SeaMex Entities, and the SeaMex Entities' secured bank lenders negotiated an amendment to the SeaMex Entities' secured bank facility in the months immediately preceding the Petition Date to remove certain events of default related to a Seadrill Limited chapter 11 filing, remove certain change in control provisions, and implement certain other revisions.  The SeaMex bank facility had been previously amended in a manner that allowed the pre-existing Seadrill Limited guarantee to lapse.  As currently structured, Seadrill anticipates the SeaMex Entities' funded-debt obligations and business operations will be largely unaffected by these chapter 11 proceedings.

**Seabras Sapura (Non-Debtor Group).**  In May 2012, Seadrill and Malaysian oilfield services company SapuraKencana Petroleum Berhad (now known as Sapura Energy Berhad) ("Sapura"), through certain of their respective subsidiaries, entered into a joint venture known as Seabras Sapura to own and operate offshore oil and gas service vessels in Brazil.  In connection with this joint venture, Seadrill holds 50-percent ownership interests in an Austrian limited liability company Seabras Sapura Holding GmbH ("Seabras Holding") and a Brazilian limited liability company Seabras Sapura Participacoes Ltda. ("Seabras Participaçoes").  Sapura owns the remaining 50 percent of each entity.  Through their respective subsidiaries, Seabras Holding and Seabras Participaçoes (collectively with such subsidiaries, "Seabras") own and operate six pipe-laying support vessels, all of which are operating off the coast of Brazil.  Sapura subsidiaries are the managers of the jointly owned entities under the relevant agreements, though the Seabras Sapura joint venture is generally self-managed (*i.e.*, Seadrill Management does not provide management services).

As of the Petition Date, certain Seabras entities are obligated under approximately $1.2 billion in funded-debt obligations, which include:

- approximately $400 million outstanding under a senior secured credit facility (the "PLSV I Facility") due May 2024, secured by two pipe-laying support vessels (the *Sapura Diamante* and the *Sapura Topazio*);

- approximately $690 million outstanding under a senior secured credit facility (the "PLSV II Facility") due April 2025, secured by three additional pipe-laying support vessels (the *Sapura Jade*, the *Sapura Onix*, and the *Sapura Rubi*); and

- approximately $170 million outstanding under a senior secured credit facility due 2032, secured by one pipe-laying support vessel (the *Sapura Esmeralda*)

- approximately $20 million under a senior secured credit facility due 2020, which benefits from a standby letter of credit that is secured by one pipe-laying support vessel (the *Sapura Esmeralda*).

34

Both Seadrill Limited and Sapura issued limited guarantees of the PLSV I Facility and PLSV II Facility debt. Before the Petition Date, to preserve and maximize the value of Seadrill's investment in Seabras, Seadrill successfully negotiated with Seabras, Sapura, and the lenders under the PLSV I Facility and PLSV II Facility a waiver of up to six months of certain potential defaults arising out of Seadrill Limited's chapter 11 filing. Accordingly, Seadrill anticipates that Seabras's funded-debt obligations and business operations will be largely unaffected by the commencement of these chapter 11 cases. Seadrill will continue to engage in discussions with all parties regarding a comprehensive solution to ring-fence Seabras from Seadrill Limited's restructuring.

***Archer Limited (Non-Debtor Group).*** Seadrill Limited owns a 15.7-percent equity interest in non-Debtor Archer Limited ("Archer"), a Bermuda exempted company that specializes in global drilling and well services. In September 2007, Seadrill spun off its well services division by establishing an independent well services company, Seawell Limited ("Seawell"), and completing a $50 million private placement of 20 million shares of Seawell. In February 2011, Seawell completed a merger with Allis-Chambers Energy, Inc., and the combined company was renamed Archer Limited. The 84.3 percent of Archer common shares not owned by Seadrill Limited are publicly traded on the OSE under the ticker symbol "ARCHER." Archer is self-managed. As of the Petition Date, Archer's funded debt obligations included:

- approximately $628 million outstanding under a $750 million secured, bank-funded credit facility due September 2020; and

- approximately $25 million outstanding under a €48.4 million Hermes covered term loan facility due September 2020; and

- approximately $45 million outstanding under subordinated, convertible facilities (for which Seadrill Limited is the lender) due 2021.

In the months immediately preceding the Petition Date, the Debtors, Archer, and Archer's secured bank lenders negotiated—as part of a broader Archer refinancing that resulted in its current capital structure—a release of pre-existing Seadrill Limited guarantees and a reduction in the Seadrill Limited-funded subordinated loans and fees (under which approximately $146 million was previously outstanding) to the current $45 million outstanding and, to avoid cross-defaults and to insulate Archer and its subsidiaries from a Seadrill chapter 11 filing, certain amendments to the Archer bank-funded credit facilities. As part of the transaction, Seadrill Limited also paid a fee in an amount equal to approximately ten percent (approximately $28 million) of the aggregate, contingent guaranteed liabilities and agreed that the subordinated loans and fees would be convertible to Archer equity at a pre-agreed price. Archer consummated its broader financial restructuring through a Bermuda scheme of arrangement and parallel chapter 15 proceeding. As currently structured, Seadrill anticipates that Archer's funded-debt obligations and business operations will be largely unaffected by these chapter 11 cases.

### (iii)    Ship Finance International Limited

SFL is 36-percent owned by Hemen, with the remaining common shares trading on the NYSE under the ticker symbol "SFL" and held by non-Seadrill affiliated entities. Over the years, certain of the Debtors have entered into sale and leaseback arrangements with SFL subsidiaries, which are guaranteed by Seadrill Limited. As of the Petition Date, certain of the Debtors were party to three sale/leaseback agreements with SFL subsidiaries. As of the Petition Date, approximately $1.1 billion in aggregate obligations remained outstanding under the SFL lease agreements, all of which is guaranteed by Seadrill Limited.

Beginning in late 2016, as part of their broader restructuring, the Debtors commenced discussions with SFL regarding a consensual restructuring of the SFL leases. The Debtors submitted an initial proposal to SFL in October 2016. SFL responded with a counter-proposal with respect to two of the three SFL leases in November 2016. Negotiations were then largely silent until mid-2017, when the Debtors and SFL exchanged a series of proposals and engaged in lengthy discussions that ultimately resulted in a consensual resolution that is embodied in the Restructuring Support Agreement.

Pursuant to the SFL resolution, each of the three existing SFL lease agreements will be amended to provide for a 29 percent deferral of lease payments for a period of five years. Deferred amounts will be paid five years from the date on which the relevant amount was deferred as part of the adjusted charter rate until the applicable purchase obligation/put option date under each lease. The strike price in respect of the call options for each lease will be adjusted by adding deferred amounts and subtracting repaid amounts in accordance with the adjusted charter hire rates until the relevant call option date on a dollar for dollar basis. The purchase obligation/put option date (for two of the three leases) and amount will be adjusted such that the all-in internal rate of return under each lease is reduced from the implied contractual level to 6.0 percent, with the put option amount under the lease in respect of the *West Linus* rig being further adjusted to $86 million. The SFL leases will be further amended in a manner broadly consistent with the Bank Deal terms. The independent members of the Seadrill Limited board of directors considered and approved the SFL resolution prior to its consummation. SFL and its subsidiaries will otherwise be unaffected by these chapter 11 cases.

In the context of the broader restructuring contemplated by the Restructuring Support Agreement, including the substantial new money financing to be provided, in part, by Hemen, the Debtors believe that the SFL resolution represents the best available alternative under the circumstances. On the Effective Date of the plan, the Debtors will assume amended versions of the SFL leases reflecting the terms described above.

**B.      Seadrill's Operations**

Seadrill contracts with vendors and customers across the globe to provide drilling services, in both benign and harsh operating environments from shallow to ultra-deepwater. The Debtors' largest customers include Petroleo Brasileiro S.A., or "Petrobras," (the Brazilian national oil company), Total S.A. Group, ExxonMobil Corp., LLOG Exploration Company, and Statoil ASA. The Debtors' rigs are located around the world.

The substantial majority of the Debtors' 32 rigs came online in 2007 or later. The Debtors' current contract backlog (calculated as the contracted-for day rate multiplied by the outstanding term for all active contracts) is approximately $3.1 billion. The average contract duration for the Debtors' floaters is 10 months and jack-up rigs is 30 months. Thus, the majority of the Debtors' contract backlog will come due over the course of the next one and one half years, which may be difficult to replace so long as current market conditions persist.

As of the Petition Date, 15 of the Debtors' 32 rigs are not under contract and have either been warm stacked or cold stacked. Warm stacked rigs maintain a significant number of crew and are kept fully operational and ready for deployment. Cold stacked rigs are stored in a harbor, shipyard, or other designated offshore area and the majority of the crew is dismissed or reassigned to another rig. The Debtors' warm stacked floaters cost them approximately $50,000 per rig per day while cold-stacked floaters cost them approximately $10,000 per rig per day. There is no material difference in the costs for warm stacked and cold stacked jack-up rigs.

Specifically, the Debtors own 13 jack-up rigs (8 of which are currently under contract), while their non-Debtor affiliates own an additional 8 jack-up rigs.  Of the Debtors' 13 jack-up rigs, 3 are qualified for harsh environment drilling.  A summary of the year built, location, and contract status of the Debtors' 13 jack-up rigs is set forth below.

| Rig | Year | Location | Contract |
|---|---|---|---|
| *West Epsilon* | 1993 | Norway | *stacked*[8] |
| *West Prospero* | 2007 | Malaysia | *stacked* |
| *West Vigilant* | 2008 | Malaysia | *stacked* |
| *West Ariel* | 2008 | Republic of Congo | February 2018 |
| *West Freedom* | 2009 | Venezuela | September 2017 |
| *West Cressida* | 2009 | Malaysia | September 2017 |
| *West Callisto* | 2010 | Saudi Arabia | November 2018 |
| *West Leda* | 2010 | Malaysia | *stacked* |
| *West Elara* | 2011 | Norway | September 2027 |
| *West Castor* | 2013 | Mexico | December 2019 |
| *West Telesto* | 2013 | Malaysia | December 2017 |
| *West Tucana* | 2013 | Sharjah | *stacked* |
| *West Linus* | 2014 | Norway | December 2028 |

Additionally, The Debtors own 12 semi-submersible rigs (3 of which are currently under contract), while their non-Debtor affiliates own an additional 4 semi-submersible rigs.  Of the Debtors' 12 semi-submersible rigs, 6 are qualified for harsh environment drilling.  A summary of the year built, location, and contract status of the Debtors' 12 semi-submersible rigs is set forth below.

| Rig | Year | Location | Contract |
|---|---|---|---|
| *West Alpha* | 1986 | Norway | *stacked* |
| *West Venture* | 2000 | Norway | *stacked* |
| *West Phoenix* | 2008 | UK | November 2017 |
| *West Hercules* | 2008 | Norway | *stacked* |
| *West Taurus* | 2008 | Spain | *stacked* |
| *West Eminence* | 2009 | Spain | *stacked* |
| *West Orion* | 2010 | Malaysia | *stacked* |
| *West Pegasus* | 2011 | Spain | *stacked* |
| *West Eclipse* | 2011 | Angola | June 2018 |
| *Sevan Driller* | 2009 | Malaysia | *stacked* |
| *Sevan Brasil* | 2012 | Brazil | July 2018 |
| *Sevan Louisiana* | 2013 | USA | *stacked* |

The Debtors own 7 drillships (6 of which are currently under contract), while their non-Debtor affiliates own an additional 4 drillships.  A summary of the year built, location, and contract status of the Debtors' 7 drillships is set forth below.

---

[8]     As described in greater detail below, when a drilling rig is not under contract, it may be "stacked" or stored in a non-operating state until the rig owner is able to secure a contract for that rig.

| Unit | Year | Location | Contract |
|------|------|----------|----------|
| *West Navigator* | 2000 | Norway | *stacked* |
| *West Gemini* | 2010 | Angola | October 2017 |
| *West Tellus* | 2013 | Brazil | October 2019 |
| *West Neptune* | 2014 | USA | November 2018 |
| *West Jupiter* | 2014 | Nigeria | December 2019 |
| *West Saturn* | 2014 | Brazil | October 2019 |
| *West Carina* | 2015 | Brazil | June 2018 |

The Debtors employ approximately 3,760 highly skilled individuals across 22 countries and 5 continents to operate their drilling rigs and perform various other corporate functions.  The Debtors' monthly payroll is approximately $42 million.  The skills and knowledge of Seadrill's employee base are essential to preserving operational stability, safety, and efficiency, which in turn is necessary to maximize value over the course of the Chapter 11 Cases.

