# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| SEADRILL LIMITED, *et al.*,[1] | ) Case No. 17-60079 (DRJ) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE DEBTORS' PROPOSED JOINT PLAN OF REORGANIZATION, (III) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (IV) APPROVING THE RIGHTS OFFERING PROCEDURES AND RELATED MATERIALS, (V) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, (VI) AUTHORIZING THE DEBTORS TO CARRY OUT CERTAIN PRELIMINARY CORPORATE STEPS, AND (VII) GRANTING RELATED RELIEF

> **THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**
>
> **A HEARING WILL BE HELD ON THIS MATTER FOR JANUARY 10, 2018, AT 10:00 A.M. (CT) IN COURTROOM 400, 4th FLOOR, UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, 515 RUSK STREET, HOUSTON, TEXAS 77002.**

---

[1]   Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/Seadrill. The location of Debtor Seadrill Americas, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 11025 Equity Drive, Suite 150, Houston, Texas 77041.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

## Introduction[2]

### I.     A Clear Path to Emergence.

1.     The Plan currently is the only clear path to a value-maximizing resolution of these chapter 11 cases.  The Plan is the product of years of negotiation and hard-fought discussions in an effort to resolve an extremely complicated distressed company.  Prepetition, after nearly two years of negotiations, the Debtors and certain of their key stakeholders agreed on the terms of a restructuring transaction that will:

- reduce overall leverage through the equitization of $2.3 billion in unsecured debt;

- increase liquidity through a $1.06 billion new capital injection (comprised of both debt and equity); and

- re-profile the Debtors' $5.7 billion in secured bank debt by way of (a) an approximately five year maturity extension (on average) under each of the Bank Facilities, (b) the elimination of near-term amortization obligations, and (c) additional covenant relief.

2.     The Debtors commenced these chapter 11 cases to implement this transaction—on the first day of these cases, the Debtors filed their original version of the Plan, a related Disclosure Statement, and a confirmation scheduling motion (which the Court subsequently granted) seeking a disclosure statement hearing on January 10, 2018 and a confirmation hearing on March 26, 2018. Contemporaneously herewith, the Debtors filed a first amended version of the Plan and have revised the Disclosure Statement, both of which are designed to implement the deal contemplated by the Restructuring Support Agreement.

---

[2]     Capitalized terms used but not otherwise defined in this Introduction have the meaning given to such terms in the body of this Motion.

3.     But the Debtors' work is not done.  Even with the immense amount of effort and value built into the Plan and the Restructuring Support Agreement, the Debtors continue to seek an alternative that may deliver even more value to their estates.  To that end, a key component of implementing the Debtors' restructuring is the marketing process that commenced approximately one year prior to the Debtors' chapter 11 filing,[3] and which has contined post-filing.  As part of the postpetition process, the Debtors reached out to 89 potential investors and, after multiple phases and extensive discussions, meetings, and diligence efforts, ultimately received interest from two potential investor constituencies—Barclays Capital (also a bondholder) and an ad hoc group of bondholders (the "Ad Hoc Group") that have been active in these chapter 11 cases.  Both Barclays and the Ad Hoc Group have submitted proposals that contemplate their participation in the Debtors' restructuring, within the same structure broadly contemplated by the current Plan.  Both proposals would require certain third party consents that the parties have not yet secured. The Debtors continue to analyze the proposals and engage with Barclays and the Ad Hoc Group, as well other active constituencies in these chapter 11 cases, regarding outstanding diligence requests and other issues.

4.     Further, the Debtors have engaged in an extensive diligence effort, chiefly with the Creditors' Committee, but also with Barclays and the Ad Hoc Group.  The Debtors have provided access to nearly 100,000 documents and participated in a number of diligence and management meetings, in both New York and London.  Moreover, the Debtors filed a disclosure statement on the first day of these chapter 11 cases—meaning interested parties have had access to the large

---

[3]     *See Declaration of David R. Hilty, Managing Director of Houlihan Lokey, Inc., in Support of the Joint Chapter 11 Plan of Reorganization of Seadrill Limited and Its Debtor Affiliates* [Docket No. 6].

majority of the Debtors' disclosure for more than three months.  Additionally, in the two weeks leading up to the filing of this Motion, the Debtors shared advanced drafts of the revised Plan, Disclosure Statement, this Motion, and related documents with various interested parties, including the Creditors' Committee, Barclays, and the Ad Hoc Group.  Finally, the Debtors provided detailed supporting analyses regarding the valuation, liquidation analysis, and financial projections annexed to the revised Disclosure Statement and intend to provide supplemental analyses contemporaneously herewith or shortly hereafter.  In other words, the Debtors have made every effort to engage with and respond to diligence requests from the active constituencies in these chapter 11 cases, including as it relates to the Plan, Disclosure Statement, and related solicitation procedures and forms.

5.      While the Debtors will continue to seek to engage in discussions and diligence with interested constituencies and evaluate alternatives to the Plan, the Plan is confirmable in its current state and the Debtors are fully prepared to proceed with confirmation.  The Debtors believe the Plan currently embodies the value-maximizing alternative—indeed, it remains the Debtors' only actionable alternative.  The Debtors will continue to diligently pursue discussions with potential additional investors (including Barclays and the Ad Hoc Group) in an effort to secure even greater value for their stakeholders.  The competitive tension necessary to secure incremental value, though, exists only so long as the Debtors continue to press ahead with their existing transaction. The Debtor's current Plan is the foundation on which a more valuable alternative would be built— the Debtors firmly believe that if they cease forward progress, that value-building process will stagnate.  Moreover, stalling the process could endanger the Debtors' current deal, potentially leaving them without any path to emergence.  In any event, the Debtors have established a reasonable confirmation timeline and lingering any longer in chapter 11 will do little more than

add to administrative costs.  Further, as set forth in the revised Disclosure Statement and accompanying financial projections, industry conditions remain challenging, which mitigates in favor of proceeding as efficiently as possible.

6.       For these reasons, the Debtors continue to believe that it is prudent to continue forward in line with the confirmation schedule outlined on the first day of these chapter 11 cases, and the first step toward confirmation is solicitation.  Proceeding to seek approval of the Disclosure Statement and launch solicitation of the Plan will not in any way prejudice the Debtors' restructuring or marketing processes or forestall further settlement discussions with any party in interest in these chapter 11 cases.  The Debtors will continue to actively consider and negotiate the terms of any proposals in line with their duty to maximize value for their stakeholders.  If the Debtors elect to proceed with a competing alternative, it will be because that alternative creates additional value—*i.e.*, provides more to stakeholders entitled to vote on the Plan.  Thus, there is no harm in commencing the solicitation process now.

## II.       Summary of Relief Requested.

7.       ***Solicitation Procedures and Noticing Plan.***  This Motion seeks approval of the Disclosure Statement, reasonable and appropriate solicitation procedures, and related solicitation forms.  As described herein, the Debtors intend to implement a comprehensive noticing plan designed to give the many thousands of voting creditors and other parties in interest, who are spread across the globe, maximum notice under the circumstances and a full opportunity to be heard in connection with confirmation.  This process will maximize the effectiveness of the confirmed Plan and, ultimately, the Debtors' fresh start upon emergence.

8.       ***Rights Offering Procedures.***  In parallel with the plan solicitation process, the Debtors intend to commence the subscription process for the debt and equity rights offerings contemplated by the Plan.  As set forth in the Plan, so long as holders of general unsecured claims

at Debtors Seadrill Limited, North Atlantic Drilling Limited, and Sevan Drilling Limited vote as a class to accept the plan, such holders in accepting classes are entitled to participate in their pro rata portion of (a) an $85 million offering of the new secured notes to be issued pursuant to the Plan and (b) a $25 million offering of the new equity in reorganized Seadrill Limited.  To avoid the unnecessary cost and delay of registering the offered securities with the Securities and Exchange Commission during these chapter 11 cases, only claimants that qualify as "accredited" or "qualified" investors (discussed below) are eligible to participate in the rights offerings.  As described below, the Debtors seek approval of reasonable and appropriate procedures and related forms to identify eligible accredited investors and solicit their participation in the rights offerings. While the Debtors intend to take certain administrative steps to confirm the identity of holders eligible to participate in the rights offerings, the subscription process will not commence until nearer to or after the confirmation hearing.  Thus, as with the solicitation process, approving the rights offering procedure and forms at this juncture will not prejudice any party in interest, even if the Debtors elect to pursue a proposal that alters the terms of the rights offerings.

9.     ***Preliminary Corporate Steps.***  Finally, as previously described, the Debtors intend to carry out a series of steps to effectuate their corporate reorganization into a new "IHCo" / "RigCo" / "NSNCo" holding structuring that supports the broader economic deal.  These steps will ultimately be set forth in a corporate steps plan to be included in the Debtors' plan supplement at a future date.  While the vast majority of the steps will be implemented after confirmation of the Plan, due to pressing time constraints, the Debtors are seeking authority herein to take certain preliminary steps, aimed at preparing their broader organization for the corporate steps process to be undertaken after confirmation of the Debtors' chapter 11 plan.  These preliminary steps are administrative in nature and have no material economic effect on the Debtors' enterprise or any

party in interest in these chapter 11 cases.  Out of an abundance of caution, however, the Debtors

seek the Court's approval to carry out these steps prior to confirmation.  Timely executing their

corporate reorganization prior to emergence from chapter 11 is an essential component of

effectuating the Debtors' restructuring.

## III.    Next Steps.

10.    As the Court is aware, the Plan (and the consensus embodied therein) is a significant

achievement in light of the market backdrop.  To ensure that they are able to capitalize on the

benefits of the Plan, though, it is imperative that these cases stay on schedule.  Even setting aside

that the Debtors have agreed to certain milestones as part of their restructuring, in light of the

current level of consensus, spending additional time in chapter 11 would do little more than result

in unnecessary administrative costs.  Proceeding with solicitation will not in any way prejudice

the Debtors' marketing process or ongoing discussions with interested parties, the Debtors' estates,

or parties entitled to vote to accept or reject the plan.   Accordingly, for the reasons described

herein, the Debtors respectfully submit that the Court should grant this Motion so that the Debtors

may proceed with the next steps toward emergence from chapter 11.