### C.    The Debtor's Prepetition Capital Structure

As of the Petition Date, the Debtors were liable for approximately $8 billion in aggregate funded-debt obligations.  These obligations arise under the 12 Bank Facilities and the six Unsecured Bond issuances.  Seadrill Limited is an obligor under all 12 of the Bank Facilities.  The table below summarizes the Debtors' prepetition capital structure, with near-term maturing obligations indicated in red.

| Bank Facilities *(in US$ millions)* | Principal |
|-------------------------------------|-----------|
| ***Seadrill Limited Facilities*** | |
| $400 million facility due 2017 — *Jack-Up Facility* | 135 |
| $450 million facility due 2017 — *West Eminence Facility* | 265 |
| $300 million facility due 2018 | 144 |
| $1.50 billion facility due 2019 | 1,125 |
| $1.35 billion facility due 2019 | 945 |
| $950 million facility due 2019 | 566 |
| $450 million facility due 2020 | 122 |
| $440 million facility due 2017 — *Split Facility* | 64 |
| $1.45 billion facility due 2018 — *Split Facility* | 322 |
| ***NADL Facility (Seadrill Limited Guaranteed)*** | |
| $2.00 billion facility due 2017 — *NADL Facility* | 908 |
| ***AOD Facility (Seadrill Limited Guaranteed)*** | |
| $360 million facility due 2018 | 210 |
| ***Sevan Facility (Seadrill Limited Guaranteed)*** | |
| $1.75 billion facility due 2018 | 875 |
| **Total Bank Facilities** | **$5,681 million** |

**Unsecured Bonds** *(in US$ millions—Net of Seadrill Holdings)*

| | |
|---|---|
| *Seadrill Limited Bonds* | |
| $1.00 billion bond due 2017 — *Maturing Bonds* | 843 |
| NOK 1.80 billion bond due 2018 | 211 |
| SEK 1.50 billion bond due 2019 | 168 |
| $500 million bond due 2020 | 479 |
| *NADL Bonds* | |
| NOK 1.50 billion bond due 2018 — *Seadrill Limited Guaranteed* | 166 |
| $600 million bond due 2019 | 413 |
| **Total Unsecured Bonds** | **$2,280 million** |

**Danske Guarantee Facility**

| | |
|---|---|
| Outstanding Obligations | $60 million |

| | |
|---|---|
| **Total Obligations Outstanding** | **$8,021 million** |

(i)     **Bank Facilities**

The Debtors generally incurred the obligations under the Bank Facilities described below to finance corporate acquisitions or the construction or acquisition of new rigs. The facilities are secured by, among other things, (a) a first priority, perfected mortgage in one or more of the Debtors' drilling rigs, (b) guarantees from the applicable rig-owning entities, and (c) first-priority security interests in the rig-owning entities' shares, earnings, and earnings accounts. No financial institution possesses a blanket lien over the Debtors' entire fleet. Instead, the secured credit facilities are secured by non-overlapping subsets of the Debtors' rigs.

(a)     **Seadrill Limited Facilities**

*$400 million facility due 2017 ("Jack-Up Facility"):* On December 8, 2011, Seadrill Limited entered into that certain Senior Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain of Seadrill Limited's wholly-owned Debtor subsidiaries as guarantors, Nordea Bank Norge ASA, as agent, and the lender parties thereto. On April 28, 2016, the parties executed an amendment extending the maturity of the Jack-Up Facility from December 8, 2016 to May 31, 2017. On April 26, 2017, the parties executed an amendment to further extend the maturity of the Jack-Up Facility to August 31, 2017. On August 11, 2017, the parties executed a final amendment to extend the maturity of the Jack-Up Facility to September 14, 2017. Collateral securing the Jack-Up Facility includes four jack-up rigs owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

*$450 million facility due 2017 ("West Eminence Facility"):* On December 13, 2013, certain of the Debtors entered into that certain Senior Secured Credit Facility Agreement, by and among Debtor Seadrill Eminence Ltd., as borrower, Seadrill Limited and one wholly-owned Debtor subsidiary of Seadrill Limited, as guarantors, Danske Bank A/S, as agent, and the lender parties thereto. On April 28, 2016, the parties executed an agreement extending the maturity date of the $450 million *West Eminence* Facility from June 20, 2016 to December 31, 2016. On November 22, 2016 and April 26, 2017, the parties executed additional agreements further extending the maturity, ultimately to August 15, 2017. On August 14, 2017, because the Debtors' and the requisite lenders could not reach a consensual resolution to further extend the maturity of the *West Eminence* Facility (due to a single holdout lender), the Debtors sought and a court of competent jurisdiction in Bermuda entered an order approving a scheme of arrangement that effectuated an extension of the maturity of the $450 million *West Eminence* Facility to September 14, 2017. Collateral

securing the *West Eminence* Facility includes one semi-submersible drilling rig—the *West Eminence*—owned by a Debtor subsidiary of Seadrill Limited, assignment of certain earnings accounts, and a pledge of the common equity shares of Debtor and rig-owning entity Seadrill Eminence Ltd.

*$300 million facility due 2018:* On July 16, 2013, Seadrill Limited entered into that certain Senior Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain wholly-owned Debtor subsidiaries of Seadrill Limited as guarantors, DNB Bank ASA, as agent, and the lender parties thereto. The $300 million facility matures in July 2018. Collateral securing the $300 million facility includes two jack-up rigs owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

*$1.50 billion facility due 2019:* On July 30, 2014, certain of the Debtors entered into that certain Senior Secured Credit Facility Agreement, by and among Debtors Seadrill Saturn Ltd., Seadrill Jupiter Ltd., and Seadrill Neptune Hungary Kft., as borrowers, Seadrill Limited and certain wholly-owned Debtor subsidiaries of Seadrill Limited as guarantors, Nordea Bank Finland Plc, London Branch, as agent, and the lender parties thereto. The $1.50 billion facility matures in August 2019. Collateral securing the facility includes three drillships owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

*$1.35 billion facility due 2019:* On August 26, 2014, Seadrill Limited entered into that certain Senior Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain wholly-owned Debtor subsidiaries of Seadrill Limited as guarantors, DNB Bank ASA, as agent, and the lender parties thereto. The $1.35 billion facility matures in August 2019. Collateral securing the facility includes one drillship and two semi-submersible drilling rigs owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

*$950 million facility due 2019:* On January 26, 2015, Seadrill Limited entered into that certain Senior Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain wholly-owned Debtor subsidiaries of Seadrill Limited as guarantors, Nordea Bank AB, London Branch, as agent, and the lender parties thereto. The $950 million facility matures in January 2020. Collateral securing the facility includes one drillship and one semi-submersible drilling rig owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

*$450 million facility due 2020:* On August 26, 2015, Seadrill Limited entered into that certain Senior Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain wholly-owned Debtor subsidiaries of Seadrill Limited as guarantors, Nordea Bank AB, London Branch, as agent, and the lender parties thereto. The 2015 $450 million facility matures in August 2020. Collateral securing the facility includes six jack-up rigs owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

**(b)      Seadrill Limited Split Facilities.**

As described above, on August 16, 2017, the Debtors and the Seadrill Partners Entities executed a transaction to address three credit facilities that previously straddled the Seadrill Limited and Seadrill Partners capital structures. Pursuant to that transaction, the Seadrill Limited guarantee of the $420 million Seadrill Partners facility due 2018 was severed, leaving the Debtors with no other obligations under that facility. Certain of the Seadrill Subsidiary Entities, however, were primary obligors (and had pledged

collateral) under the two other facilities described below, so the obligations under those two facilities were split between the applicable Seadrill Limited and Seadrill Partners corporate group entities.

**$440 million facility due 2017.**  On December 4, 2012, Seadrill Limited entered into that certain Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain of Seadrill Limited's Debtor subsidiaries, certain non-Debtor subsidiaries of Seadrill Partners, as guarantors, Citibank Europe plc, UK branch, as agent, and the lender parties thereto.  Pursuant to a transaction closing on August 16, 2017, certain obligations under the $440 million facility were novated to the Seadrill Partners corporate group before the facility was amended and restated to effectuate the split of the Seadrill Limited and Seadrill Partners corporate groups, resulting in the only obligations remaining outstanding being by Seadrill Limited and its obligor, wholly-owned subsidiaries.  Collateral securing the Debtors' obligations under the split facility includes one jack-up rig owned by a Debtor subsidiary of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of Debtor and rig-owning entity Seadrill Telesto Ltd.

**$1.45 billion facility due 2018.**  On March 20, 2013, certain of the Debtors entered into that certain Senior Secured Credit Facility Agreement, by and among Debtor Seadrill Tellus Ltd. and non-Debtor Seadrill Vela Hungary Kft. ("Seadrill Vela Hungary"), as borrowers, Seadrill Limited, one Debtor subsidiary of Seadrill Limited and certain non-Debtor subsidiaries of Seadrill Partners, as guarantors, ING Bank N.V., as agent, and the lenders party thereto.  Pursuant to a transaction closing on August 16, 2017, the $1.45 billion facility was amended and restated to effectuate the split between the Seadrill Limited and Seadrill Partners corporate groups, resulting in only a portion of the obligations remaining outstanding as to Seadrill Limited and its obligor, wholly-owned subsidiaries.  Collateral securing the Debtors' obligations under the split facility includes one drillship owned by Seadrill Tellus Ltd., a Debtor subsidiary of Seadrill Limited, , assignment of certain earnings accounts, and a pledge of the common equity shares of Debtor and rig-owning entity Seadrill Tellus Ltd.

### (c)      NADL Facility (Seadrill Limited Guaranteed)

**$2.00 billion facility due 2018 ("NADL Facility"):**  On April 15, 2011, NADL entered into that certain Senior Secured Credit Facility Agreement, by and among NADL, as borrower, Seadrill Limited and certain subsidiaries of NADL, as guarantors, DNB Bank ASA, as agent, and the agents and lenders party thereto.  As described below, on April 28, 2016, the parties executed an agreement extending the maturity of the NADL Facility from April 15, 2017 to June 30, 2017.  On April 26, 2017, the parties executed an amendment to further extend the maturity to September 14, 2017.  Collateral securing the NADL Facility includes three semi-submersible drilling rigs, two jack-ups, and one drillship owned by Debtor subsidiaries of NADL, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

### (d)      AOD Facility (Seadrill Limited Guaranteed)

**$360 million facility due 2018:**  On April 9, 2013, three non-Debtor subsidiaries of AOD (collectively, the "AOD Borrower Subsidiaries") entered into that certain Senior Secured Credit Facility Agreement, by and among the AOD Borrower Subsidiaries, as borrowers, Seadrill Limited, one Debtor subsidiary of Seadrill Limited, Seadrill GCC Operations Limited, and AOD, as guarantors, ABN AMRO Bank N.V., as agent, and the other agents and lenders party thereto.  The AOD Facility matures in April 2018.  Collateral securing the facility includes three jack-up rigs owned by non-Debtor subsidiaries of AOD, assignment of certain earnings accounts, and pledges of the common equity shares of the non-Debtor obligor rig-owning entities.  As described herein, the AOD Borrower Subsidiaries did not commence chapter 11 cases, but certain Debtors, including Seadrill Limited and Seadrill GCC Operations Limited, are obligors under the AOD facility

41

(e)        **Sevan Facility (Seadrill Limited Guaranteed)**

***$1.75 billion facility due 2018:***  On September 30, 2013, certain Debtor subsidiaries of Sevan (collectively,  the "Sevan Borrower Subsidiaries")  entered into that certain Senior Secured Facility Agreement, by and among the Sevan Borrower Subsidiaries, as borrowers, Seadrill Limited and certain subsidiaries of Sevan, as guarantors, ING Bank N.V., as agent, and the lenders party thereto.  The Sevan Facility matures in October 2018.  Collateral securing the facility includes three ultra-deepwater Sevan design cylindrical-hull semi-submersible rigs owned by Debtor subsidiaries of Sevan, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

(ii)        **Unsecured Bonds**

The Debtors are also obligated under six issuances of unsecured bonds—four issued by Seadrill Limited and two issued by NADL.  Details regarding the unsecured bonds are provided below.

(a)        **Seadrill Limited Unsecured Bonds**

***$1.00 billion bond due 2017 ("Maturing Bonds"):***  On September 14, 2012, Seadrill Limited issued $1.0 billion of 5.625% senior unsecured notes due September 2017.  The notes are governed by that certain indenture, dated September 14, 2012, among Seadrill Limited, as issuer, and Deutsche Bank Trust Company Americas, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the notes.

***NOK 1.80 billion bond due 2018:***  On March 12, 2013, Seadrill issued NOK 1.8 billion of senior unsecured notes due March 2018.  The notes are governed by that certain bond agreement, dated March 11, 2013, among Seadrill Limited, as issuer, and Norsk Tillitsmann ASA, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the notes.

***SEK $1.50 billion bond due 2019:***  On March 18, 2014, Seadrill Limited issued SEK 1.5 billion of senior unsecured notes due March 2019.  The notes are governed by that certain bond agreement, dated March 17, 2014, among Seadrill Limited, as issuer, and Norsk Tillitsmann ASA, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the notes.