## Jurisdiction, Venue, and Procedural Background

11.    The United States Bankruptcy Court for the Southern District of Texas

(the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference from the United States District Court for the Southern*

*District of Texas*, dated May 24, 2012 (the "Amended Standing Order").  The Debtors confirm

their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion

to the extent that it is later determined that the Court, absent consent of the parties, cannot enter

final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

12. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13. The bases for the relief requested herein are sections 105, 363, 1125, 1126, and 1128 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 3016, 3017, 3018, and 3020, and rules 2002-1 and 3016-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Local Rules").

14. On September 12, 2017 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Mark Morris, Chief Financial Officer of Seadrill Management Ltd., in Support of the Chapter 11 Petitions and First Day Motions* [Docket No. 4] and the *Declaration of Edgar W. Mosley II, Managing Director of Alvarez & Marsal, in Support of the Chapter 11 Petitions and First Day Motions* [Docket No. 5].

## Relief Requested

15. The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), granting the following relief:

    a. ***Disclosure Statement.*** Approving the *Disclosure Statement Relating to the First Amended Joint Chapter 11 Plan of Reorganization of Seadrill Limited and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, substantially in the form attached to the Order as Schedule 1 (the "Disclosure Statement")[4] as containing "adequate information" as required by section 1125 of the Bankruptcy Code;

    b. ***Solicitation and Voting Procedures.*** Approving procedures for: (i) soliciting, receiving, and tabulating votes to accept or reject the

---

[4] Capitalized terms used but not defined herein have the meanings given to them in the *Amended Joint Chapter 11 Plan of Reorganization of Seadrill Limited and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith (as amended, supplemented, or modified from time to time, the "Plan").

Plan; (ii) voting to accept or reject the Plan; and (iii) filing objections to the Plan (the "Solicitation and Voting Procedures"), substantially in the form attached to the Order as Schedule 2;

c.   **Ballots.**  Approving the ballots, substantially in the forms attached to the Order as Schedules 3A, 3B, 3C, 3D, 3E, 3F, 3G, 3H, 3I, 3J, 3K, 3L, 3M, 3N, and 3O (collectively, the "Ballots");

d.   **Solicitation Packages.**  Finding that the solicitation materials and documents included in the solicitation packages (the "Solicitation Packages") that will be sent to, among others, holders of Claims entitled to vote to accept or reject the Plan, are in compliance with Bankruptcy Rules 3017(d) and 2002(b);

e.   **Cover Letter.**  Approving the form of letter (the "Cover Letter") that the Debtors will send to holders of Claims entitled to vote to accept or reject the Plan urging such parties to vote in favor of the Plan, substantially in the form attached to the Order as Schedule 7;

f.   **Confirmation Hearing Notice.**  Approving the form and manner of notice of the hearing to be held by the Court to consider Confirmation (the "Confirmation Hearing," and the notice thereof, the "Confirmation Hearing Notice") pursuant to section 1129 of the Bankruptcy Code, substantially in the form attached to the Order as Schedule 8;

g.   **Plan Supplement Notice.**  Approving the notice related to the filing of the Plan Supplement, substantially in the form attached to the Order as Schedule 9 (the "Plan Supplement Notice");

h.   **Non-Voting Status Notices.**  Approving:  (i) the form of notice applicable to holders of Claims that are Unimpaired under the Plan and who are, pursuant to section 1126(f) of the Bankruptcy Code, conclusively presumed to accept the Plan; (ii) the form of notice applicable to holders of Claims or Interests that are Impaired under the Plan and who are deemed to reject the Plan; and (iii) the form of notice applicable to holders of Claims or Interests that are subject to a pending objection by the Debtors and who are not entitled to vote the disputed portion of such Claim or Interest (each, a "Non-Voting Status Notice"), substantially in the form attached to the Order as Schedules 4, 5, and 6, respectively;

i.   **Assumption and Rejection Notices.**  Approving the form of notices to counterparties to Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan (the "Assumption Notice" and the "Rejection Notice," respectively), substantially in the forms attached to the Order as Schedules 10 and 11, respectively;

j.     ***Rights Offering Procedures.***    Approving procedures and instructions for participating in the Notes Rights Offering and the Equity Rights Offering (as defined in the Plan and together, the "<u>Rights Offerings</u>," and the procedures for the Rights Offerings, the "<u>Rights Offering Procedures</u>"), substantially in the form attached to the Order as <u>Schedules 12A</u> and <u>12B</u>.

k.     ***Rights Offering Materials.***   Approving the form of materials necessary to the consummation of the Rights Offerings under the terms of the Rights Offering Procedures, including (i) the accredited investor certification letter, (ii) the subscription agreement; and (iii) the subscription form (collectively, the "<u>Rights Offering Materials</u>"), substantially in the form attached to the Order as <u>Schedules 13A</u>, <u>13B</u>, <u>13C</u>, <u>13D</u>, and <u>13E</u> respectively.

l.     ***Preliminary Corporate Steps***.  Authorizing the Debtors to form any new corporate entities necessary to execute their corporate reorganization, including those entities listed in <u>Schedule 14</u>.

m.     ***Confirmation Dates.***  Establishing certain dates and deadlines with respect to Confirmation, subject to modification as necessary.

16.     On September 13, 2017, the Court entered the *Order Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Disclosure Statement and Plan Confirmation* [Docket No. 96] (the "<u>Scheduling Order</u>"), which established the following dates for purposes of Confirmation:

| Event | Date | Description |
|---|---|---|
| Disclosure Statement Objection Deadline | January 3, 2018, at 4:00 p.m., prevailing Central Time | Deadline by which parties in interest may object to the Disclosure Statement and adequacy thereof |
| Disclosure Statement Hearing | January 10, 2018, at 10:00 a.m., prevailing Central Time | Date of the hearing at which the Court will consider approval of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code |
| Solicitation Deadline | January 17, 2018 | Deadline by which the Debtors must distribute Solicitation Packages, including Ballots, to holders of Claims entitled to vote to accept or reject the Plan |

| Event | Date | Description |
|---|---|---|
| Voting Deadline | March 9, 2018, at 4:00 p.m., prevailing Central Time | Deadline by which holders of Claims may vote to accept or reject the Plan pursuant to Bankruptcy Rule 3017(c), and by which all Ballots, (including the Master Ballots and Beneficial Ballots) must be properly executed, completed, and delivered as specified in the Solicitation and Voting Procedures |
| Plan Objection Deadline | March 9, 2018, at 4:00 p.m., prevailing Central Time | Deadline by which parties in interest may file objections to Confirmation |
| Confirmation Hearing Date | March 26, 2018, at 9:00 a.m., prevailing Central Time | Date of the hearing at which the Court will consider Confirmation |

17.    By this Motion, the Debtors seek to establish the following dates and deadlines in addition to those previously established by the Court pursuant to the Scheduling Order (together, the "Plan Confirmation Schedule"):

| Event | Date | Description |
|---|---|---|
| Voting Record Date | January 10, 2018 | Date for determining (i) which holders of Claims in the Voting Classes, as defined herein, are entitled to vote to accept or reject the Plan and (ii) whether Claims have been properly assigned or transferred to an assignee under Bankruptcy Rule 3001(e) such that the assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim (the "Voting Record Date") |
| Publication Deadline | January 17, 2018 | Date by which the Debtors will submit the Confirmation Hearing Notice in a format modified for publication (the "Publication Notice") |
| Deadline to File Confirmation Brief | March 21, 2018, at 4:00 p.m., prevailing Central Time | Date by which the Debtors shall file their brief in support of Confirmation and in response to objections thereto (the "Confirmation Brief Deadline") |

| Event | Date | Description |
|---|---|---|
| Deadline to File Voting Report | March 21, 2018, at 4:00 p.m., prevailing Central Time | Date by which the report tabulating the voting on the Plan (the "Voting Report") shall be filed with the Court |

**Plan Summary**

18.     The restructuring transaction embodied in the Plan contemplates, among other things, the elimination of near-term amortization obligations and extension of maturities under the Debtors' secured bank facilities by approximately five years, on average, and the equitization of $2.3 billion in unsecured bond obligations, and a $1.06 billion new-money equity investment, which will take the form of $860 million in new secured notes and a $200 million direct equity investment.  Under the Plan, $85 million on the new secured notes and $25 million of the direct equity investment will be available to holders of general unsecured claims at Seadrill Limited, NADL, and Sevan under certain circumstances pursuant to the Rights Offerings (described below).  Specifically, the Plan provides for the following distributions to be made to the Debtors' stakeholders:

| Class | Claim | Treatment of Claim/Equity Interest |
|---|---|---|
| | *Other Claims* | |
| A1 | Other Secured Claims | Each holder of an Allowed Other Secured Claim shall receive as determined by the Debtors or the Reorganized Debtors, as applicable: (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| A2 | Other Priority Claims | Each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim. |
| A3 | Intercompany Claims | On the Effective Date, Intercompany Claims shall, at the election of the applicable Debtor, be (a) Reinstated or (b) released. |
| | *Claims against Seadrill Limited* | |
| B1-a | $1.5B Credit Agreement Secured Claims against Seadrill Limited | On the Effective Date, each holder of an Allowed Class B1-a Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $1.5B Credit Agreement in principal amount equal to the amount of its Allowed Class B1-a Claims. |