***$500 million bond due 2020:***  On September 25, 2013, Seadrill Limited issued $500 million of 6.125% senior unsecured notes due September 2020.  The notes are governed by that certain indenture, dated September 25, 2013, among Seadrill Limited, as issuer, and Deutsche Bank Trust Company Americas, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the notes.

(b)        **NADL Unsecured Bonds**

***NOK 1.5 billion bond due 2018 (Seadrill Limited Guaranteed):***  On October 30, 2013, NADL issued NOK 1.5 billion of senior unsecured notes due October 2018.  The notes are governed by that certain bond agreement, dated October 30, 2013, among NADL, as issuer, and Norsk Tillitsmann ASA, as indenture trustee, as amended by that certain First Amendment and Restatement Agreement, dated February 13, 2015, among NADL, as issuer, and Nordic Trustee ASA, as indenture trustee.  The obligations under the notes are unsecured and are fully and unconditionally guaranteed on a senior unsecured basis by Seadrill Limited pursuant to that certain On Demand Guarantee, dated February 13, 2015, among Seadrill Limited, as guarantor, and Nordic Trustee ASA as bond trustee.

***$600 million bond due 2019:***  On January 31, 2014, NADL issued $600 million of 6.25% senior unsecured notes due January 2019.  The notes are governed by that certain indenture, dated January 31,

2014, among NADL, as issuer, and Deutsche Bank Trust Company Americas, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the notes.

### (iii)   Danske Guarantee Facility

Seadrill Limited maintains a guarantee facility with Danske Bank A/S ("Danske"), pursuant to which Danske provides certain operations-related credit support to third parties.  Pursuant to the Danske Guarantee Facility, Seadrill Limited may request that Danske guarantee obligations to third parties, or issue letters of credit and other similar instruments, up to an aggregate amount of $90 million.  These instruments generally secure obligations under the Debtors' customer contracts, as well as obligations in connection with the Debtors' bids on new drilling contracts.  As of the Petition Date, there are approximately $54 million in obligations outstanding under the Danske guarantee facility.  In most cases, the Debtors' customers require these performance guarantees in the ordinary course of business as a prerequisite to entering into new customer contracts.

### (iv)   Publicly-Held Common Shares

*Seadrill Limited:*  Seadrill Limited is a publicly-held Bermuda exempted company listed on the NYSE and the OSE under the symbol "SDRL."  Seadrill Limited common shares have traded on the OSE since November 2005, and on the NYSE since April 2010.  As of the Petition Date, Seadrill Limited's nonaffiliated public float represents 75.8 percent of total shares issued and outstanding, and Seadrill Limited's principal shareholder, Hemen, holds 24.2 percent of Seadrill Limited's issued and outstanding common shares.

*NADL:*  NADL is a publicly-held Bermuda exempted company listed on the NYSE and the Norwegian over-the-counter exchange under the symbol "NADL."  NADL common shares have traded on the NYSE since January 2014.  As of the Petition Date, Seadrill Limited owned approximately 70.4 percent of NADL's issued and outstanding common shares.

*Sevan:*  Sevan is a publicly-held Bermuda exempted company listed on the OSE under the symbol "SEVDR."  Sevan common shares have traded on the OSE since June 2015.  As of the Petition Date, Seadrill Limited owns approximately 50.1 percent of Sevan's issued and outstanding common shares.

## VI.   EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.   Market Decline and Industry-Specific Challenges

Approximately three years ago, the oil and gas industry entered what has become a sustained down cycle that was brought on by low commodities prices.  Seadrill has not been immune to the effects of the market decline.  Oil prices peaked in mid-2014 at more than $115 per barrel before declining to less than $30 per barrel by early 2016.  While oil prices have recovered modestly since early 2016, they have hovered near or below breakeven pricing for offshore drilling projects.  During that same period, Seadrill Limited's common share trading price fell to a fraction of mid-2014 highs.

Seadrill also faces a mix of offshore drilling industry-specific risks.  In response to the recent market downturn, operators have significantly pared back new drilling activity.  Even as the market begins to improve, it is likely that the recovery for offshore drilling companies such as Seadrill will lag behind the market due to the comparatively high break-even price for offshore drilling projects.

Further, upstream capital expenditures, and especially the demand for offshore drilling services, are influenced as much by market expectations as actual market performance.  Due to the size of the required capital investment and typical length of offshore drilling contracts, upstream capital expenditure

levels are unlikely to improve if operators expect continued volatility in the commodities markets. As a result, on an industry-wide basis, average semi-submersible rig dayrates have decreased by more than $200,000 from mid-2014 highs, while drillship dayrates have decreased by nearly $300,000 over that time period.

Finally, Seadrill operates in a highly competitive sector. Even in good times, offshore drilling contractors compete vigorously for new engagements. This competition has only intensified due to the substantial industry-wide excess rig capacity. While operators may consider a range of factors in contracting for drilling services, they tend to focus more closely on price in a weak market. These conditions have put substantial downward pressure on the day rates offshore drillers are able to charge. Additionally, while Seadrill's long-term contracts help to insulate it from market pressures, certain operators have aggressively pursued contract amendments in an attempt to extract favorable terms.

Although the Debtors and other offshore oil companies have actively sought to delay (and in some cases cancel) deliveries of newly-constructed rigs, and have divested or scrapped older rigs, global utilization rates remain well below historical highs.

### B.    Proactive Approach to Addressing Liquidity Constraints

In response to deteriorating market conditions, the Debtors have implemented various initiatives to reduce costs and increase efficiency. Since the end of 2014, the Debtors have reduced their employee headcount from approximately 9,500 enterprise-wide employees to approximately 4,780 enterprise-wide employees. The Debtors also decreased their rig and operating costs from $1.61 billion in 2015 to $1.02 billion in 2016 (including by stacking certain rigs), and their general and administrative expenses from $248 million in 2015 to $234 million in 2016. Moreover, Seadrill Limited suspended dividends to its common shareholders in November 2014 given uncertain market conditions. In part due to these efforts, as of the Petition Date, the Debtors had approximately $1 billion in cash. The Debtors intend to fund the Chapter 11 Cases with the consensual use of cash collateral, without the need for debtor-in-possession financing.

The Debtors also have taken steps to address contingent liabilities related to their newbuild contracts. Newbuild contract purchase obligations typically span several years and come due as the shipyard completes construction and delivers the newbuild rigs. The Debtors, however, successfully negotiated a number of newbuild deferrals and other relief with the shipyards. Hemen has close business relationships with substantially all of the Debtors' shipyards, which has helped the Debtors manage these multi-billion dollar obligations. The Debtors will continue to be able to leverage this relationship as long as Hemen remains a significant Seadrill Limited stakeholder.

Four of Seadrill's 14 newbuild contracts, implicating approximately $1.8 billion in obligations, are with Debtor entities. The purchase obligations under each of these contracts are coming due in the near term. In light of market conditions and continued low utilization rates, the Debtors are seeking to further defer these purchase obligations. But, the Debtors were unable to reach such a resolution prepetition. Further, the counterparty to two of the Debtor newbuild contracts initiated arbitration proceedings regarding the Debtors' obligations thereunder. The Debtors remain in active negotiations with this newbuild counterparty. While the Debtors may seek to reject newbuild contracts if they are unable to reach satisfactory commercial resolutions, their preference is for a consensual resolution with the counterparties.

Recognizing the need to examine more comprehensive restructuring solutions, Seadrill sought outside strategic advice beginning in late 2015. Seadrill ultimately engaged Kirkland & Ellis LLP (U.S. counsel), Slaughter and May (U.K. counsel and legacy corporate counsel), Conyers Dill & Pearman Limited (Bermuda counsel), and Advokatfirmaet Thommessen AS (Norway counsel) as legal advisors, Houlihan

Lokey, Inc. and Morgan Stanley as financial advisors, and Alvarez & Marsal North America, LLC as restructuring advisor.

### C.    Creditor Negotiations, Bank Deal, Capital Raise Process, and Chapter 11 Filing

In May 2015, Seadrill executed certain amendments providing for limited covenant relief under the Bank Facilities.  As the market downturn persisted, Seadrill determined that it would require a more comprehensive solution to bridge to a market recovery and began to focus on negotiating a transaction that would provide for at least a five-year liquidity runway, consistent with its business plan.  Seadrill thereafter commenced discussions with the Bank CoCom regarding a broader restructuring, which ultimately led to the R1 Agreement.

As part of the R1 Agreement, the parties agreed to the initial April 30, 2017 long stop date by which Seadrill was to implement a comprehensive restructuring either in the form of an out-of-court refinancing or a transaction to be implemented through an in-court process.  But the parties were unable to reach agreement with respect to a consensual restructuring by the April 30, 2017 long stop date.  Instead, they agreed to further extend the maturities of the West Eminence Facility (to August 15, 2017), the Jack-Up Facility (to August 31, 2017), and NADL Facility (to September 14, 2017), as well as extend the long stop date to July 31, 2017.  The parties ultimately agreed to an additional, final extension of the long stop date (to September 12, 2017) and the maturities of the West Eminence Facility and the Jack-Up Facility (both to September 14, 2017, coinciding with the NADL Facility maturity).

Further Bank CoCom discussions—made possible by more than a year of Bank Facility extensions starting with the R1 Agreement—proved successful.  Beginning in late 2016, the Debtors and the Bank Lenders began to coalesce around what would become the foundation of the Debtors' restructuring—the Bank Deal.  But the Bank Lenders required, as a precondition to consummating the Bank Deal, that the Debtors secure a new capital investment of at least $1 billion to support their businesses through the downturn.  Accordingly, in September 2016, the Debtors launched a capital raise marketing process, seeking at least $1 billion in financing.

By December 2016, the Debtors had received indications of interest from several potential investors—substantially all of whom indicated that any feasible deal would necessarily include Hemen due to its industry presence, expertise, and key stakeholder relationships.  Initially, however, Hemen suggested that the Debtors first seek to raise capital in the market, potentially without Hemen's explicit backing.  By early 2017, however, the Debtors' concluded successful capital raise required the direct involvement of Hemen.

After further discussions, in March 2017, Hemen and Centerbridge submitted a proposal that would develop into the Capital Commitment.  Centerbridge has no prior affiliation with Hemen or Seadrill—thus, Centerbridge acted as an initial market check of the terms of the Capital Commitment.  Hemen's decision to back the Capital Commitment gave the Debtors the leverage to negotiate a Bank Deal that the Bank Lenders may never have supported with an alternative investor.  Many of the Bank Lenders have significant long-term relationships with Hemen and told Seadrill the necessary level of concessions and flexibility were conditioned on Hemen's involvement in Seadrill post-restructuring.

Seadrill's negotiations with Hemen and Centerbridge developed in parallel with a Capital Commitment syndication process, pursued by the Debtors after Hemen and Centerbridge expressed a desire for additional co-investors, which ultimately brought the non-Hemen/Centerbridge Commitment Parties into the fold.  Hemen is a world-renowned leader in the offshore drilling and shipping markets and Hemen's participation in the Capital Commitment helped validate the investment opportunity and attracted others to participate. After engaging in extensive discussions with the Debtors, Hemen, and Centerbridge, the parties reached a resolution under which Hemen and Centerbridge would syndicate a portion of the Capital

Commitment to additional Commitment Parties. From the Debtors' perspective, the core economic terms from the Hemen/Centerbridge proposal remained largely unchanged. Further, collectively, the Commitment Parties hold approximately 40 percent of the Unsecured Bonds, meaning that the proposed syndication potentially prevents future litigation with the Unsecured Bondholder stakeholder group.

In the more than one year of active negotiations preceding the Petition Date, the board of directors of Seadrill Limited (the "Board")—including a subcommittee of the Board formed to consider restructuring-related matters—met on a number of occasions to consider various restructuring proposals, maturity extensions, and certain ancillary matters, including the Non-Consolidated Entity insulating transactions described above. Further, on January 10, 2017, to fill two vacancies of retiring Board members, the Board appointed two fully independent directors (collectively, the "Independent Directors"), each of whom had prior restructuring experience the Board recognized would benefit Seadrill's ongoing negotiations. The Independent Directors separately considered certain of the restructuring transactions, including the Non-Consolidated Entity insulating transactions and any related-party transactions like the Hemen-backed Capital Commitment. On September 7, 2017, the Board unanimously approved the Debtors' entry into the Restructuring Support Agreement. On September 12, 2017, approximately 97 percent of the Bank Lenders, the Commitment Parties, and SFL (and certain of SFL's subsidiaries) executed the Restructuring Support Agreement.

In accordance with the terms of the Restructuring Support Agreement, on the Petition Date, the Debtors commenced these chapter 11 cases, as well as the parallel Bermuda insolvency proceedings of Seadrill Limited, NADL, and Sevan described below.