| Class | Claim | Treatment of Claim/Equity Interest |
|-------|-------|-----------------------------------|
| B1-b | $483MM Credit Agreement Secured Claims against Seadrill Limited | On the Effective Date, each holder of an Allowed Class B1-b Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $483MM Credit Agreement in a principal amount equal to its Allowed Class B1-b Claims. |
| B1-c | $450MM Eminence Credit Agreement Secured Claims against Seadrill Limited | On the Effective Date, each holder of an Allowed Class B1-c Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $450MM Eminence Credit Agreement in a principal amount equal to the amount of its Allowed Class B1-c Claims. |
| B1-d | $1.35B Credit Agreement Secured Claims against Seadrill Limited | On the Effective Date, each holder of an Allowed Class B1-d Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $1.35B Credit Agreement in a principal amount equal to the amount of its Allowed Class B1-d Claims. |
| B1-e | $950MM Credit Agreement Secured Claims against Seadrill Limited | On the Effective Date, each holder of an Allowed Class B1-e Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $950MM Credit Agreement in a principal amount equal to the amount of its Allowed Class B1-e Claims. |
| B1-f | $450MM Nordea Credit Agreement Secured Claims against Seadrill Limited | On the Effective Date, each holder of an Allowed Class B1-f Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $450MM Nordea Credit Agreement in a principal amount equal to the amount of its Allowed Class B1-f Claims. |
| B1-g | $440MM Credit Agreement Secured Claims against Seadrill Limited | On the Effective Date, each holder of an Allowed Class B1-g Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $440MM Credit Agreement in a principal amount equal to the amount of its Allowed Class B1-g Claims. |
| B1-h | $400MM Credit Agreement Secured Claims against Seadrill Limited | On the Effective Date, each holder of an Allowed Class B1-h Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $400MM Credit Agreement in a principal amount equal to the amount of its Allowed Class B1-h Claims. |
| B1-i | $300MM Credit Agreement Secured Claims against Seadrill Limited | On the Effective Date, each holder of an Allowed Class B1-i Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $300MM Credit Agreement in a principal amount equal to the amount of its Allowed Class B1-i Claims. |
| B2 | Guarantee Facility Claim against Seadrill Limited | On the Effective Date, each holder of an Allowed Guarantee Facility Claim against Seadrill Limited shall receive their Pro Rata share of participation in the Amended Guarantee Facility. |
| B3 | General Unsecured Claims against Seadrill Limited | • **If Class B3 votes to accept the Plan**, each holder of an Allowed General Unsecured Claim against Seadrill Limited (including Allowed Seadrill Limited Unsecured Note Claims, Seadrill Limited Interest Rate Swap Claims, and Seadrill Limited Currency Swap Claims, and NADL Guaranteed Unsecured Note Claims) shall receive: (A) 100 percent of its Pro Rata share (measured by reference to the Unsecured Pool Denominator) of |

| Class | Claim | Treatment of Claim/Equity Interest |
|---|---|---|
| | | the Unsecured Pool Equity and, (B) if such holder's General Unsecured Claim is Allowed in a liquidated, non-contingent amount prior to the Subscription Expiration Deadline (as defined in the Rights Offering Procedures), such holder's General Unsecured Claim is not the subject of an unresolved objection to the allowance thereof as of the Subscription Expiration Deadline, and such holder is an Eligible Holder, it shall also receive 100 percent of its Pro Rata share (measured by reference to the Eligible Holder Denominator) of (1) the Note Rights and (2) the Equity Rights; *provided*, *however*, that the Commitment Parties have agreed not to receive the Note Rights and Equity Rights on account of any General Unsecured Claims against Seadrill held by such Commitment Parties as of the RSA Effective Date. <br><br> • **If Class B3 votes to reject the Plan**, each holder of an Allowed General Unsecured Claim against Seadrill Limited shall receive the Liquidation Recovery, unless otherwise ordered by the Bankruptcy Court. <br><br> *provided*, *however*, that the holders of Credit Agreement Unsecured Claims against Seadrill Limited have agreed to forgo their right to receive their Pro Rata share of any recovery on account of such Credit Agreement Unsecured Claims against Seadrill Limited (but not, for the avoidance of doubt, any other General Unsecured Claims or under any other plan of reorganization or alternative restructuring); *provided further*, that, for the avoidance of doubt, holders of Credit Agreement Unsecured Claims against Seadrill Limited shall be entitled to vote to accept or reject the Plan on account of such Claims. |
| B4 | Seadrill Limited 510(b) Claims | • **If Class B3 votes to accept the Plan**, each holder of an Allowed Seadrill Limited 510(b) Claim shall receive its Pro Rata share of the Equity Recovery. <br><br> • **If Class B3 votes to reject the Plan**, each holder of an Allowed Seadrill Limited 510(b) Claim will be extinguished and shall not receive or retain any distribution, property, or other value on account of their Seadrill Limited 510(b) Claims. |
| B5 | Interests in Seadrill Limited | All Interests in Seadrill Limited will be extinguished in accordance with the Description of the Transaction Steps and: <br><br> • **If Class B3 votes to accept the Plan**, each holder of an Allowed Interest in Seadrill Limited shall receive its Pro Rata share of the Equity Recovery. <br><br> • **If Class B3 votes to reject the Plan**, each Allowed Seadrill Limited 510(b) Claim will be extinguished and each holder of an Allowed Interest in Seadrill Limited shall not receive or retain any distribution, property, or other value on account of its Interest in Seadrill Limited. |
| | *Claims against Other Seadrill Debtors* | |
| C1-a | $1.5B Credit Agreement Claims against Other Seadrill Debtors | On the Effective Date, each holder of an Allowed Class C1-a Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $1.5B Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-a Claim less (ii) the principal amount of its participation |

14

| Class | Claim | Treatment of Claim/Equity Interest |
|-------|-------|-------------------------------------|
| | | received on account of its Class B1-a Claims, if any. |
| C1-b | $483MM Credit Agreement Claims against Other Seadrill Debtors | On the Effective Date, each holder of an Allowed Class C1-b Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $483MM Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-b Claim less (ii) the principal amount of its participation received on account of its Class B1-b Claims, if any. |
| C1-c | $450MM Eminence Credit Agreement Claims against Other Seadrill Debtors | On the Effective Date, each holder of an Allowed Class C1-c Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $450MM Eminence Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-c Claim less (ii) the principal amount of its participation received on account of its Class B1-c Claims, if any. |
| C1-d | $1.35B Credit Agreement Claims against Other Seadrill Debtors | On the Effective Date, each holder of an Allowed Class C1-d Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $1.35B Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-d Claim less (ii) the principal amount of its participation received on account of its Class B1-d Claims, if any. |
| C1-e | $950MM Credit Agreement Claims against Other Seadrill Debtors | On the Effective Date, each holder of an Allowed Class C1-e Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $950MM Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-e Claim less (ii) the principal amount of its participation received on account of its Class B1-e Claims, if any. |
| C1-f | $450MM Nordea Credit Agreement Claims against Other Seadrill Debtors | On the Effective Date, each holder of an Allowed Class C1-f Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $450MM Nordea Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-f Claim less (ii) the principal amount of its participation received on account of its Class B1-f Claims, if any. |
| C1-g | $440MM Credit Agreement Claims against Other Seadrill Debtors | On the Effective Date, each holder of an Allowed Class C1-g Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $440MM Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-g Claim less (ii) the principal amount of its participation received on account of its Class B1-g Claims, if any. |
| C1-h | $400MM Credit Agreement Claims against Other Seadrill Debtors | On the Effective Date, each holder of an Allowed Class C1-h Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $400MM Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-h Claim less (ii) the principal amount of its participation received on account of its Class B1-h Claims, if any. |
| C1-i | $300MM Credit Agreement Claims against Other Seadrill Debtors | On the Effective Date, each holder of an Allowed Class C1-i Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended $300MM Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-i Claim less (ii) the principal amount of its participation received on account of its Class B1-i Claims, if any. |

| Class | Claim | Treatment of Claim/Equity Interest |
|---|---|---|
| C1-j | Prepetition AOD Credit Agreement Claims against Other Seadrill Debtors | On the Effective Date, each holder of an Allowed Class C1-j Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended AOD Credit Agreement in a principal amount equal to the amount of its Allowed Class C1-j Claim. |
| C2 | General Unsecured Claims against Other Seadrill Debtors | On the Effective Date, each holder of an Allowed General Unsecured Claim against an Other Seadrill Debtor shall, at the election of the applicable Debtor, be (a) Reinstated or (b) paid in full in Cash. |
| C3 | Interests in Other Seadrill Debtors | On the Effective Date, each holder of an Allowed Interest in an Other Seadrill Debtor shall be Reinstated. |
| | *Claims against NADL* | |
| D1 | Credit Agreement Claim against NADL | On the Effective Date, each holder of an Allowed Class D1 Claim shall receive its Pro Rata participation in the Amended Credit Facility entered into pursuant to the Amended NADL Credit Agreement in principal amount equal to the amount of its Allowed Class D1 Claims. |
| D2 | NADL Revolving Loan Claim | On the Effective Date, NADL Revolving Loan Claims shall, at the election of NADL, be (a) Reinstated or (b) released. |
| D3 | General Unsecured Claims against NADL | • **If Class D3 votes to accept the Plan**, each holder of an Allowed General Unsecured Claim against NADL (including NADL Guaranteed Unsecured Note Claims and NADL Non-Guaranteed Unsecured Note Claims) shall receive: (A) 70 percent of its Pro Rata share (measured by reference to the Unsecured Pool Denominator) of the Unsecured Pool Equity and, (B) if such holder's General Unsecured Claim is Allowed in a liquidated, non-contingent amount prior to the Subscription Expiration Deadline (as defined in the Rights Offering Procedures), such holder's General Unsecured Claim is not the subject of an unresolved objection to the allowance thereof as of the Subscription Expiration Deadline, and such holder is an Eligible Holder, it shall also receive 70 percent of its Pro Rata share (measured by reference to the Eligible Holder Denominator) of (1) the Note Rights and (2) the Equity Rights; *provided*, *however*, that the Commitment Parties and any Permitted Transferee of Claims against or Interests in the Debtors as of the RSA Effective Date have agreed not to receive the Note Rights and Equity Rights on account of any General Unsecured Claims against NADL held by such Commitment Parties as of the RSA Effective Date.<br><br>• **If Class D3 votes to reject the Plan**, each holder of an Allowed General Unsecured Claim against NADL shall receive the Liquidation Recovery, unless otherwise ordered by the Bankruptcy Court.<br><br>*provided*, *however*, that the holders of Credit Agreement Unsecured Claims against NADL have agreed to forgo their right to receive their Pro Rata share of any recovery on account of such Credit Agreement Unsecured Claims against NADL (but not, for the avoidance of doubt, any other General Unsecured Claims or under any other plan of reorganization or alternative restructuring); *provided*, *further*, that, for the avoidance of doubt, holders of Credit Agreement Unsecured Claims shall be entitled to vote to accept or reject the Plan on account of such Claims. |