## D.      Independent Investigation

On January 10, 2017, the Seadrill board of directors appointed two disinterested directors (the "Disinterested Directors") to fill vacancies from retiring board members. Shortly after their appointment, the Disinterested Directors commenced an independent investigation analyzing potential claims that the Debtors may have against related parties. The investigation primarily has focused on a dozen related-party transactions from 2013 to 2016. Seadrill has provided more than 1,000 documents in response to specific requests and access to more than 2 million emails from 20 key custodians for the investigation. Kirkland & Ellis and Baker Tilly have interviewed 31 people involved in the transactions. The Restructuring Support Agreement provides for a termination event if the Disinterested Directors determine the contemplated releases are inappropriate. The Disinterested Directors are nearing completion of the investigation.

## E.      Bermuda Proceedings

To implement the foregoing restructuring, in parallel with these chapter 11 cases, contemporaneously with the Debtors' commencing these chapter 11 cases, Seadrill Limited, NADL, and Sevan (collectively, the "Bermuda Debtors") commenced "provisional liquidation" proceedings (the "Bermuda Proceedings") pursuant to sections 161 and 170 of the Bermuda Companies Act 1981 by presenting "winding up" petitions to the Bermuda Court. Upon the application of the Bermuda Debtors, the Bermuda Court will be requested to appoint joint "provisional liquidators" for each of the Bermuda Debtors with respect to the restructuring of those companies in these chapter 11 cases. The joint provisional liquidators act as officers of the Bermuda Court, and will be required under the order to report to the Bermuda Court from time to time on the progress of the Bermuda Debtors' chapter 11 proceedings. The Bermuda Debtors' application will also seek to limit the joint provisional liquidators' powers such that the Bermuda Debtors' management team and boards of directors will remain in control of the Bermuda Debtors' day-to-day operations and these chapter 11 cases and the joint provisional liquidators will have the power to oversee the process, including the review of documents. Upon the appointment of joint

provisional liquidators in respect of each of the Bermuda Debtors, a statutory stay of proceedings in Bermuda against those three entities or their assets will automatically arise.  On the "return date" for the Bermuda petitions—similar to a "second day" hearing in a chapter 11 proceeding—the Bermuda Debtors will seek to postpone their petitions for a specified period, while the Debtors administer these chapter 11 cases.

After the effective date of the Debtors' chapter 11 plan, to effectuate the issuance of new equity by reorganized Seadrill Limited and certain other restructuring transactions, the Debtors will seek a winding up order from the Bermuda Court and the joint provisional liquidators will assume full powers and become permanent liquidators in respect of the Bermuda Debtors and proceed with the formal liquidation and dissolution of the Bermuda Debtors in accordance with Bermuda law.  The common equity holders of the Bermuda Debtors will not receive a distribution or otherwise retain any value given that those entities have no assets as a result of the implementation of the Debtors' chapter 11 plan (other than as set forth above). On or before the effective date of the Debtors' chapter 11 plan, the Debtors will form "new" (*i.e.*, reorganized) Seadrill Limited, NADL, and Sevan to hold the assets of "old" Seadrill Limited, NADL, and Sevan and otherwise reside in their respective positions in the new RigCo/NSNCo holding structuring described above.

## VII.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.   Corporate Structure upon Emergence

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions), each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### B.   Expected Timetable of the Chapter 11 Cases

As described above, the Investment Agreement contains a nine month milestone to secure confirmation of a chapter 11 plan and an eleven month milestone to emerge from chapter 11.  Thus, to ensure that the Debtors and their stakeholders will benefit from the Capital Commitment and, more broadly, the Restructuring Support Agreement, the Debtors intend to move as quickly as practicable during these chapter 11 cases.  Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 within eleven months after the Petition Date.  **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

### C.   First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Edgar W. Mosley II,*

*Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First Day Motions*, filed on [●] [Docket No. ●].  Significantly, pursuant to the First Day Motions, the Debtors sought and were granted the authority to pay the Claims of a number of their vendors in full, in the regular course business, including Mineral Contractor Claims.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at [●].

### D. Other Procedural and Administrative Motions

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Ordinary Course Professionals Motion.  On [●], the Debtors filed the Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business [Docket No. ●] (the "OCP Motion").  The OCP Motion seeks to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses.  On [●], the Bankruptcy Court entered an order granting the OCP Motion [Docket No. ●].

- Retention Applications.  On [●], the Debtors filed a number of applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including Kirkland & Ellis, LLP, Slaughter and May, and Conyers Dill & Pearman Limited as legal counsel, Houlihan Lokey Capital, Inc. as financial advisor, Alvarez & Marsal North America, LLC as restructuring advisor, PricewaterhouseCoopers LLP as independent auditor, and Ernst & Young LLP as tax services provider (collectively, the "Retention Applications").  Between [●] and [●], the Bankruptcy Court approved each of the Retention Applications.  The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases.  The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

### E. Schedules and Statements

On [●], the Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket Nos. ●].

### F. [Appointment of Official Committee]

[On [●], the U.S. Trustee filed the [●], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases.  The Committee is currently composed of the following members:  [●].  The Committee has retained [●] as its legal counsel and [●] as its financial advisor.]

### G. Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement  or  continuation  of  litigation  against  the  Debtors  that  was  or  could  have  been

commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

### H.     Postpetition Marketing Process

The Debtors commenced a comprehensive marketing process prepetition to ensure that the terms of the Capital Commitment are the highest and best terms available under the circumstances.  The Debtors' prepetition marketing efforts are described in greater detail in the *Declaration of David R. Hilty, Managing Director of Houlihan Lokey Capital, Inc., in Support of Chapter 11 Petitions and the Joint Chapter 11 Plan of Reorganization of Seadrill Limited and its Debtor Affiliates*, filed on [●] [Docket No. ●] (the "Hilty Declaration").  The Debtors' contemplated postpetition marketing process is described below.

As part of the Debtors' efforts to solicit alternative proposals, the Debtors intend to continue their marketing process seeking alternative proposals from financial and strategic parties.  Due to operational risks, the Debtors did not reach out to certain strategic parties, many of whom are significant market competitors, during the prepetition marketing process.  However, in order to explore every viable alternative, the Debtors and their advisors will reach out to such strategic parties that have been identified as potential investors during a robust postpetition marketing process.  This process is more fully detailed in the marketing procedures, attached to the Hilty Declaration as **Exhibit A**.

Similar to the prepetition process, the Debtors and their advisors will identify potential interested parties, including those solicited prepetition (collectively, the "Potential Interested Parties").  Houlihan Lokey will distribute sanitized and publicly available information to the Potential Interested Parties, which will:

- describe, among other things, the operations and assets of the Debtors, the investments contemplated by the Investment Agreement, and the other restructuring transactions; and

- request that each Potential Interest Party sign an NDA to receive further confidential information.

The Debtors intend to conduct the postpetition marketing process as a two-step process, consisting of Phase I and Phase II, as described below.  As part of Phase I, each Potential Interested Party that signs an NDA (collectively, the "Phase I Parties") will receive access to confidential information regarding the Restructuring Transactions, a projection model, an independent industry report, and access to a virtual data room consisting of due diligence materials, as well as further information as the Debtors deem appropriate.

The Debtors will then request each Phase I Party to submit a preliminary, written, non-binding offer (an "Indicative Offer") for an alternative investment proposal.  The Debtors will evaluate Indicative Offers in consultation with their advisors, and, in their sole discretion, the Debtors may select a limited number of Phase I Parties to participate in Phase II (such parties, collectively, the "Phase II Parties").

Phase II Parties will have the opportunity to complete additional diligence, including management meetings, to facilitate preparation of final offers.  The Debtors will request the Phase II Parties to provide final offers by a certain date, after which the Debtors will evaluate any alternative investments and determine whether any are higher or otherwise better than the terms of the Investment Agreement.

This marketing process will ensure that the proposals received accurately reflect the state of the market, and the process has provided an opportunity for interested parties to express their interest and submit a proposal if they wish to do so. At this time (subject to any subsequent bona fide offers from other potential investors, including the strategic investors), the Debtors believe that the fully documented Capital Commitment, as reflected in the fully executed Investment Agreement, represents the highest and best offer that the Debtors have received and maximizes value for all stakeholders.

## VIII.   RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.   Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

#### 1.   Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.   The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are waived or not met, the Effective Date will not take place.

#### 3.   The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

#### 4.   The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not

unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.  Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.  Continued Risk upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for oil and natural gas (and thus demand for the services the Debtors provide), and increasing expenses. See Article VIII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses," which begins on page 56. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 10. Risk that the Bermuda Court will not Grant Recognition of the Confirmation Order

After the Effective Date, the Reorganized Debtors intend to seek recognition of the Confirmation Order in Bermuda. There is a risk that the Bermuda Court will not grant such recognition, which may affect the Reorganized Debtors' ability to effectuate certain relief granted pursuant to the Confirmation Order in Bermuda.

### 11. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 12. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, including by agreeing to massive reductions in the amounts of their claims against the Debtors' estates and facilitating a critical source of post-emergence liquidity by backstopping Rights Offering, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

### 13. Recoveries for Certain Classes are Tied to Whether Certain Classes Vote to Accept the Plan

Whether certain holders of General Unsecured Claims at Seadrill Limited, NADL, and Sevan are entitled to a specific level of recovery under the Plan is tied to whether such classes vote to accept or reject the Plan. Holders of General Unsecured Claims at Seadrill Limited, NADL, and Sevan should carefully review their treatment under the Plan. Holders of Interests in Seadrill Limited will note be entitled to any recovery under the Plan unless holders of General Unsecured Claims at Seadrill Limited vote as a Class to accept the Plan.

### B.  Risks Related to Recoveries under the Plan

#### 1.  The Reorganized Debtors May Not Be Able to Achieve their Projected Financial Results

The Reorganized Debtors may not be able to achieve their projected financial results.  The financial projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular.  While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, the value of the New Seadrill Common Shares may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

#### 2.  A Liquid Trading Market for the New Seadrill Common Shares May Not Develop

Although the Debtors and the Reorganized Debtors intend to apply to relist the New Seadrill Common Shares on a national securities exchange on or as soon as reasonably practicable after the Effective Date, the Debtors make no assurance that they will be able to obtain this listing or, even if the Debtors do, that liquid trading markets for shares of New Seadrill Common Shares will develop.  The liquidity of any market for shares of New Seadrill Common Shares will depend upon, among other things, the number of holders of shares of New Seadrill Common Shares, New Seadrill's financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New Seadrill Common Shares will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell New Seadrill Common Shares may be substantially limited.

#### 3.  The Trading Price for the Shares of New Seadrill Common Shares May Be Depressed Following the Effective Date

Assuming that the Effective Date occurs, shares of New Seadrill Common Shares will be issued to holders of certain Classes of Claims or Interests (as applicable).  Following the Effective Date of the Plan, shares of New Seadrill Common Shares may be sold to satisfy withholding tax requirements.  In addition, holders of Claims or Interests (as applicable) that receive New Seadrill Common Shares may seek to sell such securities in an effort to obtain liquidity.  These sales and the volume of New Seadrill Common Shares available for trading could cause the trading price for the New Seadrill Common Shares to be depressed, particularly in the absence of an established trading market for the New Seadrill Common Shares.

#### 4.  Certain Holders of New Seadrill Common Shares May Be Restricted in their Ability to Transfer or Sell their Securities

To the extent that the New Seadrill Common Shares issued under the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities.  Resales by holders of Claims or Interests (as applicable)

who receive New Seadrill Common Shares pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law.  Such holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Seadrill Common Shares may not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any holder of New Seadrill Common Shares to freely resell the New Seadrill Common Shares (including, as applicable, shares issuable upon exercise of the Note Rights and Equity Rights (as applicable).  As set forth in the Investment Agreement, the Debtors have agreed to take certain steps to register the New Seadrill Common Shares after the Effective Date.  *See* Article XII to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 67.

### 5.  Restricted Securities Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act.  Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act.  Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144.  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period.  An affiliate may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.  While the Debtors currently expect that the current public information requirement will be met when the six-month holding period expires, they cannot guarantee that resales of the restricted securities will qualify for an exemption from registration under Rule 144.  In any event, holders of restricted securities should expect to be required to hold their restricted securities for at least six months.

Holders of New Seadrill Common Shares who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities.  Resale restrictions are discussed in more detail in Article XII to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 67.

### 6.  Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," which begins on page 67, to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and holders of Claims and Interests.