| Class | Claim | Treatment of Claim/Equity Interest |
|---|---|---|
| D4 | NADL 510(b) Claims | On the Effective Date, each holder of an Allowed NADL 510(b) Claim will be extinguished and shall not receive or retain any distribution, property, or other value on account of their NADL 510(b) Claims. |
| D5 | Interests in NADL | On the Effective Date, each Interest in NADL will be extinguished5 in accordance with the Description of the Transaction Steps and each holder of such Interest in NADL shall not receive or retain any distribution, property, or other value on account of its Interest in NADL. |
| | *Claims against Other NADL Debtors* | |
| E1 | Credit Agreement Claims against Other NADL Debtors | On the Effective Date, each holder of an Allowed Class E1 Claim shall receive its Pro Rata participation in the Amended Credit Facility entered into pursuant to the Amended NADL Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class E1 Claim less (ii) the principal amount of its participation received on account of its Class D1 Claims, if any. |
| E2 | General Unsecured Claims against Other NADL Debtors | On the Effective Date, each holder of an Allowed General Unsecured Claim against an Other NADL Debtor shall, at the election of the applicable Debtor, be (a) Reinstated or (b) paid in full in Cash. |
| E3 | Interests in Other NADL Debtors | On the Effective Date, each Interest in an Other NADL Debtor shall be Reinstated. |
| | *Claims against Sevan* | |
| F1 | Credit Agreement Claims against Sevan | On the Effective Date, each holder of an Allowed Class F1 Claim shall receive its Pro Rata participation in the Amended Sevan Credit Facility. |
| F2 | Sevan Second Lien Claim | On the Effective Date, all Sevan Second Lien Claims shall, at the election of Sevan, be (a) Reinstated or (b) released. |
| F3 | General Unsecured Claims against Sevan | • **If Class F3 votes to accept the Plan**, each holder of an Allowed General Unsecured Claim against Sevan shall receive: (A) 70 percent of its Pro Rata share (measured by reference to the Unsecured Pool Denominator) of the Unsecured Pool Equity and, (B) if such holder's General Unsecured Claim is Allowed in a liquidated, non-contingent amount prior to the Subscription Expiration Deadline (as defined in the Rights Offering Procedures), such holder's General Unsecured Claim is not the subject of an unresolved objection to the allowance thereof as of the Subscription Expiration Deadline, and such holder is an Eligible Holder, it shall also receive 70 percent of its Pro Rata share (measured by reference to the Eligible Holder Denominator) of (1) the Note Rights and (2) the Equity Rights; *provided, however*, that the Commitment Parties Commitment Parties and any Permitted Transferee of Claims against or Interests in the Debtors as of the RSA Effective Date have agreed not to receive the Note Rights and Equity Rights on account of any General Unsecured Claims against Sevan held by such Commitment Parties as of the RSA Effective Date. |

---

5   "Extinguished" in this paragraph means the extinguishment of economic interests pursuant to Bermuda law.

| Class | Claim | Treatment of Claim/Equity Interest |
|---|---|---|
| | | • **If Class F3 votes to reject the Plan**, each holder of an Allowed General Unsecured Claim against Sevan shall receive the Liquidation Recovery, unless otherwise ordered by the Bankruptcy Court.<br><br>*provided, however,* that the holders of Credit Agreement Unsecured Claims against Sevan have agreed to forgo their right to receive their Pro Rata share of any recovery on account of such Credit Agreement Unsecured Claims against Sevan (but not, for the avoidance of doubt, any other General Unsecured Claims or under any other plan of reorganization or alternative restructuring); *provided, further,* that, for the avoidance of doubt, any holders of Credit Agreement Unsecured Claims against Sevan shall be entitled to vote to accept or reject the Plan on account of such Claims. |
| F4 | Sevan 510(b) Claims | On the Effective Date, each holder of an Allowed Sevan 510(b) Claim will be extinguished and shall not receive or retain any distribution, property, or other value on account of its Sevan 510(b) Claims. |
| F5 | Interests in Sevan | On the Effective Date, each holder of an Interest in Sevan will be extinguished[6] in accordance with the Description of the Transaction Steps and each such holder shall not receive or retain any distribution, property, or other value on account of its Interest in Sevan. |
| *Claims against Other Sevan Debtors* | | |
| G1 | Sevan Credit Agreement Subsidiary Claims | On the Effective Date, each holder of an Allowed Class G1 Claim shall receive its Pro Rata participation in the Amended Sevan Credit Facility. |
| G2 | General Unsecured Claims against Other Sevan Debtors | On the Effective Date, each holder of an Allowed General Unsecured Claim against an Other Sevan Debtor shall, at the election of the applicable Debtor, be (a) Reinstated or (b) paid in full in Cash. |
| G3 | Interests in Other Sevan Debtors | On the Effective Date, each Allowed Interest in an Other Sevan Debtor shall be Reinstated. |

19.     In accordance with the foregoing description of the treatment of holders of Claims and Interests, the Debtors intend to solicit the votes of only those holders of Claims that are entitled to vote to accept or reject the Plan.  The following chart summarizes the Classes of Claims under the Plan that are entitled to vote:[7]

---

[6]   "Extinguished" in this paragraph means the extinguishment of economic interests pursuant to Bermuda Law.

[7]   The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  The Debtors reserve the right to modify the Plan in accordance with the terms thereof, including the right to withdraw the Plan as to an individual Debtor at any time before the Confirmation Date.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| *Other Claims* | | | |
| A1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| A2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| A3 | Intercompany Claims | Impaired/ Unimpaired | Presumed to Accept or Deemed to Reject |
| *Claims against Seadrill Limited* | | | |
| B1-a | $1.5B Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-b | $483MM Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-c | $450MM Eminence Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-d | $1.35B Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-e | $950MM Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-f | $450MM Nordea Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-g | $440MM Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-h | $400MM Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-i | $300MM Credit Agreement Secured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B2 | Guarantee Facility Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B3 | General Unsecured Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B4 | Seadrill Limited 510(b) Claims | Impaired | Deemed to Reject |
| B5 | Interests in Seadrill Limited | Impaired | Deemed to Reject |
| *Claims against Other Seadrill Debtors* | | | |
| C1-a | $1.5B Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-b | $483MM Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-c | $450MM Eminence Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-d | $1.35B Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| C1-e | $950MM Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-f | $450MM Nordea Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-g | $440MM Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-h | $400MM Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-i | $300MM Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-j | Prepetition AOD Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C2 | General Unsecured Claims against Other Seadrill Debtors | Unimpaired | Presumed to Accept |
| C3 | Interests in Other Seadrill Debtors | Unimpaired | Presumed to Accept |
| *Claims against NADL* | | | |
| D1 | Secured Credit Agreement Claim against NADL | Impaired | Entitled to Vote |
| D2 | NADL Revolving Loan Claim | Impaired/ Unimpaired | Presumed to Accept or Deemed to Reject |
| D3 | General Unsecured Claims against NADL | Impaired | Entitled to Vote |
| D4 | NADL 510(b) Claims | Impaired | Deemed to Reject |
| D5 | Interests in NADL | Impaired | Deemed to Reject |
| *Claims against Other NADL Debtors* | | | |
| E1 | Credit Agreement Claims against Other NADL Debtors | Impaired | Entitled to Vote |
| E2 | General Unsecured Claims against Other NADL Debtors | Unimpaired | Presumed to Accept |
| E3 | Interests in Other NADL Debtors | Unimpaired | Presumed to Accept |
| *Claims against Sevan* | | | |
| F1 | Secured Credit Agreement Claims against Sevan | Impaired | Entitled to Vote |
| F2 | Sevan Second Lien Claim | Impaired/ Unimpaired | Presumed to Accept or Deemed to Reject |
| F3 | General Unsecured Claims against Sevan | Impaired | Entitled to Vote |
| F4 | Sevan 510(b) Claims | Impaired | Deemed to Reject |
| F5 | Interests in Sevan | Impaired | Deemed to Reject |

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| | *Claims against Other Sevan Debtors* | | |
| G1 | Credit Agreement Claims against Other Sevan Debtors | Impaired | Entitled to Vote |
| G2 | General Unsecured Claims against Other Sevan Debtors | Unimpaired | Presumed to Accept |
| G3 | Interests in Other Sevan Debtors | Unimpaired | Presumed to Accept |

20.     Based on the foregoing (and as discussed in greater detail herein), the Debtors are proposing to solicit votes to accept or reject the Plan from holders of Claims in Classes B1-a, B1-b, B1-c, B1-d, B1-e, B1-f, B1-g, B1-h, B1-i, B2, B3, C1-a, C1-b, C1-c, C1-d, C1-e, C1-f, C1-g, C1-h, C1-i, C1-j, D1, D3, E1, F1, F3, and G1 (each, a "Voting Class," and collectively, the "Voting Classes").  The Debtors are **not** proposing to solicit votes from holders of Claims or Interests in Classes A1, A2, A3, B4, B5, C2, C3, D2, D4, D5, E2, E3, F2, F4, F5, G2, and G3 (each a "Non-Voting Class," and collectively, the "Non-Voting Classes").

### The Rights Offerings[8]

21.     The Plan contemplates the consummation of the Notes Rights Offering and the Equity Rights Offering (together, the "Rights Offerings") to raise a portion of the $1.06 billion new capital injection backed by the Commitment Parties on the terms set forth in the Investment Agreement.  Specifically, so long as holders of general unsecured claims at Seadrill Limited, NADL, and Sevan vote as a class to accept the Plan, $85 million of the New Secured Notes will be made available for subscription pursuant to the Notes Rights Offering and $25 million of the equity in reorganized Seadrill Limited will be made available for subscription pursuant to the Equity Rights Offering.  The Rights Offerings are a key component of the Debtors' proposed

---

8     The following is intended to provide a summary of the proposed terms of Rights Offering and of the Rights Offering Procedures. To the extent that this summary is inconsistent with the Rights Offering Procedures, the Rights Offering Procedures shall control. Capitalized terms not otherwise defined in this section have the meanings given to them in the Investment Agreement and the Rights Offering Procedures.

restructuring and a key source of value for eligible participants.  The terms of the Rights Offerings have been extensively negotiated among the Debtors and the Commitment Parties.