### 7.   The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### C.   Risks Related to the Debtors' and the Reorganized Debtors' Businesses

### 14.   The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Facility upon emergence.

### 15.   The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately

predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 16. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 17. Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The financial projections contained in **Exhibit G** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

### 18. The Debtors' Substantial Liquidity Needs May Impact and Revenue

The Debtors operate in a capital-intensive industry. The Debtors' principal sources of liquidity historically have been cash flow from operations, borrowings under various bank-funded facilities, issuances of bonds, and issuances of equity securities. If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices, decreased E&P sector capital expenditures,

or otherwise, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to comply with the terms and condition of any cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### 19. Oil and Natural Gas Prices Are Volatile, and Continued Low Oil or Natural Gas Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition

The Debtors' revenues, profitability and the value of their properties substantially depend on the willingness of their operator customer base to make operating and capital expenditures to explore and drill for, develop, and produce oil and natural gas. Operators' willingness to conduct such activities are in turn dependent on prevailing oil and natural gas prices. Further, since operators are reluctant to increase drilling activities in a high-volatility commodities pricing environment, demand for the Debtors' services is affected as much by oil and natural gas price expectations as actual pricing. In short, the Debtors face a high level of exposure to oil and natural gas price swings. Oil and natural gas are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand and are subject to both short- and long-term cyclical trends. Oil and natural gas prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions. The Debtors expect such volatility to continue in the future. The prices for oil and natural gas are subject to a variety of factors beyond the Debtors' control, such as:

- worldwide production and demand for oil and gas and geographical dislocations in supply and demand;

- the cost of exploring for, developing, producing and delivering oil and gas;

- expectations regarding future energy prices and production;

- advances in exploration, development and production technology;

- the ability of the Organization of Petroleum Exporting Countries ("OPEC"), to set and maintain levels and pricing;

- the level of production in non-OPEC countries;

- international sanctions on oil-producing countries, or the lifting of such sanctions;

- government regulations, including restrictions on offshore transportation of oil and natural gas;

- local and international political, economic and weather conditions;

- domestic and foreign tax policies;

- the development and exploitation of alternative fuels and unconventional hydrocarbon production, including shale;

- worldwide economic and financial problems and the corresponding decline in the demand for oil and gas and, consequently, our services;

- the policies of various governments regarding exploration and development of their oil and gas reserves, accidents, severe weather;

- natural disasters and other similar incidents relating to the oil and gas industry; and

- the worldwide political and military environment, including uncertainty or instability resulting from an escalation or additional outbreak of armed hostilities or other crises in the Middle East, eastern Europe or other geographic areas or further acts of terrorism in the United States, Europe or elsewhere.

Continued volatility or weakness in oil and natural gas prices (or the perception that oil and natural gas prices will remain depressed) generally leads to decreased upstream spending, which in turn negatively affects demand to the Debtors' services. A sustained decline in oil or natural gas prices may materially and adversely affect the Debtors' future business, financial condition, results of operations, liquidity or ability to finance planned capital expenditures. As a result, if there is a further decline or sustained depression in commodity prices, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments, or obtain additional capital, all of which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### 20. The Offshore Drilling Industry is Influenced by Several Factors That Can Reduce the Demand for the Debtors' Services

While the price of oil and gas has a significant impact on the offshore drilling industry, several other factors have the potential to reduce the demand for the Debtors' services and disrupt the Debtors' business, including:

- the availability of debt financing on reasonable terms;

- the level of costs for associated offshore oilfield and construction services;

- oil and gas transportation costs;

- the level of rig operating costs, including crew and maintenance;

- the discovery of new oil and gas reserves;

- the political and military environment of oil and gas reserve jurisdictions; and

- regulatory restrictions on offshore drilling.

### 21. The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business

The Debtors' operations are subject to extensive laws and regulations in a number of different countries across the globe, including complex environmental laws and occupational health and safety laws. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties. The Debtors' operations create the risk of environmental liabilities to governments or third parties for any unlawful discharge of oil, gas or other pollutants into the air or water. In the event of environmental violations, the Reorganized Debtors may be charged with remedial costs and land owners may file claims for alternative water supplies, property damage or bodily injury. Laws and regulations protecting the environment have become more stringent in recent years, and may, in some circumstances, result in liability for environmental damage regardless of negligence or fault. In addition, pollution and similar environmental risks generally are not fully insurable. These liabilities and costs could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

### 22. The Debtors' Operations are Subject to Hazards Inherent in the Energy Services Industry.

Risks inherent in the offshore drilling industry, such as equipment defects, accidents, and explosions, can cause personal injury, loss of life, suspension of operations, damage to formations, damage to facilities, business interruption and damage to, or destruction of property, equipment and the environment. These risks could expose the Debtors to substantial liability for personal injury, wrongful death, property damage, loss of oil and natural gas production, pollution and other environmental damages and could result in a variety of claims, losses and remedial obligations that could have an adverse effect on the Debtors' business and results of operations. The existence, frequency and severity of such incidents will affect operating costs, insurability and relationships with customers, employees and regulators. In particular, the Debtors' customers may elect not to purchase our services if they view our safety record as unacceptable, which could cause us to lose customers and substantial revenue.

### 23. The Debtors Operate in a Highly-Competitive Industry with Significant Potential for Excess Capacity.

The offshore drilling industry is highly competitive and fragmented and includes several large companies that compete in many of the markets we serve, as well as numerous small companies that compete with us on a local basis. Offshore drilling contracts are generally awarded on a competitive bid basis or through privately negotiated transactions. In determining which qualified drilling contractor is awarded a contract, the key factors are pricing, rig availability, rig location, the condition and integrity of equipment, its record of operating efficiency, including high operating uptime, technical specifications, safety performance record, crew experience, reputation, industry standing and customer relations. Our operations may be adversely affected if our current competitors or new market entrants introduce new drilling rigs with better features, performance, prices or other characteristics compared to our drilling rigs, or expand into service areas where we operate.

Competitive pressures and other factors may result in significant price competition, particularly during industry downturns, which could have a material adverse effect on our results of operations and financial condition.

### 24. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, the Reorganized Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 25. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  Because competition for experienced personnel in the offshore drilling industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 26. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

### 27. The Debtors may not be able to negotiate an acceptable consensual resolution to address outstanding continent newbuild obligations

As of the Petition Date, the Debtors were obligated for approximately $4 billion in contingent obligations under 14 newbuild contracts.  While the Debtors were unable to reach a comprehensive consensual resolution prior to the Petition Date, the Debtors intend to continue discussions postpetition.  There can be no assurances that the Debtors will reach a comprehensive resolution.

## IX.   SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.*

<div style="border:1px solid black">

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.** PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

</div>

### A.      Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of Claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" which begins on page 6, provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes B1(a-i), B2, B3, C1(a-j), D1, D2, D3, E1, F1, F2, F3, and G1 (collectively, the "Voting Classes").  The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from holders of Claims or Interests in Classes A1, A2, A3, B4, B5, C2, C3, C4, D5, E2, E3, F4, F5, G2, and G3.  Additionally, the Disclosure Statement Order provides that certain holders of Claims or Interests in the Voting Classes, such as those holders whose Claims or Interests have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.      Voting Record Date

**The Voting Record Date is [●]**.  The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim.

### C.      Voting on the Plan

**The Voting Deadline is [●], at [●] p.m. (prevailing Central Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be (a) electronically submitted utilizing the online balloting portal maintained by the Notice and Claims Agent on or before the Voting Deadline; or (b) properly executed, completed, and delivered (either by using the envelope provided, by first class mail, overnight courier, or personal delivery) so that the ballots are **actually received** by the Notice and Claims Agent on or before the Voting Deadline at the following address:

<div style="border:1px solid black">

**DELIVERY OF BALLOTS**

**SEADRILL LIMITED**
**C/O PRIME CLERK**
**830 3RD AVENUE 3RD FLOOR**
**NEW YORK, NY 10022**

</div>

> If you received an envelope addressed to your nominee, please return your ballot to your nominee, allowing enough time for your nominee to cast your vote on a ballot before the Voting Deadline.

**PLEASE SELECT JUST ONE OPTION TO VOTE.
EITHER RETURN PROPERLY EXECUTED PAPER BALLOT WITH YOUR VOTE
OR
VOTE VIA ELECTRONIC MAIL TO [●]**

Holders of Claims who cast a ballot via electronic mail to [●] with "[●]" in the subject line should NOT also submit a paper Ballot.

FOR ANY BALLOT CAST VIA ELECTRONIC MAIL, A FORMAT OF THE ATTACHMENT MUST BE FOUND IN THE COMMON WORKPLACE AND INDUSTRY STANDARD FORMAT (*I.E.*, INDUSTRY-STANDARD PDF FILE) AND THE RECEIVED DATE AND TIME IN THE SOLICITATION AGENT'S INBOX WILL BE USED AS A TIMESTAMP FOR RECEIPT.

IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL FREE AT [●]. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.

D.     **Ballots Not Counted**

<u>No ballot will be counted toward Confirmation if, among other things</u>:  (1) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), the administrative agents under the Bank Facilities, or the Debtors' financial or legal advisors instead of the Solicitation Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

X.     **RIGHTS OFFERING PROCEDURES**

The procedures and instructions for exercising Note Rights and Equity Rights, as applicable, are set forth in the Rights Offering Procedures, which are attached to this Disclosure Statement as **<u>Exhibit E</u>**. The Rights Offering Procedures are incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to exercise Subscription Rights.

**TO PARTICIPATE IN THE RIGHTS OFFERING, EACH ELIGIBLE HOLDER MUST COMPLETE ALL THE STEPS OUTLINED IN THE RIGHTS OFFERING PROCEDURES.  IF ALL OF THE STEPS OUTLINED IN THE RIGHTS OFFERING PROCEDURES ARE NOT COMPLETED BY THE SUBSCRIPTION EXPIRATION DEADLINE OR THE BACKSTOP FUNDING DEADLINE, AS APPLICABLE, THE ELIGIBLE HOLDER SHALL BE DEEMED TO HAVE <u>FOREVER AND IRREVOCABLY RELINQUISHED AND WAIVED</u> ITS RIGHT TO PARTICIPATE IN THE RIGHTS OFFERING.**

## XI.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit F** and incorporated herein by reference is a liquidation analysis (the "<u>Liquidation Analysis</u>") prepared by the Debtors with the assistance of the Debtors' advisors.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to holders of Claims or Interests (to the extent holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Seadrill Common Shares to be distributed

under the Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C.     Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "<u>Financial Projections</u>").  Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," which begins on page 50, for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **<u>Exhibit G</u>** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.     Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[9]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims is eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims in such Class shall be deemed to have accepted the Plan.

---

[9]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

### E.    Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### 2.    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F.    Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors.  Accordingly, the Debtors, with the assistance of their advisors, produced the Valuation Analysis that is set forth in **Exhibit H** attached hereto and incorporated herein by reference.  As set forth in the Valuation Analysis, the Debtors' going-concern value recoveries to creditors under the Plan

are substantially higher than the recoveries such creditors would receive in a hypothetical liquidation of the Seadrill enterprise under chapter 7 of the Bankruptcy Code, as illustrated in the Liquidation Analysis. Accordingly, the Valuation Analysis further supports the Debtors conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

## XII.   CERTAIN SECURITIES LAW MATTERS

The Debtors believe the New Secured Notes, the New Seadrill Common Shares, the Equity Rights and the Note Rights to be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities laws.

### A.   Issuance of Securities under the Plan

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash. In general, securities issued under section 1145 of the Bankruptcy Code may be resold without registration unless the recipient is an "underwriter" with respect to those securities. In reliance upon this exemption, the Debtors believe that the offer and sale under the Plan of New Seadrill Common Shares pursuant to the Equity Recovery and the Unsecured Pool Equity will be exempt from registration under the Securities Act and state securities laws with respect to any such Holder who is not deemed to be an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

Each of (i) the Equity Rights, and the New Seadrill Common Shares issued in the Equity Rights Offerings or to the Equity Commitment Parties, (ii) the Note Rights, the New Secured Notes, and the New Seadrill Common Shares issued in the Notes Rights Offering or to the Debt Commitment Parties, and (iii) the New Seadrill Common Shares issued in connection with the Structuring Fee will be issued without registration in reliance upon the exemption set forth in Section 4(a)(2) of the Securities Act and/or Regulation S. Section 4(a)(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act will not apply to the offer and sale of a security in connection with transactions not involving any public offering. The term "issuer," as used in Section 4(a)(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security. Any securities issued in reliance on Section 4(a)(2) will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law. Regulation S provides that the registration requirements of section 5 of the Securities Act will not apply to certain offerings and sales of securities outside of the United States. Only Eligible Holders may receive and exercise Equity Rights and Note Rights under the Plan. Eligible Holders include Accredited Investors and Qualified Investors that are not U.S. Persons.

### B.   Subsequent Transfers of Securities Issued under the Plan

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made

in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

You should confer with your own legal advisors to help determine whether or not you are an "underwriter."

To the extent that persons who receive the securities issued under the Plan that are exempt from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Securities issued under the Plan that are "restricted securities" may only be sold pursuant to a registration statement or pursuant to exemption therefrom, such as the exemption provided by Rule 144 under the Securities Act.