22.     To avoid the potential expense and delay of registering the securities to be issued pursuant to the Rights Offerings with the SEC during this chapter 11 cases, the Debtors will seek to issue the securities pursuant to the Rights Offerings in reliance on the registration exemptions set forth in section 4(a)(2) of the Securities Act of 1933 (the "Securities Act") and Regulation S promulgated thereunder.  Thus, in simple terms, only certain investors are eligible to participate in the Rights Offerings.  Pursuant to the Rights Offerings Procedures, the Debtors will carry out the Rights Offerings as a two-step process.  First, the Debtors will transmit a letter (the "Certification Letter") to holders of Claims in Classes B3, D3, and F3 (in the form attached to the Order as Schedule 13A) that will require the Eligible Holder to confirm that it is an Accredited Investor or a Qualified Investor.  This letter will be transmitted along with such holders' solicitation packages. Holders should refer to the descriptions set forth in the Rights Offering Procedures and seek independent legal advice to determine whether they are eligible as Accredited Investors or Qualified Investors.  Holders will be required to return the certification letter along with their ballots, by no later than the Voting Deadline.

23.     In the event that holders of Claims in Classes B3, D3, and/or F3 vote as a class to accept the Plan, the Debtors will then carry out solicitation of the Rights Offerings to all holders that returned a Certification Letter in compliance with the Rights Offering Procedures.  The subscription period for the Rights Offerings will remain open for a period of approximately 30 days.  The material terms of the Rights Offerings will be set forth in the Rights Offering Procedures that will be transmitted to all parties that are entitled to participate.  While the Debtors intend to transmit Certification Letters to verify the identities of Accredited Investors and Qualified

Investors eligible to participate in the Rights Offerings in parallel with Plan solicitation, the Debtors do not anticipate launching the Rights Offering subscription process until nearer to or after the confirmation hearing.

24.     Only eligible holders with Claims allowed prior to the expiration of the Rights Offerings' subscription period shall be allowed to participate pursuant to the Plan and Rights Offering Procedures.  For more information regarding subscription to the Rights Offerings, eligible holders should refer to the Rights Offering Procedures, the form of which are attached to the Order as Schedules 12A and 12B.  The Rights Offering Procedures have been designed to efficiently transmit all materials necessary for participation in the Rights Offering in compliance with applicable bankruptcy and non-bankruptcy law.  Moreover, the subscription forms are designed to assure the clear communication of the requirements for, and to facilitate, such participation.  Thus, the Rights Offering Procedures afford Eligible Holders a fair and reasonable opportunity to participate in the Rights Offering and should be approved.

**Preliminary Corporate Reorganization Steps**

25.     To support both the deal with the Debtors' secured bank lenders and certain bondholders and the new $1.06 billion capital injection ($860 million of which will be in the form of new secured notes ("NSNs")), the Plan contemplates the reorganization of the Debtors' corporate structure into two principal holdings groups, RigCo and NSNCo, both of which will sit below a new intermediate holding company, IHCo.  The Debtor rig-owning and intragroup charterer entities, as well as the management and operating entities, will be transferred to sit beneath RigCo, which will form the security package to support the Debtors' re-profiled secured

bank facilities.  The Debtors' interests in the non-consolidated entities[9] and certain non-rig owning entities will be transferred to sit beneath NSNCo, which will issue the NSNs to the new capital investors.  The remaining Seadrill Limited subsidiaries that will not sit below RigCo or NSNCo will be transferred to a newly incorporated ultimate holding company for the Seadrill enterprise, referred to herein as "New Seadrill."  Both RigCo and NSNCo will sit below IHCo, which will in turn be a direct, wholly owned subsidiary of New Seadrill.  Both RigCo and IHCo will issue certain guarantees in support of the bank deal and new capital injection.

26.     The Debtors have designed an implementation process to effectuate this corporate reorganization and to help facilitate the Debtors' timely emergence from chapter 11.  Completing the Transaction Steps requires that the Debtors obtain a number of corporate consents and execute various share and asset transfer documents required in jurisdictions in which Seadrill entities are incorporated across the globe.  It is important that the corporate steps be completed on an expeditious basis so that the collateral packages supporting the re-profiled Bank Facilities and the NSNs will be in place at the time of the Debtors' projected emergence from chapter 11.  Failure to timely complete the Transaction Steps could delay the Debtors' emergence from chapter 11, thereby resulting in additional administrative costs.

27.     To ensure a timely emergence from chapter 11, the Debtors have identified certain preliminary corporate steps, the consummation of which that will have not economic effect on either the Debtors' estates or parties in interest in these chapter 11 cases.  The Debtors propose to consummate these steps prior to confirmation of the Plan to prepare the broader Seadrill enterprise to undertake the corporate reorganization that will be required by the Plan, once confirmed.

---

[9]     Seadrill's non-consolidated entities comprise the following entities and their respective subsidiaries: Seadrill Partners LLC, Seamex Limited, Seabras Sapura Holding GmbH, and Seabras Sapura Participacoes Ltda.

28.     Specifically, the Debtors propose to incorporate any new entities necessary to consummate their corporate restructuring, including the 18 new Bermuda and United Kingdom entities listed in Schedule 14,[10] each of which will be necessary to effectuate their corporate reorganization (including RigCo, NSNCo, IHCo, and New Seadrill, among others).  These entities will be formed and remain dormant as shell entities pending confirmation of the Plan.  Formation of the entities will allow the Debtors to secure necessary corporate approvals prior to confirmation, thus avoiding potentially costly delays associated with formation and seeking such consents after confirmation.  The fees to incorporate each Bermuda entity amount to approximately $5,845, and the fees to incorporate each United Kingdom entity amount to GBP106.10.  Such costs are negligible in comparison to the savings associated with an efficient post-confirmation implementation process and timely emergence from chapter 11.

29.     Consummating these steps will have no substantive economic effect on the Debtors' estates or parties in interest but will avoid potential delays that could be very costly. Accordingly, this Court should authorize the Debtors to incorporate the entities listed in Schedule 14 prior to confirmation of the Plan.

## Noticing Plan

30.     The Debtors have undertaken to design and implement a comprehensive noticing plan meant to afford all parties in interest the maximum notice practical under the circumstances and the maximum opportunity to cast their vote (as applicable) or be heard in connection with confirmation of the Plan.  The Debtors have more than 19,000 parties listed on their noticing matrix, spread across approximately 100 countries and speaking 45 different languages.  These

---

[10]   While Schedule 14 for the avoidance of doubt lists all entities the Debtors intend to incorporate at this time, the Debtors seek authority to incorporate all new entities necessary to consummate their corporate restructuring, irrespective of whether such entity is listed on Schedule 14.

parties include current and former employees, vendors, customers, taxing authorities, insurers, and other similar parties in interest.   More than 17,000 of these parties reside in countries where an official or common language is English, Norwegian, Spanish, Thai, Arabic, or Portuguese.   The Debtors also have six issuances of publicly-held bonds and three publicly-traded holding companies.   While the Debtors are unable to ascertain with certainty the precise number and location of their bondholders and shareholders at any given moment, the Debtors are able to serve notice on bondholders and shareholders through the proper intermediaries in Europe and the United States.

31.    To ensure as broad a notice as possible, the Debtors request the Court's approval to take the following steps:

- distribute the solicitation packages to voting parties in the form and manner described herein;

- mail all approximately 19,000 parties listed on the Debtors' noticing matrix with the Confirmation Hearing Notice, which will include information regarding the Confirmation Hearing, deadlines related thereto, and the releases contained in the Plan;

- serve the Confirmation Hearing Notice on all bondholders (along with the other solicitation materials) and existing shareholders through the appropriate intermediaries;

- publish the Confirmation Hearing Notice in *USA Today* (national edition), the *Financial Times* (global edition), and certain additional local publications, in English or translated (as applicable to local publications);

- translate certain key documents, including the Confirmation Hearing Notice and Ballots into Norwegian, Spanish, Thai, Arabic, and Portuguese for either service or posting on the Debtors' restructuring website at http://cases.primeclerk.com/Seadrill/; and

- provide notice of a hotline and restructuring website that parties are able to access for additional information.

32.    To further bolster the process of these chapter 11 cases, the Debtors have already executed a similarly broad noticing program to notify parties in interest of the commencement of

the Debtors' chapter 11 cases and the claims bar dates. The Debtors believe that the above-described process appropriately satisfies the need for broad notice in a case of this scope, without incurring excessive costs. Accordingly, the Debtors submit that all parties in interest will be on appropriate notice of their right to vote to accept or reject the Plan (as applicable) and their right to be heard in connection with confirmation of the Plan.

## **Basis for Relief**

### I.       **The Court Should Approve the Disclosure Statement.**

####       A.       **The Standard for Approval of the Disclosure Statement.**

33.       Pursuant to section 1125 of the Bankruptcy Code, the proponent of a proposed chapter 11 plan must provide "adequate information" regarding that plan to holders of impaired Claims entitled to vote on the plan. Specifically, section 1125(a)(1) of the Bankruptcy Code provides, in relevant part, as follows:

> '[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

34.       The primary purpose of a disclosure statement is to provide all material information that creditors and interest holders affected by a proposed plan need to make an informed decision regarding whether or not to vote for the plan. *See, e.g., Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote."); *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985) ("The primary purpose of a disclosure statement is to give the creditors the information they need to decide whether to accept the plan."); *In re Phx. Petroleum, Co.*, 278 B.R. 385, 392

27

(Bankr. E.D. Pa. 2001) ("[T]he general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan."); *In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987) ("The primary purpose of a disclosure statement is to provide all material information which creditors and equity security holders affected by the plan need in order to make an intelligent decision whether to vote for or against the plan."). Congress intended that such informed judgments would be needed to both negotiate the terms of, and vote on, a plan of reorganization. *Century Glove, Inc.*, 860 F.2d at 100.

35.     "Adequate information" is a flexible standard, based on the facts and circumstances of each case. 11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records."); *see also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *First Am. Bank of N.Y. v. Century Glove, Inc.*, 81 B.R. 274, 279 (D. Del. 1988) (noting that adequacy of disclosure for a particular debtor will be determined based on how much information is available from outside sources); S. Rep. No. 95-989, at 121 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5907 ("The information required will necessarily be governed by the circumstances of the case.").