Persons (i) who receive securities that are exempt under section 1145 of the Bankruptcy Code but who are deemed "underwriters" or (ii) who receive securities issued under the Plan that are "restricted securities" would, however, be permitted to sell such securities without registration if an available resale exemption exists, including the exemptions provided by Rule 144 or Rule 144A under the Securities Act.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.**

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH HOLDER AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

**XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX AND BERMUDA TAX CONSEQUENCES OF THE PLAN**

**A.    Introduction**

The following discussion summarizes certain United States ("U.S.") federal income tax and Bermuda tax consequences of the implementation of the Plan to the Debtors, and the U.S. federal income tax consequences to certain holders of Claims entitled to vote on the Plan.  It does not address the U.S. federal income tax consequences to holders of Claims not entitled to vote on the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules

and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable U.S. Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

In general, other than with respect to the U.S. Entities (as defined below), the Debtors are not taxpayers in the U.S.  As such, the Debtors will only take positions with respect to issues of U.S. federal income tax law to the extent they are required to do so by Applicable U.S. Tax Law.  Unless stated expressly herein, nothing in this summary should be interpreted to imply that the Debtors will take any particular position with respect to issues of Applicable U.S. Tax Law to the extent the Debtors are not required by Applicable U.S. Tax Law to take a particular position.

This summary does not address non-U.S. (other than the limited discussion of Bermuda tax consequences to the Debtors included below), state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, U.S. holders whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, persons who hold Claims or who will hold any consideration received pursuant to the Plan as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy).  Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that Claims will be treated in accordance with their form for U.S. federal income tax purposes.  The U.S. federal income tax consequences of the implementation of the Plan to the Debtors and holders of Claims described below also may vary depending on the nature of any Restructuring Transactions that the Debtors engaged in.

This summary does not address the receipt, if any, of property by holders of Claims other than in their capacity as such (*e.g.*, this summary does not discuss the treatment of any commitment fee or similar arrangement or the receipt of any debt or equity interest pursuant to any backstop agreement, including the Investment Agreement (other than as expressly described below)).  The treatment of the receipt of any such property may vary significantly from the treatment described herein, and Holders of Claims or Interests should consult their own tax advisors regarding any applicable consequences.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder"

is any holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities) that are holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME AND BERMUDA TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### B.   Certain U.S. Federal Income Tax Consequences to the Debtors

As discussed immediately below, the Debtors do not anticipate that the Restructuring Transactions will result in any material U.S. federal income tax consequences to the Debtors.  This summary (a) does not address any determinations with respect to "earnings and profits" for U.S. tax purposes and (b) assumes that any intercompany obligation that is owed by a U.S. Entity (as defined below) to any entity outside of such U.S. Entity's U.S. federal consolidated tax group is not modified pursuant to the Plan.

### (i)   Cancellation of Debt Income

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") for U.S. federal income tax purposes, upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the sum of (A) the amount of cash paid, (B) the issue price of any new indebtedness of the debtor issued, and (C) the fair market value of any other consideration (including stock or warrants of the debtor or another entity) given in satisfaction of such indebtedness at the time of the exchange.

A very limited number of entities held directly or indirectly by the Debtors are treated as U.S. entities (or as disregarded entities of other U.S. entities) for U.S. tax purposes (the "U.S. Entities").  None of the U.S. Entities are the primary obligors on the debt that will be modified or discharged pursuant to the Plan, and the Debtors believe that none of obligors on the debt that will be modified pursuant to the Plan are subject to U.S. federal income tax.  Although certain of the U.S. Entities guarantee debt that is being modified or discharged pursuant to the Plan, the release or modification of a guarantee generally does not cause U.S. federal income tax consequences to the guarantor unless the guarantor is treated as a primary or co-obligor on the underlying debt instrument under a facts-and-circumstances analysis.  The Debtors do not believe that any U.S. Entity would be treated as a primary or co-obligor under these principles. Accordingly, the Debtors (including the U.S. Entities) do not currently expect to realize significant COD Income for U.S. federal income tax purposes as a result of the Restructuring Transactions.

### (ii)      Limitation of NOL Carryforward and Other Tax Attributes

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its surviving net operating loss ("NOL") carryovers, capital loss carryovers, tax credit carryovers, and certain other tax attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Debtors allocable to periods before the Effective Date (collectively, the "Pre-Change Losses") that may be utilized to offset future taxable income generally is subject to an annual limitation.  The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the distribution of the New Seadrill Common Shares pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses (if any) will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

### (a)      General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs:  [_]% for ownership changes occurring in September 2017).

If a corporation (or affiliated group) has a net unrealized built-in gain at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then the section 382 limitation may be increased to the extent that the debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.  If a corporation (or affiliated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or affiliated group's) net unrealized built-in gain or net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

Notwithstanding the rules described above, if post-ownership change, a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change (the "Business Continuity Requirement"), the annual limitation resulting from the ownership change is zero.

As discussed below, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (b)      Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when shareholders or so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least

71

50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies, the Business Continuity Requirement does not apply, although a different business continuation requirement may apply under the Treasury Regulations. If the 382(l)(5) Exception applies and the Debtors undergo another "ownership change" within two years after the Effective Date, then the Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception because under the 382(l)(6) Exception, the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo an ownership change within two years without automatically triggering the elimination of its Pre-Change Losses. If the 382(l)(6) Exception applies, the Business Continuity Requirement discussed above also applies.

The Debtors do not expect to have material U.S. NOLs or other tax attributes subject to the rules of sections 382 and 383 of the Tax Code (other than tax basis in assets) at the time of the Restructuring Transactions. The Debtors have not determined the extent to which the Debtors' ability to claim depreciation deductions may be subject to limitation pursuant to the above rules.

### C.      Bermuda Tax Consequences to the Debtors

Certain of the Debtors, including Seadrill Limited, the Debtors' ultimate parent company, NADL, and Sevan, are Bermuda-incorporated entities. Bermuda generally does not impose obligations under any corporate tax regime and, as a result, the Debtors do not anticipate any Bermuda tax consequences pursuant to the Plan.

### D.      Certain U.S. Federal Income Tax Consequences to the Holders of Certain Claims

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to holders of Claims who are U.S. Holders. U.S. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

In general, the U.S. federal income tax treatment of Holders of Claims will depend, in part, on whether the receipt of consideration under the Plan qualifies as an exchange of stock or securities pursuant to a tax free reorganization or if, instead, the consideration under the Plan is treated as having been received in a fully taxable disposition. Whether the receipt of consideration under the Plan qualifies for reorganization treatment will depend on, among other things, (a) whether the Claim being exchanged constitutes a "security" and (b) whether the Debtor against which a Claim is asserted is the same entity that is issuing the consideration under the Plan.

Neither the Tax Code nor the Treasury Regulations promulgated thereunder defines the term "security." Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. The Debtors have not yet made any determinations regarding the treatment of any particular Claim as a security under U.S. federal income tax law.

(i)     **U.S. Federal Income Tax Consequences to Holders of Credit Agreement Claims**

Pursuant to the Plan, except to the extent that a U.S. Holder of a Credit Agreement Claim agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claims, each U.S. Holder of the Credit Agreement Claims will receive its pro rata share of participation in the Amended Credit Facility that corresponds to the Credit Facility under which such Credit Agreement Claim arose.

The following discussion generally assumes that the amendments to each of the relevant underlying credit agreements will constitute a "significant modification" of each applicable credit agreement under Applicable U.S. Tax Law and, specifically, the rules under Treasury Regulations Section 1.1001-3. Whether the particular amendments being made to each underlying credit agreement constitute a "significant modification" will depend upon, among other things, the original maturity date, yield to maturity, and other aspects of each underlying credit agreement. The Debtors have not yet performed an analysis of each credit agreement to determine whether the contemplated modifications will constitute a "significant modification" of any particular credit agreement, and the Debtors will only make such a determination with respect to any particular credit agreement to the extent they are required to do so under Applicable U.S. Tax Law, including the rules related to original issue discount ("OID") reporting obligations.

(a)     **Treatment of a Holder of a Credit Agreement Claim if such Credit Agreement Claim is Treated as a Security and the Interest in the Applicable Amended Credit Facility Constitutes a Security of the Applicable Debtor**

If a Credit Agreement Claim is treated as a security and at least some of the consideration received in exchange for such Claim is also determined to be a "security" of the applicable Debtor, then the exchange of such Claims should be treated as a reorganization under the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID), and subject to the rules relating to market discount, a U.S. Holder of such a Claim should recognize gain (but not loss), to the extent of the lesser of (a) the amount of gain realized from the exchange (generally equal to the fair market value of all of the consideration (or issue price of debt instruments), including cash, received, minus the U.S. Holder's adjusted basis, if any, in the Claim) or (b) the cash and the fair market value (or issue price of debt

instruments) of "other property" received that is not permitted to be received under sections 354 and 356 of the Tax Code without recognition of gain.

With respect to an Amended Credit Facility that is treated as a "security" of the applicable Debtor, such U.S. Holder should obtain a tax basis in such Amended Credit Facility, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or OID), and subject to the rules relating to market discount, equal to (a) the tax basis of the Claim surrendered, less (b) the cash received, plus (c) gain recognized (if any).  The holding period for such Amended Credit Facility should include the holding period for the exchanged Claims.

With respect to an Amended Credit Facility that is not treated as a "security" of the applicable Debtor, U.S. Holders should obtain a tax basis in such Amended Credit Facility, other than any amounts treated as received in satisfaction of OID, and subject to the rules relating to market discount, equal to the property's fair market value (or issue price, in the case of debt instruments) as of the date such property is distributed to the U.S. Holder.  The holding period for any such Amended Credit Facility should begin on the day following the receipt of such Amended Credit Facility.

> **(b)** **Treatment of a Holder of a Credit Agreement Claim if such Credit Agreement Claim is Determined Not to be a "Security" or None of the Consideration Received under the Plan Constitutes Stock or Securities of the Applicable Debtor**

If a Credit Agreement Claim is determined not to be a "security" or none of the consideration received by a U.S. Holder of such Claim is determined to be a stock or "security" of the applicable Debtor, then a U.S. Holder of such Claim will be treated as receiving its distributions under the Plan in a taxable exchange under section 1001 of the Tax Code.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID, if any), each U.S. Holder of a Credit Agreement Claim should recognize gain or loss in an amount equal to the difference, if any, between (i) the issue price of the Amended Credit Facility interest received, and (ii) the U.S. Holder's adjusted tax basis in its Credit Agreement Claim. Subject to the rules regarding market discount and accrued interest discussed below, any gain or loss recognized will generally be capital gain or loss and will generally be long-term capital gain or loss if the U.S. Holder has held the Claim for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations.

U.S. Holders of such Claims should obtain a tax basis in the debt instrument received, other than any such amounts treated as received in satisfaction of OID, equal to the debt's issue price (as discussed below) as of the date of the exchange.  The holding period for such debt instrument should begin on the day following the Effective Date.

> **(c)** **Determination of Issue Price and OID with respect to Claims under Amended Credit Facilities**

As noted above, holders of Credit Agreement Claims will receive their pro rata share of participation in the Amended Credit Facilities, and the amount of gain or loss recognized by U.S. Holders of such Claims will be determined by the issue price of a U.S. Holder's pro rata share of the debt instrument received under the Amended Credit Facility.  The determination of "issue price" for purposes of this analysis will depend, in part, on whether the Credit Agreement Claims are traded on an established market for U.S. federal income tax purposes (or "publicly traded").  Under applicable Treasury Regulations, a debt instrument will not be treated as publicly traded if the outstanding stated principal amount of the issue that includes the debt instrument is $100 million or less on the relevant determination date.

The issue price of a debt instrument that is not traded on an established market, but that is issued in exchange for Claims against the Debtors that are publicly traded, would be the fair market value of the Claims that are publicly traded.  The issue price of a debt instrument that is neither publicly traded nor issued for Claims that are publicly traded would generally be its stated redemption price at maturity (provided that the interest rate on the debt instrument is equal to or exceeds the applicable federal rate published by the IRS).  Claims against the Debtors may be traded on an established market for these purposes even if no trades actually occur and there are merely firm or indicative quotes with respect to such Claims.

In the event the issue price of a Claim under an Amended Credit Facility is lower than its "stated redemption price at maturity" (i.e., the sum of all payments to be made on the debt instrument (other than "qualified stated interest"), including payments as a result of any interest that is "payable in kind") by more than a statutory de minimis amount, it would be treated as issued with OID.  Where debt instruments are treated as being issued with OID, a U.S. Holder of any such debt instrument will generally be required to include any OID in income over the term of such debt instrument in accordance with a constant yield-to-maturity method, regardless of whether the U.S. Holder is a cash or accrual method taxpayer, and regardless of whether and when such U.S. Holder received cash payments of interest on such debt instrument (other than cash attributable to qualified stated interest, which is includible in income in accordance with the U.S. Holder's normal method of tax accounting).  Accordingly, a U.S. Holder could be treated as receiving income in advance of a corresponding receipt of cash.  Any OID that a U.S. Holder includes in income will increase the tax basis of the U.S. Holder in its interest in such debt instrument.  A U.S. Holder of an interest in such new debt instruments will not be separately taxable on any cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the pro rata shares of such debt instruments by the amount of such payments.

In general, interest (including OID, if any) received or accrued by U.S. Holders should be treated as foreign source interest ordinary income.