36.     Courts in the Fifth Circuit acknowledge that determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within the broad discretion of the court. *See, e.g.*, *Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.),* 150 F.3d 503, 518 (5th Cir. 1998) ("The legislative history of § 1125

indicates that, in determining what constitutes 'adequate information' with respect to a particular disclosure statement, 'both the kind and form of information are left essentially to the judicial discretion of the court' and that 'the information required will necessarily be governed by the circumstances of the case.'") (internal citations omitted), *cert. denied*, 526 U.S. 1144 (1999); *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis.   This determination is largely within the discretion of the bankruptcy court."). Accordingly, the determination of whether a disclosure statement contains adequate information must be made on a case-by-case basis, focusing on the unique facts and circumstances of each case. *See Phx. Petroleum*, 278 B.R. at 393.

37.     In making a determination as to whether a disclosure statement contains adequate information as required by section 1125 of the Bankruptcy Code, courts typically look for disclosures related to topics such as:

    a.     the events that led to the filing of a bankruptcy petition;

    b.     the relationship of the debtor with its affiliates;

    c.     a description of the available assets and their value;

    d.     the company's anticipated future;

    e.     the source of information stated in the disclosure statement;

    f.     the debtors' condition while in chapter 11;

    g.     claims asserted against the debtor;

    h.     the estimated return to creditors under a chapter 7 liquidation;

    i.     the future management of the debtor;

    j.     the chapter 11 plan or a summary thereof;

    k.     financial information, valuations, and projections relevant to a creditor's decision to accept or reject the chapter 11 plan;

l.       information relevant to the risks posed to creditors under the plan;

m.       the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers;

n.       litigation likely to arise in a nonbankruptcy context; and

o.       tax attributes of the debtor.

*See In re U.S. Brass Corp.*, 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996); *see also In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (listing the factors courts have considered in determining the adequacy of information provided in a disclosure statement); *In re Metrocraft Pub. Serv., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same).  Disclosure regarding all topics is not necessary in every case.  *See U.S. Brass*, 194 B.R. at 424; *see also Phx. Petroleum*, 278 B.R. at 393 ("[C]ertain categories of information which may be necessary in one case may be omitted in another; no one list of categories will apply in every case.").

**B.      The Disclosure Statement Contains Adequate Information in Accordance with Section 1125 of the Bankruptcy Code.**

38.      The Disclosure Statement provides "adequate information" to allow holders of Claims in the Voting Classes to make informed decisions about whether to vote to accept or reject the Plan.  Specifically, the Disclosure Statement contains a number of categories of information that courts consider "adequate information," including, without limitation:

| Category | Description | Location in Disclosure Statement |
|---|---|---|
| Debtors' Corporate History, Structure, and Business Overview | An overview of the Debtors' corporate history, business operations, organizational structure, and capital structure. | Article V |
| Events Leading to the Chapter 11 Filings | An overview of the Debtors' out-of-court restructuring efforts in response to deteriorating economic conditions, including the negotiations with respect to the Plan and the Restructuring Support Agreement. | Article VI |
| Material Developments and Anticipated Events of the Chapter 11 Cases | A summary of the projected course of events in the chapter 11 cases. | Article VII |

| Category | Description | Location in Disclosure Statement |
|---|---|---|
| Projected Financial Information | A projected consolidated income statement. | Exhibit G |
| Valuation Analysis | A valuation of the post-Confirmation going concern value of the Debtors. | Exhibit H |
| Liquidation Analysis | An analysis of the liquidation value of the Debtors. | Exhibit F |
| Risk Factors | Certain risks associated with the Debtors' businesses, as well as certain risks associated with forward-looking statements and an overall disclaimer as to the information provided by and set forth in the Disclosure Statement. | Article VIII |
| Solicitation and Voting Procedures | A description of the procedures for soliciting votes to accept or reject the Plan and voting on the Plan. | Article IX |
| Confirmation of the Plan | Confirmation procedures and statutory requirements for Confirmation and Consummation of the Plan, including a liquidation analysis, financial projections, and a valuation. | Article XI; Exhibit F; Exhibit G; Exhibit H |
| Certain Securities Laws Matters | A description of the applicability of section 1145 of the Bankruptcy Code and the issuance of New Common Stock and other Securities under the Plan. | Article XII |
| Certain United States Federal Income Tax and Bermuda Tax Consequences of the Plan | A description of certain U.S. federal income tax law and Bermuda tax law consequences of the Plan. | Article XIII |
| Recommendation | A recommendation by the Debtors that holders of Claims in the Voting Classes should vote to accept the Plan. | Article XIV |

39.     Further, the Disclosure Statement contains an extensive description of the Debtors' postpetition marketing process and competing bids received to date.  Based on the foregoing, the Debtors submit that the Disclosure Statement complies with all aspects of section 1125 of the Bankruptcy Code and addresses the information set forth above in a manner that provides adequate information to holders of Claims entitled to vote to accept or reject the Plan.  Accordingly, the Debtors submit that the Disclosure Statement contains "adequate information" and therefore should be approved.

**C.      The Disclosure Statement Provides Sufficient Notice of Injunction, Release, and Exculpation Provisions in the Plan.**

40.      Bankruptcy Rule 3016(c) requires that, if a plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code, the plan and disclosure statement must describe, in specific and conspicuous language, the acts to be enjoined and the entities subject to the injunction.

41.      Article VIII of the Plan describes in detail the entities subject to an injunction under the Plan and the acts that they are enjoined from pursuing.  Further, the language in Article VIII of the Plan is in bold, making it conspicuous to anyone who reads it.  Moreover, Article VIII.B and VIII.C of the Plan describe in detail entities subject to or providing a release under the Plan, and the Claims and Causes of Action so released, and Article VIII.D of the Plan describes in detail the entities entitled to exculpation under the Plan.  Each of the foregoing sections is set forth, conspicuously, in bold typeface.  Further, Article III.L of the Disclosure Statement describes in detail entities subject to or providing a release under the Plan and the Claims and Causes of Action so released, and the entities entitled to exculpation under the Plan, also in conspicuous, bold typeface.  The Disclosure Statement further describes, in great detail, the Debtors' independent investigation related to the releases contained in the Plan.  Finally, each of the Ballots and the Confirmation Hearing Notice describes in detail entities subject to or providing a release under the Plan, the Claims and Causes of Action so released in conspicuous, bold typeface.  Each of the Disclosure Statement, Ballots, and Confirmation Hearing Notice conspicuously state that any party that does not specifically object to its inclusion as a Releasing Party will be bound by the Plan's release provisions.  Accordingly, the Debtors respectfully submit that the Disclosure Statement complies with Bankruptcy Rule 3016(c) by conspicuously describing the conduct and parties enjoined, released, or exculpated by the Plan.

32

II.    **The Court Should Approve the Solicitation and Voting Procedures, Including the Voting and Tabulation Procedures, the Materials, and the Timeline for Soliciting Votes on the Plan.**

    A.    **The Standard for Approval of Voting and Tabulation Procedures.**

42.    Section 1126(c) of the Bankruptcy Code provides that:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under section (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designed under subsection (e) of this section, that have accepted or rejected the plan.

Additionally, Bankruptcy Rule 3018(c) provides, in part, that "[a]n acceptance or rejection [of a plan] shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent and conform to the appropriate Official Form." Consistent with these requirements, the Debtors propose to use the Solicitation and Voting Procedures, which procedures include specific voting and tabulation requirements and processes, as follows.

    B.    **Completion of Ballots.**

43.    To facilitate the process of tabulating all votes received, the Debtors propose that a Ballot be counted in determining the acceptance or rejection of the Plan only if it satisfies certain criteria. Specifically, the Voting and Tabulation Procedures provide that the Debtors not count a Ballot if it is, among other things, illegible, submitted by or on behalf of a holder of a Claim that is not entitled to vote on the Plan, unsigned, or not clearly marked. Further, the Debtors, subject to a contrary order of the Court, may waive any defects or irregularities as to any particular Ballot at any time, either before or after the close of voting, and any such waivers shall be documented in the Voting Report.

C.     **Ballot Tabulation and Voting Procedures.**

44.     The proposed Voting and Tabulation Procedures set forth specific criteria with respect to the general tabulation of Ballots and voting procedures applicable to holders of Claims. The Debtors believe that the proposed Voting and Tabulation Procedures will facilitate the Plan confirmation process.  Specifically, the procedures will clarify any obligations of holders of Claims entitled to vote to accept or reject the Plan and will create a straightforward process by which the Debtors can determine whether they have satisfied the numerosity requirements of section 1126(c) of the Bankruptcy Code.  Accordingly, the Debtors submit that the Voting and Tabulation Procedures are in the best interests of their estates and all parties in interest and that good cause supports the relief requested herein.

D.     **The Court Should Approve the Forms of the Ballots.**

45.     In accordance with Bankruptcy Rule 3018(c), the Debtors have prepared and customized the Ballots, and all votes to accept or reject the Plan must be cast by using an appropriate Ballot.  Although based on Official Form B 314, the Ballots have been modified to (a) address the particular circumstances of the chapter 11 cases and (b) include certain additional information that is relevant and appropriate for Claims in certain of the Voting Classes.  The proposed Ballots for each Voting Class are annexed as Schedules 3A, 3B, 3C, 3D, 3E, 3F, 3G, 3H, 3I, 3J, 3K, 3L, 3M, 3N, and 3O to the Order.  The Debtors respectfully submit that the forms of the Ballots comply with Bankruptcy Rule 3018(c) and, therefore, should be approved.

E.     **The Court Should Approve the Form and Distribution of the Solicitation Packages and Cover Letter to Parties Entitled to Vote on the Plan.**

46.     Bankruptcy Rule 3017(d) specifies the materials to be distributed to holders of allowed claims upon approval of a disclosure statement, including the court-approved plan and

34

disclosure statement and notice of the time within which acceptances and rejections of the plan may be filed.