The above discussion is subject to the discussion of the CPDI rules discussed below.

### (d) Contingent Payment Debt Instruments

In light of certain features of the Amended Credit Facilities, including (a) the cash sweep mechanism coupled with the fact that one or more of the Amended Credit Facilities may be deemed to be issued with OID for U.S. tax purposes if a particular Amended Credit Facility is subject to a "significant modification," [10] and (b) the effect of the amortization conversion election, it is possible that one or more of the Amended Credit Facilities could be treated as contingent payment debt instruments ("CPDIs") subject to the "noncontingent bond method" for accruing OID.

Under the noncontingent bond method, each U.S. Holder should be required to accrue OID on a constant yield to maturity basis based on the "comparable yield" of any debt instrument determined to be a CPDI, which generally is the rate at which the Debtors could issue a fixed rate debt instrument with terms and conditions similar to the applicable debt.  U.S. Holders should accrue interest based on the comparable yield.  U.S. Holders should not be required to separately include in income any additional amount for the interest payments actually received, except to the extent of positive or negative adjustments, as discussed below.

---

[10]   U.S. tax law is unclear on whether "pure" timing contingencies can cause a debt instrument to be subject to the CPDI rules.  The Debtors will only take a position on that issue to the extent they determine that they are required to make a determination with respect to whether any particular Amended Credit Facility constitutes a CPDI.

If, during any taxable year, the actual payments with respect to any CPDIs exceed the projected payments for that taxable year, U.S. Holders should incur a "net positive adjustment" under the contingent debt regulations equal to the amount of such excess. U.S. Holders should treat a net positive adjustment as additional interest income in that taxable year.

If, during any taxable year, the actual payments with respect to any CPDIs are less than the amount of projected payment for that taxable year, U.S. Holders may incur a "net negative adjustment" under the contingent debt regulations equal to the amount of such deficit. This net negative adjustment should (a) reduce a U.S. Holder's interest income on the relevant Amended Credit Facility for that taxable year, and (b) to the extent of any excess after application of (a), give rise to an ordinary loss to the extent of such U.S. Holder's interest income on the CPDIs during prior taxable years, reduced to the extent such interest was offset by prior net negative adjustments. Any net negative adjustment in excess of the amounts described in (a) and (b) should be carried forward as a negative adjustment to offset future interest income with respect to the relevant Amended Credit Facility or to reduce the amount realized on a sale, exchange, or repurchase of the CPDIs. As a result of the rules described above, recipients of CPDIs may be required to include amounts in income prior to receipt of cash attributable to such income.

The Debtors have not yet determined whether any particular Amended Credit Facility will constitute a CPDI or determined the "comparable yield" or a schedule of projected payments. The Debtors will only determine whether any particular Amended Credit Facility constitutes a CPDI, and will only determine the "comparable yield" or construct a schedule of projected payments, to the extent they determine they are required to do so under Applicable U.S. Tax Law. In the event the Debtors do not make these determinations, each U.S. Holder would be required to independently make the relevant determinations. In the event the Debtors determine that any Amended Credit Facility constitutes a CPDI and determines they are required to make determinations with respect to a schedule of projected payments, such information will be determined following the close of the Restructuring Transactions, and can be obtained by contacting the Reorganized Debtors at a contact address that will be determined at a later date.

The rules related to CPDIs are complex. U.S. Holders are encouraged to consult their own tax advisors, including with respect to whether any particular Amended Credit Facility constitutes a CPDI.

### (ii)     U.S. Federal Income Tax Consequences to Holders of General Unsecured Claims Against Seadrill, NADL, and Sevan

#### (a)     In General

The recoveries to be received by U.S. Holders of General Unsecured Claims against Seadrill, NADL, and Sevan will depend on whether certain Classes B3, D3, and F3, respectively, vote to accept the Plan.

Pursuant to the Plan, except to the extent that a U.S. Holder of a General Unsecured Claim agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claims, if the applicable class votes to accept the Plan, a U.S. Holder of a General Unsecured Claim will receive its pro rata share of (a) New Seadrill Common Shares, (b) the Note Rights, and (c) the Equity Rights.[11]

---

[11]   However, the Commitment Parties and any Permitted Transferee of Company Claims/Interests held by a Commitment Party as of the Agreement Effective Date shall not receive the Note Rights and Equity Rights shall not receive the Note Rights and Equity Rights.

Pursuant to the Plan, except to the extent that a U.S. Holder of a General Unsecured Claim agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claims, if the applicable class does not vote to accept the Plan, a U.S. Holder of a General Unsecured Claim will receive the Liquidation Recovery, which may be composed of New Seadrill Common Shares and/or Cash.

<div style="text-align:center">

**(b)      U.S. Federal Income Tax Consequences to Holders of General Unsecured Claims against NADL and Sevan**

</div>

Because none of the non-cash consideration being issued is being issued by NADL or Sevan, although the issue is not free from doubt, the exchange of the General Unsecured Claims against NADL and Sevan under the Plan will likely be fully taxable under section 1001 of the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID, if any), each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (i) the fair market value of the consideration received in exchange for such Claim; and (ii) such U.S. Holder's adjusted basis, if any, in such Claim. Subject to the rules regarding market discount and accrued interest discussed below, any gain or loss recognized will generally be capital gain or loss and will generally be long-term capital gain or loss if the U.S. Holder has held the Claim for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations.

U.S. Holders of such Claims should obtain a tax basis in the non-cash consideration received, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or OID, if any), equal to such property's fair market value as of the date such property is distributed to the U.S. Holder. The holding period for any such non-cash consideration should begin on the day following the Effective Date.

<div style="text-align:center">

**(c)      U.S. Federal Income Tax Consequences to Holders of General Unsecured Claims Against Seadrill**

</div>

Pursuant to the Plan, except to the extent that a U.S. Holder of a General Unsecured Claim against Seadrill agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claims, if the applicable class votes to accept the Plan, a U.S. Holder of a General Unsecured Claim will receive its pro rata share of (a) New Seadrill Common Shares, (b) the Note Rights, and (c) the Equity Rights.[12]

<div style="text-align:center">

**(i)      Treatment if General Unsecured Claims are "Securities" of Seadrill and At Least Some of the Consideration Received Under the Plan Constitutes Stock or Securities of Seadrill**

</div>

If a General Unsecured Claim against Seadrill is determined to be a "security" of Seadrill and at least some of the consideration received is also deemed to be a stock or a "security" of Seadrill, then the exchange of such Claims pursuant to the Plan should be treated as a reorganization under the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID), and subject to the rules relating to market discount, a U.S. Holder of such a Claim should recognize gain (but not loss), to the extent of the lesser of (a) the amount of gain realized from the exchange (generally equal to the fair market value of all of the consideration (or issue price of debt instruments), including cash,

---

[12]   However, the Commitment Parties and any Permitted Transferee of Company Claims/Interests held by a Commitment Party as of the Agreement Effective Date shall not receive the Note Rights and Equity Rights shall not receive the Note Rights and Equity Rights.

<div style="text-align:center">77</div>

received, minus the U.S. Holder's adjusted basis, if any, in the Claim) or (b) the cash and the fair market value (or issue price of debt instruments) of "other property" received that is not permitted to be received under sections 354 and 356 of the Tax Code without recognition of gain.

With respect to non-cash consideration that is treated as a "stock or security" of Seadrill, such U.S. Holder should obtain a tax basis in such property, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or OID), and subject to the rules relating to market discount, equal to (a) the tax basis of the Claim surrendered, less (b) the cash received, plus (c) gain recognized (if any). The holding period for such non-cash consideration should include the holding period for the exchanged Claims.

With respect to non-cash consideration that is not treated as a "stock or security" of Seadrill, U.S. Holders should obtain a tax basis in such property, other than any amounts treated as received in satisfaction of OID, and subject to the rules relating to market discount, equal to the property's fair market value (or issue price, in the case of debt instruments) as of the date such property is distributed to the U.S. Holder. The holding period for any such property should begin on the day following the receipt of such property.

<blockquote>

**(ii)**      **Treatment if General Unsecured Claims against Seadrill are Not "Securities" of Seadrill or None of the Consideration Received Under the Plan Constitutes Stock or Securities of Seadrill**

</blockquote>

If a General Unsecured Claim against Seadrill is determined not to be a "security" of Seadrill or none of the consideration received by a U.S. Holder of such Claim is determined to be a stock or a "security" of Seadrill, then the exchange of such Claims pursuant to a Plan should be subject to the same treatment as the General Unsecured Claims against NADL and Sevan, as discussed above.

<blockquote>

**(d)**      **Exercise of the Note Rights and Equity Rights**

**(i)**      **Nature of Rights**

</blockquote>

The characterization of the Note Rights and the Equity Rights their subsequent exercise for U.S. federal income tax purposes—as simply the exercise of options to acquire the property that is subject to the Note Rights or Equity Rights or, alternatively, as an integrated transaction pursuant to which the applicable option consideration is acquired directly in partial satisfaction of a U.S. Holder's Claim—is uncertain. Although the issue is not free from doubt, unless otherwise noted this discussion assumes that the exchange of a Claim for the Note Rights and Equity Rights (along with the other consideration under the Plan) is a separately identifiable step from the exercise of such Note Rights and Equity Rights.

<blockquote>

**(ii)**      **Exercise of the Note Rights**

**(1)**      **General Issues**

</blockquote>

A U.S. Holder that elects to exercise the Note Rights should be treated as purchasing, in exchange for its Note Rights and the amount of cash funded by the U.S. Holder to exercise the Note Rights, the New Seadrill Common Shares and New Secured Notes it is entitled to purchase pursuant to the Note Rights. Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a U.S. Holder should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises the Note Rights.

A U.S. Holder's holding period in the New Secured Notes received upon exercise of a Note Right generally should commence the day following the exercise date.

A U.S. Holder that does not exercise a Note Right may be entitled to claim a capital loss equal to the amount of tax basis allocated to the Note Right, subject to any limitations on such U.S. Holder's ability to utilize capital losses.  Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of electing not to exercise the Note Right.

### (2)    Issue Price and OID of New Secured Notes

Upon the exercise of the Note Rights, a U.S. Holder will receive both New Seadrill Common Equity and New Secured Notes.  The New Seadrill Common Equity and New Secured Notes should constitute an "investment unit" under Applicable U.S. Tax Law (and the Debtors have agreed that such treatment is appropriate in connection with the New Seadrill Common Equity and New Secured Notes being issued pursuant to the Investment Agreement to parties other than Holders of Claims) (the "Note Rights Investment Unit").  Accordingly, the issue price of the New Secured Notes will depend on the issue price of the Note Rights Investment Unit.  Because the Note Rights Investment Unit is identical to the investment unit being received by other parties to the Investment Agreement (the "Other Investment Agreement Investment Units"), although the issue is not free from doubt, the Debtors will report that the issue price of the Note Rights Investment Unit is identical to the issue price of the Other Investment Agreement Investment Units.  Under Applicable U.S. Tax Law, because the Other Investment Agreement Investment Units are being issued solely for a set amount of cash, the issue price of each Other Investment Agreement Investment Unit will be equal to the amount of cash paid to acquire the Other Investment Agreement Investment Unit.  That issue price will then be allocated between the New Seadrill Common Equity and New Secured Notes based on their respective fair market values, with the amount allocated to the New Secured Notes determining the issue price of the New Secured Notes.  The Debtors expect that this will result in the New Secured Notes being issued with a substantial amount of OID (in addition to OID related to the "payment in kind" feature of the New Secured Notes).  OID with respect to the New Secured Notes will generally be subject to the same rules discussed in the context of Credit Agreement Claims, above.

The above discussion is subject to the discussion of the CPDI rules, below.

### (3)    Tax Basis in New Seadrill Common Shares and New Secured Notes

Although not free from doubt, a U.S. Holder's aggregate tax basis in the New Seadrill Common Shares and New Secured Notes received should equal the sum of (i) the amount of cash paid by the U.S. Holder to exercise its Note Rights plus (ii) such U.S. Holder's tax basis in its Note Rights immediately before the option is exercised.  In connection with this determination, although not free from doubt, after allocating the issue price of the Note Rights Investment Unit, as described above, a U.S. Holder should further allocate such U.S. Holder's tax basis in its Note Rights immediately before its exercise among the New Seadrill Common Shares and New Secured Notes in accordance with their respective fair market values.

A U.S. Holder's holding period for the New Seadrill Common Shares received on the Effective Date pursuant to the exercise of the Equity Rights should begin on the day following the Effective Date.

The determination of a U.S. Holder's aggregate tax basis in the New Seadrill Common Shares and New Secured Notes is subject to uncertainty, and U.S. Holders should consult their own tax advisors regarding such allocation.