47.     In accordance with this requirement, the Debtors propose to send the Solicitation Packages to provide holders of Claims in the Voting Classes with the information they need to be able to make informed decisions with respect to how to vote on the Plan.  Specifically, on or before the Solicitation Deadline, the Debtors will cause the Solicitation Packages to be distributed by first-class U.S. mail to those holders of Claims in the Voting Classes.  Each Solicitation Package will include the following materials:

a.      a copy of the Solicitation and Voting Procedures;

b.      an appropriate Ballot, together with detailed voting instructions with respect thereto and a pre-addressed, postage prepaid return envelope (as applicable);

c.      the Cover Letter;

d.      the Disclosure Statement (and exhibits thereto, including the Plan);

e.      the Order (without exhibits, except the Solicitation and Voting Procedures, as set forth above);

f.      the Confirmation Hearing Notice; and

g.      such other materials as the Court may direct.

48.     The Debtors request that they be authorized to distribute the Plan, the Disclosure Statement, and the Order (without exhibits, except for the Solicitation and Voting Procedures) to holders of Claims entitled to vote on the Plan in electronic format (*i.e.*, on a CD-ROM or flash drive).  Only the Ballots, the Cover Letter, and the Confirmation Hearing Notice will be provided in paper format.  Distribution in this manner will translate into significant monetary savings for the Debtors' estates (the Plan, the Disclosure Statement, and the proposed Order collectively total hundreds of pages) by reducing printing and postage costs.  Bankruptcy courts have permitted

debtors to transmit solicitation documents in electronic format in other large chapter 11 cases in the interest of saving printing and mailing costs. Further, all documents will be available in print on request to the Notice and Claims Agent and electronically, free of charge, at the Debtors' restructuring website at http://cases.primeclerk.com/Seadrill/.

49.     In many instances, certain brokerage firms and banks or their agents (collectively, the "Nominees") hold Claims in certain of the Debtors rather than the individual holders themselves (collectively, the "Beneficial Holders"). To ensure proper tabulation of votes for such Claims, the Notice and Claims Agent will deliver Solicitation Packages to holders of record as of the Voting Record Date, including Nominees. Additionally, after delivery of the Solicitation Package to Nominees, the Notice and Claims Agent will distribute master ballots to Nominees. The Ballots for Beneficial Holders will instruct each Beneficial Holder voting on the Plan through a Nominee to return the Beneficial Ballot to the appropriate Nominee in sufficient time for such Nominee to timely cast votes to accept or reject the Plan on behalf of the Beneficial Holders. The Notice and Claims Agent will then tabulate each such Ballot received.

50.     Additionally, the Debtors will provide (a) complete Solicitation Packages (excluding the Ballots) to the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") and (b) the Order (in electronic format) and the Confirmation Hearing Notice to all parties required to be notified Bankruptcy Rules 2002 and Local Rule 2002-1 (the "2002 List") as of the Voting Record Date. Any party that receives the materials in electronic format but would prefer paper format may contact the Notice and Claims Agent and request paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense). The Debtors will not mail Solicitation Packages or other solicitation materials to holders of Claims that have already been paid in full during the chapter 11 cases or

36

that are authorized to be paid in full in the ordinary course of business pursuant to an order previously entered by this Court.

51.     The Debtors respectfully request that the Notice and Claims Agent be authorized (to the extent not authorized by another order of the Court) to assist the Debtors in (a) distributing the Solicitation Package, (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by holders of Claims, (c) responding to inquiries from holders of Claims and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, (d) soliciting votes on the Plan, and (e) if necessary, contacting creditors and equityholders regarding the Plan.

**F.      The Court Should Approve the Notice of Confirmation Hearing.**

52.     The Debtors will serve the Confirmation Hearing Notice on all known holders of Claims and Interests and the 2002 List (regardless of whether such parties are entitled to vote on the Plan) by no later than January 17, 2018, which will provide all parties in interest with more than 50 days' notice of the Plan Objection Deadline and more than 60 days' notice of the Confirmation Hearing.   The Confirmation Hearing Notice will include the following: (a) instructions as to how to view or obtain copies of the Disclosure Statement (including the Plan and the other exhibits thereto), the Order, and all other materials in the Solicitation Package (excluding Ballots) from the Notice and Claims Agent and/or the Court's website via PACER; (b) notice of the Voting Deadline; (c) notice of the date by which the Debtors will file the Plan Supplement; (d) notice of the Plan Objection Deadline; (e) notice of the Confirmation Hearing Date and information related thereto; and (f) as described above, notice of the Plan's release provisions and effect thereof.

53.     Bankruptcy Rule 2002(l) permits the Court to "order notice by publication if it finds that notice by mail is impracticable or that it is desirable to supplement the notice." Therefore, in addition to the foregoing distribution of the Confirmation Hearing Notice, the Debtors will publish the Publication Notice within ten business days after the Solicitation Deadline on one occasion in the *USA Today* (national edition), the *Financial Times* (global edition), and any such other local publications, in English or translated, that the Debtors deem appropriate and disclose in their Affidavit of Service.  The Debtors believe that the Publication Notice will provide sufficient notice of, among other things, the entry of the Order, the Voting Deadline, the Plan Objection Deadline, and the Confirmation Hearing to parties who did not otherwise receive notice thereof by mail. Additionally, service and publication of the Confirmation Hearing Notice comports with the requirements of Bankruptcy Rule 2002 and should be approved.

**G.     The Court Should Approve the Plan Supplement Notice.**

54.     The Plan defines "Plan Supplement" to mean the compilation of documents and forms of documents, schedules, and exhibits to the Plan that are filed by the Debtors no later than five days before the Voting Deadline on notice to parties in interest. *See* Plan at Art. I.A.125.  The Plan Supplement will include, among other materials, the following in connection with confirmation:  (a) the New Organizational Documents; (b) the Amended Credit Agreements; (c) the New Secured Notes Indenture; (d) the Intercreditor Agreement; (e) the Contribution Agreement; (f) the Amended SFL Charters; (g) the Amended Guarantee Facility; (h) the Registration Rights Agreement; (i) the Employee Incentive Plan Term Sheet; (j) the Board and Management Compensation Document; (k) the Schedule of Assumed Executory Contracts and Unexpired Leases; (l) the Schedule of Rejected Executory Contracts and Unexpired Leases; (m) the Schedule of Retained Causes of Action; (n) the Description of Transaction Steps; and (o) any and all other documentation necessary to effectuate the Restructuring Transactions or that

is contemplated by the Plan.  Notwithstanding the foregoing, the Debtors have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

55.     To ensure that all holders of Claims and Interests receive notice of the Debtors' filing of the Plan Supplement, the Debtors propose to send the Plan Supplement Notice on the date the Debtors file the Plan Supplement, or as soon as practicable thereafter.  Accordingly, the Plan Supplement Notice should be approved.

### H.     The Court Should Approve the Form of Notices to Non-Voting Classes.

56.     As discussed above, the Non-Voting Classes are **_not_** entitled to vote on the Plan. As a result, they will **_not_** receive Solicitation Packages; instead, the Debtors propose that such parties (other than Class A3 Intercompany Claims, Class D2 NADL Revolving Loan Claims, and Class F2 Sevan Second Lien Claims) receive a Non-Voting Status Notice.  Specifically, in lieu of solicitation materials, the Debtors propose to provide the following to holders of Claims and Interests in Non-Voting Classes:

| Class(es) | Status | Treatment |
|---|---|---|
| A1, A2, C2, C3, E3, F4, F5, G2, G3 | Unimpaired—Deemed to Accept | Will receive a notice, substantially in the form attached to the Order as Schedule 4, in lieu of a Solicitation Package. |
| B4, B5, D4, D5 | Impaired—Deemed to Reject | Will receive a notice, substantially in the form attached to the Order as Schedule 5, in lieu of a Solicitation Package. |
| N/A | Disputed Claims | Holders of Claims that are subject to a pending objection by the Debtors are not entitled to vote the disputed portion of their Claim.  As such, holders of such Claims will receive a notice, substantially in the form attached to the Order as Schedule 6 (which notice shall be served together with such objection). |

57.     Further, the Debtors will not provide the holders of Class A3 Intercompany Claims, Class D2 NADL Revolving Loan Claims, or Class F2 Sevan Second Lien Claims with a Solicitation Package or any other type of notice in connection with solicitation.  Intercompany

Claims, NADL Revolving Loan Claims, and Sevan Second Lien Claims will either be reinstated under the Plan or, at the option of the Debtors or the Reorganized Debtors, released or cancelled, with no distribution made on account of such Intercompany Claims. Thus, holders of Intercompany Claims, NADL Revolving Loan Claims, and Sevan Second Lien Claims will not be entitled to vote to accept or reject the Plan. Nevertheless, the Debtors are requesting a waiver from any requirement to serve such holders.

58. Each of the Non-Voting Status Notices will include, among other things: (a) instructions as to how to view or obtain copies of the Disclosure Statement (including the Plan and the other exhibits thereto), the Order, and all other materials in the Solicitation Package (excluding Ballots) from the Notice and Claims Agent free of charge and/or the Court's website via PACER; (b) a disclosure regarding the settlement, release, exculpation, and injunction language set forth in Article VIII of the Plan; (c) notice of the Plan Objection Deadline; (d) notice of the Confirmation Hearing Date; and (e) information related thereto.

59. The Debtors believe that the mailing of Non-Voting Status Notices in lieu of Solicitation Packages satisfies the requirements of Bankruptcy Rule 3017(d). Accordingly, unless the Court orders otherwise, the Debtors do not intend to distribute Solicitation Packages to holders of Claims in the Non-Voting Classes.

60. The Debtors further request that they not be required to mail Solicitation Packages or other solicitation materials to: (a) holders of Claims that have already been paid in full during the chapter 11 cases or that are authorized to be paid in full in the ordinary course of business pursuant to an order previously entered by this Court; or (b) any party to whom a notice of the hearing regarding the Court's approval of the Disclosure Statement (the "Disclosure Statement Hearing Notice") was sent but was subsequently returned as undeliverable.

**I.     The Court Should Approve the Notices to Contract and Lease Counterparties.**

61.     Article V.A. of the Plan provides that each of the Debtors' Executory Contracts and Unexpired Leases will be deemed assumed and assigned to the Reorganized Debtors as of the Effective Date, unless such agreement:  (a) previously was rejected by the Debtors; (b) is identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; or (c) is the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date or pursuant to which the requested effective date of such rejection is after the Effective Date.  *See* Plan at Art. V.A.  Additionally, Article V.D of the Plan provides that the Debtors will provide Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties.  *Id.* at Art. V.D.