(4)     **Possible Treatment as Contingent Payment Debt Instruments**

There is a possibility that the restrictions on the ability of NSNCo to elect to pay the "PIK" portion of the New Secured Notes' interest in cash may cause the New Secured Notes to be treated as CPDIs subject to the "noncontingent bond method" for accruing OID.  In the event the New Secured Notes are treated as CPDIs, the same rules discussed in the context of Credit Agreement Claims, above, should apply.

The Debtors have not yet determined whether the New Secured Notes will constitute a CPDI or determined the "comparable yield" or a schedule of projected payments.  The Debtors will only determine whether the New Secured Notes constitute CPDIs, and will only determine the "comparable yield" or construct a schedule of projected payments, to the extent they determine they are required to do so under Applicable U.S. Tax Law.  In the event the Debtors do not make these determinations, each U.S. Holder would be required to independently make the relevant determinations.  In the event the Debtors determine that the New Secured Notes constitute CPDIs and determine they are required to make determinations with respect to a schedule of projected payments, such information will be determined following the close of the Restructuring Transactions, and can be obtained by contacting the Reorganized Debtors at a contact address that will be determined at a later date.  Although not free from doubt, in light of the Debtors' current view of the likelihood that the "PIK" portion of the New Secured Notes' interest would be paid in cash, the Debtors are currently of the view that the New Secured Notes would not constitute CPDIs.

The rules related to CPDIs are complex. U.S. Holders are encouraged to consult their own tax advisors, including with respect to whether the New Secured Notes constitute CPDIs.

(iii)     **Exercise of the Equity Rights**

A U.S. Holder that elects to exercise the Equity Rights will be treated as purchasing, in exchange for its Equity Rights and the amount of cash funded by the U.S. Holder to exercise the Equity Rights, the New Seadrill Common Shares it is entitled to purchase pursuant to the Equity Rights.  Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a U.S. Holder should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises the Equity Rights.  A U.S. Holder's aggregate tax basis in the New Seadrill Common Shares will equal the sum of (i) the amount of cash paid by the U.S. Holder to exercise its Equity Rights plus such U.S. Holder's tax basis in its Equity Rights immediately before the option is exercised.  A U.S. Holder's holding period for the New Seadrill Common Shares received on the Effective Date pursuant to the exercise of the Equity Rights should begin on the day following the Effective Date.

A U.S. Holder that elects not to exercise the Equity Rights may be entitled to claim a capital loss equal to the amount of tax basis allocated to the Equity Rights, subject to any limitations on such U.S. Holder's ability to utilize capital losses.  Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of electing not to exercise the Equity Rights.

(iii)     **Bond Premium**

If a U.S. Holder's initial tax basis in its interest in an Amended Credit Facility or New Secured Notes exceeds the stated redemption price at maturity of such interest in such Amended Credit Facility or New Secured Notes, such U.S. Holder will be treated as acquiring the Amended Credit Facility or New Secured Notes with "bond premium."  Such U.S. Holder generally may elect to amortize the premium over the remaining term of the Amended Credit Facility or New Secured Notes on a constant yield method as an offset to interest when includible in income under such U.S. Holder's regular accounting method.  If a U.S. Holder does not elect to amortize the premium, that premium will decrease the gain or increase the loss

such U.S. Holder would otherwise recognize on disposition of the Claim under such Amended Credit Facility or New Secured Notes.

### (iv)     Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's initial tax basis in the debt instrument is less than (a) the stated redemption price at maturity or (b) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the stated redemption price at maturity multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### (v)     Accrued Interest and OID

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but untaxed interest (or OID) on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income.  Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest previously was included in the U.S. holder's gross income but was not paid in full by the Debtors.

The tax basis of any non-cash consideration determined to be received in satisfaction of accrued but untaxed interest (or OID, if any) should generally equal the fair market value of such non-cash consideration.  The holding period for any such non-cash consideration should begin on the day following the Effective Date.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to holders of Claims in each Class will be allocated first to the principal amount of Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. However, certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the holder should be allocated in some way other than as provided in the Plan.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### (vi) U.S. Federal Income Tax Consequences to Holders of Owning and Disposing of Interests in Amended Credit Facilities and New Secured Notes

As noted above, in general, interest (including OID, if any) received or accrued by U.S. Holders with respect to Amended Credit Facilities and New Secured Notes should be treated as foreign source ordinary income.

Subject to the discussion of CPDIs immediately below, unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of interest in the Amended Credit Facilities or New Secured Notes. Such capital gain will be long-term capital gain if at the time of the sale, redemption, or other taxable disposition, the U.S. Holder held the debt for more than one year. Long-term capital gains of an individual taxpayer are generally taxed at preferential rates. The deductibility of capital losses is subject to certain limitations.

To the extent any Amended Credit Facility or the New Secured Notes constitute CPDIs, different rules apply. In such case, upon disposition, the U.S. Holder should recognize gain or loss upon the sale, exchange, or maturity of such debt in an amount equal to the difference, if any, between the consideration received in exchange therefor and its adjusted basis therein. In general, a U.S. Holder's adjusted basis should be its initial basis (determined pursuant to the rules discussed above), increased by the amount of interest it previously accrued with respect to such CPDIs (in accordance with the comparable yield and the projected payment schedule thereof), decreased by any interest payments that have been made, and increased or decreased by the amount of any positive or negative adjustment, respectively, that it is required to make. Any recognized gain should be ordinary interest income (rather than capital gain), and any recognized loss should be ordinary loss to the extent of interest a U.S. Holder included as income in the current or previous taxable years in respect of such CPDIs, and thereafter, capital loss.

If a U.S. Holder's adjusted basis in the CPDIs it receives is different than the issue price of the CPDI (e.g., the U.S. Holder receives the CPDIs in a transaction that is a tax free reorganization, as discussed above), such U.S. Holder must allocate any difference between the adjusted issue price and its basis to daily portions of interest or projected payments over the remaining term of the CPDI. If the U.S. Holder's basis is higher than the adjusted issue price of the CPDI, the amount of the difference allocated to a daily portion of interest or to a projected payment should be treated as a negative adjustment on the date the daily portion accrues or the payment is made. On the date of the adjustment, a U.S. Holder's adjusted basis in the CPDI should be reduced by the amount the U.S. Holder treats as a negative adjustment. If the U.S. Holder's basis is less than the adjusted issue price of the CPDI, the amount of the difference allocated to a daily portion of interest or to a projected payment should be treated as a positive adjustment on the date the daily portion accrues or the payment is made. On the date of the adjustment, a U.S. Holder's adjusted basis in the debt instrument should be increased by the amount it treats as a positive adjustment.

The rules related to CPDIs are complex, and U.S. Holders are encouraged to consult their own tax advisors.

### (vii) U.S. Federal Income Tax Consequences to Holders of Owning and Disposing of New Seadrill Common Shares

Subject to the discussion regarding the passive foreign investment company ("PFIC") rules below, distributions, if any, made by New Seadrill out of current or accumulated earnings and profits (as determined for U.S. federal income tax purposes and including any taxes withheld from such distribution) with respect to the New Seadrill Common Shares, should generally be taxable to a U.S. Holder as foreign source ordinary dividend income. Distributions in excess of current and accumulated earnings and profits should be treated as a non-taxable return of capital to the extent of a U.S. Holder's basis in the New Seadrill

82

Common Shares and thereafter as capital gain. New Seadrill does not intend to determine its earnings and profits on the basis of U.S. federal income tax principles and, as a result, U.S. Holders should expect to treat all distributions on the New Seadrill Common Shares as dividends.

Dividends paid on the New Seadrill Common Shares should not be eligible for the dividends received deduction generally allowed to U.S. corporations with respect to dividends paid by domestic corporations or lower rates of dividend taxation allowed to non-corporate U.S. Holders.

A special set of U.S. federal income tax rules apply to ownership interests (or options to acquire ownership interests) in a PFIC. A non-U.S. corporation is a PFIC in any taxable year in which, after taking into account certain look-through rules, either (i) at least 75% of its gross income is passive income or (ii) at least 50% of the average value (determined on a quarterly basis) of its assets is attributable to assets that produce or are held to produce passive income. In making this determination, the non-U.S. corporation is treated as earning its proportionate share of any income and owning its proportionate share of any assets of a subsidiary corporation in which it owns, directly or indirectly, a 25% or greater interest, by value. Passive income generally includes, but is not limited to, dividends, interest, rents, royalties, and capital gains. If New Seadrill is a PFIC at any time during which a U.S. Holder owns the New Seadrill Common Shares, the U.S. Holder would be subject to additional U.S. information return filing requirements and the potentially materially adverse rules discussed below. New Seadrill has not made, and will not make, a determination as to whether it is, was or ever will be a PFIC. Therefore, U.S. Holders are urged to consult their own tax advisors regarding the classification of New Seadrill as a PFIC and any attendant U.S. federal income tax consequences.

If New Seadrill is classified as a PFIC for any taxable year during which a U.S. Holder owns the New Seadrill Common Shares, the PFIC rules may alter the tax consequences of owning the New Seadrill Common Shares with respect to gains from the sale or other disposition of, and "excess distributions" with respect to, the New Seadrill Common Shares. Under the "default PFIC regime," in general, an "excess distribution" is any distribution to a U.S. Holder that is greater than 125% of the average annual distributions received by the U.S. Holder (including return of capital distributions) during the three preceding taxable years or, if shorter, a U.S. Holder's holding period. If New Seadrill is classified as a PFIC for any taxable year during which a U.S. Holder owns the New Seadrill Common Shares, gains from the sale or other disposition of, and "excess distributions" with respect to, the New Seadrill Common Shares should be allocated ratably over a U.S. Holder's entire holding period and taxed at the highest ordinary income tax rate in effect for each such taxable year (subject to certain exceptions). Moreover, interest should be charged retroactively at the rate applicable to underpayments of tax (with respect to each such tax year's ratable allocation) through the date of gains from the sale or other disposition of, and "excess distributions" with respect to, the New Seadrill Common Shares.

New Seadrill does not intend to prepare or provide the information that would enable a U.S. Holder to make a "qualified electing fund" election. U.S. Holders should consult with their own tax advisors with respect to whether the unfavorable PFIC rules may be avoidable by electing to mark the New Seadrill Common Shares to market.

The rules relating to PFICs are extremely complex and U.S. Holders are urged to consult their own tax advisors to determine the consequences of owning New Seadrill Common Shares in the event that New Seadrill is treated as a PFIC during any taxable year during which a U.S. Holder will own the New Seadrill Common Shares.

The above discussion assumes New Seadrill is not treated as a controlled foreign corporation (a "CFC") under Applicable U.S. Tax Law, but no assurance can be made in that regard. U.S. Holders are urged to consult their own tax advisors on the consequences of New Seadrill being treated as a CFC.

### (viii)   Limitation on Use of Capital Losses

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### (ix)   Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, interest, dividends and gains from the sale or other disposition of capital assets. U.S. holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of consideration received pursuant to the Plan.

### E.   Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims

Because the issuers of consideration under the Plan are not U.S. entities, there generally should not be any U.S. federal income tax consequences to non-U.S. Holders with respect to the exchange of Claims under the Plan or the ownership or disposition of consideration received pursuant to the Plan.

### F.   Information Reporting and Back-up Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will also comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan, as well as future payments made with respect to consideration received under the Plan.  The Debtors do not expect distributions or payments to holders of Claims under the Plan to be subject to material withholding under the Tax Code.

Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

### G.    FATCA

A 30% withholding tax may be imposed on the payments of interest and dividends on the consideration received pursuant to the Plan, and after December 31, 2018, on the payments of gross proceeds from the sale or other disposition of Exchange Consideration that are made to a U.S. Holder or to certain foreign financial institutions, investment funds, and other non-U.S. persons receiving payments on a U.S. Holder's behalf if such U.S. Holder or such persons fail to comply with certain information reporting requirements ("FATCA Withholding"). Amounts that a U.S. Holder receives could be subject to FATCA Withholding if such U.S. Holder holds the consideration received under the Plan through another person (e.g., a foreign bank or broker) that is subject to FATCA Withholding because it fails to comply with these requirements (even if such Holder would not otherwise have been subject to withholding).  Holders should consult their own tax advisors regarding FATCA Withholding.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S., OR NON-INCOME TAX LAW, AND OF ANY CHANGE IN APPLICABLE U.S. TAX LAW**.

[*Remainder of page intentionally left blank*]

## XIV.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.


Dated:  September 12, 2017                          SEADRILL LIMITED
                                                    on behalf of itself and all other Debtors


                                                    _/s/_____
                                                    Mark Morris
                                                    Chief Financial Officer
                                                    Seadrill Limited

## Exhibit A

**Plan of Reorganization**

**<u>Exhibit B</u>**

**Restructuring Support Agreement**

**<u>Exhibit C</u>**

**Corporate Organization Chart**

**<u>Exhibit D</u>**

**Disclosure Statement Order**

## <u>Exhibit E</u>

**Rights Offering Procedures**

**<u>Exhibit F</u>**

**Liquidation Analysis**

**<u>Exhibit G</u>**

**Financial Projections**

**Exhibit H**

**Valuation Analysis**