62.     To ensure that counterparties to Executory Contracts and Unexpired Leases receive notice of assumption or rejection of their Executory Contract or Unexpired Lease (and any corresponding Cure Claim) pursuant to the Plan, the Debtors will mail an Assumption Notice or a Rejection Notice, as appropriate, within the time periods specified in the Plan.

**J.     The Court Should Approve the Voting Record Date.**

63.     Bankruptcy Rule 3017(d) provides that, for the purposes of soliciting votes in connection with the confirmation of a plan, "creditors and equity security holders shall include holders of stocks, bonds, debentures, notes, and other securities of record on the date the order approving the disclosure statement is entered or another date fixed by the court, for cause, after notice and a hearing."  Bankruptcy Rule 3018(a) contains a similar provision regarding determination of the record date for voting purposes.

64.     The Debtors request that the Court exercise its authority under Bankruptcy Rules 3017(d) and 3018(a) to establish January 10, 2018, as the Voting Record Date. Moreover, the Debtors propose that, with respect to any transferred Claim, the transferee shall be

entitled to receive a Solicitation Package and, if the holder of such Claim is entitled to vote with respect to the Plan, cast a Ballot on account of such Claim *only if*:  (a) all actions necessary to effectuate the transfer of the Claim pursuant to Bankruptcy Rule 3001(e) have been completed by the Voting Record Date; or (b) the transferee files by the Voting Record Date (i) the documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (ii) a sworn statement of the transferor supporting the validity of the transfer.  In the event a Claim is transferred after the Voting Record Date, the transferee of such Claim shall be bound by any vote on the Plan made by the holder of such Claim as of the Voting Record Date.

65.     The Debtors request that, after distribution of Solicitation Packages to holders of Claims entitled to vote on the Plan by the Solicitation Deadline, the Court require that all holders of Claims entitled to vote on the Plan complete, execute, and return their customized Ballots (in accordance with the instructions on the Ballots) so that they are *actually received* by the Notice and Claims Agent on or before the Voting Deadline, which the Court has established as March 9, 2018, at 4:00 p.m., prevailing Central Time.

66.     The foregoing timing and materials will afford holders of Claims entitled to vote on the Plan sufficient time to review and analyze such materials and subsequently make an informed decision as to whether to vote to accept or reject the Plan before the Voting Deadline, consistent with the requirements of the applicable Bankruptcy Rules.  *See* Fed. R. Bankr. P. 3017(d) (after approval of a disclosure statement, the debtor must transmit the plan, the approved disclosure statement, a notice of the time within which acceptances and rejections of such plan may be filed, and any other information that the court may direct to certain holders of claims).  Accordingly, the Debtors request that the Court approve the form of, and the Debtors'

proposed procedures for distributing, the Solicitation Packages to the holders of Claims in the Voting Classes.

### III.    The Court Should Approve the Procedures for Confirming the Plan.

####     A.    The Court Should Approve the Procedures for Filing Objections to the Plan.

67.     Section 1128 of the Bankruptcy Code provides that a court shall hold a hearing on confirmation of a plan and provides that parties in interest can object to confirmation.  The Court has already established March 26, 2018, at 9:00 a.m., prevailing Central Time as the Confirmation Hearing Date.  In addition, the Court has also established March 9, 2018, at 4:00 p.m., prevailing Central Time as the Plan Objection Deadline.

68.     The Debtors request that the Court direct the manner in which parties in interest may object to confirmation of the Plan.  Pursuant to Bankruptcy Rule 3020(b)(1), objections to confirmation of a plan must be filed and served "within a time fixed by the court."   The Confirmation Hearing Notice will require that objections to confirmation of the Plan or requests for modifications to the Plan, if any, must:

> a.    be in writing;
>
> b.    conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court;
>
> c.    state, with particularity, the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and
>
> d.    be filed with the Court (contemporaneously with a proof of service) upon the applicable notice parties, so as to be ***actually received*** on or before the Plan Objection Deadline.

69.     The Debtors also request that they (and other parties in support of the Plan) be permitted to file a reply to any objections to Confirmation of the Plan and a memorandum in support of confirmation by March 21, 2018, at 4:00 p.m., prevailing Central Time.

70.     The Debtors believe that the Confirmation Brief Deadline will afford the Court, the Debtors, and other parties in interest reasonable time to consider any objections and proposed modifications prior to the Confirmation Hearing.

**IV.     The Court Should Approve the Rights Offering Procedures and the Form of the Rights Offering Materials.**

71.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  In the Fifth Circuit, bankruptcy courts have authorized the use or sale of property of the estate outside the ordinary course of business when such use or sale is grounded upon a "sound business purpose" and is proposed in good faith.  *See, e.g.*, *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).  Once a debtor articulates a valid business justification under section 363, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief the action was in the best interest of the company.  *See In re Pisces Energy, LLC*, No. 09-36591-H5-11, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009) (holding that the 'business judgment test' "requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment"); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992)

(quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008). Further, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp., (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

72.     As described in the Disclosure Statement, the Rights Offerings are a key component of the Plan. The Debtors submit that the approval of the Rights Offering Procedures and the Rights Offering Materials are necessary to the successful effectuation of the Rights Offerings and provide Eligible Holders (as defined in the Rights Offering Procedures) a fair and reasonable opportunity to participate in the Rights Offerings. Thus, the Debtors believe that approval of the Rights Offering Procedures and the Rights Offering Materials is in the best interests of their estates and creditors and an appropriate exercise of business judgment.

73.     Moreover, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." In essence, the Court may enter an order that safeguards the value of the debtor's estate if doing so is consistent with the Bankruptcy Code. *See Chinichian v. Campolongo* (*In re Chinichian*) 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Tr., Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) ("[T]he Bankruptcy Court is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy

laws."). To the extent that approval of the Rights Offerings Procedures and the Rights Offerings Materials is necessary to effectuate consummation of the Plan, the Debtors believe that the Court's application of section 105(a) of the Bankruptcy Code here is appropriate.

## V.   The Court Should Authorize the Debtors to Carry out the Preliminary Corporate Steps prior to Confirmation.

74.   The Bankruptcy Code also supports authorizing the Debtors to carry out the preliminary corporate steps described herein prior to confirmation. As described above, Section 363(b) provides that debtors may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." The use, sale, or lease of property of the estate, other than in the ordinary course of business, is authorized when it was based on the debtor's business judgment. *See, e.g.*, *In re Cont'l Air Lines, Inc.*, 780 F.2d at 1226. To determine whether the business judgment test is met, courts require "a showing that the proposed course of action will be advantageous to the estate." *In re Pisces Energy,* 2009 WL 7227880, at *6. A sound business purpose for the transfer of a debtor's assets outside the ordinary course of business may be found where such a transfer is necessary to preserve the value of assets for the estate, its creditors, or interest holders. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3rd Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2nd Cir. 1983).

75.   Here, incorporating the entities listed in <u>Schedule 14</u> is necessary to the Debtors' reorganization and represents a sound exercise of the Debtors' business judgment. The proposed implementation process represents the preliminary steps required to effectuate corporate reorganization that serves as the foundation for the Debtors' broader restructuring restructuring and is necessary to implement new $1.06 billion capital injection and secured bank facility re-profiling. Incorporating a relatively small number of new entities prior to confirmation ultimately

costs very little and avoids potentially costly delays that could arise if the Debtors were to wait to incorporate such entities until after confirmation of the Plan.

76.     Thus, the Debtors submit that incorporating the entities listed in <u>Schedule 14</u> prior to confirmation is well within their business judgment and is in the best interests of their estates and should be authorized.

<b><u>Non-Substantive Modifications</u></b>

77.     The Debtors request authorization to make non-substantive changes to the Disclosure Statement, Disclosure Statement Hearing Notice, Plan, Confirmation Hearing Notice, Solicitation Packages, Non-Voting Status Notices, Ballots, Publication Notice, Cover Letter, Solicitation and Voting Procedures, Plan Supplement Notice, Assumption and Rejection Notices, Voting and Tabulation Procedures, Rights Offering Procedures, Rights Offering Materials, and related documents without further order of the Court, including changes to correct typographical and grammatical errors, if any, and to make conforming changes to the Disclosure Statement, the Plan, and any other materials in the Solicitation Packages before distribution.

<b><u>Notice</u></b>

78.     Notice of the hearing on the relief requested in the Motion has been provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Local Rules, and is sufficient under the circumstances. Without limiting the forgoing, due notice was afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties in interest, including (a) the U.S. Trustee; (b) counsel to the Creditors' Committee; (c) the agents for each of the Debtors' secured credit facilities; (d) the Bank CoCom; (e) the indenture trustee for each of the Debtors' unsecured notes; (f) the Commitment Parties; (g) counsel to the parties referenced in clauses (c) to (f); (h) the Office of the United States Attorney for the Southern District of Texas; (i) the state attorneys general for states in which the Debtors conduct business; (j) the

47

Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Victoria, Texas
December 15, 2017

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4284
Facsimile:      (713) 308-4184
Email:          ptomasco@jw.com
                mcavenaugh@jw.com

-and-

Jennifer F. Wertz (TX Bar No. 24072822)
100 Congress Avenue, Suite 1100
Austin, Texas 78701
Telephone:      (512) 236-2247
Facsimile:      (512) 391-2147
Email:          jwertz@jw.com

-and-

Rachel Biblo Block (TX Bar No. 24097382)
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone:      (214) 953-6070
Facsimile:      (214) 661-6810
Email:          rblock@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anna G. Rotman, P.C. (TX Bar No. 24046761)
Brian E. Schartz (TX Bar No. 24099361)
609 Main Street
Houston, Texas 77002
Telephone:      (713) 836-3600
Facsimile:      (713) 836-3601
Email:          anna.rotman@kirkland.com
                brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Anup Sathy, P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Adam C. Paul (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                anup.sathy@kirkland.com
                ross.kwasteniet@kirkland.com
                adam.paul@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Certificate of Service**

I certify that on December 15, 2017, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh