### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SEADRILL LIMITED, *et al.*,[1] | ) | Case No. 17-60079 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 1002** |

### NOTICE OF FILING OF REDLINE OF DISCLOSURE STATEMENT RELATING TO THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SEADRILL LIMITED AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that on September 12, 2017, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of Seadrill Limited and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 20] (the "Disclosure Statement") with the United States Bankruptcy Court for the Southern District of Texas (the "Court").

**PLEASE TAKE FURTHER NOTICE** that on December 15, 2017, the Debtors filed the *Disclosure Statement Relating to the* First Amended Joint Chapter 11 Plan of Reorganization of Seadrill Limited and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Amended Disclosure Statement") [Docket No. 826] with the Court.

**PLEASE TAKE FURTHER NOTICE** that on December 15, 2017, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect Thereto, (VI) Authorizing the Debtors to Carry Out Certain Preliminary Corporate Steps, and (VII) Granting Related Relief* [Docket No. 828] (the "Motion")with the Court.

---

[1]   Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/Seadrill.  The location of Debtor Seadrill Americas, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 11025 Equity Drive, Suite 150, Houston, Texas 77041.

**PLEASE TAKE FURTHER NOTICE** that, contemporaneously herewith, the Debtors filed the *Disclosure Statement Relating to th*e *Second Amended Joint Chapter 11 Plan of Reorganization of Seadrill Limited and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Second Amended Disclosure Statement") [Docket No. 1002].

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit A** is a redline reflecting the variations between the Amended Disclosure Statement and the Second Amended Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE** a hearing to consider approval of the Second Amended Disclosure Statement and relief requested in the Motion will commence on **February 26, 2018, at 3:00 p.m., prevailing Central Time**, before the Honorable David R. Jones, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of Texas, Courtroom 400, 515 Rusk Street, Houston, Texas 77002 (the "Court").

**PLEASE TAKE FURTHER NOTICE** that copies of the Disclosure Statement, the Amended Disclosure Statement, the Motion, the Second Amended Disclosure Statement, and all documents filed in these chapter 11 cases are available free of charge by visiting http://cases.primeclerk.com/Seadrill or by calling (844) 858-8891 (toll-free in North America) or (312) 667-1347 (outside North America).  You may also obtain copies of any pleadings by visiting the Court's website at https://ecf.txsb.uscourts.gov in accordance with the procedures and fees set forth therein.

[*Remainder of page intentionally left blank.*]

Victoria, Texas
February 26, 2018

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4284
Facsimile:      (713) 308-4184
Email:           ptomasco@jw.com
                    mcavenaugh@jw.com


*Co-Counsel to the Debtors and Debtors in*
*Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anna G. Rotman, P.C. (TX Bar No. 24046761)
Brian E. Schartz (TX Bar No. 24099361)
609 Main Street
Houston, Texas 77002
Telephone:     (713) 836-3600
Facsimile:      (713) 836-3601
Email:           anna.rotman@kirkland.com
                    brian.schartz@kirkland.com

-and-


James H.M. Sprayregen, P.C. (admitted *pro hac* vice)
Anup Sathy, P.C. (admitted *pro hac* vice)
Ross M. Kwasteniet, P.C. (admitted *pro hac* vice)
Adam C. Paul (admitted *pro hac* vice)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           james.sprayregen@kirkland.com
                    anup.sathy@kirkland.com
                    ross.kwasteniet@kirkland.com
                    adam.paul@kirkland.com


*Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Exhibit A</u>**

**Redline**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

|  |  |
|---|---|
| In re: | ) ) Chapter 11 |
| SEADRILL LIMITED, *et al.*,[1] | ) ) Case No. 17-60079 (DRJ) |
| Debtors. | ) ) (Jointly Administered) |

**DISCLOSURE STATEMENT RELATING TO THE ~~FIRST~~SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SEADRILL LIMITED AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**JACKSON WALKER L.L.P.**
Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 19010
Houston, Texas 77010
Telephone:      (713) 752-4284
Facsimile:       (713) 308-4184
Email:             ptomasco@jw.com
                        mcavenaugh@jw.com


-and-

Jennifer F. Wertz (TX Bar No. 24072822)
100 Congress Avenue, Suite 1100
Austin, Texas 78701
Telephone:      (512) 236-2247
Facsimile:       (512) 391-2147
Email:             jwertz@jw.com

~~-and-~~ *Co-Counsel to the Debtors and Debtors in Possession*
~~Rachel Biblo Block (TX Bar No. 24097382)~~
~~2323 Ross Avenue, Suite 600~~
~~Dallas, Texas 75201~~
~~Telephone:      (214) 953-6070~~
~~Facsimile:       (214) 661-6810~~
~~Email:             rblock@jw.com~~

*Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anna G. Rotman, P.C. (TX Bar No. 24099361)
Brian E. Schartz (TX Bar No. 24046761)
609 Main Street
Houston, Texas 77002
Telephone:      (713) 836-3600
Facsimile:       (713) 836-3601
Email:             anna.rotman@kirkland.com
                        brian.schartz@kirkland.com


-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Anup Sathy, P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet~~Anup Sathy~~, P.C. (admitted *pro hac vice*)
Adam ~~Ross M. Kwasteniet, P.C.~~ Paul (admitted *pro hac vice*)
300 North LaSalle Street~~Adam C. Paul (admitted *pro hac vice*)~~
Chicago, Illinois 60654~~300 North LaSalle Street~~
Telephone:      (312) 862-2000~~Chicago, Illinois 60654~~
~~Telephone:~~Facsimile:      (312) 862-2~~000~~00
~~Facsimile:       (312) 862-2200~~Email: james.sprayregen@kirkland.com
~~Email:             james.sprayregen      anup.sathy@kirkland.com~~
~~anup.sathy~~ross.kwasteniet@kirkland.com
~~ross.kwasteniet~~adam.paul@kirkland.com
~~adam.paul@kirkland.com~~

*Co-Counsel to the Debtors*
*Co-Counsel to the*and Debtors in Possession
~~and Debtors in Possession~~

---

[1]   Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/Seadrill.  The location of Debtor Seadrill Americas, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 11025 Equity Drive, Suite 150, Houston, Texas 77041.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS ENTITLED TO VOTE FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF SEADRILL LIMITED AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS, CERTAIN HOLDERS OF CLAIMS, AND CERTAIN COMMITMENT PARTIES THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF APPROXIMATELY 99 PERCENT OF THE CLAIMS ARISING UNDER THE BANK FACILITIES AND HOLDERS OF APPROXIMATELY 4070 PERCENT OF THE UNSECURED BONDS. THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.

IN ADDITION, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "COMMITTEE"), WHICH IS A COURT-APPOINTED FIDUCIARY FOR HOLDERS OF UNSECURED CLAIMS AS A WHOLE, RECOMMENDS THAT HOLDERS OF UNSECURED CLAIMS VOTE TO ACCEPT THE PLAN. HOLDERS OF UNSECURED CLAIMS SHOULD ALSO REVIEW THE LETTER FROM THE COMMITTEE INCLUDED WITH THIS DISCLOSURE STATEMENT, WHICH DISCUSSES THE ISSUES THE COMMITTEE HAS SETTLED AND THE PLAN'S PROPOSED TREATMENT OF HOLDERS OF UNSECURED CLAIMS (THE "COMMITTEE LETTER"). THE COMMITTEE URGES ALL HOLDERS OF UNSECURED CLAIMS TO CONSIDER THE COMMITTEE LETTER AND VOTE IN FAVOR OF THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO

CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RSA.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VIII, ENTITLED "RISK FACTORS," WHICH BEGINS ON PAGE 87, BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR

FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

UPON CONFIRMATION OF THE PLAN, CERTAIN (BUT NOT ALL) OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.  OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS.  TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.

THE PERMISSION OF THE BERMUDA MONETARY AUTHORITY IS REQUIRED, UNDER THE PROVISIONS OF THE EXCHANGE CONTROL ACT 1972 AND RELATED REGULATIONS, FOR ALL ISSUANCES AND TRANSFERS OF SHARES (WHICH INCLUDES THE ORDINARY SHARES) OF BERMUDA COMPANIES TO OR FROM A NON-RESIDENT OF BERMUDA FOR EXCHANGE CONTROL PURPOSES, OTHER THAN IN CASES WHERE THE BERMUDA MONETARY AUTHORITY HAS GRANTED A GENERAL PERMISSION. THE BERMUDA MONETARY AUTHORITY, IN ITS NOTICE TO THE PUBLIC DATED JUNE 1, 2005, HAS GRANTED A GENERAL PERMISSION FOR THE ISSUE AND SUBSEQUENT TRANSFER OF ANY SECURITIES OF A BERMUDA COMPANY FROM AND/OR TO A NON-RESIDENT OF BERMUDA FOR EXCHANGE CONTROL PURPOSES FOR SO LONG AS ANY "EQUITY SECURITIES" OF THE COMPANY (WHICH WOULD INCLUDE THE ORDINARY SHARES) ARE LISTED ON AN "APPOINTED STOCK EXCHANGE" (WHICH WOULD INCLUDE THE NYSE AND OSE). IN GRANTING THE GENERAL PERMISSION THE BERMUDA MONETARY AUTHORITY ACCEPTS NO RESPONSIBILITY FOR THE FINANCIAL SOUNDNESS OR THE CORRECTNESS OF ANY OF THE STATEMENTS MADE OR OPINIONS EXPRESSED HEREIN.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- TECHNOLOGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- OIL AND NATURAL GAS PRICES AND THE OVERALL HEALTH OF THE OIL AND NATURAL GAS INDUSTRY;

- FUTURE DEMAND FOR OFFSHORE DRILLING SERVICES;

- THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES;

- AVAILABILITY AND TERMS OF CAPITAL;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- COSTS OF CONDUCTING THE DEBTORS' OTHER OPERATIONS;

- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**

- **EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**

- **ENVIRONMENTAL LIABILITIES;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **GOVERNMENTAL REGULATION AND TAXATION OF THE OIL AND NATURAL GAS INDUSTRY;**

- **DEVELOPMENTS IN OIL-PRODUCING AND NATURAL GAS-PRODUCING COUNTRIES;**

- **UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;**

- **PLANS, OBJECTIVES, AND EXPECTATIONS;**

- **THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;**

- **RISKS IN CONNECTION WITH ACQUISITIONS;**

- **THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS; AND**

- **THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION OR PRICE PRESSURE BY CUSTOMERS; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.**

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................................................... 1

II.    PRELIMINARY STATEMENT .............................................................................................. 1

III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN .......................................................................................................................................... 88

    A.     What is chapter 11? ................................................................................................... 88
    B.     Why are the Debtors sending me this Disclosure Statement? ................................... 88
    C.     Am I entitled to vote on the Plan? ............................................................................ 88
    D.     What will I receive from the Debtors if the Plan is consummated? ....................... 1111
    E.     What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim? ................................................................................................. 2626
    F.     Will my treatment change under the Plan? ............................................................. 2727
    G.     Are any regulatory approvals required to consummate the Plan? ........................... 2727
    H.     What happens to my recovery if the Plan is not confirmed or does not go effective? ............... 2828
    I.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" ................................................................................................... 2828
    J.      Is there potential litigation related to the Plan? ...................................................... 2828
    K.     Will the final amount of Allowed Unsecured Claims affect the recovery of holders of Allowed Unsecured Claims (excluding the Commitment Parties) Entitled to Vote under the Plan? ........................................................................................................... 2828
    L.     How will the preservation of the Causes of Action impact my recovery under the Plan? .......... 3030
    M.    Will there be releases and exculpation granted to parties in interest as part of the Plan? .......... 3131
    N.     What is the deadline to vote on the Plan? ............................................................... 3434
    O.     How do I vote for or against the Plan? .................................................................... 3434
    P.     Why is the Bankruptcy Court holding a Confirmation Hearing? ........................... 3434
    Q.     When is the Confirmation Hearing set to occur? .................................................... 3434
    R.     What is the purpose of the Confirmation Hearing? ................................................ 3535
    S.     What is the effect of the Plan on the Debtors' ongoing businesses? ....................... 3535
    T.     What are the Notes Rights Offering and the Equity Rights Offerings? ................... 3535
    U.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ................................................................................................. 3535
    V.     Do the Debtors recommend voting in favor of the Plan? ........................................ 3636
    W.    Who is Committed by the RSA to Support the Plan? .............................................. 3636

IV.   THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN ............................ 3737

    A.     Restructuring Support Agreement ........................................................................... 3737
    B.     The Plan .................................................................................................................. 4343

V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ....... 4848

    A.     Seadrill's Corporate History ................................................................................... 4848
    B.     Seadrill's Operations .............................................................................................. 5555
    C.     The Debtor's Prepetition Capital Structure ............................................................. 5656

VI.   EVENTS LEADING TO THE CHAPTER 11 FILINGS .............................................................. 6262

    A.     Market Decline and Industry-Specific Challenges ................................................. 6262
    B.     Proactive Approach to Addressing Liquidity Constraints ....................................... 6363
    C.     Creditor Negotiations, Bank Deal, Capital Raise Process, and Chapter 11 Filing .................... 6464
    D.     Disinterested Directors' Independent Investigation ................................................ 6565

E. Bermuda Proceedings ....................................................................................... 7474

VII. **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** ...........................................................................................................**7575**

 A. Corporate Structure upon Emergence ........................................................... 7575
 B. Expected Timetable of the Chapter 11 Cases ................................................ 7676
 C. First/Second Day Relief .................................................................................. 7676
 D. Other Procedural and Administrative Motions .............................................. 7777
 E. Schedules and Statements ............................................................................... 7777
 F. Establishment of a Claims Bar Date ............................................................... 7878
 G. Appointment of Official Committee ............................................................... 7878
 H. Formation of Equity Committee Denied ......................................................... 7878
 I. Formation of Ad Hoc Group ........................................................................... 7979
 J. Litigation Matters ........................................................................................... 7979
 K. Postpetition Marketing Process ...................................................................... 7979
 L. The Global Settlement ..................................................................................... 81
 L.M. Discussions with Other Constituencies .......................................................... 8383
 N. Proposed Amendments to Certain RSA Term Sheets. .................................... 84

VIII. **RISK FACTORS** ..................................................................................................**8787**

 A. Bankruptcy Law Considerations .................................................................... 8888
 B. Risks Related to Recoveries under the Plan ................................................... 9191
 C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses ....... 9494

IX. **SOLICITATION AND VOTING PROCEDURES** .............................................**100100**

 A. Holders of Claims Entitled to Vote on the Plan ............................................. 100100
 B. Voting Record Date ......................................................................................... 101101
 C. Voting on the Plan ........................................................................................... 101101
 D. Ballots Not Counted ........................................................................................ 102102

X. **RIGHTS OFFERING PROCEDURES** ............................................................**102102**

XI. **CONFIRMATION OF THE PLAN** ...................................................................**103103**

 A. Requirements for Confirmation of the Plan .................................................... 103103
 B. Best Interests of Creditors/Liquidation Analysis .......................................... 103103
 C. Feasibility ........................................................................................................ 104104
 D. Acceptance by Impaired Classes .................................................................... 104104
 E. Confirmation without Acceptance by All Impaired Classes ........................... 105105
 F. Valuation of the Debtors ................................................................................. 106106

XII. **CERTAIN SECURITIES LAW MATTERS** .....................................................**106106**

 A. Issuance of Securities under the Plan ............................................................. 106106
 B. Subsequent Transfers of Securities Issued under the Plan .............................. 107107

XIII. **CERTAIN UNITED STATES FEDERAL INCOME TAX AND BERMUDA TAX CONSEQUENCES OF THE PLAN** ...................................................................**108108**

 A. Introduction ..................................................................................................... 108108
 B. Certain U.S. Federal Income Tax Consequences to the Debtors ..................... 110110
 C. Bermuda Tax Consequences to the Debtors ................................................... 112112
 D. Certain U.S. Federal Income Tax Consequences to the Holders of Certain Claims .............. 112112
 E. Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims ..... 127127
 F. Information Reporting and Back-up Withholding .......................................... 127127

  G.  FATCA ................................................................................................................... 127127

**XIV. RECOMMENDATION** .................................................................................................**128128**

**EXHIBITS**

EXHIBIT A      Plan of Reorganization

EXHIBIT ~~B~~B1    Restructuring Support and Lock-Up Agreement

EXHIBIT B2    Amendment to the Restructuring Support and Lock-Up Agreement

EXHIBIT B3    Amendment to the Investment Agreement

EXHIBIT C      Corporate Organization Chart

EXHIBIT D      Disclosure Statement Order

EXHIBIT E1    Equity Rights Offering Procedures

EXHIBIT E2    Notes Rights Offering Procedures

EXHIBIT F      Liquidation Analysis

EXHIBIT G      Financial Projections

EXHIBIT H      Valuation Analysis

## I.        INTRODUCTION

Seadrill Limited and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors," and together with Seadrill Limited's direct and indirect non-Debtor subsidiaries and affiliates, collectively, "Seadrill"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the ~~First~~*Second* *Amended Joint Chapter 11 Plan of Reorganization of Seadrill Limited and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated [●] (the "Plan").[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS, CERTAIN HOLDERS OF CLAIMS, AND CERTAIN COMMITMENT PARTIES THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF APPROXIMATELY 99 PERCENT OF THE CLAIMS ARISING UNDER THE BANK FACILITIES (AS DEFINED BELOW) AND HOLDERS OF APPROXIMATELY ~~40~~70 PERCENT OF THE UNSECURED BONDS (AS DEFINED BELOW), SUPPORT CONFIRMATION OF THE PLAN AND THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  ADDITIONALLY, AS SET FORTH IN THE COMMITTEE LETTER, THE COMMITTEE SUPPORTS THE PLAN AND RECOMMENDS THAT ALL HOLDERS OF GENERAL UNSECURED CLAIMS VOTE TO ACCEPT THE PLAN.   THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

**HEMEN HOLDING LTD. ("HEMEN") HOLDS A SUBSTANTIAL PORTION OF THE DEBTORS' OUTSTANDING UNSECURED BONDS.  AS AN INSIDER OF THE DEBTORS, HEMEN'S VOTE TO ACCEPT THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING IF THE DEBTORS HAVE MET THE REQUIREMENTS OF SECTION 1129(A)(10) OF THE BANKRUPTCY CODE.  THAT BEING SAID, BECAUSE THE DEBTORS ANTICIPATE THAT HOLDERS OF CREDIT AGREEMENT CLAIMS AT SEADRILL LIMITED AND NORTH ATLANTIC DRILLING LIMITED WILL VOTE TO ACCEPT THE PLAN, HEMEN'S VOTE WILL NONETHELESS BE COUNTED FOR PURPOSES OF DETERMINING WHETHER CLASSES B3 AND D3 HAVE VOTED TO ACCEPT THE PLAN UNDER SECTION 1126 OF THE BANKRUPTCY CODE.**

## II.       PRELIMINARY STATEMENT

Seadrill was formed in 2005.  Since then, it has grown into one of the world's largest offshore drilling contractors and now serves customers around the globe.  Seadrill's customers (typically referred to as "operators") include super-major and major oil and gas companies, state-owned national oil companies, and comparatively smaller, local independent offshore exploration and production companies.  The Debtors' fleet, which makes up the substantial majority of the enterprise-wide Seadrill fleet, consists of 32 offshore drilling units, including 7 drillships, 12 semi-submersible rigs, and 13 jack-up rigs.  Seadrill has also contracted for the construction and delivery of 14 additional offshore drilling units (including 4 drillships, 2 semi-submersible rigs, and 8 jack-up rigs) that are in varying stages of completion in

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern**.

shipyards located in Southeast Asia.  Four of Seadrill's newbuild contracts are with Debtor entities.  In simple terms, the Debtors' business is to contract their 32 rigs for a specified period of time (often spanning several years) at a contracted-for daily rate or "dayrate."

As of the Petition Date, the Debtors are liable for more than $8 billion in aggregate funded-debt obligations, including:  (a) obligations under 12 Seadrill Limited backed, secured bank-funded credit facilities (the "Bank Facilities," and the lenders thereunder, the "Bank Lenders") with an aggregate principal amount outstanding of approximately $5.7 billion (each with a discrete collateral package— primarily non-overlapping combinations of the Debtors' offshore drilling rigs), the administrative agent banks for which form the Bank CoCom (described below); and (b) six series of unsecured bonds (the "Unsecured Bonds") with an aggregate principal amount outstanding of approximately $2.3 billion. Additionally, the Debtors are liable for an aggregate of approximately (a) $1.8 billion in contingent liabilities under 4 newbuild contracts and (b) $1.1 billion in capital lease obligations under three sale/leaseback agreements with certain of SFL's subsidiaries.  The Debtors are also liable for certain de minimis pension obligations.

For the last three years, oil and natural gas prices have been in a down cycle.  Offshore drillers like Seadrill depend on "upstream" capital expenditures to fuel continued growth and success.  During this down cycle, a number of large upstream oil and natural gas exploration and production companies, servicing companies, and operators have been forced to seek chapter 11 protection.  Even the super-major oil and gas companies that have avoided restructurings have aggressively scaled back exploration and production-related capital expenditures.  As a result, the distress in the upstream sector has spread to service providers and other ancillary businesses that depend on upstream capital expenditures for their revenues, including offshore drilling companies like Seadrill.  The graphic below highlights the link between Seadrill's success and commodity pricing conditions by comparing the declines in the trading price from mid-2014 to today of (a) crude oil, (b) Seadrill Limited, NADL, and Sevan common shares, and (c) certain of the Unsecured Bonds (with and without a Seadrill Limited guarantee).





Oil prices peaked in mid-2014 at more than $115 per barrel before declining to less than $30 per barrel by early 2016.  While oil prices have recovered modestly since early 2016, they have hovered near or below breakeven pricing for offshore drilling projects.  During that same period, Seadrill Limited's common share trading price fell to a fraction of mid-2014 highs.

As an initial response to deteriorating market conditions, in November 2014, Seadrill Limited decided to suspend dividends to shareholders.  In early 2015, Seadrill began discussions with the Bank Lenders, which resulted in limited covenant relief under its secured bank-funded facilities pursuant to amendments executed in May 2015.  While the Debtors' cash position has been strong since Seadrill Limited suspended dividends, it became clear that maturing funded-debt obligations would be difficult, if not impossible, to refinance and could cause an enterprise-wide liquidity squeeze if not addressed proactively.  Thus, beginning in late 2015 and into early 2016, Seadrill continued broader discussions with a group of lenders that would, in April 2016, be formally appointed the as "coordinating committee" (the "Bank CoCom"), and included each of the administrative agent banks under the Bank Facilities.

As a result of discussions with the Bank CoCom, in April 2016, Seadrill executed amendments and waiver agreements (collectively, the "R1 Agreement") with respect to the Bank Facilities that resulted in additional covenant relief and extended the maturities of certain of the Bank Facilities.  As part of the R1 Agreement, the parties established April 30, 2017 as the "long stop" date by which Seadrill was to implement a broader restructuring.  In March and April 2017, Seadrill and the requisite Bank Lenders again agreed to extend the maturities of certain of the Bank Facilities and also agreed to extend the long stop date to July 31, 2017.  The requisite Bank Lenders subsequently agreed to a further, final extension of the long stop date to September 12, 2017 and applicable Bank Facility maturities to September 14, 2017.[2]

---

[2]   As described below, on August 14, 2017, because the Debtors' and the requisite Bank Lenders could not reach a consensual resolution to further extend the maturity of the maturing *West Eminence* Facility, the Debtors sought and a court of competent jurisdiction in Bermuda entered an order approving a scheme of arrangement that effectuated an extension the maturity of the maturing *West Eminence* Facility to September 14, 2017.

3

Seadrill took full advantage of the time provided by the foregoing maturity extensions to explore a number of strategic alternatives. The key focus at the outset of negotiations with the Bank Lenders was to secure at least a five-year liquidity runway to bridge to a broader market recovery. This runway, embodied in the Bank Deal (described below), forms the foundation of the Debtors' restructuring. While the Bank Lenders expressed a willingness to enter into a transaction to extend maturities and reduce near-term amortization obligations as part of a broader restructuring, they insisted that the transaction be supported by a capital injection of at least $1 billion to ensure that Seadrill has sufficient liquidity to weather the economic storm and, in part, to serve as credit support for the restructured Bank Facility obligations.

Thus, beginning in September 2016, the Debtors launched a capital raise process seeking at least $1 billion in new financing. After nearly six months of marketing efforts and negotiations, the Debtors received a joint proposal from Hemen Holding Ltd. ("Hemen"), Seadrill Limited's largest shareholder and a leading investor in the offshore space, and Centerbridge Credit Partners L.P. ("Centerbridge") that contemplated a $1 billion investment. Over time, that proposal developed into a $1.06 billion commitment (the "Capital Commitment") backed not only by Hemen and Centerbridge, but also by a syndicate of additional investors (together with Hemen and Centerbridge, the "Initial Commitment Parties"). The As of the Petition Date, the Initial Commitment Parties hoeld approximately 40 percent of the Debtors' approximately $2.3 billion in outstanding bonds (the "Unsecured Bonds"). Following a marketing process conducted by the Debtors (as described below), during which two committed alternative plan proposals were submitted, the Debtors, the Committee, the Initial Commitment Parties and other original Restructuring Support Agreement parties, and certain additional holders of Unsecured Bonds (collectively with the Initial Commitment Parties, the "Commitment Parties") have reached a global resolution such that the Commitment Parties, including the Initial Commitment Parties and holders of Unsecured Bonds who joined the Restructuring Support Agreement in connection with the global settlement, now hold approximately 70 percent of the Unsecured Bonds and the Capital Commitment has increased to $1.08 billion. Thus, while the Bank Deal serves as the foundation of the Debtors' restructuring, the opportunity to participate in the Capital Commitment has served as an important building block for consensus. both pre- and postpetition. The terms of the New Secured Notes (defined below) will require $227.5 million in cash to be held following the Effective Date in a segregated account unavailable to the Debtors unless certain financial conditions are met. The Debtors believe that this term, which was negotiated as part of their broader restructuring, is reasonable and necessary under the circumstances and does not give rise to any circumstances that would render their reorganization infeasible.

The continued investment of Hemen was critical to the success of the Debtors' fund raising goals. *First*, the Bank CoCom refused to waive change-of-control default provisions in the Bank Facility credit agreements tied to Hemen's level of ownership of Seadrill Limited. Many of the Bank Lenders have significant long-term relationships with Hemen and told Seadrill the necessary level of concessions and flexibility were conditioned on Hemen's involvement in Seadrill post-restructuring. While the Prepetition Credit Agreements required Hemen to maintain a certain level of ownership in Seadrill Limited, under the Amended Credit Agreements, Hemen's required ownership stake may decrease to as little as 5 percent within three years after the Effective Date. *Second*, many of the third parties Seadrill spoke to said they would only be interested in investing in the Debtors' recapitalization if Hemen was an anchor investor. Hemen is a world-renowned leader in the offshore drilling and shipping markets and Hemen's participation in the Capital Commitment (described below) helped validate the investment opportunity and attracted others to participate. Initially, however, Hemen was resistant to the idea of being the lead investor, preferring to let other investors set market-clearing terms. After further discussions and a request from the Debtors to submit a proposal, in March 2017, Hemen (partnering with Centerbridge) submitted a proposal. This proposal ultimately developed into the Capital Commitment.

On the heels of this resolution, after nearly two years of negotiations, the Debtors, approximately 97 percent of the Bank Lenders (a support level that has since risen to 99 percent), the Initial Commitment

4

Parties, and SFL (and certain of SFL's subsidiaries) agreed to the consensual restructuring transaction set forth in the Restructuring Support Agreement.   Together, the Initial Commitment Parties he~~l~~d approximately 40 percent of the Unsecured Bonds. ~~Importantly,~~ as of the ~~fact that~~ Petition Date.  Following a marketing process conducted by the Debtors (as described below), during which two committed alternative plan proposals were ~~negotiating with~~submitted, a global settlement was reached whereby the Commitment Parties ~~has been disclosed numerous times dating back to 2016 and other bondholders had the opportunity to execute nondisclosure agreements for purposes of receiving nonpublic information and participating in negotiations.  The Debtors are hopeful that many more holders~~now hold approximately 70 percent of the Unsecured Bonds~~ will join~~.  Additionally, the Committee and each of its members now support the ~~restructuring embodied in the ~~Restructuring Support Agreement~~as well, on the terms described herein and set forth in the Plan.  Thus, every major constituency that has been active in the Chapter 11 Cases now supports the restructuring embodied in, and confirmation of, the Plan.

The Restructuring Support Agreement, a copy of which is attached hereto as **Exhibit B~~B~~1** and incorporated herein by reference, contemplates a series of transformative restructuring transactions that will:

- eliminate near-term amortization obligations and extend maturities under the Debtors' secured bank facilities by approximately five years, on average (the "Bank Deal");

- equitize $2.3 billion in unsecured bond obligations, approximately $250 million in unsecured interest rate and currency swap claims, and other non-assumed lease and contract claims;

- facilitate a $1.~~06~~08 billion capital injection backed by the Commitment Parties, which will take the form of $86~~0~~80 million in new secured notes (the "New Secured Notes") and a $200 million direct equity investment;

- leave employee, customer, and ordinary trade Claims largely Unimpaired; and

- re-cast the Debtors' corporate structure into a new "IHCo"/"RigCo"/"NSNCo" holding structure that will support both the Bank Deal and the Capital Commitment.

The amendments to the Restructuring Support Agreement and Investment Agreement necessary to implement the global settlement described herein are attached hereto as **Exhibit B2 and Exhibit B3, respectively.** In addition to addressing the Debtor's capital structure, the transactions contemplated by the Restructuring Support Agreement will preserve Seadrill's valuable relationships with the Bank Lenders, which collectively represent a substantial portion of the worldwide rig financing market.  The transactions will also preserve Seadrill's valuable relationship with Hemen, which is Seadrill's largest shareholder, is affiliated with one of the largest oil tanker and shipping groups in the world, and is critical to Bank Lender consent to a restructuring.  Finally, the broad consensus embodied in the Restructuring Support Agreement will ensure that the Chapter 11 Cases proceed in an efficient, cost-effective manner.  In accordance with the Restructuring Support Agreement, on the Petition Date, the Debtors commenced these chapter 11 cases.

In addition to the recapitalization contemplated by the Restructuring Support Agreement, the Debtors negotiated a series of transactions in the months preceding the Petition Date to limit the effects of the Chapter 11 Cases on certain of the Debtors' non-Debtor Affiliates, including cross-defaults that would otherwise have been triggered upon a Seadrill Limited chapter 11 filing, thereby limiting the number of Seadrill~~ and~~ associated entities filing for chapter 11 protection.  Seadrill Limited owns substantial, but non-controlling, interests in a number of entities described below as "Non-Consolidated Entities."   Seadrill Limited's ownership interests in the Non-Consolidated Entities collectively form a key enterprise value driver and failure to insulate the Non-Consolidated Entities from the effects of the Chapter 11 Cases could

have led to cross-defaults that could have destroyed a great deal of that value. Each of the Non-Consolidated Entities, as well as the applicable prepetition insulating transaction, are described in greater detail in Article V.A(ii) of this Disclosure Statement, entitled "Non-Consolidated Entities and Description of Insulating Transactions," which begins on page 50.

To capture the full benefit of the compromises embodied in the Restructuring Support Agreement, and to avoid losing the Capital Commitment, the Debtors must move through chapter 11 at a steady pace. The investment agreement governing the Capital Commitment (the "Investment Agreement") has two key milestones:

- entry of an order confirming the Debtors' chapter 11 plan within nine months following the Petition Date; and

- the effective date of the Debtors' chapter 11 plan occurring within two months following the confirmation of the Plan.

These milestones allow the Debtors more than sufficient time to market test the terms of the Capital Commitment to determine whether they are the best available under the circumstances.[3] The Debtors negotiated an unqualified, 90-day "go shop" period (measured from the Petition Date) under the Investment Agreement to allow this value-maximizing marketing process to occur. In the months since the Petition Date, the Debtors have diligently pursued their marketing process, reaching out to 89 potential investors (including five who were recommended by the advisors to the Creditors' Committee and two bondholder groups) and engaging in substantial discussions and diligence efforts over multiple phases. The Debtors continue to engage with the two remaining participating Two participants in the marketing process, Barclays and the Ad Hoc Group (each defined and described below).), submitted binding bids in light of the global settlement described below, each has elected to not to continue to pursue its respective standalone bid. The Debtors' postpetition marketing process, including descriptions of the two alternative proposals, is described in greater detail in Article VII.K of this Disclosure Statement, entitled "Postpetition Marketing Process," which begins on page 79. After extensive arms-length negotiations between the Committee and the Debtors, the Debtors agreed to the global settlement which maximizes value for general unsecured creditors and to support confirmation of the Plan.

The Debtors are soliciting the Plan because they believe the Plan represents the best alternative currently available for all stakeholders. However, the Debtors, in an exercise of their fiduciary duties, may nonetheless determine to pursue an alternative to the extent such alternative is higher or otherwise better than the transaction currently contemplated by the Plan. Indeed, the Debtors recently received proposals from each of Barclays and the Ad Hoc Group. Both proposals contemplate Barclays' and the Ad Hoc Groups', as applicable, participation in the Debtors' restructuring, within the same structure broadly contemplated by the current Plan. Both proposals require certain third-party consents that the parties have not yet secured. The Debtors are currently in the process of evaluating both proposals and will continue to engage with both Barclays and the Ad Hoc Group in hopes of reaching a global resolution.

If the Debtors do elect to implement changes to the current transaction structure on account of the Barclays or Ad Hoc Group proposals, or another proposal, they will file an amended plan of reorganization and may provide additional disclosure or solicitation materials to parties entitled to vote to accept or reject the Plan. The Debtors anticipate that any such amended plan would result in equal or more favorable

---

[3]  The Investment Agreement further requires that the Debtors secure entry of an order approving this Disclosure Statement within five months after the Petition Date, a milestone that has since been extended to facilitate the February 26, 2018 hearing regarding approval of this Disclosure Statement.

~~treatment for classes entitled to vote to accept or reject the Plan. The Debtors believe that the Plan, as currently structured, maximizes the value of their estates.~~

Shortly after the commencement of these chapter 11 cases, the Ad Hoc Group formed and made certain claims regarding the pre-chapter 11 filing negotiations and discussions by certain of the Initial Commitment Parties. The Debtors have investigated the Ad Hoc Group's claims by, among other things, reviewing pre-chapter 11 filing correspondence between certain of the Initial Commitment Parties' advisors and the members of the Ad Hoc Group. Any assertions of exclusion have been disputed by certain members of the Initial Commitment Parties Moreover, the Debtors held by holding a number of in person settlement conferences and provided substantial diligence over the course of these chapter 11 cases. The Ad Hoc Group participated in the Debtors' broader settlement discussions with the Committee and the original Restructuring Support Agreement parties. The Committee also commenced an investigation into these claims.

Ultimately, since the Petition Date, the Debtors and the original Restructuring Support Agreement parties were able to work constructively with the Committee, the Ad Hoc Group, and Barclays to resolve any issues that such parties had with the Plan. To that end, the Plan now reflects a global compromise with the Committee, Ad Hoc Group, and Barclays, in addition to maintaining the support of the original Restructuring Support Agreement parties. The compromises and settlements to be implemented pursuant to the Plan, preserve value by enabling the Debtors to avoid costly and time-consuming litigation with the Committee that would delay the Debtors' emergence from chapter 11. For more information regarding the Committee settlement, see Article VII.L of this Disclosure Statement, entitled "The Global Settlement," which begins on page 81.

The formulation of the Restructuring Support Agreement and Plan is a significant achievement for the Debtors in the face of historic commodity price declines and a depressed operating environment. The Debtors strongly believe that the Plan is in the best interests of the Debtors' estates, and represents the best available alternative at this time. Given the Debtors' core strengths, including their modern fleet, highly-skilled workforce, global reach, and successful operating and safety track record, the Debtors are confident they can efficiently implement the restructuring set forth in the Restructuring Support Agreement to ensure their long-term viability and success. For these reasons, the Debtors strongly recommend that holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.

**PLEASE TAKE NOTICE THAT THE COMMITMENT PARTIES, WHO ARE PARTY TO THE RESTRUCTURING SUPPORT AGREEMENT HAVE AGREED TO WAIVE THEIR RIGHT TO PARTICIPATE IN THE RIGHTS OFFERINGS AND CASH DISTRIBUTION OPEN TO HOLDERS OF GENERAL UNSECURED CLAIMS IN CLASSES B3, D3, AND F3 ON ACCOUNT OF GENERAL UNSECURED CLAIMS HELD AS OF SEPTEMBER 12, 2017 (WITH RESPECT TO THE ORIGINAL COMMITMENT PARTIES) AND JANUARY 5, 2018, (WITH RESPECT TO THE NEW COMMITMENT PARTIES), SO LONG AS THE RESTRUCTURING SUPPORT AGREEMENT REMAINS IN EFFECT. THE BOND HOLDINGS THAT ARE SUBJECT TO SUCH WAIVER TOTAL APPROXIMATELY 70 PERCENT OF THE DEBTORS' UNSECURED BOND CLAIMS. SUCH WAIVER OF THE ABILITY TO PARTICIPATE IN THE RIGHTS OFFERINGS AND CASH DISTRIBUTION (AS WELL AS THE OTHER RESTRICTIONS UNDER THE RESTRUCTURING SUPPORT AGREEMENT AND INVESTMENT AGREMENT) REMAINS IN PLACE SO LONG AS THE RESTRUCTURING SUPPORT IS EFFECTIVE, EVEN IN THE APPLICABLE COMMITMENT PARTY HAS TRADED THE APPLICABLE UNSECURED BONDS TO A PERSON NOT PARTY TO THE RESTRUCTURING SUPPORT AGREEMENT. PARTIES SHOULD CAREFULLY CONSIDER APPLICABLE RESTRICTIONS UNDER THE RESTRUCTURING SUPPORT AGREEMENT AND INVESTMENT AGREEMENT, IF ANY, WHEN PURCHASING THE DEBTORS' UNSECURED BONDS OR OTHER GENERAL UNSECURED CLAIMS AGAINST THE DEBTORS' ESTATES. IF YOU**

PURCHASE AN UNSECURED BOND HELD BY AN EXISTING RESTRUCTURING SUPPORT AGREEMENT PARTY AS OF SEPTEMBER 12, 2017 OR JANUARY 5, 2018, AS APPLICABLE, YOU MAY NOT BE ENTITLED TO PARTICIPATE IN THE RIGHTS OFFERINGS AND CASH DISTRIBUTION ON ACCOUNT OF SUCH UNSECURED BONDS.  FOR THE AVOIDANCE OF DOUBT, ALL HOLDERS OF GENERAL UNSECURED CLAIMS IN CLASSES B3, D3, AND F3 WILL BE ENTITLED TO PATRICIATE IN THE UNSECURED POOL EQUITY DISTRIBUTION, IRRESPECTIVE OF WHETHER SUCH GENERAL UNSECURED CLAIMS ARE SUBJECT TO THE RESTRICTIONS SET FORTH IN THE RESTRUCTURING SUPPORT AGREEMENT.

THE DEBTORS MAY SEEK APPROVAL OF THE AMENDMENTS TO THE TERM SHEETS RELATED TO CERTAIN OF THE RSA TERM SHEETS AS SET FORTH IN THIS DISCLOSURE STATEMENT.  THE DEBTORS MAY NOT OBTAIN THE REQUISITE CONSENT NECESSARY TO APPROVE THESE AMENDMENTS.  ACCORDINGLY, PARTIES ENTITLED TO VOTE ON THE PLAN SHOULD NOT CONSIDER THE AMENDMENTS SET FORTH IN THIS DISCLOSURE STATEMENT AS PART OF THE CONSIDERATION UNDER THE PLAN.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold.  Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to

section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Any rights of the Nordic Trustee with respect to voting are expressly preserved. Each Class's respective voting status is set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| | *Other Claims* | | |
| A1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| A2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| A3 | Intercompany Claims | Impaired/ Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| | *Claims against Seadrill Limited* | | |
| B1-a | $1.5B Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-b | $483MM Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-c | $450MM Eminence Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-d | $1.35B Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-e | $950MM Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-f | $450MM Nordea Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-g | $440MM Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-h | $400MM Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-i | $300MM Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-j | AOD Credit Agreement Guarantee Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-k | NADL Credit Agreement Guarantee Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B1-l | Sevan Credit Agreement Guarantee Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B2 | Guarantee Facility Claims against Seadrill Limited | Impaired | Entitled to Vote |
| B3 | General Unsecured Claims against Seadrill Limited | Impaired | Entitled to Vote |

9

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| B4 | Seadrill Limited 510(b) Claims | Impaired | ~~Not~~ Entitled to Vote (Deemed to Reject) |
| B5 | Interests in Seadrill Limited | Impaired | ~~Not~~ Entitled to Vote (Deemed to Reject) |
| *Claims against Other Seadrill Debtors* | | | |
| C1-a | $1.5B Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-b | $483MM Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-c | $450MM Eminence Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-d | $1.35B Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-e | $950MM Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-f | $450MM Nordea Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-g | $440MM Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-h | $400MM Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-i | $300MM Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C1-j | Prepetition AOD Credit Agreement Claims against Other Seadrill Debtors | Impaired | Entitled to Vote |
| C2 | General Unsecured Claims against Other Seadrill Debtors other than the Newbuild Debtors and Seadrill UK Ltd. | Unimpaired | Not Entitled to Voted (Deemed to Accept) |
| C3 | General Unsecured Claims against the Newbuild Debtors and Seadrill UK Ltd. | Impaired | Entitled to Vote |
| C3 | Interests in Other Seadrill Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| *Claims against NADL* | | | |
| D1 | ~~Secured~~ Credit Agreement Claims against NADL | Impaired | Entitled to Vote |
| D2 | NADL Revolving Loan Claim | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| D3 | General Unsecured Claims against NADL | Impaired | Entitled to Vote |
| D4 | NADL 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| D5 | Interests in NADL | Impaired | Not Entitled to Vote (Deemed to Reject) |
| *Claims against Other NADL Debtors* | | | |
| E1 | Credit Agreement Claims against Other NADL Debtors | Impaired | Entitled to Vote |
| E2 | General Unsecured Claims against Other NADL Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| E3 | Interests in Other NADL Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| *Claims against Sevan* | | | |
| F1 | ~~Secured~~ Credit Agreement Claims against Sevan | Impaired | Entitled to Vote |
| F2 | Sevan Second Lien Claim | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| F3 | General Unsecured Claims against Sevan | Impaired | Entitled to Vote |
| F4 | Sevan 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| F5 | Interests in Sevan | Impaired | Not Entitled to Vote (Deemed to Reject) |
| *Claims against Other Sevan Debtors* | | | |
| G1 | Credit Agreement Claims against Other Sevan Debtors | Impaired | Entitled to Vote |
| G2 | General Unsecured Claims against Other Sevan Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| G3 | Interests in Other Sevan Debtors | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

**D. What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to holders of Claims or Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan. As used in describing the treatment of holders of Interests in Classes B5, D5, and F5, "extinguished" means extinguishment of the economic interests pursuant to Bermuda law; the shares representing such Interests will not themselves be extinguished under Bermuda law.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE**

DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[4]

Certain holders of Claims, including holders of Credit Facility Claims in Classes B1-a, B1-b, B1-c, B1-d, B1-e, B1-f, B1-g, B1-h, B1-i, B1-j, B1-k, B1-L C1-a, C1-b, C1-c, C1-d, C1-e, C1-f, C1-g, C1-h, C1-i, C1-j, D1, E1, F1, and G1 and holders of Guarantee Facility Claims in Class B2 are projected to receive new debt equal in face amount to the amounts outstanding under the Prepetition Credit Facilities, based on their participation in the respective Amended Credit Facilities and Amended Guarantee Facility.  Such holders are nonetheless Impaired and entitled to vote to accept or reject the Plan.  Under the Plan, such holders will receive their Pro Rata share of certain amended credit facilities, which amendments will include reduced amortization obligations, extended maturities, altered collateral packages, and certain additional covenant relief.  While the Plan does not contemplate a reduction in principal amount of such credit facilities from prepetition amounts outstanding, the foregoing nonetheless constitute impairment under the Bankruptcy Code.  Thus, holders of Claims in such classes are entitled to vote to accept or reject the plan.

For the avoidance of doubt, and for illustrative purposes only, the numbers listed in the "Projected Amount of Claims" column in the summary table below for (a) Classes B1-a, B1-b, B1-c, B1-d, B1-e, B1-f, B1-g, B1-h, B1-i, C1-a, C1-b, C1-c, C1-d, C1-e, C1-f, C1-g, C1-h, C1-i, C1-j, D1, E1, F1, and G1 are the combined aggregate projected amount of Allowed Credit Agreement Secured Claims and Allowed Credit Agreement Unsecured Claims held by Credit Facility Lenders for the applicable Prepetition Credit Facilities and (b) Classes B3, D3, and F3 do not include any claim estimates for Credit Facility Unsecured Claims for purposes of calculating claim recovery levels.  Holders of Credit Facility Unsecured Claims have agreed, solely with respect to such Credit Agreement Unsecured Claims, to forgo their right to receive their Pro Rata share of any recovery on account of any General Unsecured Claims in Classes B3, D3, and F3.  The following table is for summary purposes only and is not an admission as to the actual aggregate amount of Credit Facility Secured Claims or Credit Facility Unsecured Claims contained in any of the Classes referenced in this Disclosure Statement.  In accordance with the terms of the Plan all Credit Agreement Secured Claims and Credit Agreement Unsecured Claims held by Credit Facility Lenders will be Allowed in full and such Credit Facility Lenders will be authorized to vote the full amount of any Credit Agreement Secured Claims or Credit Agreement Unsecured Claims held against any debtor, regardless of whether such claims have been specifically quantified as of the applicable Voting Deadline.

Holders of General Unsecured Claims in classes B3, D3, and F3 will receive their pro rata share of the Unsecured Pool Equity (15 percent of the New Seadrill common shares, subject to dilution by the Employee Incentive Plan and Primary Structuring Fee).  In addition, each holder of General Unsecured Claims, other than (x) any Initial Commitment Party solely with respect to Allowed General Unsecured Claims as of September 12, 2017, (y) any new Commitment Party solely with respect to Allowed General Unsecured Claims held by such party as of January 5, 2018, or (z) any Permitted Transferee solely with respect to such Allowed General Unsecured Claims referenced in the immediately preceding clauses (x) and (y) shall also receive their pro rata share of the Unsecured Pool Recovery Cash and if they are an Eligible Holder their pro rata share of the Note Rights ($119 million) and Equity Rights ($48 million).  The Commitment Parties hold approximately 70% of the total unsecured notes of the Debtors.

Holders of General Unsecured Claims in classes B3, D3, and F3 who are not Note Eligible Holders or Equity Eligible Holders or whose claims are not Allowed by the Subscription Expiration Deadline will not have the opportunity to subscribe to the Note Rights or the Equity Rights.  The Debtors anticipate that the launch of the subscription period for the rights offerings will commence approximately 14 days after Confirmation, and continue for approximately 30 days.  The rights offerings must be fully funded at the

---

[4]   The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed (as defined in the Plan) as well as other factors related to the Debtors' business operations and general economic conditions.

time of the Debtors' emergence from chapter 11, thus any restrictions on participation are reasonable. The Debtors believe that all potentially eligible holders will have a fair opportunity to participate in the rights offerings under the Plan. The Plan provides that Holders of General Unsecured Claims in classes B3, D3, and F3 who are not Note Eligible Holders or Equity Eligible Holders, to the extent they submit the appropriate certification, will receive cash in amount equal to either 7 percent or 10 percent of their Allowed General Unsecured Claim, depending on whether such holder resides in the United States, provided that the aggregate amount of cash paid to such holders may not exceed $23 million. Further information regarding participation in the rights offerings under the Plan is set forth in the Equity Rights Offering Procedures and Notes Rights Offering Procedures attached to this Disclosure Statement as **Exhibit E1 and Exhibit E2.**

The right of the indenture trustees under the Debtors' unsecured bonds to assert a charging lien on account of fees and expenses incurred in connection with these chapter 11 cases, including due to their serving as members of the Committee, is not affected by the Plan. In the event the indenture trustees elect to assert such a charging lien on the proceeds from distributions to holders of unsecured bonds under the plan, recoveries to holders of such unsecured bonds may be reduced. However, to facilitate the holders of Unsecured Note Claims to receive the full treatment set forth in the Plan without reduction by charging liens or Indenture Trustee Fees under the respective indentures or bond agreements, the Debtors or the Reorganized Debtors shall, on account of Unsecured Note Claims, pay to the Indenture Trustee under the applicable indenture or bond agreement, an amount in Cash equal to the Indenture Trustee Fees owed to the respective Indenture Trustee that are incurred and invoiced prior to the Effective Date, which amounts shall be paid and deducted from the Unsecured Pool Cash. To the extent such fees and expenses are paid on the Effective Date, the Indenture Trustees will not withhold distributions for such amounts, provided that nothing in the Plan shall prevent the Indenture Trustees from exercising their respective charging liens over cash distributions for any other amounts, including fees and expenses that may be incurred or invoiced after the Effective Date and not reimbursed by the Debtors pursuant to the Plan.

The Debtors have not conducted a comprehensive intercompany claims analysis that demonstrates the basis for holders of General Unsecured Claims in Class D3 receiving 70 percent of their Pro Rata share of the distributions. Because (a) the allocation was arrived at as part of a settlement by the Commitment Parties, (b) any downward adjustment to the distribution to Class D3 likely would have an insignificant net effect upon the distribution to general unsecured creditors in other classes, and (c) a full analysis would be an inefficient use of the estate resources, the Committee has agreed to the allocation in the context of a global settlement.

The Debtors have not conducted a comprehensive intercompany claims analysis or an entity by entity valuation analysis. The Debtors, however, believe that the settlement of the recoveries allocable to holders of General Unsecured Claims at each Debtor is fair and reasonable and satisfies the requirements for approval under Bankruptcy Rule 9019 and applicable confirmation standards under section 1129 of the Bankruptcy Code because (a) the treatments, as reflected in the Plan, were the subject of good faith settlement negotiations between the Debtors and the applicable Restructuring Support Agreement parties, both pre- and post-petition, (b) the settlement avoids the costs and expenses of conducting a full analysis of Intercompany Claims and (c) the settlement is otherwise supported by the facts and circumstances of these Chapter 11 Cases, including the consent of all of the Debtors' major creditor constituencies, including the Bank CoCom, the Commitment Parties, the Committee, and the Newbuild Counterparties, who together hold the significant majority of claims against the Debtors.

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable,

shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.  Projected Claims included in the summary table below reflect the Debtors' analysis of all proofs of claim filed as of the Claims Bar Date on January 3, 2018.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery Under the Plan[5]** |
| | | *Other Claims* | | |
| A1 | Other Secured Claims | Each holder of an Allowed Other Secured Claim shall receive as determined by the Debtors or the Reorganized Debtors, as applicable:  (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $0 | N/A |
| A2 | Other Priority Claims | Each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim. | $0 | N/A |
| A3 | Intercompany Claims | Intercompany Claims shall be, at the election of the applicable Debtor, be (a) Reinstated or (b) released.[6] | N/A | 100% / 0% |
| | | *Claims against Seadrill Limited* | | |
| B1-a | $1.5B Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Each holder of an Allowed Class B1-a Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended $1.5B Credit Agreement in principal amount equal to the amount of its Allowed Class B1-a Claims. | $1,125.0 million | 90% – 92%[7] |
| B1-b | $483MM | Each holder of an Allowed Class B1-b Claim shall receive its Pro | $322.2 | 90% – |

---

[5]   The low and high ranges included in projected recoveries correspond to the valuation range in the analysis performed by Houlihan Lokey and attached hereto as **Exhibit H**.

[6]   If the Debtors choose to reinstate an intercompany claim, the relevant holder of an Allowed Intercompany Claim is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  If the Debtors release an intercompany claim, the relevant holder of an Allowed Intercompany Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and will not receive any distribution under the Plan.

The Seadrill Partners Entities (as defined below) believe that the Disclosure Statement does not contain adequate information concerning the treatment of Class A3 Intercompany Claims.  Specifically, the Seadrill Partners Entities assert that the Disclosure Statement fails to provide adequate information regarding the timing and basis for the Debtors' election to either release or reinstate Intercompany Claims.  The Seadrill Partners Entities have requested, and the Debtors have agreed, to provide adequate information to the Seadrill Partners Entities in connection with the proposed treatment of Class A3 Intercompany Claims by no later than 14 business days before objections to confirmation of the Plan are due to be filed with the Bankruptcy Court.  The Seadrill Partners Entities reserve all of their rights to object to confirmation of the Plan or any other plan of reorganization proposed in these cases on any and all grounds.

[7]   The projected recoveries on account of the Credit Facility Claims reflect the average estimated market value of the Amended Credit Facilities based on the proposed terms.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan[5] |
| | Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Rata share of participation in the Amended Credit Facility under the Amended $483MM Credit Agreement in a principal amount equal to its Allowed Class B1-b Claims. | million | 92% |
| B1-c | $450MM Eminence Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Each holder of an Allowed Class B1-c Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended $450MM Eminence Credit Agreement in a principal amount equal to the amount of its Allowed class B1-c Claims. | $264.7 million | 90% – 92% |
| B1-d | $1.35B Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Each holder of an Allowed Class B1-d Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended $1.35B Credit Agreement in a principal amount equal to the amount of its Allowed class B1-d Claims. | $945 million | 90% – 92% |
| B1-e | $950MM Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Each holder of an Allowed Class B1-e Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended $950MM Credit Agreement in a principal amount equal to the amount of its Allowed class B1-e Claims. | $566.1 million | 90% – 92% |
| B1-f | $450MM Nordea Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Each holder of an Allowed Class B1-f Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended $450MM Nordea Credit Agreement in a principal amount equal to the amount of its Allowed class B1-f Claims. | $102.5 million | 90% – 92% |
| B1-g | $440MM Credit Agreement ~~Secured~~ Claims against Seadrill | Each holder of an Allowed Class B1-g Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended $440MM Credit Agreement in a principal amount equal to the amount of its Allowed class B1-g Claims. | $64.1 million | 90% – 92% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan[5] |
| | Limited | | | |
| B1-h | $400MM Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Each holder of an Allowed Class B1-h Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended $400MM Credit Agreement in a principal amount equal to the amount of its Allowed class B1-h Claims. | $135.1 million | 90% – 92% |
| B1-i | $300MM Credit Agreement ~~Secured~~ Claims against Seadrill Limited | Each holder of an Allowed Class B1-i Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended $300MM Credit Agreement in a principal amount equal to the amount of its Allowed class B1-i Claims. | $144 million | 90% – 92% |
| B1-j | AOD Credit Agreement Guarantee Claims against Seadrill Limited | On the Effective Date, each holder of an Allowed Class B1-j Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended AOD Credit Agreement in a principal amount equal to the amount of its Allowed Class B1-j Claims. | $210 million | 90% – 92% |
| B1-k | NADL Credit Agreement Guarantee Claims against Seadrill Limited | On the Effective Date, each holder of an Allowed Class B1-k Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended NADL Credit Agreement in a principal amount equal to the amount of its Allowed Class B1-k Claim. | $908.3 million | 90% – 92% |
| B1-l | Sevan Credit Agreement Guarantee Claims against Seadrill Limited | On the Effective Date, each holder of an Allowed Class B1-l Claim shall receive its Pro Rata share of participation in the Amended Credit Facility entered into pursuant to the Amended Sevan Credit Agreement in a principal amount equal to the amount of its Allowed Class B1-l Claim. | $875.0 million | 90% – 92% |
| B2 | Guarantee Facility Claim against Seadrill Limited | Each holder of an Allowed Guarantee Facility Claim against Seadrill Limited shall receive their Pro Rata share of participation in the Amended Guarantee Facility. | $59.9 million | 100% |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan[5] |
| B3 | General Unsecured Claims against Seadrill Limited | i.    ~~If Class B3 votes to accept the Plan, each~~Each holder of an Allowed General Unsecured Claim against Seadrill Limited ~~(including Allowed Seadrill Limited Unsecured Note Claims, Interest Rate Swap Claims against Seadrill Limited, and Currency Swap Claims against Seadrill Limited, and NADL Guaranteed Unsecured Note Claims)~~ shall receive~~:~~ ~~(A)~~ 100 percent of its Pro Rata share (measured by reference to the Unsecured Pool Denominator) of the Unsecured Pool Equity~~;~~ and~~, (B)~~<br><br>ii.    each holder of an Allowed General Unsecured Claim against Seadrill Limited, other than (x) any Initial Commitment Party solely with respect to Allowed General Unsecured Claims held by such party as of September 12, 2017, (y) any New Commitment Party solely with respect to Allowed General Unsecured Claims held by such party as of January 5, 2018, or (z) any Permitted Transferee solely with respect to such Allowed General Unsecured Claims referenced in the immediately preceding clauses (x) and (y) shall also | ~~Low Case:[8]~~ ~~$2,216~~$3,280 million<br><br>~~Mid Case:~~ ~~$3,045 million~~<br><br>~~High Case:~~ ~~$3,873 million[9]~~ | ~~Low Case:[10]~~ 32% – ~~46~~7%[11]<br><br>~~Mid Case:~~ ~~22% – 33%~~<br><br>~~High Case:~~ ~~18% – 26%~~ |

---

[8]    ~~As described below, the Projected Amount of Claims for Class B3 includes an illustrative range of potential claim amounts on account of certain potential obligations under the Debtors' newbuild contracts.  Additionally the Projected Amount of Claims for Class B3 does not include any amounts on account of guarantees of certain Seabras funded debt obligations or amounts in respect of the applicable Debtor's obligations under letters of undertaking and other agreements entered into in connection with the PLSV I Facility and PSLV II Facility (each as defined below) that could potentially give rise to liability. Additional information is provided in Article III.K of this Disclosure Statement, entitled "Will the final amount of Allowed Unsecured Claims affect the recovery of holders of Allowed Unsecured Claims Entitled to Vote under the Plan?," which begins on page 20.~~

[9]    The Projected Amount of Claims for Class B3 includes an aggregate claim amount of $1.064 billion in favor of the Newbuild Counterparties, which is part of the global settlement described herein.  Additionally the Projected Amount of Claims for Class B3 does not include any amounts on account of guarantees of certain Seabras funded debt obligations or amounts in respect of the applicable Debtor's obligations under letters of undertaking and other agreements entered into in connection with the PLSV I Facility and PSLV II Facility (each as defined below) that could potentially give rise to liability.  Additional information is provided in Article III.K of this Disclosure Statement, entitled "Will the final amount of Allowed Unsecured Claims affect the recovery of holders of Allowed Unsecured Claims (excluding the Commitment Parties) Entitled to Vote under the Plan?," which begins on page 20.

[10]    ~~The projected recovery of class B3 (including each of the low, mid, and high cases) reflects the recovery levels to holders of unsecured claims who are not signatories to the RSA and includes the in-the-money value of the Rights Offering.~~

[11]    The projected recovery of class B3 reflects the recovery levels to holders of unsecured claims who are not signatories to the RSA and includes the in-the-money value of the rights offerings, in which the Commitment Parties have agreed not to participate solely in respect of (x) Allowed General Unsecured Claims held by any any Initial Commitment Party oas of September 12, 2017, (y) Allowed General Unsecured Claims held by any New Commitment Party as of January 5, 2018, or (z) Allowed General Unsecured Claims referenced in the immediately preceding clauses (x) and (y) of any Permitted Transferee.

| | | | | |
|---|---|---|---|---|
| | | receive 100 percent of its Pro Rata share (measured by reference to the Unsecured Pool Denominator) of:<br><br>A.   the Unsecured Pool Recovery Cash; and<br><br>~~A.~~B.          if such holder's General Unsecured Claim is Allowed in a liquidated, non-contingent amount prior to the Subscription Expiration Deadline ~~(as defined in the Rights Offering Procedures),~~ such holder's General Unsecured Claim is not the subject of an unresolved objection to the allowance thereof as of the Subscription Expiration Deadline, and such holder is ~~an Eligible Holder, it shall also receive 100 percent of its Pro Rata share (measured by reference to the Eligible Holder Denominator) of (1) the Note Rights and (2) the Equity Rights; _provided, however_, that the Commitment Parties and any Permitted Transferee of Claims against or Interest in the Debtors as of the RSA Effective Date) have agreed not to receive the Note Rights and Equity Rights on account of any General Unsecured Claims against Seadrill held by such Commitment Parties as of the RSA Effective Date.~~:<br><br>•   ~~**If Class B3 votes to reject the Plan**, each holder of an Allowed General Unsecured Claim against Seadrill Limited shall receive the Liquidation Recovery, unless otherwise ordered by the Bankruptcy Court.~~<br><br>I.   ~~_provided, however_, that the holders of Credit Agreement Unsecured Claims against Seadrill Limited have agreed to forgo their right to receive their Pro Rata share of any recovery on account of such Credit Agreement Unsecured Claims against Seadrill Limited (but not, for the avoidance of doubt, any other General Unsecured Claims or under any other plan of reorganization or alternative restructuring); _provided further_, that, for the avoidance of doubt, holders of Credit Agreement Unsecured Claims against Seadrill Limited shall be entitled to vote to accept or reject the Plan on account of such Claims.~~a Note Eligible Holder, the Note Rights; and/or<br><br>II.  an Equity Eligible Holder, the Equity Rights;<br><br>_provided, however_ that if such holder is a Certified Non-Eligible Holder, it shall receive, subject to Article III.I of the Plan, Cash in an amount equal to: (A) 7 percent of such holder's General Unsecured Claim, if such holder is not a Note Eligible Holder; or (B) 10 percent of such holder's General Unsecured Claim, if such holder is not an Note Eligible Holder and not an Equity Eligible holder. | | |
| B4 | Seadrill Limited 510(b) Claims | ~~If~~if **Class B3 votes to accept the Plan**, each holder of an Allowed Seadrill Limited 510(b) Claim shall receive its Pro Rata share ~~of the Equity Recovery.~~ (measured by reference to the aggregate amount of Allowed Seadrill Limited 510(b) Claims | $0 | N/A |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan[5] |
| | | and Allowed Interests in Seadrill Limited) of the Equity Recovery; and<br><br>~~If~~if **Class B3 votes to reject the ~~p~~Plan**, each holder of an Allowed Seadrill Limited 510(b) Claim shall not receive or retain any distribution, property, or other value on account of their Seadrill Limited 510(b) Claims. | | |
| B5 | Interests in Seadrill Limited | ~~All Interests in Seadrill Limited will be extinguished in accordance with the Description of the Transaction Steps and:~~<br><br>~~If~~if **Class B3 votes to accept the Plan**, each holder of an Allowed Interest in Seadrill Limited shall receive its Pro Rata share ~~of the Equity Recovery.~~ (measured by reference to the aggregate amount of Allowed Seadrill Limited 510(b) Claims and Allowed Interests in Seadrill Limited) of the Equity Recovery; and<br><br>if **Class B3 votes to reject the ~~p~~Plan**, each holder of an Allowed Interest in Seadrill Limited shall not receive or retain any distribution, property, or other value on account of its Interest in Seadrill Limited. | N/A | N/A |
| | | *Claims against Other Seadrill Debtors* | | |
| C1-a | $1.5B Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-a Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended $1.5B Credit Agreement in a principal amount equal to ~~(i)~~ the amount of its Allowed Class C1-a Claim ~~less (ii) the principal amount of its participation received on account of its Class B1-a Claims, if any.~~ | $1,125.0 million | 90% – 92% |
| C1-b | $483MM Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-b Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended $483MM Credit Agreement in a principal amount equal to ~~(i)~~ the amount of its Allowed Class C1-b Claim ~~less (ii) the principal amount of its participation received on account of its Class B1-b Claims, if any.~~ | $322.2 million | 90% – 92% |
| C1-c | $450MM Eminence Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-c Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended $450MM Eminence Credit Agreement in a principal amount equal to ~~(i)~~ the amount of its Allowed Class C1-c Claim ~~less (ii) the principal amount of its participation received on account of its Class B1-c Claims, if any.~~ | $264.7 million | 90% – 92% |
| C1-d | $1.35B Credit Agreement | Each holder of an Allowed Class C1-d Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under | $945 million | 90% – 92% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan[5] |
| | Claims against Other Seadrill Debtors | the Amended $1.35B Credit Agreement in a principal amount equal to ~~(i)~~ the amount of its Allowed Class C1-d Claim less ~~(ii) the principal amount of its participation received on account of its Class B1-d Claims, if any~~. | | |
| C1-e | $950MM Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-e Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended $950MM Credit Agreement in a principal amount equal to ~~(i)~~ the amount of its Allowed Class C1-e Claim less ~~(ii) the principal amount of its participation received on account of its Class B1-e Claims, if any~~. | $566.1 million | 90% – 92% |
| C1-f | $450MM Nordea Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-f Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended $450MM Nordea Credit Agreement in a principal amount equal to ~~(i)~~ the amount of its Allowed Class C1-f Claim less ~~(ii) the principal amount of its participation received on account of its Class B1-f Claims, if any~~. | $102.5 million | 90% – 92% |
| C1-g | $440MM Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-g Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended $440MM Credit Agreement in a principal amount equal to ~~(i)~~ the amount of its Allowed Class C1-g Claim ~~less (ii) the principal amount of its participation received on account of its Class B1-g Claims, if any~~. | $64.1 million | 90% – 92% |
| C1-h | $400MM Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-h Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended $400MM Credit Agreement in a principal amount equal to ~~(i)~~ the amount of its Allowed Class C1-h Claim ~~less (ii) the principal amount of its participation received on account of its Class B1-h Claims, if any~~. | $135.1 million | 90% – 92% |
| C1-i | $300MM Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-i Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended $300MM Credit Agreement in a principal amount equal to ~~(i)~~ the amount of its Allowed Class C1-i Claim ~~less (ii) the principal amount of its participation received on account of its Class B1-i Claims, if any~~. | $144 million | 90% – 92% |
| C1-j | Prepetition AOD Credit Agreement Claims against Other Seadrill Debtors | Each holder of an Allowed Class C1-j Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended AOD Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class C1-j Claim. | $210 million | 90% – 92% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan[5] |
| C2 | General Unsecured Claims Against Other Seadrill Debtors other than the Newbuild Debtors and Seadrill UK Ltd. | ~~Each~~On the Effective Date, each holder of an Allowed General Unsecured Claim against an Other Seadrill Debtor other than the Newbuild Debtors and Seadrill UK Ltd. shall, at the election of the applicable Debtor, be (a)  Reinstated or (b) paid in full in Cash.~~-~~ | $3.8 million | 100% |
| C3 | General Unsecured Claims against the Newbuild Debtors and Seadrill UK Ltd. | On the Effective Date, each holder of an Allowed General Unsecured Claim against a Newbuild Debtor or Seadrill UK Ltd. shall receive its Pro Rata share of Cash in an amount equal to such holder's Liquidation Recovery. | $1,064 million | 0%[12] |
| ~~C3~~C4 | Interests in Other Seadrill Debtors | Each holder of an Allowed Interest in an Other Seadrill Debtor shall be Reinstated. | N/A | 100% |
| | | *Claims against NADL* | | |
| D1 | Credit Agreement Claim against NADL | Each holder of an Allowed Class D1 Claim shall receive its Pro Rata share of participation in the Amended Credit Facility under the Amended NADL Credit Agreement in principal amount equal to the amount of its Allowed Class D1 Claims. | $908.3 million | 90% – 92% |
| D2 | NADL Revolving Loan Claim | The holder of the NADL Revolving Loan Claim shall, at the election of NADL, be (a) Reinstated or (b) released. | $155.0 million | 100%/0% |
| D3 | General Unsecured Claims against NADL | i.   ~~If Class D3 votes to accept the Plan, each~~Each holder of an Allowed General Unsecured Claim against NADL ~~(including NADL Guaranteed Unsecured Note Claims and NADL Non-Guaranteed Unsecured Note Claims)~~ shall receive:~~  (A)~~  70 | $673.0 million[14] | ~~Low Case:~~[15] ~~22% – 32%~~ |

---

[12]   The Newbuild Debtors and Seadrill UK Ltd. are non-operating entities have *de minimis* assets available for distribution, accordingly, Class C3 recoveries are expected to be essentially zero.

[14]   Holders of Unsecured Note Claims with recourse against both NADL and Seadrill Limited will recover as members of both Classes B3 and D3, for a total projected recovery under the Plan of ~~54% – 79% (low case), 39% – 57% (mid case), or 31% – 45% (high case).~~55% to 79%.

[15]   ~~The projected recovery of class D3 reflects the recovery levels to holders of unsecured claims who are not signatories to the RSA and includes the in-the-money value of the Rights Offering.~~

percent[13] of its Pro Rata share (measured by reference to the Unsecured Pool Denominator) of the Unsecured Pool Equity; and, (B)

ii.   each holder of an Allowed General Unsecured Claim against NADL, other than (x) any Initial Commitment Party solely with respect to Allowed General Unsecured Claims held by such party as of September 12, 2017, (y) any New Commitment Party solely with respect to Allowed General Unsecured Claims held by such party as of January 5, 2018, or (z) any Permitted Transferee solely with respect to such Allowed General Unsecured Claims referenced in the immediately preceding clauses (x) and (y) shall also receive 70 percent of its Pro Rata share (measured by reference to the Unsecured Pool Denominator) of:

A.   the Unsecured Pool Recovery Cash; and

A.B.      if such holder's General Unsecured Claim is Allowed in a liquidated, non-contingent amount prior to the Subscription Expiration Deadline (as defined in the Rights Offering Procedures), such holder's General Unsecured Claim is not the subject of an unresolved objection to the allowance thereof as of the Subscription Expiration Deadline, and such holder is an Eligible Holder, it shall also receive 70 percent of its Pro Rata share (measured by reference to the Eligible Holder Denominator) of (1) the Note Rights and (2) the Equity Rights; provided, however, that the Commitment Parties and any Permitted Transferee of Claims against or Interests in the Debtors as of the RSA Effective Date have agreed not to receive the Note Rights and Equity Rights on account of any General Unsecured Claims against NADL held by such Commitment Parties as of the RSA Effective Date.;

• **If Class D3 votes to reject the Plan,** each holder of an Allowed General Unsecured Claim against NADL shall receive the Liquidation Recovery, unless otherwise ordered by the Bankruptcy Court.

I.   provided, however, that the holders of Credit Agreement Unsecured Claims against NADL have agreed to forgo their right to receive their Pro Rata share of any recovery on account of such Credit Agreement Unsecured Claims against NADL (but not, for the avoidance of doubt, any other General Unsecured Claims or under any other plan of reorganization or alternative restructuring); provided, further, that, for the avoidance of doubt, holders of Credit Agreement Unsecured Claims shall be entitled to vote to accept or reject the Plan on account of such Claims. a Note Eligible Holder, the Note Rights; and/or

| |
|---|
| **Mid Case:** 16% 23% – 33%[16] |
| **High Case:** 13% 18% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan[5] |
| | | II. an Equity Eligible Holder, the Equity Rights; _provided, however_ that if such holder is a Certified Non-Eligible Holder, it shall receive, subject to Article III.I of the Plan, Cash in an amount equal to: (A) 7 percent of such holder's General Unsecured Claim, if such holder is not a Note Eligible Holder; or (B) 10 percent of such holder's General Unsecured Claim, if such holder is not an Note Eligible Holder and not an Equity Eligible holder. | | |
| D4 | NADL 510(b) Claims | Each holder of an Allowed NADL 510(b) Claim shall not receive or retain any distribution, property, or other value on account of their Seadrill Limited 510(b) Claims. | 0% | N/A |
| D5 | Interests in NADL | Each Interest in NADL shall be extinguished in accordance with the Description of the Transaction Steps and each holder of such Interest in NADL shall not receive or retain any distribution, property, or other value on account of its Interest in NADL. | N/A | 0% |
| | | _Claims against Other NADL Debtors_ | | |
| E1 | Credit Agreement Claims against Other NADL Debtors | On the Plan Effective Date, each holder of an allowed Credit Agreement Claim against an Other NADL Debtor shall receive its pro rata participation in the Amended Credit Facility under the Amended NADL Credit Agreement in a principal amount equal to (i) the amount of its Allowed Class E1 Claim less (ii) the principal amount of its participation received on account of its Class D1 Claims, if any. | $908.3 million | 90% – 92% |
| E2 | General Unsecured Claims against Other NADL | On the Plan Effective Date, each holder of an allowed General Unsecured Claim against an Other NADL Debtor shall, at the election of the applicable Debtor, be (a) Reinstated or (b) paid in full in Cash. | $1.7 million | 100% |

---

[13]   Holders of General Unsecured Claims in Class D3 will receive 70 percent of their Pro Rata share of the Unsecured Pool Equity, Note Rights, and Equity Rights as a result of the fact that holders of General Unsecured Claims are entitled to lesser recoveries under the Debtors' Liquidation Analysis, attached hereto as **Exhibit F**.  As a result of prepetition negotiations among the Debtors and parties to the Restructuring Support Agreement, the Debtors agreed to provide for a 70 percent recovery level to holders of General Unsecured Claims in Class D3.  The Debtors believe that such resolution is reasonable under the circumstances and satisfies applicable confirmation standards.

The Committee asserts the Debtors have not conducted a comprehensive intercompany claims analysis that demonstrates the basis for Holders of General Unsecured Claims in Class D3 receiving 70% of their Pro Rata Share of the distributions. Because (a) the allocation was arrived at as part of a settlement by the Commitment Parties, (b) any downward adjustment to the distribution to Class D3 likely would have an insignificant net effect upon the distribution to general unsecured creditors in other classes, and (c) a full analysis would be an inefficient use of the estate resources, the Committee has agreed to the allocation in the context of a global settlement.

[16]   The projected recovery of class D3 reflects the recovery levels to holders of unsecured claims who are not signatories to the RSA and includes the in-the-money value of the Rights Offering.

23

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan[5] |
| | Debtors | | | |
| E3 | Interests in Other NADL Debtors | On the Plan Effective Date, each allowed Interest in an Other NADL Debtor shall be Reinstated. | N/A | 100% |
| | | *Claims against Sevan* | | |
| F1 | Credit Agreement Claims against Sevan | Each holder of an Allowed Class F1 Claim shall receive its Pro Rata ~~share of~~ participation in the Amended Sevan Credit Facility entered into pursuant to the Amended Sevan Credit Agreement in a principal amount of its Allowed Class F1 Claim. | N/A[17] | 90% – 92% |
| F2 | Sevan Second Lien Claim | All Sevan Second Lien Claims shall, at the election of Sevan, be (a) Reinstated or (b) released | $217.5 million | 100%/0% |
| F3 | General Unsecured Claims against Sevan | i.   ~~If Class F3 votes to accept the Plan, each~~Each holder of an Allowed General Unsecured Claim against Sevan shall receive~~: (A)~~ 70 percent[18] of its Pro Rata share (measured by reference to the Unsecured Pool Denominator) of the Unsecured Pool Equity~~; and (B)~~ released<br><br>ii.   each holder of an Allowed General Unsecured Claim against Sevan, other than (x) any Initial Commitment Party solely with respect to Allowed General Unsecured Claims held by such party as of September 12, 2017, (y) any New Commitment Party solely with respect to Allowed General Unsecured Claims held by such party as of January 5, 2018], or (z) any Permitted Transferee solely with respect to such Allowed General Unsecured Claims referenced in the immediately preceding clauses (x) and (y) shall also receive 70 percent of its Pro Rata share (measured by reference to the Unsecured Pool Denominator) of:<br><br>A.   the Unsecured Pool Recovery Cash; and<br><br>~~A.~~B.   if such holder's General Unsecured Claim is Allowed in a liquidated, non-contingent amount prior to the Subscription Expiration Deadline ~~(as defined in the Rights Offering Procedures)~~, such holder's General Unsecured Claim is not the subject of an unresolved | $0 | N/A |

---

[17]   For the avoidance of doubt, while Sevan does not provide a guarantee under the Prepetition Sevan Credit Agreement, it does provide certain security in favor of the Credit Facility Lenders under the Prepetition Sevan Credit Agreement. Accordingly, such Credit Facility Lenders hold a Claim against Sevan for purposes of voting to accept or reject the Plan at Sevan.

[18]   Holders of General Unsecured Claims in Class F3 will receive 70 percent of their Pro Rata share of the Unsecured Pool Equity, Note Rights, and Equity Rights as a result of the fact that holders of General Unsecured Claims are entitled to lesser recoveries under the Debtors' Liquidation Analysis, attached hereto as **Exhibit F**. As a result of prepetition negotiations among the Debtors and parties to the Restructuring Support Agreement, the Debtors agreed to provide for a 70 percent recovery level to holders of General Unsecured Claims in Class F3.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan[5] |
| | | objection to the allowance thereof as of the Subscription Expiration Deadline, and such holder is ~~an Eligible Holder, it shall also receive 70 percent of its Pro Rata share (measured by reference to the Eligible Holder Denominator) of (1) the Note Rights and (2) the Equity Rights; *provided, however*, that the Commitment Parties Commitment Parties and any Permitted Transferee of Claims against or Interests in the Debtors as of the RSA Effective Date have agreed not to receive the Note Rights and Equity Rights on account of any General Unsecured Claims against Sevan held by such Commitment Parties as of the RSA Effective Date.~~. <br><br> • ~~**If Class F3 votes to reject the Plan**, each holder of an Allowed General Unsecured Claim against Sevan shall receive the Liquidation Recovery, unless otherwise ordered by the Bankruptcy Court.~~ <br><br> I. ~~*provided, however*, that the holders of Credit Agreement Unsecured Claims against Sevan have agreed to forgo their right to receive their Pro Rata share of any recovery on account of such Credit Agreement Unsecured Claims against Sevan (but not, for the avoidance of doubt, any other General Unsecured Claims or under any other plan of reorganization or alternative restructuring); *provided, further*, that, for the avoidance of doubt, holders of Credit Agreement Unsecured Claims against Sevan shall be entitled to vote to accept or reject the Plan on account of such Claims.~~a Note Eligible Holder, the Note Rights; and/or <br><br> II. an Equity Eligible Holder, the Equity Rights; <br><br> *provided, however* that if such holder is a Certified Non-Eligible Holder, it shall receive, subject to Article III.I of the Plan, Cash in an amount equal to: (A) 7 percent of such holder's General Unsecured Claim, if such holder is not a Note Eligible Holder; or (B) 10 percent of such holder's General Unsecured Claim, if such holder is not an Note Eligible Holder and not an Equity Eligible holder. | | |
| F4 | Sevan 510(b) Claims | Each holder of an Allowed Sevan 510(b) Claim shall not receive or retain any distribution, property, or other value on account of their Sevan 510(b) Claims. | $0 | N/A |
| F5 | Interests in Sevan | Each holder of an Interest in Sevan will be extinguished and shall not receive or retain any distribution, property, or other value on | N/A | 0% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan[5] |
| | | account of its Interest in Sevan. | | |
| | | *Claims against Other Sevan Debtors* | | |
| G1 | Sevan Credit Agreement Subsidiary Claims | Each holder of an Allowed Class G1 Claim shall receive its Pro Rata participation in the Amended Sevan Credit Facility  entered into pursuant to the Amended Sevan Credit Agreement in a principal amount of its Allowed Class G1 Claim.. | $875.0 million | 90% – 92% |
| G2 | General Unsecured Claims against Other Sevan Debtors | Each holder of an Allowed General Unsecured Claim against an Other Sevan Debtor shall, at the election of the applicable Debtor, be (a) Reinstated or (b) paid in full in Cash. | $0 | N/A |
| G3 | Interests in Other Sevan Debtors | Each Allowed Interest in an Other Sevan Debtor shall be Reinstated. | N/A | 100% |

### E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article III of the Plan.

#### 1.    Administrative Claims

Administrative Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein. Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in Article II.A of the Plan, and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Administrative Claims must be Filed with

the Bankruptcy Court and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date, holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors and the requesting party no later than 60 days after the Effective Date.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

### 2.    Priority Tax Claims

Priority Tax Claims will be satisfied as set forth in Article II.C of the Plan, as summarized herein. Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

### F.    Will my treatment change under the Plan?

As described herein, the Debtors ~~are~~have engaged in ~~the midst of~~ a postpetition marketing ~~process. Additionally, the Debtors are in~~ and comprehensive settlement discussions with certain parties in interest. ~~As described above, Barclays and the Ad Hoc Group have both submitted proposals that contemplated their participation in the Debtors' restructuring transaction.   To the extent the Debtors elect to implement either proposal or implement a settlement with the Creditors' Committee or other unsecured creditor constituency, it is possible that the treatment for holders of General Unsecured Claims in Classes B3, D3, and F3 will change.   The Debtors anticipate that any such change would be neutral or beneficial to holders of General Unsecured Claims in Classes B3, D3, and F3.~~

~~Notably, the~~The Debtors are not aware of any actionable alternative or settlement proposal at this time that would result in greater recoveries to holders of Claims and Interests than those described herein. ~~Each of the~~ Moreover, the Plan now embodies a global resolution supported by the Committee, the Ad Hoc Group, Barclays, and ~~Ad Hoc Group proposals would require certain consents of non-debtor third~~the Restructuring Support Agreement parties ~~that the parties have not yet secured.  Thus, the~~.  In light of the global settlement, the Ad Hoc Group and Barclays are no longer pursuing their standalone bids submitted in connection with the Debtors' marketing process.  The Debtors continue to believe that the Plan represents the most feasible, highest and otherwise best, value-maximizing alternative.  For all of these reasons, the Debtors recommend that you vote to accept the Plan.

### G.    Are any regulatory approvals required to consummate the Plan?

There are no known U.S. regulatory approvals that are required to consummate the Plan.  However, to the extent such any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**H.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 103, and the Liquidation Analysis attached hereto as **Exhibit F**.

**I.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article ~~XI~~XI of this Disclosure Statement, entitled "~~Confirmation of the Plan,~~"Confirmation of the Plan" which begins on page 103, for a discussion of the conditions precedent to consummation of the Plan.

**J.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation.  *See* Article VIII.C.11 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases," which begins on page 99.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article VIII.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan," which begins on page 88.

As described herein, the Debtors and the active constituencies in these chapter 11 cases have arrived at a global settlement under which the Committee and other active unsecured creditor constituencies have agreed to support confirmation of the Plan.

**K.      Will the final amount of Allowed Unsecured Claims affect the recovery of holders of Allowed Unsecured Claims (excluding the Commitment Parties) Entitled to Vote under the Plan?**

The Debtors' estimate of aggregate Allowed General Unsecured Claims against Debtors Seadrill Limited, NADL, and Sevan, and the estimated recovery percentage of such claims under the Plan, is as follows:

| Debtor/Class | Projected Claims | Projected Recovery |
|---|---|---|
| Seadrill Limited — Class B3 | ~~Low Case:~~ | ~~Low Case:~~ |

| Debtor/Class | Projected Claims | Projected Recovery |
|---|---|---|
| | ~~$2,216 million~~ ~~**Mid Case:**~~ $3,045 ~~million~~ ~~**High Case:**~~ ~~$3,873~~280 million | 32~~% 46%~~ ~~**Mid Case:**~~ ~~23% 33%~~ ~~**High Case:**~~ ~~18% 26~~ - 47% |
| NADL — Class D3 | $673.0 million[19] | ~~**Low Case:**~~ ~~22% 32%~~ ~~**Mid Case:**~~ ~~16%~~ 23% ~~**High Case:**~~ ~~13% 18~~ - 33% |
| Sevan — Class F3 | $0 | N/A |

General Unsecured Claims against Debtors other than Seadrill Limited, NADL, ~~and Sevan~~Sevan, the Newbuild Debtors, and Seadrill UK Ltd. will be paid in full in cash on the Effective Date or Reinstated—thus, such claims are unimpaired and not entitled to vote to accept or reject the Plan. Although the Debtors' estimate of Allowed General Unsecured Claims is generally the result of the Debtors' and their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material. The projected amount of General Unsecured Claims set forth herein is subject to change.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to holders of General Unsecured Claims against Seadrill Limited, NADL, and Sevan could change as well, and such changes could be material.

~~The counterparties to certain newbuild Executory Contracts have asserted that the aggregate amount of their potential Claims outstanding against Seadrill Limited is approximately $1.657 billion. The Debtors disagree, although they have not yet reached a conclusion as to the precise amounts of any such claims. Additionally, as described below, the Debtors are in discussions with their newbuild counterparties in hopes of reaching a consensual resolution. To the extent such Allowed Claims are greater than $0, they may decrease the projected recovery percentages under the Plan for Class B3. The summary table above lists projected recovery percentages for holders of Claims in Class B3 taking into account an illustrative range of potential Allowed Claims on account of the Debtors' newbuild executory contracts. These amounts include $0 (low case), $828.5 million (mid case), and $1.657 billion (high case) for such potential newbuild-related General Unsecured Claims. Additional information regarding the Debtors' discussions with their newbuild counterparties is provided in Article VII.L(iii) of this Disclosure Statement, entitled "Newbuilds," which begins on page 68.~~

---

[19]   Holders of Unsecured Note Claims with recourse against both NADL and Seadrill Limited will recover as members of both Classes B3 and D3, for a total projected recovery under the Plan of ~~54% 79% (low case), 39% 57% (mid case), or 31% 45% (high case)~~55 - 79%.

The Newbuild Counterparties have asserted that the aggregate amount of potential Claims outstanding against Seadrill Limited for purposes of assumption of the Newbuild Contracts is not less than $1.657 billion based on the outstanding contract balance of four drillships (not including other contractual amounts due, such as interest, fees, costs, and damages) less the amounts paid to date.  The Debtors disagreed with this amount and, in an effort to reach a settlement, engaged with the Newbuild Counterparties and the Committee regarding a settlement of such claim amount.  As part of the global settlement described herein and reflected in the Plan, and the Newbuild Stipulation, the Debtors and the Newbuild Counterparties have agreed that the Newbuild Counterparties will be entitled to Allowed General Unsecured Claims in the aggregate amount of $1.064 billion against Seadrill Limited (Class B3).  The Newbuild Counterparties will also be entitled to Allowed General Unsecured Claims in the aggregate amount of $1.064 billion against the Newbuild Debtors (Class C3)  The Debtors believe such settlement is reasonable in light of the global settlement embodied in the Plan and in light of the increased certainty regarding the aggregate amount of Class B3 General Unsecured Claims.

Additionally, as described below, the Debtors are in discussions with Sapura (as defined below) their joint venture partner in the Seabras (as defined below) joint venture and Seabras's secured bank lenders regarding the Seadrill Limited guarantees of the PLSV I Facility and PLSV II Facility debt (as described below).and the other obligations applicable to Seadrill under the Seabras Sapura Agreements, including the related letters of undertaking (as described below).  While such discussions are ongoing, a resolution has not been reached and there is no assurance that such a resolution will be reached.  In the absence of a resolution, it is the Debtors' view that Claims arising under such Seadrill Limited guarantees or pursuant to the financial obligations included in the letters of undertaking will be treated as General Unsecured Claims in Class B3.  Since such the Debtors believe that Claims are contingent and unliquidated in nature, the summary table above does not include any amount on account of such potential Allowed Claims.  Moreover, absent a consensual resolution, the proposed treatment of such Claims under the Plan and certain actions contemplated to be taken in connection with the Restructuring Transactions, including the corporate reorganization relating to the Non-Consolidated Entities, if implemented without the requisite waivers and consents in place, will trigger defaults and events of defaults under the relevant Seabras Sapura Agreements and allow the Finance Parties and Secured Parties (as such terms are defined in such agreements) to exercise remedies and take enforcement actions, which will adversely impact any interest that the Debtors have in the Seabras joint venture.   Additional information regarding the Debtors' discussions with Sapura and Seabras's secured bank lenders is provided in Article VII.M(ii) of this Disclosure Statement, entitled "Seabras," which begins on page 83.

Finally, the Debtors, or any official committees appointed in the Chapter 11 CasesCommittee, may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change.  These changes could affect recoveries to holders of General Unsecured Claims against Seadrill Limited and NADL, and such changes could be material.

**L.      How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the following:  (a) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as

of the Effective Date; and (b) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The of the Debtors against it.  Except as specifically released under the Plan or pursuant to a Final Order, the Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.** Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Bankruptcy Court order Final Order, the Reorganized Debtors expressly reserve all such Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

### M.    Will there be releases and exculpation granted to parties in interest as part of the Plan?

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the other parties to the Restructuring Support Agreement in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT FILE AN OBJECTION WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to

demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

Potential claims that will be released include claims against Seadrill Limited, its directors and officers, and other insiders relating to certain prepetition transactions.  Additional information regarding the Seadrill Limited Disinterested Directors' independent investigation is set forth below.  In the Debtors' view, and based on the independent investigation as described below, the terms of the plan, including the releases and exculpation contained therein, are fair, equitable, reasonable, necessary to the reorganization, and in the best interests of the Debtors' estates. Therefore, the Debtors believe that the Plan is confirmable, which the Debtors intend to prove at the Confirmation Hearing.

The Committee investigated the marketing process, including Hemen's influence over the process, the assumption of the SFL leases, the value of various non-consolidated entities and the release of various claims relating to prepetition transactions.  However, after extensive arms-length negotiations, the Committee agreed to the global settlement which maximizes value for general unsecured creditors.  The Committee now supports confirmation of the Plan.

  **1. Releases by the Debtors.**

  **Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Seadrill Entities' in- or out-of-court restructuring efforts, intercompany transactions between or among the Seadrill Consolidated Group or between the Seadrill Consolidated Group and the Non-Consolidated Entities, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Investment Agreement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

  **2. Releases by Holders of Claims and Interests.**

  **As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Seadrill Entities' in- or out-of-court restructuring efforts, intercompany transactions between or among the Seadrill Consolidated Group or between the Seadrill Consolidated Group and the Non-Consolidated Entities, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure**

Statement, the Investment Agreement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the Investment Agreement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 3.   Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 4.   Injunction

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any

**right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

### 5. Release of Liens.

Except (1) with respect to the Liens securing Other Secured Claims (depending on the treatment of such Claims), (2) with respect to the~~any~~ Liens securing the Secured Credit Agreement Secured Claims (that continue in force after the Effective Date in accordance with Article IV.H. of the Plan, (3) with respect to the charging liens of each of the Indenture Trustees (including the respective Indenture Trustees' rights to maintain, enforce, and exercise such charging liens), or (34) as otherwise provided in the Planherein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including for the avoidance of doubt, the Amended Finance Documents, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and its successors and assigns.

### N. What is the deadline to vote on the Plan?

The Voting Deadline is March 9April 5, 2018, at 4:00 p.m. (prevailing Central Time).

### O. How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot or a master ballot including your vote is **actually received** by the Debtors' solicitation agent, Prime Clerk LLC (the "Solicitation Agent") **on or before the Voting Deadline,** *i.e.* March 9April 5**, 2018, at 4:00 p.m. prevailing Central Time**. *See* Article IX of this Disclosure Statement, entitled "SOLICITATION AND VOTING PROCEDURES," which begins on page 100 for more information.

### P. Why is the Bankruptcy Court holding a Confirmation Hearing?

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

### Q. When is the Confirmation Hearing set to occur?

The Bankruptcy Court has scheduled the Confirmation Hearing for March 26April 17, 2018, at 9:00 [●] a.m. (prevailing Central Time). The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than March 9April 5, 2018, at 4:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit D** and incorporated herein by reference.

**R.   What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**S.   What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will not be forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date and unless otherwise provided in the Plan, the Reorganized Debtors may then operate their businesses and, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**T.   What are the Notes Rights Offering and the Equity Rights Offerings?**

The holders of General Unsecured Claims against Seadrill Limited, NADL, and Sevan that are Note Eligible Holders or Equity Eligible Holders, as applicable, have an opportunity to collectively invest up to $85119.4 million to acquire New Secured Notes and New Seadrill Common Shares through the Notes Rights Offering and up to $2548.1 million to acquire New Seadrill Common Shares through the Equity Rights Offerings.  The procedures for participating in the Notes Rights Offering and Equity Rights Offerings are set forth in the Rights Offering Procedures and described in Article X of this Disclosure Statement, entitled "Rights Offering Procedures," which begins on page 102.

**U.   Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Prime Clerk LLC, via one of the following methods:

*By regular mail, hand delivery, or overnight mail at:*
Seadrill Limited
c/o Prime Clerk LLC
830 3rd Avenue, 3rd Floor
New York, NY 10022

*By electronic mail at:*
seadrillballots@primeclerk.com

*By telephone (toll free) at:*
844-276-3026 (U.S. and Canada Toll Free)
0-800-591-8054 (Brazil Toll Free)
01-800-681-5354 (Mexico Toll Free)
070-80601847 (Nigeria Toll Free)

800-25-030 (Norway Toll Free)
800-850-0029 (Saudi Arabia Toll Free)
800-492-2272 (Singapore Toll Free)
1-800-011-156 (Thailand Toll Free)
8000-3570-4559 (UAE Toll Free)
0-800-069-8580 (UK Toll Free)
(917) 962-8497 (Other International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at http://cases.primeclerk.com/Seadrill (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy/ (for a fee). Translated versions of the Notice of Confirmation and certain other notices filed in the Chapter 11 Cases are available free of charge from the website of the Solicitation Agent at http://cases.primeclerk.com/Seadrill.

Holders of General Unsecured Claims that wish to contact counsel to the Committee, may do so via the following methods:

**Mail:**
Counsel to Creditors' Committee
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

**Phone:** 212.715.9100
**Fax:** 212.715.8000

**Attn:**
Thomas Moers Mayer, Esq.
Douglas Mannal, Esq.
Jennifer Sharret, Esq.

**Website:**
http://www.kramerlevin.com/

Holders of General Unsecured Claims may also contact counsel to the Creditors' Committee by electronic mail at: **SeadrillUCCinquiry@kramerlevin.com.**

## V.    Do the Debtors recommend voting in favor of the Plan?

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result from any other available alternative. The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## W.    Who is Committed by the RSA to Support the Plan?

The Plan is supported by parties, including, but not limited to, the Debtors, certain holders of Claims, certain holders of Interests, and the Commitment Parties, as set forth in the following chart:

| Support Parties | Support (expressed as an approximate percentage of the total principal amount of claims outstanding) |
|---|---|
| Debtors | N/A |
| Holders of Credit Agreement Claims | 99% |
| Holders of Unsecured Bonds | 4070% |
| Holders of Interests in Seadrill Limited | 24%[20] |
| Shipyard Claimants | 100% |

- Hemen holds a substantial portion of the Debtors' outstanding Unsecured Bonds. As an insider of the Debtors, Hemen's vote to accept the Plan will not be counted for purposes of determining if the Debtors have met the requirements of section 1129(a)(10) of the Bankruptcy Code. That being said, because the Debtors anticipate that holders of Credit Agreement Claims at Seadrill Limited and North Atlantic Drilling Limited will vote to accept the plan, Hemen's vote will nonetheless be counted for purposes of determining whether Classes B3 and D3 have voted to accept the Plan under section 1126 of the Bankruptcy Code.

Additionally, as described herein and set forth in the Committee Letter, pursuant to the global settlement embodied in the Plan, the Committee now supports confirmation of the Plan and recommends that all holders of General Unsecured Claims vote to accept the Plan.

## IV.    THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN

### A.    Restructuring Support Agreement

On September 12, 2017, the Debtors, holders of approximately 97 percent of Claims arising under the Bank Facilities (a consent level that has since risen to 99%), the Initial Commitment Parties, and SFL (and certain of SFL's subsidiaries) entered into the Restructuring Support Agreement. Since executing the Restructuring Support Agreement, the Debtors have further documented the terms of the prearranged restructuring contemplated thereby, including the Plan.[21] Further, pursuant to the terms of the global settlement embodied in the Plan, the members of the Ad Hoc Group and Barclays, have agreed to join the Restructuring Support Agreement as Commitment Parties and the Newbuild Counterparties have agreed to sign a similar support agreement under which they have agreed to support confirmation of the Plan. The restructuring transactions contemplated by the Plan will (a) re-profile the Bank Facility obligations to eliminate near-term amortization obligations and extend maturities; (b) reduce overall leverage through equitizing the Unsecured Bonds, unsecured interest rate and currency swap claims, and other non-assumed lease and contractual obligations; (c) result in a $1.0608 billion new capital injection (as set forth in the Investment Agreement); (d) leave employee, customer, and ordinary trade Claims largely Unimpaired; and (e) reorganize the Seadrill corporate structure to support the re-profiled Bank Facilities and new capital injection. Each of the major restructuring transactions contemplated by the Restructuring Support Agreement is described in greater detail below. The Debtors believe that the transactions contemplated by the Restructuring Support Agreement are the best available restructuring terms and will allow Seadrill to

---

[20]   Inclusive solely of 100 percent of Hemen's Interest in Seadrill Limited.

[21]   The key terms of the Plan are discussed in greater detail in Section V.B of this Disclosure Statement, entitled "The Plan," immediately following this section.

succeed as a restructured company after emergence from these chapter 11 cases and will afford meaningful runway to allow the market to recover.

  ***Corporate Reorganization.*** To support the Bank Deal and Capital Commitment, Seadrill will execute a corporate reorganization that will ultimately result in a new holding company and a new IHCo/RigCo/NSNCo holding structure.  Seadrill will move its rig-owning entities, intragroup charterer entities and its operating and management entities under the new RigCo holding company structure and the rigs and the earnings from operation of the rigs will continue to serve as collateral under the re-profiled Bank Facilities.  Both RigCo and NSNCo will be organized beneath another new intermediate holding company structure, or "IHCo."  IHCo will be a direct subsidiary of New Seadrill, and New Seadrill will issue guarantees of the re-profiled Bank Facility obligations.  Each Seadrill entity that is a newbuild entity will be a subsidiary of New Seadrill.  The RigCo entity will also issue guarantees of the re-profiled Bank Facility obligations.  IHCo will provide security over the shares of RigCo and RigCo will provide security over RigCo bank accounts and intercompany loans in each case in favor of all Bank Lenders, effectively cross-collateralizing the Bank Facility obligations across all of the rig-owning entities (*i.e.*, the Bank Lenders will maintain first priority liens on their own, unique collateral packages and will share in cross-collateralization at the RigCo level across all Bank Facilities).  The Non-Consolidated Entities will not grant any guarantees, security, pledges, or other credit support in connection with the New Secured Notes or corporate reorganization.  As part of the corporate reorganization, the existing non-trading intercompany balances (between different subsidiaries of Seadrill) and intergroup balances (between Seadrill subsidiaries and Non-Consolidated Entities) will be rationalized.

  Transitioning to the new IHCo/RigCo/NSNCo structure from Seadrill's current corporate structure will require that Seadrill complete a number of corporate transaction steps (the "Transaction Steps") that will be set forth in the Description of the Transaction Steps that will be included as part of the Plan Supplement.  Completing the Transaction Steps requires that Seadrill obtain a number of corporate consents and , consents from third parties, governmental approvals and regulatory clearances and execute various share and asset transfer documents required in jurisdictions in which Seadrill entities are incorporated across the globe.  These third party consents are required in particular in connection with the transfer of certain shares, the assignment or novation of certain loan agreements, and the granting of security over assets that will be held by NSNCo or by subsidiaries of NSNCo following completion of the Transaction Steps. Governmental approvals and regulatory clearances are required in particular in respect of completion of the Capital Commitment.  Additional steps will also be required in connection with the rationalization of intercompany and intergroup balances, including executing documents to settle or novate balances.  The implementation and completion of the "hive down" The Debtors currently have significant outstanding intercompany liabilities.  As part of the Transaction Steps, the Debtors intend to settle or novate a number of those intercompany balances to reduce overall intercompany intercompany liabilities and eliminate certain intercompany balances that would span across the RigCo and NSNCo corporate silos.  Such actions are required to properly implement the corporate restructuring described herein.  The implementation and completion of this corporate reorganization will need to be done in conjunction with the completion and satisfaction of the conditions precedent to the effectiveness of the re-profiled Bank Facilities and the New Secured Notes, among other things.  The Debtors intend to take all steps practical to prepare the enterprise prior to confirmation of the Plan and will take the final steps to satisfy these conditions contemplated by the Transaction Steps after confirmation but prior to effectiveness of the Plan.  The Debtors, with the help of their tax advisor Ernst & Young, have completed an in-depth analysis of any tax consequences of the corporate reorganization described herein.[22]  Based on such analysis, the Debtors do not believe there are any material, negative tax consequences of the corporate reorganization other than as will be disclosed in the Description of the Transaction Steps.  The Debtors shall seek all regulatory clearances and consents as

---

[22] The Debtors' and Ernst & Young's analysis has been performed in reliance on historical financial information and is subject to change based on updated financial information.

necessary to complete the Transaction Steps.  A simplified graphic of the corporate reorganization is set forth below.



**Bank Deal.**  If they can obtain a five-year runway to weather this historic downturn, the Debtors believe their business can support the proposed leverage at emergence from the Chapter 11 Cases over the long term.  The foundation of the financial restructuring contemplated by the Restructuring Support Agreement is the Bank Deal, the core terms of which are:  (a) an on average five-year maturity extension under the Bank Facilities; (b) the elimination of amortization obligations from the Petition Date through December 31, 2019 (with amortization obligations reinstated on a modified basis thereafter); (c) a financial covenant holiday until 2021 subject to a $525 million RigCo minimum liquidity requirement, which ratchets down over time; and (d) certain financial covenant waivers.  As part of the consideration for these valuable concessions, each of the Bank Facilities will benefit from, among other things, the RigCo guarantee and security over RigCo shares, bank accounts and intercompany loans described above.



*Capital Commitment.* The Restructuring Support Agreement further contemplates the Capital Commitment, which will be in the form of a $200 million direct equity investment and a $8680 million New Secured Notes investment. In return for the $200 million equity investment, the investors will receive their respective portions of 25 percent of the new common equity in New Seadrill on terms set forth in the Investment Agreement. The New Secured Notes will mature seven years after their issuance and will carry an interest rate of 12 percent—with 8 percent paid "in kind" and 4 percent paid in cash. Purchasers of the New Secured Notes will also receive an aggregate of 57.5 percent of the new equity in New Seadrill, subject to dilution from certain equity fees and the Employee Incentive Program (as defined in the plan) on terms set forth in the Investment Agreement. ~~Participation in the $1.06~~Taking into account the global settlement

40

described herein, participation in the $1.08 billion Capital Commitment will be allocated among the Debtors' stakeholders as follows:

| Stakeholder | Allocation | Form of Allocation |
|---|---|---|
| *New Secured Notes Investment* | | |
| Hemen/Centerbridge | $~~440~~321.7 million | Direct Investment |
| Other Commitment Parties (including the Ad Hoc Group and Barclays) | $~~335~~439.1 million | Direct Investment |
| Holders of General Unsecured Claims, with Note Rights | $~~85~~119.4 million | Notes Rights Offering (Backstopped by certain of the Commitment Parties) |
| *Direct Equity Investment* | | |
| Hemen/Centerbridge | $~~125~~85.8 million | Direct Investment |
| ~~Certain~~ Other Commitment Parties (including the Ad Hoc Group and Barclays) | $~~50~~66.1 million | Direct Investment |
| Holders of General Unsecured Claims, with Equity Rights | $~~25~~48.1 million | Equity Rights Offering (Backstopped by ~~Hemen~~certain of the Commitment Parties) |

In addition to Seadrill Limited's interests in the Non-Consolidated Entities, Seadrill will transfer certain unencumbered assets to NSNCo to support the New Secured Notes and security will be granted over these assets where practicable.[23]  Finally, the New Secured Notes will benefit from:  (a) first-ranking guarantees from IHCo and all other subsidiaries of Seadrill Limited that do not sit below IHCo (subject to exceptions); (b) a Seadrill Limited guarantee ranking *pari passu* with the re-profiled Bank Facilities; (c) a first-ranking pledge over all deposit and security accounts and all cash balances held by NSNCo; and (d) a second-ranking guarantee from RigCo.

The $880 million in New Secured Notes will be secured by the Debtors' interests in the Non-Consolidated Entities (valued at between $1.9 billion to $2.3 billion under the midpoint value of the Debtors' Valuation Analysis).  In addition, $227.5 million in post-emergence cash will be escrowed to further collateralize the New Secured Notes.  Using the midpoint of the Debtors' valuation analysis, the value of the New Secured Notes and the attached equity provided would be worth more than $3 billion.

---

[23]  This proposed transfer and granting of security and certain other steps that may be taken in connection with the Restructuring Transactions (including the proposed hive down and/or change in the shareholding structure of Seabras entities and the granting of security over certain subordinated intercompany loans and/or assignment of receivables and certain other transactions contemplated in the New Secured Notes Term Sheet attached as Annex 4 to Exhibit A of the RSA), if implemented without the requisite waivers and consents in place, will trigger defaults and events of default under the relevant Seabras Sapura Agreements.  Although the Debtors will seek to obtain the necessary waivers and/or consents under such agreements to implement these transactions as part of any consensual agreement with Seabras's secured bank lenders, there is no assurance that such consents and/or waivers can be obtained.  If such consents and/or waivers are not obtained, and the Debtors nonetheless proceed with these transactions, Seabras's secured bank lenders may exercise their rights and remedies and take enforcement actions, which would adversely impact any interest the Debtors have in the Seabras joint venture.

*Unsecured Claim Equitization.*  The Bank Deal and the Capital Commitment are contingent in part upon the Debtors' commitment to reduce overall leverage and ensure a clean liquidity runway during the course of the Bank Deal amortization deferral period.  Accordingly, the Restructuring Support Agreement provides that, to the extent holders of unsecured claims at Seadrill Limited, NADL, and Sevan (Classes B3, D3, and F3) vote as a class to accept the Debtors' chapter 11 plan, such holders will receive their pro rata share of 15 percent of the new equity in New Seadrill, plus, if such holders are Eligible Holders, their pro rata share of subscription rights to participate in up to (a) $85 million of the New Secured Note portion of the Capital Commitment and (b) $25 million of the equity portion of the Capital Commitment.[24] Note Eligible Holders and/or Equity Eligible Holders with Note Rights and/or Equity Rights, their pro rata share of subscription rights to participate in up to (a) $119.4 million of the New Secured Note portion of the Capital Commitment and (b) $48.1 million of the equity portion of the Capital Commitment.[25]   The Plan further contemplates a cash distribution to certain holders of General Unsecured Claims as set forth above.  As further set forth above, holders of General Unsecured Claims in Classes B3, D3, and F3 who are a Commitment Party or a Permitted Transferee of Claims against or Interest in the Debtors will not be entitled to participate in the Note Rights Offering, Equity Rights Offering, or cash distribution open to holders of General Unsecured claims in Classes B3, D3, and F3 as of September 12, 2017 (with respect to the Original Commitment Parties) or January 5, 2018 (with respect to the New Commitment Parties).  Such holders will be allowed to participate in their pro rata share of the distribution of 15 percent of the new equity in New Seadrill.   The Original Commitment Parties, solely on account of unsecured claims acquired after September 12, 2017, and the New Commitment Parties (as defined in the Investment Agreement Amendment), solely on account of unsecured claims acquired after January 5, 2018, will also have the ability to participate in the Right Offerings and the Unsecured Pool Recovery Cash.  The Debtors shall consult with the Committee and the Required Consenting Parties to ensure that holders of General Unsecured Claims participate in the Note Rights Offering and Equity Rights Offering in accordance with Article III of the Plan.

*Equity Cancellation*.  Under the Restructuring Support Agreement, so long as holders of unsecured claims at Seadrill Limited (Class B3) vote as a class to accept  The global settlement described herein will result in materially higher distribution to holders of General Unsecured Claims at Seadrill Limited, NADL, and Sevan than originally contemplated by the Plan filed at the outset of these chapter 11 cases.  As set forth in the Committee Letter, the Committee recommends that holders of General Unsecured Claims vote to accept the Plan. Pursuant to the Valuation Analysis, the Debtors value the Note Rights to be granted to holders of General Unsecured Claims (on the conditions set forth herein) in the range of $239 million to $354 million.  Pursuant to the Valuation Analysis, the Debtors value the Equity Rights to be granted to holders of General Unsecured Claims (on the conditions set forth herein) in the range of $136 million to $218 million.

*Equity Cancellation*.  Finally, under the Plan, holders of common equity Interests in Seadrill Limited will receive their pro rata share of 2 percent of the New Seadrill Common Shares. (in the event the class B3 votes to accept the Plan).  On the Effective Date, the value in the existing Interests in Seadrill Limited, NADL and Sevan will be extinguished; a holder of such Interests shall not receive or retain any distribution, property, or other value on account of its Interest.

---

[24]   For the avoidance of doubt, holders of NADL-issued Unsecured Bonds that are not guaranteed by Seadrill Limited will receive a recovery equal to 70 percent of the recovery provided under the Debtors' chapter 11 plan to holders of Seadrill Limited-guaranteed Unsecured Bonds.

[25]   For the avoidance of doubt, holders of NADL-issued Unsecured Bonds that are not guaranteed by Seadrill Limited will receive a recovery equal to 70 percent of the recovery provided under the Debtors' chapter 11 plan to holders of Seadrill Limited-guaranteed Unsecured Bonds.

Taking into account the allocation of New Seadrill Common Shares under the Plan and pursuant to the Capital Commitment, as well as certain fees paid in New Seadrill Common Shares under the Capital Commitment, New Seadrill's *pro forma* equity ownership will be as set forth below.  The Debtors have determined that the fees paid in the form of new equity under the Capital Commitment are reasonable under the circumstances and within the market range for financings of this size and complexity with an extended commitment period.

| Stakeholder | Ownership of Seadrill Limited | Fully Diluted |
|---|---|---|
| New Secured Notes | • 57.5% pre dilution | |
| New Equity | • 25% pre dilution | |
| Unsecured Claims | • 15% pre dilution | |
| Existing Equity | • 2% pre dilution | |
| Structuring Fee | • 0.5% of equity pre dilution | |
| Structuring Fee to Hemen | • 5% of equity post dilution | |

Fully Diluted chart:
- Structuring Fee: 0.5%
- Structuring Fee (Hemen): 6.0%
- Existing Equity: 1.9%
- Unsecured Claims: 14.3%
- New Equity: 23.8%
- New Secured Notes: 54.6%

The Restructuring Support Agreement contemplates, and the Plan provides for, Structuring Fees payable to Hemen and certain other Commitment Parties in the amount of 5 percent and 0.5 percent, respectively, of the equity in reorganized Seadrill Limited.  The Structuring Fees were agreed as part of a broader restructuring transaction and provided as consideration for backing the transformative $1.08 billion Capital Commitment.  The Debtors believe that the Structuring Fees are market and satisfy the relevant confirmation standards.  The Ad Hoc Group and Barclays will receive a Closing Payment distributed *pro rata* in the aggregate amount of $1 million in cash to be distributed on the Effective Date of the Plan.

The Plan represents a significant step in the Debtors' restructuring process, which has been underway for almost two years.  The Restructuring Support Agreement, together with the Investment Agreement, will allow the Debtors to proceed expeditiously through chapter 11 to a successful emergence.

**B.      The Plan**

The Plan contemplates the following key terms, among others described herein and therein:

**1.      Issuance and Distribution of the New Shares**

The issuance of the New Shares shall be authorized without the need for any further corporate action and without any further action by the holders of any Claims or Interests.  On the Effective Date,

43

relevant holders of Claims and Interests shall receive the New Shares in exchange for their respective claims as set forth under Article III.B of the Plan.  On the Effective Date[26]:

- New Seadrill will issue 25 percent of the ~~New Seadrill Common Shares, plus any Excess~~ New Seadrill Common Shares, subject to dilution by the Employee Incentive Plan and the Primary Structuring Fee, in exchange for $200 million in Cash substantially on the terms set forth in the Investment Agreement.

- New Seadrill will issue 57.5 percent of the New Seadrill Common Shares to the purchasers of the New Secured Notes on a Pro Rata basis in accordance with the amount of New Secured Notes issued to such purchasers, subject to dilution by the Employee Incentive Plan and Primary Structuring Fee on the terms set forth in the Investment Agreement.

- New Seadrill will issue 5 percent of the New Seadrill Common Shares to Hemen on account of the Primary Structuring Fee, subject to dilution by the Employee Incentive Plan, and 0.5 percent of the New Seadrill Common Shares to the Select Commitment Parties on a Pro Rata basis in accordance with each Select Commitment Party's respective equity commitment percentage, subject to dilution  by the Employee Incentive Plan and the Primary Structuring Fee, in each case as set forth in the Investment Agreement.

- 100 percent of the New NADL Common Shares and 100 percent of the New Sevan Common Shares shall be issued to the Reorganized Debtors in accordance with the Description of Transaction Steps.

All of the New Shares issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the New Shares under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  On or as soon as reasonably practicable after the Effective Date, New Seadrill shall cause the New Seadrill Common Shares to be registered under Section 12 of the Securities Exchange Act.

For the avoidance of doubt, any claimant's acceptance of New Shares shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

### 2. Issuance and Distribution of New NADL Common Shares and New Sevan Common Shares

On or before the Effective Date, 100% of the New NADL Common Shares and New Sevan Common Shares shall be issued to the Reorganized Debtors in accordance with the Description of Transaction Steps.  For administrative convenience, the holders of Credit Agreement Claims against NADL and the Other NADL Debtors and Sevan and the Other Sevan Debtors have agreed to accept participation in the Amended NADL Credit Facility and Amended Sevan Credit Facility, as applicable, in lieu of any entitlement to receive the New NADL Common Shares and New Sevan Shares and consent to the issuance of such shares to the Reorganized Debtors in accordance with the Description of Transaction Steps.

---

[26]   Other than in the case of the New NADL Common Shares and the New Sevan Common Shares, which will be issued on or before the Effective Date~~.~~, as well as a *de minimis* amount of New Seadrill Common Shares, which will be issued by New Seadrill on the date which it is incorporated.

The retention of the New NADL Common Shares and New Sevan Common Shares is not of economic substance and ultimately maximized value for the benefit of the debtors' in-the-money creditors. Chapter 11 plans commonly provide for the maintenance of intercompany interests to maintain the Debtors' existing corporate structuring for corporate convenience and to avoid significant negative tax implications, for example. Breaking NADL and Sevan away from the broader Seadrill corporate structure would destroy value to the detriment of stakeholders throughout the Debtors' businesses, as such corporate groups are unlikely to be able to operate independently of the Seadrill group. Accordingly, the Debtors have determined that this structure maximizes value for all stakeholders.

### 3. Issuance and Distribution of New Secured Notes

On the Effective Date, NSNCo will issue the New Secured Notes in exchange for $~~86~~ 880 million in Cash, substantially on the terms set forth in the Investment Agreement and New Secured Notes Indenture. Pursuant to the Investment Agreement, the applicable Commitment Parties shall commit to purchase the full $~~86~~ 880 million in principal amount of the New Secured Notes.

### 4. Rights Offerings

If the requisite votes set forth in the Plan are obtained, the Reorganized Debtors shall consummate the Equity Rights Offering and the Notes Rights Offering in accordance with the Rights Offering Procedures. Holders of the Equity Rights shall receive the opportunity to purchase up to $~~25~~ 48.1 million of the New Seadrill Common Shares on a Pro Rata basis in accordance with the Plan and Rights Offering Procedures. Holders of the Note Rights shall receive the opportunity to purchase up to $~~85~~ 119.4 million in principal amount of the New Secured Notes on a Pro Rata basis in accordance with the Plan and Rights Offering Procedures.

~~If Class B3, Class D3, and Class F3 vote to reject the Plan, the Debtors shall not be obligated to conduct or consummate the Equity Rights Offering or the Notes Rights Offering, and the Equity Rights and Notes Rights shall be null and void ab initio and of no force and effect and the Excess New Seadrill Common Shares and New Secured Notes will be distributed to the Commitment Parties as provided in the Investment Agreement.~~

As set forth above, holders of General Unsecured Claims in Classes B3, D3, and F3 who are a Commitment Party will not be entitled to participate in the Note Rights Offering, Equity Rights Offering, or cash distribution open to holders of General Unsecured claims in Classes B3, D3, and F3 on account of General Unsecured Claims held as of September 12, 2017 (with respect to the Original Commitment Parties) or January 5, 2018 (with respect to New Commitment Parties). Such holders will be allowed to participate in their pro rata share of the distribution of 15 percent of the new equity in New Seadrill.

The Rights Offering Procedures will be authorized pursuant to the Disclosure Statement Order, forms of which are attached as **Exhibit E1** and **Exhibit E2** to this Disclosure Statement.

### 5. Amended SFL Charters

Certain of the Debtors or Reorganized Debtors, as applicable, shall enter into the Amended SFL Charters on or before the Effective Date, on terms set forth in the RSA and included in the Plan Supplement.

Confirmation shall be deemed approval of the Amended SFL Charters and related Amended Finance Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Bankruptcy Court previously, and the Debtors or Reorganized Debtors, as applicable, are authorized to execute and deliver those documents

necessary or appropriate to issue the Amended SFL Charters without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors may deem to be necessary to consummate the Amended SFL Charters, other than modifications that deviate from the SFL Term Sheet, which modifications require the consent of the Required Consenting Parties.  SFL is an affiliate of Hemen.  The Committee thoroughly investigated the propriety of the Debtors' assumption of the Amended SFL Charters, but on balance with the value created for general unsecured creditors in the context of the global settlement, as described in the Committee Letter, the Committee supports the Plan.

## 6.  Use of Proceeds

Proceeds from the issuance of the New Secured Notes and Equity Placement, as applicable, will be used, among other things, to fund certain distributions under the Plan, the Debtors' operations, and administration of the Chapter 11 Cases, as well as for general corporate purposes.

## 7.  Amended Credit Facilities

The Debtors or the Reorganized Debtors, as applicable, shall enter into the Amended Credit Facilities on or before the Effective Date, on the terms set forth in the Restructuring Support Agreement and included in the Plan Supplement.

Confirmation shall be deemed approval of the Amended Credit Agreements and related Amended Finance Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Bankruptcy Court previously, and the Debtors or Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to consummate the applicable Amended Finance Documents without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as may be agreed between the Debtors or Reorganized Debtors and the applicable Credit Facility Lenders.

Notwithstanding anything else contained herein, the Prepetition Credit Agreements and applicable Prepetition Finance Documents shall continue in full force and effect, except as amended and restated, supplemented, superseded, terminated or otherwise modified pursuant to, or in connection with, the Amended Finance Documents.

## 8.  Amended Guarantee Facility

The Debtors or Reorganized Debtors, as applicable, shall enter into the Amended Guarantee Facility on the Effective Date, on terms set forth in the RSA and included in the Plan Supplement.

Confirmation shall be deemed approval of the Amended Guarantee Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the relevant Debtors or Reorganized Debtors in connection therewith), to the extent not approved by the Bankruptcy Court previously, and the relevant Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to issue the Amended Guarantee Facility without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors may deem, with the consent of Danske, to be necessary to consummate such  Amended Guarantee Facility.

### 9.   Newbuild Counterparty Settlement

On the Effective Date, in further compromise and settlement of any Claims or controversies between the Debtors and the Newbuild Counterparties, the Newbuild Counterparties shall receive their allocated share of the Newbuild Cash Settlement as follows: $10 million to SHI and $7 million to DSME (irrespective of whether any of the Newbuild Counterparties transfer their Claims or Rights).  The fees and expenses of SHI and DSME shall be included in and paid from their respective shares of the Newbuild Cash Settlement.

### 10.  Seadrill Partners Share Pledge

On or before the Effective Date, Seadrill Limited shall contribute or transfer all the ordinary shares that it holds in Seadrill Deepwater Drillship Ltd. ("SDDL") to New Seadrill, or a wholly-owned subsidiary of Seadrill Limited or New Seadrill, with the consent of the collateral agent under TLB Credit Agreement, pursuant to (and subject to obtaining the release of, as required) the existing Equitable Mortgage Over Shares, dated as of February 21, 2014 over such ordinary shares that Seadrill Limited holds in SDDL. (the "Existing Drillship Equitable Mortgage") and, on or before the Effective Date, New Seadrill or such wholly-owned subsidiary shall (i) execute a first ranking equitable mortgage over the ordinary shares that it holds in Seadrill Deepwater Drillship Ltd. in an identical form to the Existing Drillship Equitable Mortgage, with only amendments as required to reflect changes to parties or changes in law or such other technical changes as agreed between the borrowers and the collateral agent under TLB Credit Agreement and entered into between the collateral agent and Seadrill Limited, and (ii) deliver any other documentation or take any action, in each case necessary for perfection of such mortgage.

### ~~9.~~ 11.        General Settlement of Claims and Interests

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, which distributions and other benefits will be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual and legal rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim.

The Plan will be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

Pursuant to Rule 408 of the Federal Rules of Evidence, the Plan, this Disclosure Statement, the Restructuring Support Agreement (and any exhibits or supplements relating to the foregoing), the Investment Agreement, and all negotiations relating thereto will not be admissible into evidence in any proceeding unless and until the Plan is consummated, and then only in accordance with the Plan.  In the event the Plan is not consummated, provisions of the Plan, this Disclosure Statement, the Restructuring Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto will not be binding or probative.

**10.12.      Releases**

The Plan contains certain releases (as described more fully in Article III.M of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?," which begins on page 31), including mutual releases among the Debtors, Reorganized Debtors, and certain of their key stakeholders.  Additionally, all holders of Claims or Interests that do not file an objection with the Bankruptcy Court in the Chapter 11 Cases that expressly objects to the inclusion of such holder as Releasing Party under the provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties.

## V.      THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.      Seadrill's Corporate History

Seadrill Limited was formed on May 10, 2005 as a Bermuda exempted company.  John Fredriksen, who holds a number of interests in the offshore space through Hemen and other investment vehicles, founded Seadrill and has served as chairman of Seadrill Limited's board of directors since its inception.  At the time of its formation, Seadrill acquired a fleet of three jack-up rigs pursuant to a purchase and subscription agreement with entities affiliated with Hemen.  Today, Hemen holds an approximately 24-percent ownership interest in Seadrill Limited.  During the years following its formation, Seadrill capitalized on strong demand for offshore drilling equipment and services, driven by a favorable oil pricing environment, by actively expanding its fleet, geographic footprint, and technical capabilities through both strategic acquisitions and organic growth.  By the end of 2013, Seadrill had grown into one of the world's premier offshore drilling contractors.

The majority of the rig-owning entities that are obligors under the Bank Facilities are organized as wholly-owned subsidiaries of Seadrill Limited (the "Seadrill Subsidiary Entities").  Historically, Seadrill Limited also guaranteed the obligations of certain of its non-wholly owned subsidiaries (and their respective subsidiaries), a number of which are majority-owned by Seadrill Limited and consolidated with the Seadrill Subsidiary Entities for accounting and reporting purposes.  In general, Seadrill Limited's non-wholly owned subsidiaries and their respective subsidiaries are organized into several groups, each of which is described below.  Seadrill Limited and 85 of its direct and indirect subsidiaries, not including any of the Non-Consolidated Entities, are Debtors in these chapter 11 cases

Seadrill Limited also directly or indirectly owns substantial, but non-majority, interests in four other offshore drilling and services companies that form their own respective corporate groups within the Seadrill enterprise and are not Debtors in these chapter 11 cases.  A graphic depicting a simplified version of Seadrill's corporate structure and identifying which entities are Debtors is set forth below.  Seadrill's complete corporate organization chart is attached hereto as **Exhibit BC**.



### (i)    Consolidated Entities

Seadrill Limited, the Seadrill Subsidiary Entities, and the Seadrill corporate groups that are majority-owned by Seadrill Limited are collectively referred to as the "Consolidated Entities" because they are consolidated for accounting and reporting purposes.  The Consolidated Entities operate as a single, integrated enterprise under a common management team, and the value of each Consolidated Entity group is reflected in the value of the broader Seadrill enterprise.  Seadrill Limited is an obligor (as either borrower or guarantor) under all $8 billion of the Consolidated Entities' funded-debt obligations with the exception of $413 million of Debtor North Atlantic Drilling Limited Unsecured Bond obligations.

***Seadrill Limited and the Seadrill Subsidiary Entities (Debtor Group).***  Seadrill Limited and its wholly-owned subsidiaries own and operate 22 rigs (i.e., the substantial majority of the Debtors' fleet), including six drillships, six semi-submersible rigs, and 10 jack-up rigs.  As described in greater detail below, Seadrill Limited and the Seadrill Subsidiary Entities are obligors under approximately $7.6 billion of the Consolidated Entities' funded-debt obligations, including approximately $5.7 billion under certain of the Bank Facilities and approximately $1.9 billion in Seadrill Limited-issued Unsecured Bonds.

***North Atlantic Drilling Limited (Debtor Group).***  Debtor North Atlantic Drilling Limited ("NADL," and together with its direct and indirect subsidiaries, collectively, the "NADL Entities"), a Bermuda exempted company, is a 70.4-percent subsidiary of Seadrill Limited.  The NADL Entities focus exclusively on harsh environment offshore drilling operations in the North Atlantic Ocean.  Seadrill Limited formed NADL in February 2011 to reorganize Seadrill's harsh environment activities under a single sub-holding company.  Shortly after its formation in April 2011, NADL purchased six harsh-environment drilling rigs from Seadrill Limited, which were financed by a $2 billion senior secured loan facility guaranteed by Seadrill Limited and certain of the other NADL Entities.  As of the Petition Date, the NADL Entities own and operate seven rigs, consisting of three semi submersibles, three jack up rigs, and one drillship.   As described in greater detail below, the NADL entities are direct obligors under approximately $1.5 billion of the Consolidated Entities' funded-debt obligations, including approximately $908 million under one of the Bank Facilities (which is guaranteed by Seadrill Limited) and approximately $579 million in NADL-issued Unsecured Bonds (approximately $166 million of which is guaranteed by Seadrill Limited).  NADL completed an initial public offering in February 2014.  The 29.6 percent of NADL common shares not owned by Seadrill Limited was publicly listed and traded on the NYSE under the ticker

symbol "NADL," but as a result of the filing of these Chapter 11 Cases such common shares have been delisted from the NYSE.

**_Sevan Drilling Limited (Debtor Group)._**  Debtor Sevan Drilling Limited ("Sevan," and together with its direct and indirect subsidiaries, collectively, the "Sevan Entities"), a Bermuda exempted company, is a 50.1-percent owned subsidiary of Seadrill Limited.  The Sevan Entities focus on offshore drilling in the ultra-deepwater segment.  Sevan was formed in May 2006 by Sevan Marine ASA, a Norwegian limited liability company not affiliated with Seadrill.  Seadrill Limited initially acquired 28.52 percent of Sevan's outstanding common shares for $65 million in November 2011, becoming Sevan's largest shareholder in the process.  In July 2013, Seadrill Limited completed a series of share acquisitions and other transactions that made it Sevan's controlling shareholder.  The Sevan Entities' three semi-submersible drilling rigs employ an innovative cylindrical-hull design known as the "Sevan design."  As described in greater detail below, the Sevan entities are direct obligors under approximately $875 million of the Consolidated Entities' funded-debt obligations under one of the Bank Facilities (which is guaranteed by Seadrill Limited).  The 49.9 percent of Sevan common shares not owned by Seadrill Limited ishave historically been publicly listed and tradesd on the OSE under the ticker symbol "SEVDR."," although there is no guarantee that such shares will continue to be publicly listed or trade on the OSE during the Chapter 11 Cases.

**_Asia Offshore Drilling Limited (Non-Debtor Group)._**  Non-Debtor Asia Offshore Drilling Limited ("AOD," and together with its three non-Debtor subsidiaries, collectively, the "AOD Entities"), a Bermuda exempted company, is a 66.2-percent owned subsidiary of Seadrill Limited.  The AOD Entities own three high-specification jack-up rigs, all of which are currently under contract.  Debtor Seadrill G.C.C. Operations Ltd. ("Seadrill GCC") operates each of the AOD Entities' rigs and pays the applicable AOD Entities a bareboat charter for each of the rigs.  The AOD Entities only own rigs—they do not have their own employees or operations.  AOD was formed in late 2010 by Mermaid Maritime Public Company Limited ("Mermaid"), a Thai company that is not affiliated with Seadrill Limited.  In July 2011, Seadrill participated in a private placement whereby Seadrill Limited obtained 33.75 percent of AOD's outstanding common stock and subsequently completed a series of transactions that resulted in Seadrill Limited becoming AOD's controlling shareholder.  The AOD entities are direct obligors under approximately $210 million of the Consolidated Entities' funded-debt obligations under one of the Bank Facilities (the "AOD Facility").  Mermaid continues to privately hold the remaining 33.8 percent of AOD common stock.

Debtors Seadrill Limited and Seadrill GCC guarantee the obligations under the AOD Facility.  The four AOD entities are also obligors under the AOD Facility, but are not Debtors.  Approximately 87 percent of the Bank Lenders under the AOD Facility have executed the Restructuring Support Agreement, which contains an agreement to forbear from exercising remedies against the AOD Entities as a result of Seadrill Limited's and Seadrill GCC's chapter 11 filings.  In light of the Bank Lender forbearance and the simple nature of the AOD Entities' capital structure and operations, Seadrill determined to pursue a restructuring of the AOD Entities' debt obligations without commencing chapter 11 cases for the AOD Entities at this time.  The Debtors will continue discussions with the AOD Entities' stakeholders, including, as necessary, the AOD Facility Bank Lenders not party to the Restructuring Support Agreement and Mermaid in hopes of reaching a consensual resolution of a restructuring of the AOD Entities.  As described in greater detail below, while such discussions have continued postpetition to date, a resolution has not been reached.

### (ii)    Non-Consolidated Entities and Description of Insulating Transactions

In addition to its wholly-owned subsidiaries and majority investments in NADL, Sevan, and AOD, Seadrill Limited owns non-majority interests in four other offshore drilling and services companies that, together with their respective subsidiaries, are referred to as the "Non-Consolidated Entities."  Certain of the Non-Consolidated Entities share common management with the Consolidated Entities.  Others are independently managed.  Each Non-Consolidated Entity corporate group has its own capital structure.

Seadrill Limited historically guaranteed certain of the Non-Consolidated Entities' funded-debt obligations. Thus, a Seadrill Limited chapter 11 filing would have triggered a default in each Non-Consolidated Entity corporate group. Before the Petition Date, the Debtors, the Non-Consolidated Entities, and certain of their respective secured bank lenders, however, took significant steps to insulate the Non-Consolidated Entities from a Seadrill Limited chapter 11 filing and, to the extent any insulation transactions remained ongoing as of the Seadrill Limited chapter 11 filing, negotiations with certain of their secured bank lenders continue under appropriate waivers. ~~The~~Assuming the waivers continue and a consensual resolution is reached with the applicable stakeholders, the Non-Consolidated Entity groups ~~now~~ will be largely unaffected by these chapter 11 cases. The Non-Consolidated Entity insulating transactions significantly benefit the Debtors' estates by reducing the scope and complexity of these chapter 11 cases and preserving and maximizing the going concern value of Seadrill Limited's interests in the Non-Consolidated Entities.

*Seadrill Partners LLC (Non-Debtor Group).* Seadrill Limited indirectly owns a 46.6-percent ownership interest (consisting of a 26.28 million common units and 16.5 million subordinated units out of a total of 91.8 million Seadrill Partners LLC units outstanding assuming a full conversion of subordinated units) in non-Debtor Seadrill Partners LLC ("Seadrill Partners," and together with its subsidiaries, collectively, the "Seadrill Partners Entities"), a Marshall Islands limited liability company. Seadrill Limited also directly owns minority interests in three subsidiaries of Seadrill Partners, consisting of 49 percent of Seadrill Capricorn Holdings LLC, 42 percent of Seadrill Operating LP, and 44 percent of Seadrill Deepwater Drillship Ltd. The Seadrill Partners Entities own 11 offshore drilling rigs, including four semi-submersible rigs, four drillships, and three tender rigs. Seadrill Partners was formed in June 2012 as a wholly-owned subsidiary of Seadrill Limited. In October 2012, Seadrill Partners completed an initial public offering of its common units, which trade on the NYSE under the ticker symbol "SDLP." The 53.4 percent of Seadrill Partners' common units not owned by Seadrill Limited is publicly held. In connection with Seadrill Partners' initial public offering, certain Seadrill Partners Entities entered into a management and services agreement with Seadrill Management Limited ("Seadrill Management"), a wholly owned subsidiary of Seadrill Limited that also manages the Consolidated Entities. Under this agreement, Seadrill Management performs substantially all Seadrill Partners management and administrative functions.

As of the Petition Date, certain of the Seadrill Partners Entities are obligated under more than $3.6 billion in funded-debt obligations, which include:

- approximately $2.9 billion outstanding under a secured, bank-funded "Term Loan B" credit facility due February 2021;

- approximately $340 million outstanding under a $1.45 billion secured, bank-funded credit facility originally due February 2018 (and extended to October 2020);

- approximately $280 million outstanding under a $420 million secured, bank-funded credit facility originally due January 2018 (and extended to July 2020); and

- approximately $93 million outstanding under a $119.1 million secured, bank-funded credit facility originally due December 2017 (and extended to June 2020).

Historically, each of the foregoing credit facilities, other than the Term Loan B credit facility, crossed over the Seadrill Limited and Seadrill Partners corporate groups. Seadrill Limited or certain of its wholly-owned subsidiaries were either a primary obligor or guarantor under the facilities. Where Seadrill Limited or its subsidiaries were primary obligors, Seadrill Subsidiary Entity-owned collateral (*i.e.*, rigs) secured the obligations under the facilities. To avoid cross-defaults and insulate the Seadrill Partners Entities from a Seadrill Limited chapter 11 filing, the Debtors, the Seadrill Partners Entities, and the Seadrill Partners Entities' bank lenders negotiated and executed a transaction in the months immediately preceding

51

the Petition Date that effectively "split" the non-Term Loan B facilities. Pursuant to this transaction, all Seadrill Limited guarantees and security granted by certain Seadrill Subsidiary Entities were released with respect to obligations of Seadrill Partners Entities, and the facilities were allocated among the Seadrill Limited and Seadrill Partners groups as appropriate—except that security granted by certain Seadrill Partners entities will continue to secure the obligations of the Seadrill Subsidiary Entities under their facilities until implementation of the Bank Deal. The transaction also included a maturity extension of two and one half years for the non-Term Loan B facilities, an aggregate $150 million pay down of those facilities ($100 million on closing, $25 million six months after closing, and $25 million 12 months after closing), and certain covenant relief. As currently structured, Seadrill anticipates that the Seadrill Partners Entities' funded-debt obligations and business operations will be largely unaffected by these chapter 11 cases.

In response to a potential breach of a senior secured net leverage covenant in each of the credit facilities described above in late 2017, Seadrill Partners issued amendment or waiver requests to the respective lenders under each credit facility to, among other things, remove, waive or otherwise remove the need to comply with the leverage covenant. On February 22, 2018, Seadrill Partners announced that it has received all lender consents to waive the leverage covenant until the Term Loan B matures in February 2021, subject to customary closing conditions. All closing conditions were satisfied as at February 23, 2018. The amendments and waivers were obtained in exchange for, among other things, an increased interest rate and adding the *West Vencedor* as collateral for the benefit of the Term Loan B lenders.

**SeaMex Limited (Non-Debtor Group).** Seadrill Limited indirectly owns a 50 percent ownership interest in non-Debtor SeaMex Limited ("SeaMex," and together with its direct and indirect subsidiaries, collectively, the "SeaMex Entities"), a Bermuda exempted company, pursuant to a joint venture with funds controlled by Fintech Advisory Inc. ("Fintech"), a Delaware corporation that is also one of the Commitment Parties. Fintech continues to hold the remaining 50 percent ownership interest in SeaMex. SeaMex's fleet consists of five high-specification jack-up rigs purchased from Seadrill Limited in March 2015 for $1.08 billion. As with the Seadrill Partners Entities, Seadrill Management performs substantially all of the SeaMex Entities' management and administrative functions pursuant to a management and services agreement. As of the Petition Date, the SeaMex Entities are obligated under approximately $640 million in funded-debt obligations, which consists of amounts outstanding under a $750 million secured, bank-funded credit facility due September 2019. In addition, SeaMex is obligated to Seadrill Limited for a seller's credit of $250 million.

To avoid cross-defaults, and to insulate the SeaMex Entities from a Seadrill Limited chapter 11 filing, the Debtors, the SeaMex Entities, and the SeaMex Entities' secured bank lenders negotiated an amendment to the SeaMex Entities' secured bank facility in the months immediately preceding the Petition Date to remove certain events of default related to a Seadrill Limited chapter 11 filing, remove certain change in control provisions, and implement certain other revisions. The SeaMex bank facility had been previously amended to remove the pre-existing Seadrill Limited guarantee. As currently structured, Seadrill anticipates the SeaMex Entities' funded-debt obligations and business operations will be largely unaffected by these chapter 11 proceedings.

**Seabras Sapura (Non-Debtor Group).** In February 2012, Seadrill and Malaysian oilfield services company SapuraKencana Petroleum Berhad (now known as Sapura Energy Berhad) ("Sapura"), through certain of their respective subsidiaries, entered into a joint venture known as Seabras Sapura to own and operate offshore oil and gas service vessels in Brazil. In connection with this joint venture, Seadrill holds 50-percent ownership interests in an Austrian limited liability company Seabras Sapura Holding GmbH ("Seabras Holding") and a Brazilian ~~limited liability company~~corporation Seabras Sapura Participaçõesoes S.A. ("Seabras Participaçoes"). Sapura owns the remaining 50 percent of each entity. Through their respective subsidiaries, Seabras Holding and Seabras Participaçoes (collectively with such subsidiaries, "Seabras") own and operate six pipe-laying support vessels, all of which are operating off the coast of

Brazil. Sapura subsidiaries are the managers of the jointly owned entities under the relevant agreements, though the Seabras Sapura joint venture is generally self-managed (*i.e.*, Seadrill Management does not provide management services).

As of the Petition Date, certain Seabras entities are obligated under approximately $1.3 billion in funded-debt obligations, which include:

- approximately $400 million outstanding under a senior secured credit facility (the "PLSV I Facility") consisting of two tranches due in November 2023 and May 2024, respectively, secured by two pipe-laying support vessels (the *Sapura Diamante* and the *Sapura Topazio*);

- approximately $700 million outstanding under a senior secured credit facility (the "PLSV II Facility") consisting of three tranches due April 2025, October 2025, and April 2026, respectively, secured by three additional pipe-laying support vessels (the *Sapura Jade*, the *Sapura Onix*, and the *Sapura Rubi*); and

- approximately $165 million outstanding under a senior secured credit facility due 2032, secured by one pipe-laying support vessel (the *Sapura Esmeralda*)

- approximately $25 million under a senior secured credit facility due 2020, which benefits from a standby letter of credit that is secured by one pipe-laying support vessel (the *Sapura Esmeralda*).

Both Seadrill Limited and a Sapura subsidiary issued limited guarantees covering, in each case, 50% of the PLSV I Facility and PLSV II Facility debt. As further credit support, Seadrill Limited and Sapura also entered into letters of undertaking in connection with the PLSV I Facility and PLSV II Facility. Before the Petition Date, to preserve and maximize the value of Seadrill's investment in Seabras, Seadrill successfully negotiated with Seabras, Sapura, and the lenders under the PLSV I Facility and PLSV II Facility a waiver of up to six months of certain potential defaults arising out of Seadrill Limited's chapter 11 filing, which waiver expires on February 28, 2018. Accordingly, as anticipated by Seadrill, Seabras's funded-debt obligations and business operations have been largely unaffected by the commencement of these chapter 11 cases due to the provision of the waiver. Seadrill will continue has continued to engage in discussions with all parties regarding a comprehensive solution, to ring-fence Seabras from Seadrill Limited's restructuring and believes it will soon finalize an agreement in respect of an extension of the above-mentioned waiver. As described in greater detail below, while such discussions have continued postpetition to date, a resolution has not, as yet, been reached.

***Archer Limited (Non-Debtor Group).*** Seadrill Limited owns a 15.7-percent equity interest in non-Debtor Archer Limited ("Archer"), a Bermuda exempted company that specializes in global drilling and well services. The 84.3 percent of Archer common shares not owned by Seadrill Limited are publicly traded on the OSE under the ticker symbol "ARCHER." In September 2007, Seadrill spun off its well services division by establishing an independent well services company, Seawell Limited ("Seawell"), and completing a $50 million private placement of 20 million shares of Seawell. In February 2011, Seawell completed a merger with Allis-Chambers Energy, Inc., and the combined company was renamed Archer Limited. Archer is self-managed. As of the Petition Date, Archer's funded debt obligations included:

- approximately $628 million outstanding under a $750 million secured, bank-funded credit facility due September 2020;

- approximately $25 million outstanding under a €48.4 million Hermes covered term loan facility due September 2020; and

- approximately $45 million outstanding under subordinated, convertible facilities (for which Seadrill Limited is the lender) due 2021.

In the months immediately preceding the Petition Date, the Debtors, Archer, and Archer's secured bank lenders negotiated—as part of a broader Archer refinancing that resulted in its current capital structure—a release of pre-existing Seadrill Limited guarantees and a reduction in the Seadrill Limited-funded subordinated loans and fees (under which approximately $146 million was previously outstanding) to the current $45 million principal amount outstanding and, to avoid cross-defaults and to insulate Archer and its subsidiaries from a Seadrill chapter 11 filing, certain amendments to the Archer bank-funded credit facilities.  As part of the transaction, Seadrill Limited also paid a fee in an amount equal to approximately ten percent (approximately $28 million) of the aggregate, contingent guaranteed liabilities and agreed that the subordinated loans and fees would be convertible to Archer equity at a pre-agreed price.  Archer consummated its broader financial restructuring through a Bermuda scheme of arrangement and parallel chapter 15 proceeding.  As currently structured, Seadrill anticipates that Archer's funded-debt obligations and business operations will be largely unaffected by these chapter 11 cases.

### (iii)    Ship Finance International Limited

SFL is 36-percent owned by Hemen, with the remaining common shares trading on the NYSE under the ticker symbol "SFL" and held by non-Seadrill affiliated entities.  Over the years, certain of the Debtors have entered into sale and leaseback arrangements with SFL subsidiaries, which are guaranteed by Seadrill Limited.  As of the Petition Date, certain of the Debtors were party to three sale/leaseback agreements with SFL subsidiaries.  As of the Petition Date, approximately $1.1 billion in aggregate obligations remained outstanding under the SFL lease agreements, all of which is guaranteed by Seadrill Limited.

Beginning in late 2016, as part of their broader restructuring, the Debtors commenced discussions with SFL regarding a consensual restructuring of the SFL leases.  The Debtors submitted an initial proposal to SFL in October 2016.  SFL responded with a counter-proposal with respect to two of the three SFL leases in November 2016.  Negotiations were then largely silent until mid-2017, when the Debtors and SFL exchanged a series of proposals and engaged in lengthy discussions that ultimately resulted in a consensual resolution that is embodied in the Restructuring Support Agreement.

Pursuant to the SFL resolution, each of the three existing Prepetition SFL lease agreementsCharters will be amended to provide for a 29 percent deferral of lease payments for a period of five years.  Deferred amounts will be paid five years from the date on which the relevant amount was deferred as part of the adjusted charter rate until the applicable purchase obligation/put option date under each lease.  The strike price in respect of the call options for each lease will be adjusted by adding deferred amounts and subtracting repaid amounts in accordance with the adjusted charter hire rates until the relevant call option date on a dollar for dollar basis.  The purchase obligation/put option date (for two of the three leases) and amount will be adjusted such that the all-in internal rate of return under each lease is reduced from the currently implied contractual level to 6.0 percent, with the put option amount under the lease in respect of the *West Linus* rig being further adjusted to $86 million.  The Prepetition SFL leasesCharters will be further amended in a manner broadly consistent with the Bank Deal terms.  The independent members of the Seadrill Limited board of directors considered and approved the SFL resolution prior to its consummation. SFL and its subsidiaries will otherwise be unaffected by these chapter 11 cases.

_____    The disinterested directors of Seadrill Limited board separately considered the SFL transaction and concluded it should be approved as part of the broader restructuring.  In the context of the broader restructuring contemplated by the Restructuring Support Agreement, including the substantial new money financing to be provided, in part, by Hemen, the Debtors believe that the SFL resolution represents

the best available alternative under the circumstances. On the Effective Date of the plan, the Debtors will assume ~~amended versions of~~ the Amended SFL ~~leases~~Charters reflecting the terms described above.

As discussed in the Committee Letter, the Committee thoroughly investigated the propriety of the assumption of the SFL leases and, on balance with the value created for general unsecured creditors in the context of the global settlement, the Committee supports the Plan.

## B. Seadrill's Operations

Seadrill contracts with vendors and customers across the globe to provide drilling services, in both benign and harsh operating environments varying from shallow to ultra-deepwater. The Debtors' largest customers include Petroleo Brasileiro S.A., or "Petrobras," (the Brazilian national oil company), Total S.A. Group, ExxonMobil Corp., LLOG Exploration Company, and Statoil ASA. The Debtors' rigs are located around the world.

The substantial majority of the Debtors' 32 rigs came online in 2007 or later. The Debtors' current contract backlog (calculated as the contracted-for day rate multiplied by the outstanding term for all active contracts) is approximately $3.1 billion. The average contract duration for the Debtors' floaters is 10 months and jack-up rigs is 30 months. Thus, the majority of the Debtors' contract backlog will come due over the course of the next one and one half years, which may be difficult to replace so long as current market conditions persist.

As of the Petition Date, 15 of the Debtors' 32 rigs are not under contract and have either been warm stacked or cold stacked. Warm stacked rigs maintain a significant number of crew and are kept fully operational and ready for deployment. Cold stacked rigs are stored in a harbor, shipyard, or other designated offshore area and the majority of the crew is dismissed or reassigned to another rig. The Debtors' warm stacked floaters cost them approximately $50,000 per rig per day while cold-stacked floaters cost them approximately $10,000 per rig per day. There is no material difference in the costs for warm stacked and cold stacked jack-up rigs.

Specifically, the Debtors own 13 jack-up rigs (~~8~~5 of which are currently under contract), while their non-Debtor affiliates own an additional 8 jack-up rigs. Of the Debtors' 13 jack-up rigs, 3 are qualified for harsh environment drilling. A summary of the year built, location, and contract status of the Debtors' 13 jack-up rigs is set forth below.

| Rig | Year | Location | Contract |
|---|---|---|---|
| *West Epsilon* | 1993 | Norway | *stacked*[27] |
| *West Prospero* | 2007 | Malaysia | *stacked* |
| *West Vigilant* | 2008 | Malaysia | *stacked* |
| *West Ariel* | 2008 | Republic of Congo | *stacked*~~February~~ |
| *West Freedom* | 2009 | Venezuela | ~~November~~ |
| *West Cressida* | 2009 | Malaysia | *stacked* |
| *West Callisto* | 2010 | Saudi Arabia | November 2018 |
| *West Leda* | 2010 | Malaysia | *stacked* |
| *West Elara* | 2011 | Norway | September 2027 |
| *West Castor* | 2013 | Mexico | December 2019 |

---

[27]   As described in greater detail below, when a drilling rig is not under contract, it may be "stacked" or stored in a non-operating state until the rig owner is able to secure a contract for that rig.

| Rig | Year | Location | Contract |
|---|---|---|---|
| *West Telesto* | 2013 | Malaysia | ~~March~~June 2018 |
| *West Tucana* | 2013 | Sharjah | *stacked* |
| *West Linus* | 2014 | Norway | December 2028 |

Additionally, The Debtors own 12 semi-submersible rigs (3 of which are currently under contract), while their non-Debtor affiliates own an additional 4 semi-submersible rigs.  Of the Debtors' 12 semi-submersible rigs, 6 are qualified for harsh environment drilling.  A summary of the year built, location, and contract status of the Debtors' 12 semi-submersible rigs is set forth below.

| Rig | Year | Location | Contract |
|---|---|---|---|
| *West Alpha* | 1986 | Norway | *stacked* |
| *West Venture* | 2000 | Norway | *stacked* |
| *West Phoenix* | 2008 | UK | ~~January~~ |
| *West Hercules* | 2008 | Norway | May 2018 |
| *West Taurus* | 2008 | Spain | *stacked* |
| *West Eminence* | 2009 | Spain | *stacked* |
| *West Orion* | 2010 | Malaysia | *stacked* |
| *West Pegasus* | 2011 | Spain | *stacked* |
| *West Eclipse* | 2011 | Angola | June 2018 |
| *Sevan Driller* | 2009 | Malaysia | *stacked* |
| *Sevan Brasil* | 2012 | Brazil | July 2018 |
| *Sevan Louisiana* | 2013 | USA | *stacked* |

The Debtors own 7 drillships (6 of which are currently under contract), while their non-Debtor affiliates own an additional 4 drillships.  A summary of the year built, location, and contract status of the Debtors' 7 drillships is set forth below.

| Unit | Year | Location | Contract |
|---|---|---|---|
| *West Navigator* | 2000 | Norway | *stacked* |
| *West Gemini* | 2010 | Angola | March 2018~~stacked~~ |
| *West Tellus* | 2013 | Brazil | October 2019 |
| *West Neptune* | 2014 | USA | November 2018 |
| *West Jupiter* | 2014 | Nigeria | December 2019 |
| *West Saturn* | 2014 | Brazil | October 2019 |
| *West Carina* | 2015 | Brazil | June 2018 |

~~The~~As of the Petition Date, the Debtors employ~~ed~~ approximately 3,760 highly skilled individuals across 22 countries and 5 continents to operate their drilling rigs and perform various other corporate functions.  ~~The~~As of the Petition Date, the Debtors' monthly payroll ~~is~~was approximately $42 million.  The skills and knowledge of Seadrill's employee base are essential to preserving operational stability, safety, and efficiency, which in turn is necessary to maximize value over the course of the Chapter 11 Cases.

**C.    The Debtor's Prepetition Capital Structure**

As of the Petition Date, the Debtors were liable for approximately $8 billion in aggregate funded-debt obligations.   These obligations arise under the 12 Bank Facilities and the six Unsecured Bond

issuances.  Seadrill Limited is an obligor under all 12 of the Bank Facilities.  The table below summarizes the Debtors' prepetition capital structure, with near-term maturing obligations indicated in red.

| **Bank Facilities** *(in US$ millions)* | **Principal** |
|---|---|
| ***Seadrill Limited Facilities*** | |
| $400 million facility due 2017 — *Jack-Up Facility* | 135 |
| $450 million facility due 2017 — *West Eminence Facility* | 265 |
| $300 million facility due 2018 | 144 |
| $1.50 billion facility due 2019 | 1,125 |
| $1.35 billion facility due 2019 | 945 |
| $950 million facility due 2019 | 566 |
| $450 million facility due 2020 | 103 |
| $440 million facility due 2017 — *Split Facility* | 64 |
| $1.45 billion facility due 2018 — *Split Facility* | 322 |
| ***NADL Facility (Seadrill Limited Guaranteed)*** | |
| $2.00 billion facility due 2017 — *NADL Facility* | 908 |
| ***AOD Facility (Seadrill Limited Guaranteed)*** | |
| $360 million facility due 2018 | 210 |
| ***Sevan Facility (Seadrill Limited Guaranteed)*** | |
| $1.75 billion facility due 2018 | 875 |
| **Total Bank Facilities** | **$5,662 million** |

| **Unsecured Bonds** *(in US$ millions—Net of Seadrill Holdings)* | |
|---|---|
| ***Seadrill Limited Bonds*** | |
| $1.00 billion bond due 2017 — *Maturing Bonds* | 843 |
| NOK 1.80 billion bond due 2018 | 230 |
| SEK 1.50 billion bond due 2019 | 188 |
| $500 million bond due 2020 | 479 |
| ***NADL Bonds*** | |
| NOK 1.50 billion bond due 2018 — *Seadrill Limited Guaranteed* | 181 |
| $600 million bond due 2019 | 413[28] |
| **Total Unsecured Bonds** | **$2,334 million** |

| **Danske Guarantee Facility** | |
|---|---|
| Outstanding Obligations | $60 million |

| **Total Obligations Outstanding** | **$8,056 million** |

     (i)    **Bank Facilities**

The Debtors generally incurred the obligations under the Bank Facilities described below to finance corporate acquisitions or the construction or acquisition of new rigs.  The facilities are secured by, among other things, (a) a first priority, perfected mortgage in one or more of the Debtors' drilling rigs, (b) guarantees from the applicable rig-owning entities and intra-group charterers, and (c) first-priority security interests in the rig-owning entities' shares, earnings, and earnings accounts.  No financial institution

---

[28]   The balance of the $600 million of bonds due 2019 are held by the Debtors and will be cancelled under the Plan.

possesses a blanket lien over the Debtors' entire fleet.  Instead, the secured credit facilities are secured by non-overlapping subsets of the Debtors' rigs.

(a)      **Seadrill Limited Facilities**

*$400 million facility due 2017 ("Jack-Up Facility"):*  On December 8, 2011, Seadrill Limited entered into that certain Senior Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain of Seadrill Limited's wholly-owned Debtor subsidiaries as guarantors, Nordea Bank Norge ASA, as agent, and the lender parties thereto.  On April 28, 2016, the parties executed an amendment extending the maturity of the Jack-Up Facility from December 8, 2016 to May 31, 2017.  On April 26, 2017, the parties executed an amendment to further extend the maturity of the Jack-Up Facility to August 31, 2017.  On August 11, 2017, the parties executed a final amendment to extend the maturity of the Jack-Up Facility to September 14, 2017.  Collateral securing the Jack-Up Facility includes four jack-up rigs owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

*$450 million facility due 2017 ("West Eminence Facility"):*  On December 13, 2013, certain of the Debtors entered into that certain Senior Secured Credit Facility Agreement, by and among Debtor Seadrill Eminence Ltd., as borrower, Seadrill Limited and one wholly-owned Debtor subsidiary of Seadrill Limited, as guarantors, Danske Bank A/S, as agent, and the lender parties thereto.  On April 28, 2016, the parties executed an agreement extending the maturity date of the $450 million *West Eminence* Facility from June 20, 2016 to December 31, 2016.  On November 22, 2016 and April 26, 2017, the parties executed additional agreements further extending the maturity, ultimately to August 15, 2017.  On August 14, 2017, because the Debtors' and the requisite lenders could not reach a consensual resolution to further extend the maturity of the *West Eminence* Facility, the Debtors sought and a court of competent jurisdiction in Bermuda entered an order approving a scheme of arrangement that effectuated an extension of the maturity of the $450 million *West Eminence* Facility to September 14, 2017.  Collateral securing the *West Eminence* Facility includes one semi-submersible drilling rig—the *West Eminence*—owned by a Debtor subsidiary of Seadrill Limited, assignment of certain earnings accounts, and a pledge of the common equity shares of Debtor and rig-owning entity Seadrill Eminence Ltd.

*$300 million facility due 2018:* On July 16, 2013, Seadrill Limited entered into that certain Senior Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain wholly-owned Debtor subsidiaries of Seadrill Limited as guarantors, DNB Bank ASA, as agent, and the lender parties thereto.  The $300 million facility matures in July 2018.  Collateral securing the $300 million facility includes two jack-up rigs owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

*$1.50 billion facility due 2019:*  On July 30, 2014, certain of the Debtors entered into that certain Senior Secured Credit Facility Agreement, by and among Debtors Seadrill Saturn Ltd., Seadrill Jupiter Ltd., and Seadrill Neptune Hungary Kft., as borrowers, Seadrill Limited and certain wholly-owned Debtor subsidiaries of Seadrill Limited as guarantors, Nordea Bank Finland Plc, London Branch, as agent, and the lender parties thereto.  The $1.50 billion facility matures in August 2019.  Collateral securing the facility includes three drillships owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

*$1.35 billion facility due 2019:*  On August 26, 2014, Seadrill Limited entered into that certain Senior Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain wholly-owned Debtor subsidiaries of Seadrill Limited as guarantors, DNB Bank ASA, as agent, and the lender parties thereto.  The $1.35 billion facility matures in August 2019.  Collateral securing the facility

includes one drillship and two semi-submersible drilling rigs owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

*$950 million facility due 2019:*  On January 26, 2015, Seadrill Limited entered into that certain Senior Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain wholly-owned Debtor subsidiaries of Seadrill Limited as guarantors, Nordea Bank AB, London Branch, as agent, and the lender parties thereto.  The $950 million facility matures in January 2020.  Collateral securing the facility includes one drillship and one semi-submersible drilling rig owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

*$450 million facility due 2020:*  On August 26, 2015, Seadrill Limited entered into that certain Senior Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain wholly-owned Debtor subsidiaries of Seadrill Limited as guarantors, Nordea Bank AB, London Branch, as agent, and the lender parties thereto.  The 2015 $450 million facility matures in August 2020.  Collateral securing the facility includes six jack-up rigs owned by Debtor subsidiaries of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

(b)     **Seadrill Limited Split Facilities.**

As described above, on August 16, 2017, the Debtors and the Seadrill Partners Entities executed a transaction to address three credit facilities that previously straddled the Seadrill Limited and Seadrill Partners capital structures.  Pursuant to that transaction, the Seadrill Limited guarantee of the $420 million Seadrill Partners facility due 2018 was severed, leaving the Debtors with no other obligations under that facility.  Certain of the Seadrill Subsidiary Entities, however, were primary obligors (and had pledged collateral) under the two other facilities described below, so the obligations under those two facilities were split between the applicable Seadrill Limited and Seadrill Partners corporate group entities.

*$440 million facility due 2017.*  On December 4, 2012, Seadrill Limited entered into that certain Secured Credit Facility Agreement, by and among Seadrill Limited, as borrower, certain of Seadrill Limited's Debtor subsidiaries, certain non-Debtor subsidiaries of Seadrill Partners, as guarantors, Citibank Europe plc, UK branch, as agent, and the lender parties thereto.  Pursuant to a transaction closing on August 16, 2017, certain obligations under the $440 million facility were novated to the Seadrill Partners corporate group before the facility was amended and restated to effectuate the split of the Seadrill Limited and Seadrill Partners corporate groups, resulting in the only obligations remaining outstanding being by Seadrill Limited and its obligor, wholly-owned subsidiaries.  Collateral securing the Debtors' obligations under the split facility includes one jack-up rig owned by a Debtor subsidiary of Seadrill Limited, assignment of certain earnings accounts, and pledges of the common equity shares of Debtor and rig-owning entity Seadrill Telesto Ltd.

*$483 million facility due 2018.*  On March 20, 2013, certain of the Debtors entered into that certain Senior Secured Credit Facility Agreement, by and among Debtor Seadrill Tellus Ltd. and non-Debtor Seadrill Vela Hungary Kft. ("Seadrill Vela Hungary"), as borrowers, Seadrill Limited, one Debtor subsidiary of Seadrill Limited and certain non-Debtor subsidiaries of Seadrill Partners, as guarantors, ING Bank N.V., as agent, and the lenders party thereto.  Pursuant to a transaction closing on August 16, 2017, the $1.45 billion facility was amended and restated to effectuate the split between the Seadrill Limited and Seadrill Partners corporate groups, resulting in only a portion of the obligations (in the amount of approximately $483 million) remaining outstanding as to Seadrill Limited and its obligor, wholly-owned subsidiaries.  Collateral securing the Debtors' obligations under the split facility includes one drillship

59

owned by Seadrill Tellus Ltd., a Debtor subsidiary of Seadrill Limited, assignment of certain earnings accounts, and a pledge of the common equity shares of Debtor and rig-owning entity Seadrill Tellus Ltd.

### (c)  NADL Facility (Seadrill Limited Guaranteed)

*$2.00 billion facility due 2018 ("__NADL Facility__"):*  On April 15, 2011, NADL entered into that certain Senior Secured Credit Facility Agreement, by and among NADL, as borrower, Seadrill Limited and certain subsidiaries of NADL, as guarantors, DNB Bank ASA, as agent, and the agents and lenders party thereto.  As described below, on April 28, 2016, the parties executed an agreement extending the maturity of the NADL Facility from April 15, 2017 to June 30, 2017.  On April 26, 2017, the parties executed an amendment to further extend the maturity to September 14, 2017.  Collateral securing the NADL Facility includes three semi-submersible drilling rigs, two jack-ups, and one drillship owned by Debtor subsidiaries of NADL, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

### (d)  AOD Facility (Seadrill Limited Guaranteed)

*$360 million facility due 2018:*  On April 9, 2013, three non-Debtor subsidiaries of AOD (collectively, the "__AOD Borrower Subsidiaries__") entered into that certain Senior Secured Credit Facility Agreement, by and among the AOD Borrower Subsidiaries, as borrowers, Seadrill Limited, one Debtor subsidiary of Seadrill Limited, Seadrill GCC Operations Limited, and AOD, as guarantors, ABN AMRO Bank N.V., as agent, and the other agents and lenders party thereto.  The AOD Facility matures in April 2018.  Collateral securing the facility includes three jack-up rigs owned by non-Debtor subsidiaries of AOD, assignment of certain earnings accounts, and pledges of the common equity shares of certain non-Debtor obligor rig-owning entities.  As described herein, the AOD Borrower Subsidiaries did not commence chapter 11 cases, but certain Debtors, including Seadrill Limited and Seadrill GCC Operations Limited, are obligors under the AOD facility

### (e)  Sevan Facility (Seadrill Limited Guaranteed)

*$1.75 billion facility due 2018:*  On September 30, 2013, certain Debtor subsidiaries of Sevan (collectively, the "__Sevan Borrower Subsidiaries__") entered into that certain Senior Secured Facility Agreement, by and among the Sevan Borrower Subsidiaries, as borrowers, Seadrill Limited and certain subsidiaries of Sevan, as guarantors, ING Bank N.V., as agent, and the lenders party thereto.  The Sevan Facility matures in October 2018.  Collateral securing the facility includes three ultra-deepwater Sevan design cylindrical-hull semi-submersible rigs owned by Debtor subsidiaries of Sevan, assignment of certain earnings accounts, and pledges of the common equity shares of certain of the Debtor obligor (including rig-owning) entities.

### (ii)  Unsecured Bonds

The Debtors are also obligated under six issuances of unsecured bonds—four issued by Seadrill Limited and two issued by NADL.  Details regarding the unsecured bonds are provided below.

### (a)  Seadrill Limited Unsecured Bonds

*$1.00 billion bond due 2017 ("__Maturing Bonds__"):*  On September 14, 2012, Seadrill Limited issued $1.0 billion of 5.625% senior unsecured notes due September 2017.  The notes are governed by that certain indenture, dated September 14, 2012, among Seadrill Limited, as issuer, and Deutsche Bank Trust Company Americas, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the notes.

***NOK 1.80 billion bond due 2018:***  On March 12, 2013, Seadrill issued NOK 1.8 billion of senior unsecured notes due March 2018.  The notes are governed by that certain bond agreement, dated March 11, 2013, among Seadrill Limited, as issuer, and Norsk Tillitsmann ASA, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the notes.

***SEK $1.50 billion bond due 2019:***  On March 18, 2014, Seadrill Limited issued SEK 1.5 billion of senior unsecured notes due March 2019.  The notes are governed by that certain bond agreement, dated March 17, 2014, among Seadrill Limited, as issuer, and Norsk Tillitsmann ASA, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the notes.

***$500 million bond due 2020:***  On September 25, 2013, Seadrill Limited issued $500 million of 6.125% senior unsecured notes due September 2020.  The notes are governed by that certain indenture, dated September 25, 2013, among Seadrill Limited, as issuer, and Deutsche Bank Trust Company Americas, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the notes.

  **(b)**  **NADL Unsecured Bonds**

***NOK 1.5 billion bond due 2018 (Seadrill Limited Guaranteed):***  On October 30, 2013, NADL issued NOK 1.5 billion of senior unsecured notes due October 2018.  The notes are governed by that certain bond agreement, dated October 30, 2013, among NADL, as issuer, and Norsk Tillitsmann ASA, as indenture trustee, as amended by that certain First Amendment and Restatement Agreement, dated February 13, 2015, among NADL, as issuer, and Nordic Trustee ASA, as indenture trustee.  The obligations under the notes are unsecured and are fully and unconditionally guaranteed on a senior unsecured basis by Seadrill Limited pursuant to that certain On Demand Guarantee, dated February 13, 2015, among Seadrill Limited, as guarantor, and Nordic Trustee ASA as bond trustee.

***$600 million bond due 2019:***  On January 31, 2014, NADL issued $600 million of 6.25% senior unsecured notes due January 2019.  The notes are governed by that certain indenture, dated January 31, 2014, among NADL, as issuer, and Computershare Trust Company, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the notes.

  **(iii)**  **Danske Guarantee Facility**

Seadrill Limited maintains a guarantee facility with Danske Bank A/S ("Danske"), pursuant to which Danske provides certain operations-related credit support to third parties.  Pursuant to the Danske Guarantee Facility, Seadrill Limited may request that Danske guarantee obligations to third parties, or issue letters of credit and other similar instruments, up to an aggregate amount of $90 million.  These instruments ~~generally~~ secure the debtors' obligations under ~~the Debtors' customer~~a variety of contracts, as well as obligations in connection with the Debtors' bids on new drilling contracts.  As of the Petition Date, there are approximately $45 million in obligations outstanding under the Danske guarantee facility.  ~~In most cases, the Debtors' customers require these performance guarantees in the ordinary course of business as a prerequisite to entering into new customer contracts.~~

  **(iv)**  **Interest Rate and Currency Swap Claims**

Seadrill Limited and NADL have entered into a variety of derivative instruments and contracts to hedge their exposure to fluctuations in interest rates and currency exchange rates.  As of the Petition Date, there are approximately $174 million of asserted unsecured obligations at Seadrill Limited on account of its interest rate and currency swaps.  As of the Petition Date, there are approximately $75 million of asserted unsecured obligations at NADL on account of its interest rate and currency swaps.

(v)        **Publicly-Held Common Shares**

*Seadrill Limited:*  Seadrill Limited is a publicly-held Bermuda exempted company listed on the NYSE and the OSE under the symbol "SDRL."  Seadrill Limited common shares have traded on the OSE since November 2005, and on the NYSE since April 2010.  Seadrill Limited's shares have continued to trade on the NYSE and OSE postpetition.  As of the Petition Date, Seadrill Limited's nonaffiliated public float represents 75.8 percent of total shares issued and outstanding, and Seadrill Limited's principal shareholder, Hemen, holds 24.2 percent of Seadrill Limited's issued and outstanding common shares.

*NADL:*  NADL is a publicly-held Bermuda exempted company whose common shares trade on the U.S. and on the Norwegian over-the-counter exchanges.  NADL common shares traded on the NYSE from January 2014 until October 9, 2017, when the shares were formally delisted from the NYSE as a result of these Chapter 11 Cases.  As of the Petition Date, Seadrill Limited owned approximately 70.4 percent of NADL's issued and outstanding common shares.

*Sevan:*  Sevan is a publicly-held Bermuda exempted company listed on the OSE under the symbol "SEVDR."  Sevan common shares have traded on the OSE since June 2015.  On September 25, 2017, the OSE suspended trading in Sevan's common shares, although the Sevan shares have remained listed, although there is no guarantee that such share will continue to be publicly listed or trade on the OSE during these chapter 11 cases.  As of the Petition Date, Seadrill Limited owns approximately 50.1 percent of Sevan's issued and outstanding common shares.

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Market Decline and Industry-Specific Challenges

Approximately three years ago, the oil and gas industry entered what has become a sustained down cycle that was brought on by low commodities prices.  Seadrill has not been immune to the effects of the market decline.  Oil prices peaked in mid-2014 at more than $115 per barrel before declining to less than $30 per barrel by early 2016.  While oil prices have recovered modestly since early 2016, they have hovered near or below breakeven pricing for offshore drilling projects.  During that same period, Seadrill Limited's common share trading price fell to a fraction of mid-2014 highs.

Seadrill also faces a mix of offshore drilling industry-specific risks.  In response to the recent market downturn, operators have significantly pared back new drilling activity.  Even as the market begins to improve, it is likely that the recovery for offshore drilling companies such as Seadrill will lag behind the market due to the comparatively high break-even price for offshore drilling projects.

Further, upstream capital expenditures, and especially the demand for offshore drilling services, are influenced as much by market expectations as actual market performance.  Due to the size of the required capital investment and typical length of offshore drilling contracts, upstream capital expenditure levels are unlikely to improve if operators expect continued volatility in the commodities markets.  As a result, on an industry-wide basis, average semi-submersible rig dayrates have decreased by more than $200,000 from mid-2014 highs, while drillship dayrates have decreased by nearly $300,000 over that time period.

Finally, Seadrill operates in a highly competitive sector.  Even in good times, offshore drilling contractors compete vigorously for new engagements.  This competition has only intensified due to the substantial industry-wide excess rig capacity.  While operators may consider a range of factors in contracting for drilling services, they tend to focus more closely on price in a weak market.  These conditions have put substantial downward pressure on the day rates offshore drillers are able to charge.

Additionally, while Seadrill's long-term contracts help to insulate it from market pressures, certain operators have aggressively pursued contract amendments in an attempt to extract favorable terms.

Although the Debtors and other offshore oil companies have actively sought to delay (and in some cases cancel) deliveries of newly-constructed rigs, and have divested or scrapped older rigs, global utilization rates remain well below historical highs.

### B.    Proactive Approach to Addressing Liquidity Constraints

In response to deteriorating market conditions, the Debtors have implemented various initiatives to reduce costs and increase efficiency. Since the end of 2014, the Debtors have reduced their employee headcount from approximately 9,500 enterprise-wide employees to approximately 4,780 enterprise-wide employees. The Debtors also decreased their rig and operating costs from $1.61 billion in 2015 to $1.02 billion in 2016 (including by stacking certain rigs), and their general and administrative expenses from $248 million in 2015 to $234 million in 2016. Moreover, Seadrill Limited suspended dividends to its common shareholders in November 2014 given uncertain market conditions. In part due to these efforts, as of the Petition Date, the Debtors had approximately $1 billion in cash. The Debtors have to date funded the Chapter 11 Cases with the consensual use of cash collateral, without the need for debtor-in-possession financing.

The Debtors also have taken steps to address contingent liabilities related to their newbuild contracts. Newbuild contract purchase obligations typically span several years and come due as the shipyard completes construction and delivers the newbuild rigs. The Debtors, however, successfully negotiated a number of newbuild deferrals and other relief with the shipyards. Hemen has close business relationships with substantially all of the Debtors' shipyards, which has helped the Debtors manage these multi-billion dollar obligations. The Debtors will continue to be able to leverage this relationship as long as Hemen remains a significant Seadrill Limited stakeholder.

Four of Seadrill's 14 newbuild contracts, implicating approximately $1.8 billion in obligations, are with Debtor entities. The purchase obligations under each of these contracts are coming due in the near term. In light of market conditions and continued low utilization rates, the Debtors are seeking to further defer these purchase obligations. However, the Debtors were unable to reach such a resolution prepetition. Further, the counterparty to two of the Debtor newbuild contracts initiated arbitration proceedings regarding the Debtors' obligations thereunder. ~~The Debtors remain in active negotiations with this newbuild counterparty. While the Debtors may seek to reject newbuild contracts if they are unable to reach satisfactory commercial resolutions, their preference is for a consensual resolution with the counterparties. While such discussions have continued postpetition, a resolution has not yet been reached.~~ As part of the global settlement described herein, the Debtors have substantially resolved all issues with the Newbuild Counterparties, including agreeing to an aggregate $1.064 billion Allowed General Unsecured Claim to be asserted against Seadrill Limited in the Chapter 11 Cases. The Debtors have also engaged in discussions with Jurong Shipyard Pte. Ltd. and a third-party purchaser for the sale of the *West Rigel* newbuild, which would result in a significant cash payment to non-Debtor North Atlantic Rigel Ltd. As of the date of this Disclosure Statement, the sale of the *West Rigel* has not closed.

Recognizing the need to examine more comprehensive restructuring solutions, Seadrill sought outside strategic advice beginning in late 2015. Seadrill ultimately engaged Kirkland & Ellis LLP (U.S. counsel), Slaughter and May (U.K. counsel and legacy corporate counsel), Conyers Dill & Pearman Limited (Bermuda counsel), and Advokatfirmaet Thommessen AS (Norway counsel) as legal advisors, Houlihan Lokey, Inc. and Morgan Stanley as financial advisors, and Alvarez & Marsal North America, LLC as restructuring advisor.

### C.    Creditor Negotiations, Bank Deal, Capital Raise Process, and Chapter 11 Filing

In May 2015, Seadrill executed certain amendments providing for limited covenant relief under the Bank Facilities.  As the market downturn persisted, Seadrill determined that it would require a more comprehensive solution to bridge to a market recovery and began to focus on negotiating a transaction that would provide for at least a five-year liquidity runway, consistent with its business plan.  Seadrill thereafter commenced discussions with the Bank CoCom regarding a broader restructuring, which ultimately led to the R1 Agreement.

As part of the R1 Agreement, the parties agreed to the initial April 30, 2017 long stop date by which Seadrill was to implement a comprehensive restructuring either in the form of an out-of-court refinancing or a transaction to be implemented through an in-court process.  But the parties were unable to reach agreement with respect to a consensual restructuring by the April 30, 2017 long stop date.  Instead, they agreed to further extend the maturities of the West Eminence Facility (to August 15, 2017), the Jack-Up Facility (to August 31, 2017), and NADL Facility (to September 14, 2017), as well as extend the long stop date to July 31, 2017.  The parties ultimately agreed to an additional, final extension of the long stop date (to September 12, 2017) and the maturities of the West Eminence Facility and the Jack-Up Facility (both to September 14, 2017, coinciding with the NADL Facility maturity).

Further Bank CoCom discussions—made possible by more than a year of Bank Facility extensions starting with the R1 Agreement—proved successful.  Beginning in late 2016, the Debtors and the Bank Lenders began to coalesce around what would become the foundation of the Debtors' restructuring—the Bank Deal.  But the Bank Lenders required, as a precondition to consummating the Bank Deal, that the Debtors secure a new capital investment of at least $1 billion to support their businesses through the downturn.  Accordingly, in September 2016, the Debtors launched a capital raise marketing process, seeking at least $1 billion in financing.

By December 2016, the Debtors had received indications of interest from several potential investors—substantially all of whom indicated that any feasible deal would necessarily include Hemen due to its industry presence, expertise, and key stakeholder relationships.  Initially, however, Hemen suggested that the Debtors first seek to raise capital in the market, potentially without Hemen's explicit backing.  By early 2017, however, the Debtors' concluded successful capital raise required the direct involvement of Hemen.

After further discussions, in March 2017, Hemen and Centerbridge submitted a proposal that would develop into the Capital Commitment.  Centerbridge has no prior affiliation with Hemen or Seadrill—thus, Centerbridge acted as an initial market check of the terms of the Capital Commitment.  Hemen's decision to back the Capital Commitment gave the Debtors the leverage to negotiate a Bank Deal that the Bank Lenders may never have supported with an alternative investor.  Many of the Bank Lenders have significant long-term relationships with Hemen and told Seadrill the necessary level of concessions and flexibility were conditioned on Hemen's involvement in Seadrill post-restructuring.

Seadrill's negotiations with Hemen and Centerbridge developed in parallel with a Capital Commitment syndication process, pursued by the Debtors after Hemen and Centerbridge expressed a desire for additional co-investors, which ultimately brought the non-Hemen/Centerbridge Commitment Parties into the fold. Hemen is a world-renowned leader in the offshore drilling and shipping markets and Hemen's participation in the Capital Commitment helped validate the investment opportunity and attracted others to participate. After engaging in extensive discussions with the Debtors, Hemen, and Centerbridge, the parties reached a resolution under which Hemen and Centerbridge would syndicate a portion of the Capital Commitment to additional Initial Commitment Parties.  From the Debtors' perspective, the core economic terms from the Hemen/Centerbridge proposal remained largely unchanged.  Further, collectively, the Initial

Commitment Parties hold approximately 40 percent of the Unsecured Bonds, meaning that the proposed syndication potentially prevents future litigation with the Unsecured Bondholder stakeholder group.

In the more than one year of active negotiations preceding the Petition Date, the board of directors of Seadrill Limited (the "Board")—including a subcommittee of the Board formed to consider restructuring-related matters—met on a number of occasions to consider various restructuring proposals, maturity extensions, and certain ancillary matters, including the Non-Consolidated Entity insulating transactions described above. Further, on January 10, 2017, to fill two vacancies of retiring Board members, the Board appointed two fully independent directors (collectively, the "Independent Directors"), each of whom had prior restructuring experience the Board recognized would benefit Seadrill's ongoing negotiations. The Independent Directors separately considered certain of the restructuring transactions, including the Non-Consolidated Entity insulating transactions and any related-party transactions like the Hemen-backed Capital Commitment. On September 7, 2017, the Board unanimously approved the Debtors' entry into the Restructuring Support Agreement. On September 12, 2017, approximately 97 percent of the Bank Lenders, the Initial Commitment Parties, the Additional Commitment Parties, and SFL (and certain of SFL's subsidiaries) executed the Restructuring Support Agreement.

In accordance with the terms of the Restructuring Support Agreement, on the Petition Date, the Debtors commenced these chapter 11 cases, as well as the parallel Bermuda insolvency proceedings of Seadrill Limited, NADL, and Sevan described below.

**D.    Disinterested Directors' Independent Investigation**

On January 10, 2017, the Board appointed Michael Grant and David Weinstein as disinterested directors of Seadrill Limited (the "Disinterested Directors"). Messrs. Grant and Weinstein have no relationship to Hemen, any of Hemen's affiliates other than Seadrill Limited, or any other entity affiliated with Seadrill Limited or John Fredriksen that would compromise their impartiality. Messrs. Grant's and Weinstein's compensation as directors of Seadrill Limited is not contingent upon taking or approving any particular action.

Shortly after their appointment, the Disinterested Directors commenced an independent investigation into potential claims that Seadrill Limited, certain of its Consolidated Subsidiaries and/or creditors of Seadrill Limited or those subsidiaries may have against Hemen, Hemen's affiliates, other entities affiliated with Mr. Fredriksen or the Debtors, and third parties that will be released under the Plan (collectively, the "Potential Estate Claims"). The Disinterested Directors asked Debtors' counsel, Kirkland & Ellis LLP ("K&E"), to assess the legal aspects of the Potential Estate Claims. Following discussion with K&E, the Disinterested Directors recognized it also would be necessary to retain a financial advisor to help them investigate the Potential Estate Claims. They requested that Seadrill and K&E retain Professor Jack Williams and his team at Baker Tilly Virchow Krause, LLP ("Baker Tilly") to assess the financial aspects of the Potential Estate Claims.

Professor Williams has extensive experience evaluating the financial aspects of claims that debtors or their estates may pursue against related and other parties. Professor Williams has served as an examiner in *In re Lyondell Chemical Company, et al.* (Case No. 09-10023 (REG), Bankr. S.D.N.Y.) and in *In re Petra Fund REIT Corp., et al.* (Case No. 10-15500 (SCC), Bankr. S.D.N.Y.). Professor Williams also served as financial advisor to the examiner, Hon. Arthur J. Gonzalez, in *In re Residential Capital, LLC et al.* (Case No. 12-12020 (MG) Bankr. S.D.N.Y.). In addition, Professor Williams frequently has testified as an expert in cases involving claims for fraudulent transfer and breach of fiduciary duty. He was one of the lead experts for a litigation trust that successfully recovered more than $5 billion for creditors in *Tronox Inc. v. Kerr-McGee Corporation* (Adv. Pro. 09-01198 (ALG), Bankr. S.D.N.Y.). Professor Williams likewise has significant experience in advising directors of companies in financial distress.

At the direction of the Disinterested Directors, K&E and Baker Tilly issued more than 100 written document requests to the Debtors.  They included requests regarding the Debtors' historical financial condition, corporate governance, related-party transactions, dividends and other issues.  The Debtors have provided more than 67,000 documents in response to these requests.  The Disinterested Directors also directed K&E and Baker Tilly to interview individuals who were involved in or have knowledge regarding the transactions that are the subject of the investigation, including Mr. Fredriksen and other current and former directors and employees of the Debtors, Seadrill Partners, and other related parties.  K&E and Baker Tilly interviewed more than 30 individuals (some of whom were interviewed multiple times):

- Current and Former Directors of Hemen Affiliated Entities:
    - John Fredriksen, Harald Thorstein and Ørjan Svanevik
- Current and Former Directors of Seadrill, Seadrill Partners and other Related Parties:
    - Kate Blankenship, Paul Leand, Georgina Sousa, Graham Robjohns, Bart Veldhuizen and Keith MacDonald
- Current and Former Members of Seadrill Management:
    - Per Wullf, Anton Dibowitz, Mark Morris, Leif Nelson, Chris Edwards and Henrik Michael Hansen
- Seadrill Treasury and Finance:
    - John Roche, Jonas Ytreland, Jeffrey Bekkerin, Scott McReaken, Grant Creed and Alex Tounkara
- Seadrill Accounting:
    - David Sneddon, Simon Butler and Tyson DeSouza
- Seadrill Marketing, Commercial and Operations:
    - Alejandro Calderon, Ole Gaarden, Dave Morrow, Jose Firmo, Alf Ragnar Løvdal, Ray Watkins, Svein Bergstad and Jon Olav Østhus

At the direction of the Disinterested Directors, K&E analyzed Potential Estate Claims under Bermudian, English and U.S. law with respect to more than 20 transactions that date back to 2013.  The claims included fraudulent transfer (both actual and constructive fraud), breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and other similar claims with respect to the following transactions:

- Dropdown Transactions with Seadrill Partners
    - *T-15* (May 2013)
    - *T-16* (October 2013)
    - *West Leo* (December 2013)
    - *West Sirius* (December 2013)
    - *West Auriga* (March 2014)
    - Sale of 28% LP Interest in Seadrill Operating LP (July 2014)
    - *West Vela* (November 2014)
    - *West Polaris* Purchase (December 2014) and Dropdown (June 2015)
- Payment of Dividends (2013 and 2014)

66

- Guarantees of Financing for Construction of Seabras Vessels (Various)
- *Songa Eclipse* Purchase (January 2013)
- *West Janus* Sale (March 2013)
- Acquisition of Controlling Interest in Asia Offshore Drilling Limited (March 2013)
- Sale of Tender Rig Business to SapuraKencana (April 2013)
- Sale/Leaseback of *West Linus* with Ship Finance (June 2013)
- Acquisition of Controlling Interest in Sevan Drilling (July 2013)
- Purchase of Seadrill Debt by Metrogas from Lloyds (December 2013)
- Purchase of $50 Million Loan Receivable from Metrogas (March 2015)
- Creation of SeaMex JV and Guarantees (March and December 2015)
- $75 Million Subordinated Loan to Archer (October 2015 - May 2016)
- Other Intercompany Agreements and Transfers (Various)
- Insider Payments (Various)

Baker Tilly focused its financial analysis on the related party transactions identified above.

In May 2017, K&E began providing weekly telephonic updates to the Disinterested Directors with respect to the independent investigation. In addition, K&E and Baker Tilly held a telephonic meeting with the Disinterested Directors on July 12, 2017 to discuss their preliminary findings and written analyses. The Disinterested Directors also met with K&E and Baker Tilly for daylong, in-person sessions on August 4, 2017 and September 6, 2017 to discuss their supplemental findings and written analyses.

On September 7, 2017, the Board unanimously approved the Debtors entering into the RSA. Because their independent investigation was not complete at that time, the Disinterested Directors required that the Debtors have an "investigation out" under the RSA. The "investigation out" allows the Disinterested Directors to terminate the RSA if they determine following the conclusion of their investigation that granting the releases contemplated under the RSA would be inconsistent with the exercise of their fiduciary duties or applicable law. (RSA § 13.04(c)). The Debtors also have an express "fiduciary out" that permits them to terminate the RSA if a superior, alternative transaction became available.

As contemplated in the RSA, the Disinterested Directors have continued their investigation. K&E and Baker Tilly have requested and received additional information from the Debtors, conducted additional interviews, and analyzed potential additional claims. K&E has continued to provide the Disinterested Directors with weekly telephonic updates. During some of these updates, the Disinterested Directors discussed written presentations and key documents regarding certain related-party transactions that K&E provided to the Disinterested Directors in advance of the calls. The Disinterested Directors, K&E and Baker Tilly had another daylong, in-person session on December 5, 2017 to discuss their supplemental findings and written analyses.

At the direction of the Disinterested Directors, K&E and Baker Tilly have provided copies of their findings and written analyses to the Creditors' Committee's legal and financial professionals. On November 2, 2017, the Debtors also produced 67,000 documents to the Creditors' Committee that previously had been provided to Baker Tilly for the investigation. Since then, the Debtors have produced additional relevant materials to the Creditors' Committee through discovery or diligence requests. Baker

Tilly also has provided copies of its supporting analyses that the Creditors' Committee has requested regarding the investigation.  On November 3, 2017 and December 6, 2017, K&E, Baker Tilly and the Creditors' Committee's legal and financial professionals had daylong sessions to discuss the investigation and obtain the Creditors' Committee's input with respect to the investigation.  Following those meetings, Baker Tilly had additional telephonic meetings with the Creditors' Committee's financial professionals to further discuss Baker Tilly's analysis and follow up questions from the Committee.

The Disinterested Directors' investigation is nearing completion.  The Disinterested Directors have concluded that only one of the Potential Estate Claims presents a reasonable chance (*i.e.*, greater than 50 percent) for the Debtors to prevail.  If they successfully prosecute that claim, the Debtors could recover a maximum of $50 million (not discounted for the probability of success on the litigation, the costs of the litigation or the attendant business risks to the Debtors from pursuing that litigation).  The Disinterested Directors have not identified any other claims on which the Debtors have a greater than 50 percent chance to prevail and believe that the majority of the remaining Potential Estate Claims are not viable.  At the direction of the Disinterested Directors, K&E and Baker Tilly are continuing to consider information produced in connection with discovery in the Debtors' chapter 11 cases, input from the Creditors' Committee's professionals and other information that becomes available in finalizing the investigation.

The Disinterested Directors did not retain separate counsel for their investigation, but relied instead on the Debtors' counsel.  As described in the Committee Letter, the Committee conducted its own investigation into the Potential Estate Claims.  However, after extensive arms-length negotiations, the Committee agreed to the global settlement which maximizes value for General Unsecured Creditors.  The Committee now supports confirmation of the Plan.

(i)        **The Debtors' Financial Condition**

To succeed on many of the Potential Estate Claims, the Debtors would need to show they were in financial distress at the time of the relevant transaction under the balance sheet test, the ability to pay test or the capital adequacy test.  Baker Tilly assessed whether Seadrill Limited was in financial distress under these three tests during the period of December 31, 2012 through December 31, 2016.

The balance sheet test considers whether a company's debts exceed its property at fair valuation.  Baker Tilly used the income approach and market approach to assess Seadrill Limited's financial condition under the balance sheet test.  Based on these analyses, Baker Tilly concluded that Seadrill Limited first failed the balance sheet test no earlier than September 30, 2015 and no later than December 31, 2015.

The ability to pay test analyzes whether a company can pay its debts as they come due over a reasonable period of time.  The capital adequacy test measures whether a company was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction.  A company is adequately capitalized when it has sufficient capital resources and cash flows to operate its business and withstand a reasonable range of foreseeable downside fluctuations in industry-specific and general economic conditions.

For the ability to pay and capital adequacy tests, Baker Tilly analyzed factors such as Seadrill Limited's projections, historical financial performance, liquidity, leverage, capital expenditures, backlog, and covenant compliance.  Baker Tilly also considered comparable company and industry analyses as well as other indicators.  Based on these factors, Baker Tilly concluded Seadrill Limited failed the ability to pay and capital adequacy tests no earlier than the third quarter of 2015.

The ability to pay and capital adequacy tests should reflect "all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or

unsecured loans over the relevant time period." *Moody v. Pacific Security*, 971 F.2d 1056, 1072 n.24 (3d Cir. 1992). Relevant sources of funds for these tests should also reflect support from a parent company or affiliated entities. *In re Opus East, LLC*, 528 B.R. 30, 55-56 (Bankr. D. Del. 2015) ("While cash flow timing issues did arise from time to time…, the Debtor addressed these timing issues by borrowing under its line of credit with BOA, borrowing from a related party lender …, obtaining capital infusions from its parent company, triaging projects or selling an asset."), *aff'd* 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd* 2017 WL 4310367 (3d Cir. Sep. 28, 2017); *In re Bachrach Clothing, Inc.*, 480 B.R. 820, 875-76 (Bankr. N.D. Ill. 2012) (where post-LBO company had bank credit and its sponsor "had the financial strength to contribute capital and did," the court found that should "really end" the capital adequacy analysis); *In re Viscount Air Services, Inc.*, 232 B.R. 416, 434 (Bankr. D. Ariz. 1998) (finding adequate capitalization where company "was on the verge of acquiring a new, major shareholder whose financial resources appeared to improve the company's financial wherewithal").

Facts developed through the investigation show that Seadrill Limited reasonably expected it would receive financial support from entities affiliated with Mr. Fredriksen. One of those entities, Metrogas, previously functioned as Seadrill's revolving credit facility. From March 2012 through September 2013, Seadrill Limited borrowed $1.63 billion in ten short term loans from Metrogas to address cash flow issues. Metrogas quickly approved these loans at approximately market rates with no commitment fees or caps. Witnesses interviewed during the investigation confirmed that Fredriksen entities historically provided financial support whenever Seadrill Limited needed it and no funding request was ever denied.

If Baker Tilly considers that Seadrill Limited had access to capital from a Fredriksen-related entity, Seadrill Limited was able to pay its debts and was adequately capitalized through the end of Baker Tilly's testing period in December 2016.

### (ii)    Dropdown Transactions with Seadrill Partners

In June 2012, Seadrill Limited created a growth-oriented master limited partnership ("MLP") called Seadrill Partners LLC to acquire offshore drilling rigs from Seadrill Limited and third parties that were under long-term contracts with major oil companies. From May 2013 through June 2015, Seadrill Limited sold assets to Seadrill Partners in eight dropdown transactions. A conflicts committee at Seadrill Partners represented the MLP's interests in connection with each of the transactions and obtained fairness opinions that confirmed the transactions were fair from Seadrill Partners' perspective. Seadrill Limited did not obtain its own fairness opinions.

The Disinterested Directors concluded the Debtors do not have viable claims against Seadrill Partners with respect to the dropdown transactions for the following reasons.

First, Seadrill Partners benefitted Seadrill Limited. By creating an MLP, Seadrill Limited obtained an additional source of capital that attracted investors with a lower risk profile than Seadrill Limited's existing shareholders. The dropdown transactions also allowed Seadrill Limited to monetize its long-term contracts for those rigs, invest the proceeds to further grow its business, and deleverage its balance sheet by having Seadrill Partners assume significant debt. Seadrill Limited likewise eliminated its re-contracting risk in a down market with respect to the rigs it sold to Seadrill Partners while retaining equity and enhanced distribution rights in Seadrill Partners that allowed Seadrill Limited to preserve upside. Moreover, Seadrill Limited continued to operate the rigs it sold to Seadrill Partners for a management fee, which further allowed Seadrill Limited to continue to spread its overhead costs across the assets.

Second, the Debtors received fair value for each of the dropdown transactions. Baker Tilly analyzed the fairness opinions obtained by Seadrill Partners for the dropdown transactions and other contemporaneous indications of value. Baker Tilly then made certain adjustments to the fairness opinions

to assess the fairness of the dropdowns from Seadrill Limited's perspective given these contemporaneous indications of value. Based on this analysis, Baker Tilly determined that Seadrill Limited received fair value in each of the eight dropdown transactions. Moreover, in the aggregate, Seadrill Limited received $2.33 billion in exchange for assets that ranged from $2.05 billion to $2.93 billion. Thus, the percentage of value Seadrill Limited received to the value it transferred ranges from 79.4% to 113.3%. K&E also considered theories under U.S. fraudulent transfer law that might be available to collapse the dropdown transactions with certain of the dividends during 2013 and 2014 but concluded they were not viable.

Third, all of the dropdowns occurred before Seadrill Limited began experiencing financial distress sufficient to support a claim under the balance sheet test, ability to pay test or adequate capital test. Seven of the dropdowns occurred during 2013 and 2014. The eighth dropdown occurred in June 2015, which is close to the earliest date (third quarter 2015) when Baker Tilly concluded Seadrill Limited failed the ability to pay and adequate capital tests (without taking into account capital that was available from a Fredriksen-entity). For that transaction, though, Baker Tilly concluded based on its analysis that the Debtors received between 86.9% and 122.5% of the value of the rig, rendering a claim for fraudulent transfer is unlikely to succeed even if the Debtors could move up the date of financial distress.

Fourth, Seadrill Limited and Seadrill Partners created a process with arm's-length attributes to ensure the terms of each dropdown transaction were fair. Seadrill Limited would offer assets for Seadrill Partners to purchase on terms it believed were fair. The Seadrill Partners conflicts committee, which consisted of directors that were independent of Seadrill Limited, then considered each transaction and obtained opinions from third parties attesting to the fairness of each transaction to Seadrill Partners. As set forth above, Baker Tilly has now assessed these fairness opinions from Seadrill Limited's perspective and determined based on its analysis that Seadrill Limited received fair value as well.

For these reasons, the Disinterested Directors concluded that the Debtors do not have viable claims for fraudulent transfer and breach of fiduciary duty with respect to the Seadrill Partners dropdown transactions.

### (iii)   Payment of Dividends

In 2013 and 2014, Seadrill Limited paid pro rata dividends to its shareholders of approximately $1.29 billion and $1.42 billion, respectively. Based on its approximate pro rata share ownership, Hemen's portion of these dividends was approximately $315 million in 2013 and $343 million in 2014. In November 2014, Seadrill Limited suspended its dividend given uncertain market conditions and other factors. Market analysts at the time criticized Seadrill Limited for suspending its dividend. Seadrill Limited has not paid dividends since the suspension.

The Disinterested Directors concluded that the Debtors do not have viable claims to recover some or all of the dividend payments. To succeed on a fraudulent transfer claim with respect to a dividend payment, the Debtors would need to show that Seadrill Limited failed the balance sheet, ability to pay or capital adequacy tests at the time or as a result of the dividend payment. Similarly, under Bermud~~an~~ law, the dividends would be improper only if there were reasonable grounds for believing that Seadrill Limited could not satisfy the ability to pay or balance sheet tests. As set forth above, Baker Tilly concluded that Seadrill Limited was not in financial distress under any of the three tests until the third quarter of 2015—well after the final dividend payments were made.

### (iv)   Purchase of $50.9 Million Loan Receivable from Metrogas

In October 2014, Archer Limited needed $50 million in subordinated debt or equity to avoid a default under its credit facility. If Archer defaulted, Seadrill Limited faced a number of risks including that

70

Archer's lenders would call $200 million of guarantee obligations from Seadrill Limited, Seadrill Limited's other credit facilities would potentially cross default, and Seadrill Limited's 39% equity stake in Archer would materially decrease in value. Seadrill Limited therefore was committed to helping Archer avoid a default. On October 14, 2014, the Board approved Seadrill Limited underwriting $20 million of the $50 million Archer equity raise and increasing Seadrill Limited's guarantee to $250 million. By October 22, 2014, however, it was becoming clear that Archer would not be able to raise the $50 million in equity necessary to avoid the default given general market conditions and the fact that Archer's stock was trading around or below its par value. Archer was planning to report its third quarter results on October 30, 2014 so it needed to address this issue quickly. Therefore, it obtained a subordinated loan for $50 million from a Hemen-affiliate, Metrogas, on October 24, 2014. Archer then announced on October 30, 2014 that the $50 million Metrogas loan satisfied the requirement for additional funding requested by Archer's lenders under its credit facility, which allowed Archer to avoid a default.

The Disinterested Directors have not identified any documentation that shows why Seadrill Limited did not make the loan directly to Archer in October 2014 given the significant risks it faced if Archer defaulted. Various explanations have been given during interviews over the course of the investigation, including that Seadrill Limited could not provide the loan quickly enough or that it needed to analyze whether providing the loan would result in Seadrill Limited needing to reconsolidate Archer or to make a mandatory offer for Archer's ~~stock~~shares. Other interviewees suggested that Seadrill Limited had implicitly agreed to buy the loan receivable from Metrogas once it worked through these issues regarding reconsolidation and mandatory offers. The Disinterested Directors have not identified any documentation regarding this implicit obligation.

In late February 2015, Archer contacted Seadrill Limited about purchasing the loan receivable from Metrogas. On March 5, 2015, the Board agreed to purchase the receivable from Metrogas for $50.9 million (which represented the principal amount plus interest and accrued commitment fees). By the end of 2015, Seadrill Limited had written the loan down to $0 based on applicable accounting rules. Baker Tilly has concluded that Seadrill Limited did not receive fair value when it purchased the loan receivable from Metrogas.

The Disinterested Directors assessed various claims with respect to the $50.9 million purchase of the Metrogas loan. Because Seadrill Limited was not in financial distress under the balance sheet, ability to pay or adequate capitalization tests in March 2015 and there is no evidence of fraudulent intent, the Disinterested Directors concluded a claim for fraudulent transfer was unlikely to succeed. It is also unlikely that the Debtors could recover on a claim for corporate waste because there were justifications for purchasing the loan receivable, including maintaining access to financing from Metrogas (which historically had served as Seadrill Limited's de facto revolver). The Disinterested Directors, however, believe that the Debtors have a greater than 50 percent chance of prevailing on a fiduciary duty claim given the lack of documentation evidencing Seadrill Limited's implied obligation to purchase the Metrogas loan or the reasons why Seadrill Limited paid $50.9 million for a receivable that was worth far less than the amount Seadrill Limited paid. This claim, however, is not without litigation risk. Bermud~~ian~~ law and Seadrill Limited's bye-laws provide limitations on liability that could preclude recovery on any potential fiduciary duty claim the Debtors could assert given that there is no evidence of fraud or dishonesty with respect to this or any of the transactions analyzed. There are also additional challenges to recovering on fiduciary duty claims under foreign law as compared to Delaware law. Because they are assessing claims for the benefit of the estate and given the facts developed to date on this transaction, however, the Disinterested Directors concluded for purposes of their analysis that there was a greater than 50 percent chance of succeeding on the Metrogas claim.

<p style="text-align:center">(v)  <strong>Additional Investigation Transactions and Topics</strong></p>

Other than the Metrogas loan purchase claim, the Disinterested Directors have not identified any other Potential Estate Claims on which the Debtors have a greater than 50 percent chance to prevail and believe the majority of the remaining Potential Estate Claims are not viable.  Below is a summary of the remaining transactions and issues that the Disinterested Directors have considered.

**Guarantees of Financing for Construction of Seabras Vessels (Various)**:  On May 11, 2012, Seadrill Limited and SapuraKencana formed a joint venture called Seabras to service long-term deepwater pipelaying contracts with Petrobras in Brazil.  To perform under these contracts, Seabras ordered six pipe laying support vessels ("PLSVs").  Seadrill Limited and SapuraKencana provided certain guarantees to the lenders under four financing agreements to fund the construction of the PLSVs from 2013 to 2015.  Baker Tilly has concluded that these contingent guarantee liabilities are not material because, among other reasons, the collateral value of the PLSVs exceeded the amount of the guaranteed obligations at all relevant times.

***Songa Eclipse* Purchase (January 2013)**:  On January 3, 2013, Seadrill Eclipse Ltd. (a debtor subsidiary of Seadrill Limited) purchased the *Songa Eclipse* semi-submersible rig and a drilling contract with Total Offshore Angola from Songa Eclipse Ltd. for $590 million.  This was an arm's-length, third-party transaction.

***West Janus* Sale (March 2013)**: On March 21, 2013, Seadrill Janus Ltd. (a subsidiary of Seadrill Limited) sold the *West Janus* jack-up to Harrington General Trading LLC for $73 million.  This was an arm's-length, third-party transaction.

**Acquisition of Controlling Interest in Asia Offshore Drilling (March 2013)**: Beginning in late 2012, Seadrill Limited purchased additional shares in AOD on the open market and through mandatory offers to other shareholders.  These purchases increased Seadrill Limited's ownership in AOD to 66 percent. In March 2013, Seadrill Limited and Mermaid (the other principal shareholder in AOD) reached an agreement that gave Seadrill Limited control of the AOD Board.  These were arm's-length, third-party transactions.

**Sale of Tender Rig Business to SapuraKencana (April 2013)**: On April 30, 2013, Seadrill Limited sold the majority of its tender rig business to SapuraKencana for $2.9 billion.  This was an arm's-length, third-party transaction.

**Sale/Leaseback of *West Linus* with Ship Finance (June 2013)**: On June 28, 2013, NADL sold the entity that owned the *West Linus* jack-up rig to Hemen-affiliate Ship Finance as part of a sale/leaseback transaction.  At the time of the sale, the *West Linus* was under construction.  Ship Finance paid NADL the value of the *West Linus* at the time of delivery, which exceeded the construction cost.  NADL also obtained profits from operating the *West Linus*.

**Acquisition of Controlling Interest in Sevan Drilling (July 2013)**: In July 2013, Seadrill Limited acquired a majority stake in Sevan Drilling by purchasing shares on the open market.  These were arm's-length, third-party transactions.

**Purchase of Seadrill Debt by Metrogas from Lloyds (December 2013)**:  In January 2011, Seadrill Limited entered into a $1.121 billion senior secured credit facility with Lloyds and another lender to finance the acquisition of the *West Leo* and *West Pegasus*.  In 2013, Lloyds sought to divest all of its offshore investments, including its remaining interests in the Seadrill credit facility.  Lloyds agreed to sell its $851.8 million stake in the facility to Metrogas for $796.4 million—a discount of $55.4 million.  On

<p style="text-align:center">72</p>

October 22, 2013, the Board approved Seadrill Limited's entry into an agreement with Lloyds under which the loans were transferred and novated from Lloyds to Metrogas.  The sale closed on December 10, 2013.  Because Seadrill Limited only had $551 million in cash at the end of the third quarter of 2013, it could not have purchased the loans directly from Lloyds.  On December 13, 2013, Seadrill Limited sold the *West Leo* to Seadrill Partners in a dropdown transaction.  As part of that transaction, a Seadrill Partners entity entered into a "back to back" intercompany loan agreement with Seadrill Limited for $485.5 million that required the Seadrill Partners entity to make all payments to the lenders, including Metrogas.  On February 21, 2014, Seadrill Partners obtained $1.8 billion in Term Loan B financing.  Seadrill Partners used a portion of the proceeds from the Term Loan B to repay the *West Leo* portion of the senior secured credit facility, which resulted in a payment of $436 million from Seadrill Partners to Metrogas.  Seadrill Limited repaid the remaining balance of the facility (which related to the *West Pegasus*) in August 2014.  Because Seadrill Limited paid the *West Pegasus* facility approximately three years before maturity, Seadrill Limited requested a rebate from Metrogas of the portion of the discount Metrogas obtained from Lloyds that related to the remaining three-year term of the facility.  Metrogas agreed to rebate $20 million of the discount to Seadrill Limited.

**Creation of SeaMex JV and Guarantees (March and December 2015)**:  In March 2015, Seadrill Limited and Fintech created SeaMex, a joint venture formed to operate rigs in Mexico under long-term drilling contracts with Pemex.  Seadrill Limited sold five jack-ups to SeaMex for $1.325 billion.  Seadrill Limited recorded a gain of $181 million on the deconsolidation of SeaMex and the sale of the jack-ups.  In December 2015, Seadrill Limited and Fintech provided guarantees to the lenders under the financing facility for $30 million relating to potential liquidity shortfalls and $51 million for any prepayment deficits.  Both of these guarantees were released in September 2016.

**$75 Million Subordinated Loan to Archer (October 2015-May 2016)**:  In August 2015, Seadrill Limited learned Archer likely would breach certain covenants at the end of the third quarter of 2015.  At the time, Seadrill Limited continued to face a number of risks with respect to Archer, including that Archer's lenders would call $250 million of guarantee obligations from Seadrill Limited and Seadrill Limited's other credit facilities would potentially cross default.  Because of these risks, on October 8, 2015, the Board approved providing an additional $75 million in equity or subordinated debt to Archer if Archer could not sell assets or engage in another transaction acceptable to its lenders before the end of April 2016.  On December 17, 2015, the Board approved an Equity Undertaking agreement that was consistent with the terms discussed in October 2015.  Because Archer was not able to complete a sale or other transaction by April 2016, the Board approved a $75 million subordinated loan from Seadrill Limited to Archer on May 19, 2016.  Baker Tilly concluded that the value of the receivable Seadrill Limited received in exchange for the $75 million loan was significantly less than $75 million.  Baker Tilly also concluded, however, that Seadrill Limited received significant indirect benefits through the transaction, including a reduction in the probability that Seadrill Limited would be required to satisfy a $250 million in guarantee on Archer's outstanding debt and a reduction of cross-default risk.

**Other Intercompany Agreements and Transfers (Various Dates)**:  Seadrill Limited has engaged in transactions with certain related parties, including NADL, AOD, Sevan, SeaMex, Archer, SFL, Frontline, Metrogas, Seatankers, and Golden Ocean.  These transactions include loans, interest payments, lease/charter fees, and management and other fees.  Baker Tilly has reviewed certain of these transactions and concluded that the types and categories of transfers are ordinary course transactions.

**Insider Payments (Various Dates)**:  In the year prior to filing for chapter 11, the Debtors made approximately $22.9 million in payments to individual insiders.  The Debtors, Baker Tilly, K&E and the Creditors Committee's professionals are continuing to work through privacy issues under the laws of various jurisdictions so they can obtain additional details about those payments.  Based on currently-available information, the majority of these payments appear to be ordinary-course transactions such as

salaries and bonuses, retirement benefits, and expense reimbursements. In addition, in the year prior to filing for chapter 11, the Debtors made approximately $21 million in payments to corporate insiders. Nearly all of these payments (approximately $20 million of the $21 million) were fees paid to Hemen Investments Limited for the $1.~~06~~08 billion Capital Commitment.

### (vi)    Conclusion

The Disinterested Directors' investigation is nearing completion. The Disinterested Directors have concluded that only one of the Potential Estate Claims presents a reasonable chance (*i.e.*, greater than 50 percent) for the Debtors to prevail. If they successfully prosecute that claim, the Debtors could recover a maximum of $50 million (not discounted for the probability of success on the litigation, the costs of the litigation or the attendant business risks to the Debtors from pursuing that litigation). The Disinterested Directors have not identified any other claims on which the Debtors have a greater than 50 percent chance to prevail and believe that the majority of the remaining Potential Estate Claims are not viable.

Based on this investigation and following dozens of calls and meetings with K&E and Baker Tilly since May 2017, the Disinterested Directors have concluded based on all information available to date that the terms of the Debtors' restructuring described in the Plan of Reorganization are fair, reasonable and in the best interests of the estate. As set forth above, the Debtors need Hemen to participate in their restructuring. Despite the Debtors' extensive pre-petition marketing efforts, Hemen and Centerbridge provided the sole and only actionable financing proposal pre-petition, and Hemen remains one of the lead investors in Debtors' $1.~~06~~08 billion Capital Commitment under the Plan. Following additional extensive marketing efforts post-petition, the Debtors received two more bids. Both bids, however, lack independent and essential senior secured financing and regardless still require Hemen's participation in the Debtors' restructuring. During negotiations of the Bank Deal, the Co-Com also made clear that it required Hemen's participation in the Debtors' restructuring now and in the future. In turn, Hemen insisted on additional amortization deferrals, maturity extensions and covenant flexibility from the Co-Com before agreeing to participate in the $1.~~06~~08 billion Capital Commitment. The Debtors believe that the Bank Deal as reflected in the Plan—which is predicated on Hemen's participation in the Debtors' restructuring—provides the Debtors with below market terms that result in at least an additional $457 to $563 million of value to the Debtors' estates.

Hemen, however, will not participate in the Debtors' restructuring without a release of the Potential Estate Claims. The Disinterested Directors have concluded that the value of Hemen's participation in the Debtors' restructuring far exceeds any potential litigation recovery the Debtors could obtain if they pursued the Potential Estate Claims against Hemen and other entities. Thus, based on the information available to date, the Disinterested Directors believe that the releases contemplated under the Plan are necessary, fair and appropriate. The Disinterested Directors will evaluate any new material information that becomes available, including whether such information warrants reconsideration of the Disinterested Directors' conclusions and exercise of their "investigation out" set forth in the Restructuring Support Agreement.

### E.    Bermuda Proceedings

To implement the foregoing restructuring, in parallel with these chapter 11 cases, contemporaneously with the Debtors' commencing these chapter 11 cases, Seadrill Limited, NADL, and Sevan (collectively, the "Bermuda Debtors") commenced "provisional liquidation" proceedings (the "Bermuda Proceedings") pursuant to sections 161 and 170 of the Bermuda Companies Act 1981 by presenting "winding up" petitions to the Bermuda Court. Upon the application of the Bermuda Debtors, the Bermuda Court appointed three joint "provisional liquidators" for each of the Bermuda Debtors with respect to the restructuring of those companies in these chapter 11 cases. The joint provisional liquidators act as officers of the Bermuda Court, and will be required under the order to report to the Bermuda Court

from time to time on the progress of the Bermuda Debtors' chapter 11 proceedings.  Under the order appointing the joint provisional liquidators, the joint provisional liquidators' powers are limited such that the Bermuda Debtors' management team and boards of directors remain in control of the Bermuda Debtors' day-to-day operations and these chapter 11 cases and the joint provisional liquidators have the power to oversee the process, including the review of documents.  Upon the appointment of joint provisional liquidators in respect of each of the Bermuda Debtors, a statutory stay of proceedings in Bermuda against those three entities or their assets automatically arose.  On October 27, 2017, the first "return date" for the Bermuda petitions—similar to a "second day" hearing in a chapter 11 proceeding—the Bermuda Court adjourned the Bermuda "winding up" petitions to April 27, 2018.

~~Upon confirmation of the Plan, the Debtors'~~The provisional liquidators' Bermuda law counsel, with the support of the Debtors, will apply for winding up orders in respect of each of the Bermuda Debtors (each a "Winding Up Order")~~."~~ as soon as practicable following the Effective Date in accordance with the Description of the Transaction Steps. At the date previously set for the hearing of the winding up petitions, the Supreme Court of Bermuda will be requested to make a Winding Up Order in respect of each of the ~~companies~~Bermuda Debtors and at the same time make an order that the joint provisional liquidators ~~become permanent liquidators and~~continue but assume full winding up powers which will result in the displacement of the board and officers of the Bermuda Debtors. The ~~permanent~~joint provisional liquidators will then proceed to take formal steps to wind up the Bermuda Debtors. The joint provisional liquidators~~, with the support of the Bermuda Debtors,~~ will also seek formal recognition of the Confirmation Order in Bermuda. The joint provisional liquidators ~~and the Bermuda Debtors intend to commence~~have commenced the process of seeking recognition of the Confirmation Order in Bermuda prior to confirmation of the Plan. ~~The~~Upon an application by the joint provisional liquidators, on notice, the Bermuda Court may conditionally grant such recognition prior to confirmation of the Plan~~, after issuance of proper notice summons~~ in accordance with Bermuda law.  Any party wishing to contest recognition of the Confirmation Order by the Bermuda Court is required to appear at the appropriate time in the Bermuda Proceedings to contest such recognition. In the course of the winding-up, the joint provisional liquidators will seek an order dispensing with the first meeting of creditors and shareholders and will apply for an order appointing them as permanent liquidations.

On or before the effective date of the Debtors' chapter 11 plan, the Debtors will form "new" (*i.e.*, reorganized) Seadrill Limited, NADL, and Sevan to hold the assets of "old" Seadrill Limited, NADL, and Sevan and otherwise reside in their respective positions in the new RigCo/IHCo/NSNCo holding structuring described above.

## VII.  MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.  Corporate Structure upon Emergence

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions), each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

To implement the restructuring contemplated by the Plan, the Debtors intend to take a number of steps after confirmation of the plan (but prior to emergence from chapter 11) to re-cast their corporate structure and put in place their new capital structure.  These steps include:

- seeking recognition of the Confirmation Order in Bermuda;

- incorporating certain new corporate entities, including new Bermuda holding companies, that will sit in the Debtors' re-cast corporate structuring

- executing the New Secured Notes indenture and taking all steps necessary to put in place the New Secured Notes collateral agent and security package;

- taking all steps necessary to execute subscription and secure the funding on account of the Rights Offering contemplated by the Plan;

- taking all steps necessary to secure public listing of the New Seadrill Common Shares on or as soon as is reasonably practicable after emergence from chapter 11;

- reorganizing Seadrill's corporate structuring into the new IHCo/NSNCo/RigCo holding structure described herein;

- rationalizing intercompany and intergroup funding balances;

- executing and taking all steps to satisfy the conditions precedent to the effectiveness of the re-profiled secured credit facilities; and

- paying certain professional and other fees.

The Subject to obtaining the necessary corporate consents, third party consents and governmental approvals and regulatory clearances (as referred to in Article IV.A above), the Debtors anticipate that they will be able to execute all of the foregoing steps in a timely fashion on or prior to emergence from chapter 11.

## B.    Expected Timetable of the Chapter 11 Cases

As described above, the Investment Agreement contains a nine month milestone to secure confirmation of a chapter 11 plan and an eleven month milestone to emerge from chapter 11.  Thus, to ensure that the Debtors and their stakeholders will benefit from the Capital Commitment and, more broadly, the Restructuring Support Agreement, the Debtors intend to move as quickly as practicable during these chapter 11 cases.  Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 within eleven months after the Petition Date.  **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

## C.    First/Second Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Edgar W. Mosley II, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First*

*Day Motions*, filed on September 12, 2017 [Docket No. 5].  At a hearing on September 13, 2017, the Bankruptcy Court granted all of the relief initially requested in the First Day Motions.

On October 10, 2017, the Debtors held their second day hearing before the Bankruptcy Court.  At the second day hearing, the Bankruptcy Court granted certain of the first day relief on a final basis, including authority to continue to pay employee wages and benefits, pay certain taxes, and pay certain trade obligations in the ordinary course.  As an accommodation to the Committee (as defined below), the Debtors agreed to continue the final hearing with respect to continuation of the Company's cash management system and use of the Bank Lenders' cash collateral to October 24, 2017.  At the hearing on October 24, 2017, the Bankruptcy Court granted the remaining requested relief on a final basis with regards to cash management and cash collateral.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://cases.primeclerk.com/Seadrill.

### D.    Other Procedural and Administrative Motions

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Ordinary Course Professionals Motion.  On September 30, 2017, the Debtors filed the Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business [Docket No. 199] (the "OCP Motion").  The OCP Motion seeks to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses.  On October 31, 2017, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. 375].

- Retention Applications.  On September 29 and 30, 2017, the Debtors filed a number of applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including Kirkland & Ellis, LLP, and Jackson Walker L.L.P. as legal counsel, Slaughter and May, Willkie Farr & Gallagher LLP, Advokatfirmaet Thommessen AS, Skadden, Arps, Slate, Meagher & Flom LLP,  and Conyers Dill & Pearman Limited as special legal counsel, Houlihan Lokey Capital, Inc. as financial advisor, Baker Tilly Virchow Krause, LLP, as financial advisors to the disinterested directors of Seadrill Limited, Alvarez & Marsal North America, LLC as restructuring advisor, and PricewaterhouseCoopers LLP as independent auditor, and KPMG LLP as tax services provider (collectively, the "Retention Applications").  Between October 31, 2017, and November 1, 2017, the Bankruptcy Court approved each of the Retention Applications.  The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases.  The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

### E.    Schedules and Statements

On November 10, 2017, the Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket Nos. 462 through 633].

### F.      Establishment of a Claims Bar Date

On October 31, 2017, the Bankruptcy Court entered an order (the "Bar Date Order") establishing January 3, 2018 as the general claims bar date and March 12, 2018 as the governmental claims bar date [Docket No. 365].  On or before November 17, 2017, the Debtors served notice of the bar dates in accordance with the Bar Date Order.  On or before November 20, 2017, the Debtors published notice of the bar dates in accordance with the Bar Date Order.  Any party required to file a proof of claim under the Bar Date Order which fails to do so before the applicable bar date will be forever barred, estopped, and enjoined from asserting such claim against the Debtors and the Debtors will be forever discharged from any indebtedness or liability relating to such claim.  Such party will not be permitted to vote to accept or reject the Plan or receive any recovery under the Plan.

### G.      Appointment of Official Committee

On September 22, 2017, the U.S. Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors*, notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases.  The Committee is currently composed of the following members:  Nordic Trustee AS, Deutsche Bank Trust Company Americas, Computershare Trust Co., Daewoo Shipbuilding & Marine Engineering Co., Ltd., Samsung Heavy Industries Co., Ltd., Pentagon Freight Services, Inc. and Louisiana Machinery Co., Ltd.  The Committee has retained Kramer Levin Naftalis & Frankel LLP as its legal counsel, FTI Consulting as its financial advisor, and Perella Weinberg Partners as investment banker.

As discussed above, the Committee initially focused on understanding the relief requested in the First Day Motions.  The Debtors were ultimately able to consensually resolve all concerns raised by the Committee with respect to the First Day Motions.  The Committee has subsequently focused on extensive diligence and discovery efforts targeted at understanding the Debtors' business, their relationship with certain of their affiliates, and the restructuring transaction contemplated by the Restructuring Support Agreement.  The Debtors have provided substantial diligence to the Committee's advisors, including an initial informational session the week of October 2, 2017, advisors-only diligence sessions in New York the week of of October 23, 2017, diligence sessions with Company representatives in London the week of November 6, 2017, and access to over 67,000 documents.  The Debtors continue to respond to reasonable Committee diligence requests and discussions with the Committee remain ongoing.

As described herein, the Debtors have engaged in numerous discussions with the Committee to address their issues with the Plan and this Disclosure Statement, including a number of in person settlement conferences that included other parties in interest.  The Debtors have also engaged in extensive discussions with certain parties represented among the Committee's membership, including the Newbuild Counterparties and the Ad Hoc Group.  As described below, the Debtors were ultimately able to reach a global resolution supported by the Committee.

### H.      Formation of Equity Committee Denied

In the weeks following the Petition Date, a number of existing Seadrill equity holders mailed letters to the U.S. Trustee and the Bankruptcy Court advancing various arguments vis-à-vis the interests of existing equity holders, including requesting the appointment of an official committee of equity security holders.  After receiving a request for a response from the U.S. Trustee, on October 16, 2017, the Debtors submitted a response to the U.S. Trustee arguing against appointment of an official equity committee.  On October 19, 2017, the U.S. Trustee issued a statement declining to appoint an official equity committee.  On November 1, 2017, the Bankruptcy Court held a hearing to consider the requests of an official equity committee.  The Bankruptcy Court denied such appointment, finding that the requesting holder had failed to carry his burden of showing that existing equity has some prospect for a recovery in the chapter 11 cases.

As demonstrated by the proposal that developed into the Capital Commitment, as well as the proposals received from Barclays and the Ad Hoc Group, existing equity holders are substantially out of the money in these chapter 11 cases and are not likely to receive a recovery unless the conditions in the plan are satisfied.

## I. Formation of Ad Hoc Group

Shortly after the commencement of these chapter 11 cases, an ad hoc group of holders of the Unsecured Bonds (the "Ad Hoc Group") formed and ~~immediately,~~ asserted, in addition to certain material issues with the plan and the Debtors' postpetition marketing process, that its members had been ~~unfairly~~ excluded from the pre-chapter 11 filing negotiations and discussions. ~~The Debtors are investigating~~have investigated the Ad Hoc Group's claims by, among other things, reviewing pre-chapter 11 filing correspondence between certain of the Commitment Parties' advisors and the members of the Ad Hoc Group. ~~The Debtors believe that any bondholder who wanted to participate in the capital raise process could have contacted the Debtors as a number of other investors did and could have signed a confidentiality agreement and participated in the process directly or with other investors.~~ The Debtors have engaged with the Ad Hoc Group to better understand their interests and concerns. ~~The Ad Hoc Group has submitted a proposal that contemplates their participation in the Debtors' restructuring transaction. The proposal was subject to certain conditions and ongoing diligence, and is the subject of ongoing review,~~ including by ~~the Debtors and~~ providing extensive diligence and engaging in multiple in-person discussions ~~among the parties. The Ad Hoc Group has also engaged~~, and any assertion of exclusion have been disputed by certain members of the Initial Commitment Parties.

Moreover, the Debtors held a number of in person settlement conferences and provided extensive diligence ~~efforts. The~~and engagement. As described below, the Debtors ~~will continue to respond to,~~ the Ad Hoc ~~Group's reasonable diligence requests~~Group, the Committee, and ~~discussions~~certain additional stakeholders were ultimately able to reach a global resolution with respect to the Plan. Accordingly, the Ad Hoc Group ~~regarding their proposal and other matters remain ongoing~~has declined to pursue claims, as well as its alternative bid.

## J. Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

## K. Postpetition Marketing Process

The Debtors commenced a comprehensive marketing process prepetition to ensure that the terms of the Capital Commitment are the highest and best terms available under the circumstances. The Debtors' prepetition marketing efforts are described in greater detail in the *Declaration of David R. Hilty, Managing Director of Houlihan Lokey Capital, Inc., in Support of Chapter 11 Petitions and the Joint Chapter 11 Plan of Reorganization of Seadrill Limited and its Debtor Affiliates*, filed on September 12, 2017 [Docket No. 6] (the "Hilty Declaration"). The Debtors' postpetition marketing process is described below.

79

As part of the Debtors' efforts to solicit alternative proposals, the Debtors have continued their marketing process seeking alternative proposals from financial and strategic parties. Due to operational risks, the Debtors did not reach out to certain strategic parties, many of whom are significant market competitors, during the prepetition marketing process. However, in order to explore every viable alternative, the Debtors and their advisors reached out to such strategic parties that were identified as potential investors during a robust postpetition marketing process. In all, the Debtors contacted 89 potential investors (including five recommended by the advisors to the Creditors' Committee and two bondholder groups). This process is more fully detailed in the marketing procedures, attached to the Hilty Declaration as Exhibit A.

The Debtors conducted the postpetition marketing process as a three-step process, consisting of Phase I, Phase II, and Phase III, as described below. Similar to the prepetition process, the Debtors and their advisors identified potential interested parties, including those solicited prepetition (collectively, the "Potential Interested Parties").

As part of Phase I, Houlihan Lokey distributed sanitized and publicly available information to the Potential Interested Parties, which:

- described, among other things, the operations and assets of the Debtors, the investments contemplated by the Investment Agreement, and the other restructuring transactions; and

- requested that each Potential Interest Party sign an NDA to receive further confidential information.

The Debtors requested each Potential Interested Party submit a preliminary, written, non-binding offer (an "Indicative Offer") for an alternative investment proposal. The Debtors received two Indicative Offers from Potential Interested Parties, which included one from the Ad Hoc Group and one from Barclays, who is another bondholder. Additionally, at the request of the Committee, the Debtors contacted a discrete set of additional Potential Interested Parties and provided them with additional time to submit an Indicative Offer. No such parties submitted an Indicative Offer.

After consideration of the Indicative Offers received, the Debtors selected both Potential Interested Parties that submitted Indicative Offers (specifically, the Ad Hoc Group and Barclays) to participate in Phase II (such parties, collectively, the "Phase II Parties"). The Debtors have entered into nondisclosure agreements with the Phase II Parties' advisors and have provided them with diligence materials, including the opportunity to access a data room. In addition to facilitating specific diligence requests, the Debtors held management meetings with the Phase II Parties in London on November 8, 2017 and November 9, 2017. Over the course of Phase II, the Debtors completed substantial diligence for the benefit of the Phase II Parties.

The Debtors requested that the Phase II Parties confirm completion of diligence by November 12, 2017, and provide final offers by November 27, 2017. The Debtors subsequently agreed to extend the deadline for the two Phase II Parties to provide final offers to December 4, 2017. The Debtors believe that the marketing process has provided an opportunity for interested parties to express their interest and submit a proposal if they wish to do so. The 90-day postpetition marketing process period concluded on December 11, 2017, although the Debtors continue discussions with the Phase II Parties and respond to ongoing diligence requests.

As part of Phase III, the Debtors have requested that, by January 8, 2018, each of the Phase II Parties post a cash deposit equal to 10% of any proposed commitment amount pursuant to an escrow agreement and deposit letter in substantially in the form approved by the Bankruptcy Court on November

27, 2017.  The Debtors may then forward the complete package of transaction documentation to counsel to the Bank Lenders and request their feedback.  Following transmission of the documentation, the Debtors may determine to arrange a meeting with the Bank CoCom and their advisors to discuss such feedback.

On January 5, 2018, the Ad Hoc Group and Barclays each submitted final, committed alternative plan proposals.  As requested by the Debtors, the Ad Hoc Group's bid included a mark up of each of the definitive restructuring documents indicated in the marketing process letter, and included a commitment to provide financing in the entire amount of the Capital Commitment (net of the cash escrow amount).

As part of Phase III, both the Ad Hoc Group and Barclays posted deposits equal to 10 percent of the commitment amount contemplated by their respective proposals.  Following the posting of the deposits, the Debtors agreed to adjourn the hearing to consider approval of the Disclosure Statement from January 10, 2018 to February 1, 2018 to allow for continued discussions with the Ad Hoc Group and Barclays.  Ultimately, both the Ad Hoc Group and Barclays agreed to a global settlement, also supported by the Committee, that includes the Ad Hoc Group and Barclays in the existing deal embodied in the Restructuring Support Agreement.  Accordingly, neither the Ad Hoc Group nor Barclays are pursuing their standalone bids any further at this time.

At this time (subject to any subsequent bona fide offers from other potential investors, including the strategic investors), the Debtors believe that the fully documented Capital Commitment, as reflected in the fully executed Investment Agreement and now reflecting global consensus, represents the highest and best actionable offer that the Debtors have received and maximizes value for all stakeholders.  However, following completion of Phase III, the Debtors may choose to proceed with an alternative proposal.

**L.     The Global Settlement**

The Debtors have reached a comprehensive settlement with the Committee and its members (including the Indenture Trustees and the Newbuild Counterparties), the Ad Hoc Group, Barclays, and the original Restructuring Support Agreement Parties.  The material terms of the settlement are as follows:

- the inclusion of the Ad Hoc Group and Barclays as Commitment Parties under the Investment Agreement with direct allocations of New Secured Notes and equity as part of the Capital Commitment, all as set forth in greater detail in the amendments to the Restructuring Support Agreement and Investment Agreement attached hereto;

- an increase in the size of the Notes Rights Offering to $119.4 million and the Equity Rights Offering to $48.1 million available to Holders of General Unsecured Claims that are Note Eligible Holders and/or Equity Eligible Holders;

- a $23 million cash pool to be distributed to holders of Allowed General Unsecured Claims who are Certified Non-Eligible Holders, on the terms set forth in the Plan and Rights Offering Procedures;

- an additional $17 million in cash, to be distributed to holders of Allowed General Unsecured Claims other than (x) any Initial Commitment Party solely with respect to Allowed General Unsecured Claims held by such party as of September 12, 2017, (y) any New Commitment Party solely with respect to Allowed General Unsecured Claims held by such party as of January 5, 2018, or (z) any Permitted Transferee solely with respect to such Allowed General Unsecured Claims referenced in the immediately preceding clauses (x) and (y) on the terms set forth in the Plan (including the Allowed Unsecured Claims of

the Newbuild Counterparties in Class B3), less fees and expenses for the individual trade members and Indenture Trustee members of the Committee and their respective advisors;

- an additional $17 million in cash, less fees and expenses for the Newbuild Counterparty members of the Committee and their respective advisors, to be distributed to the Newbuild Counterparties on the terms set forth in the Plan;

- an agreement (i) to allow SHI's and DSME's General Unsecured Claims at Seadrill Limited and the Newbuild Debtors in the amount of $1.064 billion, (ii) to provide for rejection and termination of the Newbuild Contracts, and (iii) to provide the Debtors with an exclusive marketing period through May 28, 2018, at no cost, as more specifically set forth in the Plan and the Newbuild Stipulation;

- an additional $1 million in cash to be distributed pro rata (based on holdings) among the Ad Hoc Group and Barclays;

- an immediate cessation of all litigation and discovery efforts in relation to the Plan on the part of the Ad Hoc Group, Barclays, and the Committee;

- a range of technical modifications to the Plan and this Disclosure Statement to address certain issues raised by the Ad Hoc Group, Barclays, and the Committee; and

- an agreement for all parties to the comprehensive settlement to support the Plan.

This global settlement represents a significant step forward in the Chapter 11 Cases. The compromises and settlements to be implemented pursuant to the Plan preserve value by enabling the Debtors to avoid costly and time-consuming litigation with the Committee and other parties in interest that could delay the Debtors' emergence from chapter 11. Included with this Disclosure Statement is the Committee Letter, which urges holders of Unsecured Claims to vote in favor of the Plan.

As discussed in the Plan, the global settlement entails payment of the fees of the individual Committee members (other than DSME and SHI) and their respective advisors out of the Unsecured Recovery Pool Cash and payment of fees and expenses of third-party advisors to DSME and SHI and other Newbuild costs out of the Newbuild Cash Settlement. The Committee believes that payment of these fees is reasonable and appropriate given the Committee's indispensable role in these Chapter 11 cases and the role of the Committee members and their advisors in brokering the global settlement. The estimated fees and expenses of the individual Committee members (other than DSME and SHI) and their respective advisors, projected through the Effective Date is approximately $4,000,000.

As set forth above, holders of General Unsecured Claims in Classes B3, D3, and F3 who are a Commitment Party will not be entitled to participate in the Note Rights Offering, Equity Rights Offering, or cash distribution open to holders of General Unsecured claims in Classes B3, D3, and F3 on account of General Unsecured Claims held as of September 12, 2017 or January 5, 2018, as applicable. This restriction is also embodied in the Restructuring Support Agreement and the Investment Agreement and remains applicable to any applicable General Unsecured Claims irrespective of whether the original Commitment Party has sold or transferred the applicable General Unsecured Claim to a third party. If you purchase a General Unsecured Claim held by Commitment Party at the time such party executed the restructuring support agreement, you may not be entitled to participate in the Note Rights Offering, Equity Rights Offering, or cash distribution available to holders of General Unsecured Claims in Classes B3, D3, and F3. For the avoidance of doubt, all holders of General Unsecured Claims in Classes B3, D3, and F3 will be

allowed to participate in their pro rata share of the distribution of 15 percent of the new equity in New Seadrill.

### L.M.   Discussions with Other Constituencies

(i)   **Asia Offshore Drilling**

The Debtors have engaged in ongoing discussions with Mermaid, their joint venture partner in AOD, with the aim of implementing a structure whereby AOD may participate in the Debtors' broader restructuring. The Debtors are also discussing with counsel to the ~~AOD Facility~~ Bank Lenders alternative options if the Debtors cannot reach a resolution with ~~their joint venture partner in AOD.~~Mermaid.   While such discussions are continuing, a resolution has not been reached and there can be no guarantee that such a resolution will be reached.

(ii)   **Seabras**

Since the Petition Date, the Debtors and their advisors have continued discussions with Sapura (their joint venture partner in Seabras) and Seabras's secured bank lenders.  While such discussions are continuing, a resolution regarding the Seadrill Limited guarantees of the PLSV I Facility and PLSV II Facility debt and the other obligations of Seadrill Limited under the Seabras Sapura Agreements, including its financial and non-financial obligations under the related letters of undertaking has not been reached and there is no assurance that such a resolution will be reached.  In the absence of a resolution, it is the Debtors' view that the Claims under such Seadrill Limited guarantees and letters of undertaking will be treated as General Unsecured Claims in Class B3 and discharged pursuant to the Plan to the extent they are determined to have any value.  Such discharge would give rise to an event of default ~~of each of~~under the ~~PLSV I Facility and PLSV II Facility~~applicable Seabras Sapura Agreements and could have consequences for the Seabras entities and the Debtors.   Further, the Debtors may consider additional actions if necessary, including rejection of some or all Executory Contracts related to the Seabras joint venture.

(iii)   **Newbuilds**

~~The Debtors are currently in discussions with newbuild shipyards SHI and DSME with respect to certain outstanding contingent liabilities under four Seadrill Limited-guaranteed newbuild contracts for the construction of drillships.  SHI and DSME have asserted that as much as $1.657 billion is outstanding in the aggregate under these contracts.  The Debtors disagree, but have not yet come to a conclusion as to the magnitude of the Claims, if any, that SHI and DSME may assert under such newbuild contracts.  As described above, SHI and DSME are members of the Committee. While discussions are continuing, a resolution has not been reached, and there is no guarantee that a consensual resolution will be reached.  In the absence of a resolution, subject to the terms of the RSA and Investment Agreement, any claims held by SHI and DSME under the newbuild contracts may be treated as General Unsecured Claims under Class B3. The Debtors may consider additional alternatives to address any such General Unsecured Claims that SHI or DSME may seek to assert against Other Seadrill Debtors.~~ The Newbuild Counterparties, both members of the Committee, have asserted that the aggregate amount of potential Claims outstanding against Seadrill Limited for purposes of assumption of the Newbuild Contracts is not less than $1.657 billion based on the outstanding contract balance for four drillships (not including other contractual amounts due, such as interest, fees, costs, and damages) less the amounts paid to date.  The Debtors disagreed, and engaged in extensive discussions regarding the amounts of any such Claims.  As described above, the global settlement incorporates a settlement as to the General Unsecured Claims held by the Newbuild Counterparties.  Further details regarding the Newbuild Counterparties settlement are set forth in the stipulation attached as Exhibit F to the Amendment to the Restructuring Support and Lock-Up Agreement attached hereto as **Exhibit B2**. The Debtors believe that this settlement is reasonable under the circumstances, provides increased certainty

regarding recoveries under the Plan, and helps to pave the way for an efficient emergence from chapter 11. The Newbuild Counterparties have agreed to support confirmation of the Plan.

### N.    Proposed Amendments to Certain RSA Term Sheets.

**THE DEBTORS MAY SEEK CONSENTS TO IMPLEMENT THE FOLLOWING AMENDMENTS TO CERTAIN OF THE TERM SHEETS ATTACHED TO THE RSA.  THE DEBTORS RESERVE THE RIGHT TO AMEND THE PLAN AS NECESSARY TO IMPLEMENT THESE CHANGES AND, IN SUCH CASE, RESOLICITATION OF THE PLAN WOULD NOT BE NECESSARY.  THERE IS NO GUARANTEE THAT THE DEBTORS WILL BE ABLE TO OBTAIN THE REQUISITE VOTES NECESSARY FROM THE CREDIT FACILITY LENDERS TO APPROVE THESE AMENDMENTS.**

Capitalized terms used but not defined in this Section N of this Disclosure Statement shall have the meanings given to them in the RSA or the term sheets attached as exhibits thereto.

### 1.    Three-month extension to the maturities of the Secured Credit Facilities

Amending the Credit Facility Term Sheet attached to the RSA to grant the additional three-month extension described in the Credit Facility Term Sheet so that the maturities of the Secured Credit Facilities will fall between June 2022 and December 2024.  As a result, part II of annex 2 to the Credit Facility Term Sheet would replace part I as the new amortization schedule for the Secured Credit Facilities.

### 2.    Re-alignment of interest and amortization payment dates

Amend he Credit Facility Term Sheet to provide that (a) interest and amortization payment dates will be moved back to the 15th of the month in which the relevant quarter date falls, with RigCo Group cash calculated at the end of the previous month and (b) adjustment to the date of the cash sweep prepayment so that it is aligned with interest and amortization payment dates, such that the semi-annual cash sweep prepayment will commence on 15 June 2021.  The Credit Facility Term Sheet would further provide that debt service due on the relevant cash sweep calculation date will be deducted from the amount to be applied towards the cash sweep prepayment.

### 3.    Amendments to incorporate changes to the tax and cash pooling structure at the RigCo Group level

As it relates to the the operation of the RigCo Group cash pooling structure and existing tax residence and center of main interest covenants in the Secured Credit Facilities, the term sheets attached to the RSA would be amended as follows.

The alternative cash pooling structure would, in summary, operate as follows:

- RigCo will be the parent company of the RigCo Group.

- The hive down structure will remain the same as currently contemplated, except that, in addition, a new UK incorporated wholly-owned subsidiary of RigCo ("*Cash Pool Co*") will be set up as the header of the RigCo Group cash pool.

- RigCo will become the borrower under those Secured Credit Facilities where Seadrill Limited is currently the borrower.

- Intercompany loans will be rationalized so that no subsidiary of RigCo whose shares are subject to existing security for the lenders under any Secured Credit Facility has any intercompany loan liability to any group entity other than RigCo or Cash Pool Co.

- RigCo Group cash will be pooled at RigCo and Cash Pool Co. There would be a periodic cash sweep to Cash Pool Co, but this will exclude cash held by RigCo (which will not be required to be swept to Cash Pool Co).

- The new facility specific security over intercompany loans, to be granted to the lenders under the relevant Secured Credit Facilities, will now be over both:

  (i)   loans owed to Cash Pool Co by RigCo subsidiaries whose shares are subject to existing security under that facility; and

  (ii)  loans owed to RigCo by RigCo subsidiaries whose shares are subject to existing security under that facility.

- RigCo will receive cash:

  (i)   via dividends from Cash Pool Co or its other subsidiaries (including by reducing the existing share premium and making a distribution of the distributable reserves created by this reduction in share premium);

  (ii)  from repayment of existing intercompany loans between RigCo and its subsidiaries; and/or

  (iii) from Cash Pool Co or other subsidiaries by way of intercompany loan.

- The excess sale proceeds escrow account will remain at RigCo. The contribution account will remain at RigCo, and will be the account into which IHCo funds cash pursuant to the Contribution Agreement as well as the account in which all other RigCo cash (subject to exceptions) is pooled. The cash pool account will be at Cash Pool Co. First and second ranking security will be granted over each of these accounts in favor of the lenders under the Secured Credit Facilities and the holders of the New Secured Notes (or their representatives) respectively.

- Both RigCo (to the extent it does not become the borrower under the relevant Secured Credit Facilities) and Cash Pool Co will be guarantors under (i) the Secured Credit Facilities on a first ranking basis, (ii) the New Secured Notes Indenture on a second ranking basis and (iii) the SFL leases on a third ranking basis.

- First and second ranking security will be granted over the shares in both RigCo and Cash Pool Co in favor of the lenders under the Secured Credit Facilities and the holders of the New Secured Notes (or their representatives) respectively.

- As currently envisaged, all movements of cash from RigCo up to IHCo will be by way of either:

  (i)   intercompany loans from RigCo to IHCo; and/or

  (ii)  repayment of existing intercompany loans between IHCo and RigCo.

- The Contribution Agreement will continue to be between IHCo and RigCo.

- First and second ranking security would be granted over all intercompany loans between:

  (i)   IHCo and RigCo; and

85

(ii)  RigCo and Cash Pool Co,

in favour of the lenders under the Secured Credit Facilities and the holders of the New Secured Notes (or their representatives) respectively.

- The tax residence and centre of main interest covenants under the existing Secured Credit Facilities will be amended by adding the following language:

  "provided that the Finance Parties agree to discuss with RigCo and the Parent in good faith any proposed change(s) to any Obligor's residence for tax purposes/centre of main interest or establishment and any amendments to the provisions of this Agreement relating to tax (including the incorporation of provisions on market standard terms for the relevant jurisdiction relating to the allocation of tax deduction and withholding tax risk, such as "Qualifying Lender" and related provisions on market standard terms) following a request in writing from RigCo and the Parent which includes an explanation of the reason(s) for the change(s), and each of the Finance Parties, RigCo and the Parent agrees to act reasonably in relation to any such request and change(s).  For the avoidance of doubt, the Finance Parties are under no obligation to agree to such proposed amendments."

### 4. Technical change to the intercreditor principles term sheet to allow New Seadrill to provide parent company guarantees to AOD in respect of upstream loans

Amend the intercreditor principles term sheet attached to the RSA to allow New Seadrill to give guarantees to AOD in respect of upstream loans to RigCo or Cash Pool Co (the new header of the cash pool structure).

### 5. Amendments to the change of control mandatory prepayment event in the Credit Facility Term Sheet

Amend the change of control mandatory prepayment event in section G.10 of the Credit Facility Term Sheet to read as set out below.  The applicable percentages of shares in New Seadrill which must be held by Permitted Holders are not affected:

"Change of control provisions in each of the Secured Facility Agreements to be amended such that it is a change of control if Permitted Holders own less than the Applicable Percentage of the voting shares in Seadrill Ltd. and cease to have the director appointment rights set out at Exhibit B (Board Governance Term Sheet) of the Investment Agreement for this percentage of voting shares, provided that, in the event of John Fredriksen's death or permanent disability or incapacity, these provisions will fall away six months after such event.

"**Applicable Percentage**" means:

(a)  until the date falling 12 months after the Restructuring Effective Date, 20%;

(b)  from the date falling 12 months after the Restructuring Effective Date to and including the date falling 24 months after the Restructuring Effective Date, 10%; and

(c)  from the date falling 24 months after the Restructuring Effective Date, 5%.

In addition to the above, it will be a change of control if a third party (i.e. a person who is not a Permitted Holder) acquires (i) 50.1% of the voting shares in Seadrill Ltd. or (ii) the ability to appoint a majority of the board of directors of Seadrill Ltd.

"**Permitted Holder**" means:

(a)  any of: (i) Hemen Holding Limited; (ii) John Fredriksen; (iii) the direct or indirect descendants of John Fredriksen; (iv) a husband or wife of any person described in sub-paragraphs (ii) or (iii); (v) the estates, heirs, executor, administrator or other legal representative of a person described in sub-paragraphs (ii), (iii), or (iv) (each of the Persons described in sub-paragraphs (i) to (v), a "Hemen Party"); or (vi) any company, investment vehicle or other entity controlled or majority owned by any Hemen Party or any trust established for the benefit of any Hemen Party or any Hemen Party controlled or majority owned company, investment vehicle or other entity as referred to in this sub-paragraph (vi); and

(b)  any person acting in the capacity of an underwriter in connection with a public offering of Seadrill Ltd."

### 6.     Other changes to the Credit Facility Term Sheet

Amend to include additional language shall be included in section F.3 of the Credit Facility Term Sheet to clarify that ECA and ECA-backed lenders should not have consent or approval rights with respect to the voluntary prepayment of a facility in full or the voluntary prepayment in full of debt allocated to a rig which is being refinanced as this would be inconsistent with the specified terms relating to voluntary prepayment on a refinancing.  A new provision shall be added to the regularizing changes at annex 3 to the Credit Facility Term Sheet to clarify that evidentiary requirements in relation to insurance should be Majority Lender matters.

### 7.     Proceeds received pre-closing from the sale of the West Rigel rig

Amend the New Secured Notes Term Sheet attached to the RSA to be amended to clarify that any proceeds received from the sale of the West Rigel rig prior to the Refinancing Closing Date (which would have been Net Realisation Proceeds had they been received after the Refinancing Close Date) are to be treated as a New Secured Notes asset.  Any proceeds received from the sale of the West Rigel rig (whether received prior to or after the Refinancing Closing Date) would be applied towards a mandatory offer to repurchase New Secured Notes at par rather than 103%.

### 8.     Certain consequential amendments to reflect the global settlement

Amend the New Secured Notes Term Sheet, cash pooling term sheet and intercreditor principles term sheet attached to the RSA to be amended to reflect the increase in the principal amount of the New Secured Notes to $880 million and the corresponding amount of cash to be paid to RigCo (net of the 1% closing fee, the £100 million to be paid to IHCo, the NSN Escrow Amount and costs and expenses relating to the recapitalisation).

## VIII.   RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

**THE DEBTORS HAVE PROVIDED THE FOLLOWING RISK FACTOR DESCRIPTIONS TO SATISFY THE DISCLOSURE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE.  DISCLOSURE AND DISCUSSION OF ADDITIONAL RISK FACTORS RELATED TO THE DEBTORS BUSINESS MAY BE FOUND IN PUBLICLY**

AVAILABLE SECURITIES FILING INCLUDE SEADRILL LIMITED'S MOST RECENTLY FILED FORM 20-F AND ANY FORM 20-F FILED AFTER THE DATE OF THIS DISCLOSURE STATEMENT.

### A.   Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

### 1.   Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.   The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

### 3.   The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 4.   The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this

Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5. Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6. Continued Risk upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for oil (and thus demand for the services the Debtors provide), and increasing expenses. See Article VIII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses," which begins on page 94. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 10. Risk that the Bermuda Court will not Grant Recognition of the Confirmation Order

After the Effective Date, the Reorganized Debtors intend to seek recognition of the Confirmation Order in Bermuda.  There is a risk that the Bermuda Court will not grant such recognition, which may affect the Reorganized Debtors' ability to effectuate certain relief granted pursuant to the Confirmation Order in Bermuda.

### 11. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will

90

ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 12. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, including by agreeing to massive reductions in the amounts of their claims against the Debtors' estates and facilitating a critical source of post-emergence liquidity by backstopping the ~~Rights Offerings~~rights offerings, but only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

### ~~13.  Recoveries for Certain Classes are Tied to Whether Certain Classes Vote to Accept the Plan~~

~~Whether certain holders of General Unsecured Claims at Seadrill Limited, NADL, and Sevan are entitled to a specific level of recovery under the Plan is tied to whether such classes vote to accept or reject the Plan.  Holders of General Unsecured Claims at Seadrill Limited, NADL, and Sevan should carefully review their treatment under the Plan.  Holders of Interests in Seadrill Limited will not be entitled to any recovery under the Plan unless holders of General Unsecured Claims at Seadrill Limited vote as a Class to accept the Plan.~~

### B.    Risks Related to Recoveries under the Plan

#### 1.    The Reorganized Debtors May Not Be Able to Achieve their Projected Financial Results

The Reorganized Debtors may not be able to achieve their projected financial results.  The financial projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular.  While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, the value of the New Seadrill Common Shares may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 2. A Liquid Trading Market for the New Seadrill Common Shares May Not Develop

Although the Debtors and the Reorganized Debtors intend to apply to relist the New Seadrill Common Shares on a national securities exchange on or as soon as reasonably practicable after the Effective Date, the Debtors make no assurance that they will be able to obtain this listing or, even if the Debtors do, that liquid trading markets for shares of New Seadrill Common Shares will develop. The liquidity of any market for shares of New Seadrill Common Shares will depend upon, among other things, the number of holders of shares of New Seadrill Common Shares, New Seadrill's financial performance, and the market for similar securities, none of which can be determined or predicted. Accordingly, there can be no assurance that an active trading market for the New Seadrill Common Shares will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded. In the event an active trading market does not develop, the ability to transfer or sell New Seadrill Common Shares may be substantially limited.

### 3. A Liquid Trading Market for the New Secured Notes May Not Develop

There is no existing trading market for the New Secured Notes nor it is known with certainty whether or when a liquid trading market will develop. The Debtors do not anticipate applying to list or quote such notes on a national securities exchange such as the NYSE or NASDAQ. The possible lack of liquidity for the notes may make it more difficult for NSNCo, New Seadrill or its subsidiaries to raise additional capital, if necessary, and it may affect the price volatility of the New Secured Notes. There can also be no assurance that a holder will be able to sell its New Secured Notes at a particular time or that the prices such holder receives when it sells will be favorable. Future trading prices of the New Secured Notes will depend on many factors, including the operating performance and financial condition of New Seadrill and its subsidiaries, including NSNCo.

The market for non-investment grade debt historically has been subject to disruptions that have caused substantial volatility in the prices of securities similar to the New Secured Notes. The market for the New Secured Notes, if any, may be subject to similar disruptions that could adversely affect their value. In addition, subsequent to their initial issuance, the New Secured Notes may trade at a discount from their initial offering price, depending upon prevailing interest rates, the market for similar notes, the performance of New Seadrill and its Subsidiaries, including NSNCo, and other factors.

### 4. The Trading Price for the Shares of New Seadrill Common Shares May Be Depressed Following the Effective Date

Assuming that the Effective Date occurs, shares of New Seadrill Common Shares will be issued to holders of certain Classes of Claims or Interests (as applicable). Following the Effective Date of the Plan, shares of New Seadrill Common Shares may be sold to satisfy withholding tax requirements. In addition, holders of Claims or Interests (as applicable) that receive New Seadrill Common Shares may seek to sell such securities in an effort to obtain liquidity. These sales and the volume of New Seadrill Common Shares available for trading could cause the trading price for the New Seadrill Common Shares to be depressed, particularly in the absence of an established trading market for the New Seadrill Common Shares.

### 5. Certain Holders of New Seadrill Common Shares May Be Restricted in their Ability to Transfer or Sell their Securities

To the extent that the New Seadrill Common Shares issued under the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities. Resales by holders of Claims or Interests (as applicable)

who receive New Seadrill Common Shares pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Seadrill Common Shares may not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any holder of New Seadrill Common Shares to freely resell the New Seadrill Common Shares (including, as applicable, shares issuable upon exercise of the Note Rights and Equity Rights (as applicable)). As set forth in the Investment Agreement, the Debtors have agreed to take certain steps to register the resale of certain of the New Seadrill Common Shares after the Effective Date. *See* Article XII to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 106.

> ### 6. Restricted Securities Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act. Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period. An affiliate may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. While the Debtors currently expect that the current public information requirement will be met when the six-month holding period expires, they cannot guarantee that resales of the restricted securities will qualify for an exemption from registration under Rule 144. In any event, holders of restricted securities should expect to be required to hold their restricted securities for at least six months.

Holders of New Seadrill Common Shares who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities. Resale restrictions are discussed in more detail in Article XII to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 106.

> ### 7. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," which begins on page 106, to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and holders of Claims and Interests.

### 8.   The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### C.   Risks Related to the Debtors' and the Reorganized Debtors' Businesses

#### 1.   The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness.

#### 2.   The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

94

### 3. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4. Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The financial projections contained in **Exhibit G** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

### 5. The Debtors' Substantial Liquidity Needs May Impact and Revenue

The Debtors operate in a capital-intensive industry. The Debtors' principal sources of liquidity historically have been cash flow from operations, borrowings under various bank-funded facilities, issuances of bonds, and issuances of equity securities. If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices, decreased E&P sector capital expenditures, or otherwise, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to comply with the terms and condition of any cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

6. **Oil and Natural Gas Prices Are Volatile, and Continued Low Oil or Natural Gas Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition**

The Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on the willingness of their operator customer base to make operating and capital expenditures to explore and drill for, develop, and produce oil and natural gas. Operators' willingness to conduct such activities are in turn dependent on prevailing oil and natural gas prices. Further, since operators are reluctant to increase drilling activities in a high-volatility commodities pricing environment, demand for the Debtors' services is affected as much by oil and natural gas price expectations as actual pricing. In short, the Debtors face a high level of exposure to oil and natural gas price swings. Oil and natural gas are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand and are subject to both short- and long-term cyclical trends. Oil and natural gas prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions. The Debtors expect such volatility to continue in the future. The prices for oil and natural gas are subject to a variety of factors beyond the Debtors' control, such as:

- worldwide production and demand for oil and gas and geographical dislocations in supply and demand;

- the cost of exploring for, developing, producing and delivering oil and gas;

- expectations regarding future energy prices and production;

- advances in exploration, development and production technology;

- the ability of the Organization of Petroleum Exporting Countries ("OPEC"), to set and maintain levels and pricing;

- the level of production in non-OPEC countries;

- international sanctions on oil-producing countries, or the lifting of such sanctions;

- government regulations, including restrictions on offshore transportation of oil and natural gas;

- local and international political, economic and weather conditions;

- domestic and foreign tax policies;

- the development and exploitation of alternative fuels and unconventional hydrocarbon production, including shale;

- worldwide economic and financial problems and the corresponding decline in the demand for oil and gas and, consequently, our services;

- the policies of various governments regarding exploration and development of their oil and gas reserves, accidents, severe weather;

- natural disasters and other similar incidents relating to the oil and gas industry; and

- the worldwide political and military environment, including uncertainty or instability resulting from an escalation or additional outbreak of armed hostilities or other crises in the Middle East, eastern Europe or other geographic areas or further acts of terrorism in the United States, Europe or elsewhere.

Continued volatility or weakness in oil and natural gas prices (or the perception that oil and natural gas prices will remain depressed) generally leads to decreased upstream spending, which in turn negatively affects demand to the Debtors' services.  A sustained decline in oil or natural gas prices may materially and adversely affect the Debtors' future business, financial condition, results of operations, liquidity or ability to finance planned capital expenditures.  As a result, if there is a further decline or sustained depression in commodity prices, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments, or obtain additional capital, all of which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### 7.   The Offshore Drilling Industry is Influenced by Several Factors That Can Reduce the Demand for the Debtors' Services

While the price of oil and gas has a significant impact on the offshore drilling industry, several other factors have the potential to reduce the demand for the Debtors' services and disrupt the Debtors' business, including:

- the availability of debt financing on reasonable terms;

- the level of costs for associated offshore oilfield and construction services;

- oil and gas transportation costs;

- the level of rig operating costs, including crew and maintenance;

- the discovery of new oil and gas reserves;

97

- the political and military environment of oil and gas reserve jurisdictions; and

- regulatory restrictions on offshore drilling.

### 8. The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business

The Debtors' operations are subject to extensive laws and regulations in a number of different countries across the globe, including complex environmental laws and occupational health and safety laws. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties. The Debtors' operations create the risk of environmental liabilities to governments or third parties for any unlawful discharge of oil, gas or other pollutants into the air or water. In the event of environmental violations, the Reorganized Debtors may be charged with remedial costs and land owners may file claims for alternative water supplies, property damage or bodily injury. Laws and regulations protecting the environment have become more stringent in recent years, and may, in some circumstances, result in liability for environmental damage regardless of negligence or fault. In addition, pollution and similar environmental risks generally are not fully insurable. These liabilities and costs could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

### 9. The Debtors' Operations are Subject to Hazards Inherent in the Energy Services Industry.

Risks inherent in the offshore drilling industry, such as equipment defects, accidents, and explosions, can cause personal injury, loss of life, suspension of operations, damage to formations, damage to facilities, business interruption and damage to, or destruction of property, equipment and the environment. These risks could expose the Debtors to substantial liability for personal injury, wrongful death, property damage, loss of oil and natural gas production, pollution and other environmental damages and could result in a variety of claims, losses and remedial obligations that could have an adverse effect on the Debtors' business and results of operations. The existence, frequency and severity of such incidents will affect operating costs, insurability and relationships with customers, employees and regulators. In particular, the Debtors' customers may elect not to purchase our services if they view our safety record as unacceptable, which could cause us to lose customers and substantial revenue.

### 10. The Debtors Operate in a Highly-Competitive Industry with Significant Potential for Excess Capacity.

The offshore drilling industry is highly competitive and fragmented and includes several large companies that compete in many of the markets we serve, as well as numerous small companies that compete with us on a local basis. Offshore drilling contracts are generally awarded on a competitive bid basis or through privately negotiated transactions. In determining which qualified drilling contractor is awarded a contract, the key factors are pricing, rig availability, rig location, the condition and integrity of equipment, its record of operating efficiency, including high operating uptime, technical specifications, safety performance record, crew experience, reputation, industry standing and customer relations. Our operations may be adversely affected if our current competitors or new market entrants introduce new drilling rigs with better features, performance, prices or other characteristics compared to our drilling rigs, or expand into service areas where we operate.

Competitive pressures and other factors may result in significant price competition, particularly during industry downturns, which could have a material adverse effect on our results of operations and financial condition.

**11. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

**12. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations**

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel in the offshore drilling industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

**13. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

**14. The Debtors may not be able to negotiate an acceptable consensual resolution to ~~address outstanding continent newbuild obligations~~ restructure Asia Offshore Drilling**

As of the Petition Date, the Debtors were ~~obligated for approximately $4 billion in contingent obligations under 14 newbuild contracts. While the Debtors were unable~~not able to reach a ~~comprehensive~~ consensual resolution ~~prior~~with their JV partner in AOD, Mermaid, with respect to ~~AOD's participation in the Petition Date,~~Debtors' broader restructuring. While the Debtors are continuing discussions postpetition~~.~~, ~~T~~there can be no assurances that the Debtors will reach a comprehensive resolution.

**15. The Debtors may not be able to negotiate an acceptable consensual resolution to ~~restructure Asia Offshore Drilling~~ring-fence Seabras from Seadrill Limited's restructuring**

~~As of the Petition Date, the Debtors were not able to reach a consensual resolution with their JV partner in AOD, Mermaid, with respect to AOD's participation in the Debtors' broader restructuring. While the Debtors are continuing discussions postpetition, there can be no assurances that the Debtors will reach a comprehensive resolution.~~

**1.  ~~The Debtors may not be able to negotiate an acceptable consensual resolution to ring-fence Seabras from Seadrill Limited's restructuring~~**

As of the Petition Date, the Debtors were not able to reach agreement regarding a consensual resolution with respect to their interest in Seabras and their obligations under the agreements entered into in connection with the PLSV I Facility and PLSV II Facility.  While the Debtors are continuing discussions with lenders and Sapura postpetition, there can be no assurances that the Debtors will reach a comprehensive resolution.  Failure to reach a resolution could result in events of default under the PLSV ~~IFacility~~I Facility, PLSV II Facility and related agreements.

**16.  The Debtors may not be able to obtain all the consents required in order to implement the Transaction Steps**

The Debtors have not, as of the date of this Disclosure Statement, obtained all corporate consents, consents from third parties and governmental approvals and regulatory clearances required in order to implement the Transaction Steps. While the Debtors are engaging actively in discussions with each of the entities that must provide these corporate consents and consents from third parties, and are actively seeking the governmental approvals and regulatory clearances required, there can be no assurances that the Debtors will obtain these corporate consents and consents from third parties, or obtain these governmental approvals and regulatory clearances. Failure to obtain these corporate consents or consents from third parties could result in an implementation of the corporate reorganisation that is not consistent with the RSA and/or could result in delays to the overall implementation of the Transaction Steps and to the Capital Commitment.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan*.

<div style="border:1px solid black; padding:8px;">

**<u>THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY</u>**
PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

</div>

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of Claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" which begins on page 8, provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims or Interests in Classes B1(a–il), B2, B3, B4, B5, C1(a-j), C3, D1, D3, E1, F1, F3, and G1 (collectively, the "Voting Classes").   The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from holders of Claims or Interests in Classes A1, A2, A3, ~~B4, B5,~~ C2, ~~C3,~~ D2, D4, D5, E2, E3, F2, F4, F5, G2, and G3.  Additionally, the Disclosure Statement Order provides that certain holders of Claims or Interests in the Voting Classes, such as those holders whose Claims or Interests have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.     Voting Record Date

**The Voting Record Date is ~~January 10~~February 26**.  The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim.

### C.     Voting on the Plan

**The Voting Deadline is ~~March 9~~April 5, 2018, at 4:00 p.m. (prevailing Central Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be (a) electronically submitted utilizing the online balloting portal maintained by the Notice and Claims Agent on or before the Voting Deadline; or (b) properly executed, completed, and delivered (either by using the envelope provided, by first class mail, overnight courier, or personal delivery) so that the ballots are **actually received** by the Notice and Claims Agent on or before the Voting Deadline at the following address:

---

**DELIVERY OF BALLOTS**

**SEADRILL LIMITED
C/O PRIME CLERK
830 3RD AVENUE 3RD FLOOR
NEW YORK, NY 10022**

If you received an envelope addressed to your nominee, please return your ballot to your nominee, allowing enough time for your nominee to cast your vote on a ballot before the Voting Deadline.

---

**PLEASE SELECT JUST ONE OPTION TO VOTE.
EITHER RETURN PROPERLY EXECUTED PAPER BALLOT WITH YOUR VOTE
OR
VOTE VIA ELECTRONIC MAIL TO seadrillballots@primeclerk.com**

**Holders of Claims who cast a ballot via electronic mail to seadrillballots@primeclerk.com with "Seadrill Limited Vote" in the subject line should NOT also submit a paper Ballot.**

**FOR ANY BALLOT CAST VIA ELECTRONIC MAIL, A FORMAT OF THE ATTACHMENT MUST BE FOUND IN THE COMMON WORKPLACE AND INDUSTRY STANDARD FORMAT (*I.E.*, INDUSTRY-STANDARD PDF FILE) AND THE RECEIVED DATE AND TIME IN THE SOLICITATION AGENT'S INBOX WILL BE USED AS A TIMESTAMP FOR RECEIPT.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL FREE AT (844) 276-3028.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.**

D.      **Ballots Not Counted**

**No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), the administrative agents under the Bank Facilities, or the Debtors' financial or legal advisors instead of the Solicitation Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

X.      **RIGHTS OFFERING PROCEDURES**

The procedures and instructions for exercising ~~Note~~Equity Rights and ~~Equity~~Note Rights, as applicable, are set forth in the Rights Offering Procedures, which are attached to this Disclosure Statement as **Exhibit E1** and **Exhibit E2**.  The Rights Offering Procedures are incorporated herein by reference (terms used in this section without definition and which are not defined in the Plan have the meanings as set forth in the Rights Offering Procedures) and should be read in conjunction with this Disclosure Statement in formulating a decision to exercise Subscription Rights.  Any summary of the Rights Offering Procedures set forth in this Disclosure Statement is qualified in its entirety by the Rights Offering Procedures themselves.

**RIGHTS OFFERING REFERS TO THE EQUITY RIGHTS OFFERING OR NOTES RIGHTS OFFERING AS APPLICABLE.  TO PARTICIPATE IN THE RIGHTS OFFERINGS, EACH ELIGIBLE HOLDER MUST COMPLETE ALL THE STEPS OUTLINED IN THE RIGHTS OFFERING PROCEDURES.  IF ALL OF THE STEPS OUTLINED IN THE RIGHTS OFFERING PROCEDURES ARE NOT COMPLETED BY THE SUBSCRIPTION EXPIRATION DEADLINE OR THE BACKSTOP FUNDING DEADLINE, AS APPLICABLE, THE ELIGIBLE HOLDER SHALL BE DEEMED TO HAVE <u>FOREVER AND IRREVOCABLY RELINQUISHED AND WAIVED</u> ITS RIGHT TO PARTICIPATE IN THE RIGHTS OFFERING.**

As set forth in the Rights Offering Procedures and the Plan, certain holders of General Unsecured Claims against Seadrill Limited, NADL, and Sevan will be entitled to participate in the Note Rights Offering and Equity Rights Offering, so long as such holders are Note Eligible Holders and/or Equity Eligible Holders, respectively.  Due to certain securities law restrictions set forth in the Rights Offering Procedures, not all holders will qualify as Note Eligible Holders and/or Equity Eligible Holders.  Note Eligible Holders are holders that qualify as "qualified institutional buyers" or "accredited investors" under United States securities laws or a similar non-United States securities exemption under applicable local law for holders located outside of the United States.  Equity Eligible Holders are all holders located in the United States, as well as all holders located outside of the United States that qualify for a securities law exemption as an accredited investor (or similar such exemption) under applicable non-United States local law.  Note Eligible Holders and Equity Eligible Holders should follow the directions set forth in the Rights Offering Procedures and related forms to exercise their Note Rights and Equity Rights, respectively.

Eligible Holders who participate in the Notes Rights Offering will receive their applicable percentage of the Closing Fee, equal to 1.0% of the amount of the total New Secured Notes issuance, as defined in section 9.1(b) of the Investment Agreement.

Certified Non-Eligible Holders—*i.e.*, holders that are not Equity Eligible Holders or Note Eligible Holders, as applicable, and who properly submit such certification in accordance with the Rights Offering Procedures—are eligible to receive certain Cash consideration under the Plan in lieu of participating in the Equity Rights Offering or the Notes Right Offering. Certified Non-Eligible Holders that are not Equity Eligible Holders (*i.e.*, are located outside of the United States and do not qualify for a securities law exemption as an accredited investor (or such similar exemption) under applicable non-United States local law) shall receive Cash in an amount equal to 3 percent of their applicable General Unsecured Claim. Certified Non-Eligible Holders that are not Note Eligible Holders (*i.e.*, do not qualify as "accredited investors" under United States securities laws or a similar non-United States securities exemption under applicable local law for holders located outside of the United States) shall receive Cash in an amount equal to 7 percent of their applicable General Unsecured Claims. To submit the proper certification and receive the appropriate Cash consideration, applicable holders of General Unsecured Claims should follow the directions set forth in the Rights Offering Procedures and related forms.

As set forth above, holders of General Unsecured Claims in Classes B3, D3, and F3 who are a Commitment Party may not be entitled to participate in the Note Rights Offering or Equity Rights Offering on account of certain of their General Unsecured Claims. If you purchase a General Unsecured Claim held by an Commitment Party at the time such party executed the restructuring support agreement, you may not be entitled to participate in the Note Rights Offering or Equity Rights Offering.

## XI.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit F** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under

chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code. The Liquidation Analysis takes into account all intercompany liabilities on the Debtors' books and records and all claim holders' estimated recoveries therein reflect the collection on intercompany claims, including between Seadrill Limited and NADL.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to holders of Claims or Interests (to the extent holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Seadrill Common Shares to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections"). Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," which begins on page 87, for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors. The Debtors amended their Financial Projections in early December 2017. All Commitment Parties have elected to go forward on the terms of the revised Capital Commitment notwithstanding the updated Financial Projections.

The Financial Projections are attached hereto as **Exhibit G** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[29]

---

[29]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims is eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims in such Class shall be deemed to have accepted the Plan.

### E.     Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1.     No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

---

or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F. Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors.  Accordingly, the Debtors, with the assistance of their advisors, produced the Valuation Analysis that is set forth in **Exhibit H** attached hereto and incorporated herein by reference.  As set forth in the Valuation Analysis, the Debtors' going-concern value recoveries to creditors under the Plan are substantially higher than the recoveries such creditors would receive in a hypothetical liquidation of the Seadrill enterprise under chapter 7 of the Bankruptcy Code, as illustrated in the Liquidation Analysis.  Accordingly, the Valuation Analysis further supports the Debtors conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

## XII. CERTAIN SECURITIES LAW MATTERS

The Debtors believe the New Secured Notes, the New Seadrill Common Shares, the Equity Rights and the Note Rights to be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities laws.

### A. Issuance of Securities under the Plan

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash.  Section 1145(a)(2) of the Bankruptcy Code exempts from registration under section 5 of the Securities Act and applicable state securities laws the offer of a security through any warrant, option, right to subscribe, or conversion privilege that was sold in the manner specified in section 1145(a)(1) of the Bankruptcy Code, or the sale of a security upon the exercise of such a warrant, option, right, or privilege. In general, securities issued under section 1145 of the Bankruptcy Code may be resold without registration unless the recipient is an "underwriter" with respect to those securities.  In reliance upon this exemption, the Debtors believe that the offer and sale under the Plan of New Seadrill Common Shares pursuant to the Equity Recovery and the Unsecured Pool Equity will be exempt from registration under the Securities Act and state securities laws with respect to any such Holder who is not deemed to be an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

106

~~Each of (i) the Equity Rights, and the New Seadrill Common Shares issued in the Equity Rights Offerings or to the applicable Commitment Parties (including any Excess New Seadrill Common Shares), (ii~~Each of the (i) the Note Rights, the New Secured Notes, and the New Seadrill Common Shares issued in the Notes Rights Offering or to the applicable Commitment Parties, and (ii~~i~~) the New Seadrill Common Shares issued in connection with the Primary Structuring Fee will be issued without registration in reliance upon the exemption set forth in Section 4(a)(2) of the Securities Act, Regulation D and/or Regulation S. Section 4(a)(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act will not apply to the offer and sale of a security in connection with transactions not involving any public offering. ~~The term "issuer," as used in~~ Rule 506 of Regulation D, provides non-exclusive safe harbor conditions with respect to the exemption provided by Section 4(a)(2~~)~~). Regulation S provides that the registration requirements of section 5 of the Securities Act~~, means, among other things, a person who issues or proposes to issue~~ will not apply to the offer and sale of securities made outside of the United States to any ~~security.~~non-U.S. Person (within the meaning of Regulation S). Any securities issued in reliance on Section 4(a)(2~~)~~), including in compliance with Rule 506 of Regulation D, and/or Regulation S will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to an effective registration statement under the Securities Act, or an applicable exemption from registration under the Securities Act and other applicable law. ~~Regulation S provides that the registration requirements of section 5 of the Securities Act will not apply to certain offerings and sales of securities outside of the United States.~~ Only Note Eligible Holders may receive and exercise ~~Equity Rights and~~ Note Rights under the Plan. ~~Eligible Holders include Accredited Investors and Qualified Investors that are not U.S. Persons.~~

The New Secured Notes will not be registered under the Trust Indenture Act. Pursuant to the Trust Indenture Act, securities owned by the obligor or affiliates of the obligor are disregarded for purpose of directing the conduct of remedies by the trustee, or the exercise of trust powers by the trustee, and consenting to waivers of default. Therefore, affiliates of the Debtors (who will be purchasing New Secures Notes) will be able to exercise rights and remedies as holders of the notes.

The Equity Rights and the New Seadrill Common Shares issued in the Equity Rights Offerings will be issued without registration in reliance upon the exemption set forth Section 1145 of the Bankruptcy Code. Only Equity Eligible Holders may receive and exercise Equity Rights under the Plan.

**B.  Subsequent Transfers of Securities Issued under the Plan**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

107

You should confer with your own legal advisors to help determine whether or not you are an "underwriter."

Persons (i) who receive securities that are exempt under section 1145 of the Bankruptcy Code but who are deemed "underwriters" or (ii) who receive securities issued under the Plan that are "restricted securities" would, however, be permitted to sell such securities without registration if an available resale exemption exists, including the exemptions provided by Rule 144 or Rule 144A under the Securities Act to the extent available.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.**

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH HOLDER AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

**XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX AND BERMUDA TAX CONSEQUENCES OF THE PLAN**

**A.    Introduction**

The following discussion summarizes certain United States ("U.S.") federal income tax and Bermuda tax consequences of the implementation of the Plan to the Debtors, and the U.S. federal income tax consequences to certain holders of Claims entitled to vote on the Plan.  It does not address the U.S. federal income tax consequences to holders of Claims not entitled to vote on the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable U.S. Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

In general, other than with respect to the U.S. Entities (as defined below), the Debtors are not taxpayers in the U.S.  As such, the Debtors will only take positions with respect to issues of U.S. federal income tax law to the extent they are required to do so by Applicable U.S. Tax Law.  Unless stated expressly herein, nothing in this summary should be interpreted to imply that the Debtors will take any particular

position with respect to issues of Applicable U.S. Tax Law to the extent the Debtors are not required by Applicable U.S. Tax Law to take a particular position.

This summary does not address non-U.S. (other than the limited discussion of Bermuda tax consequences to the Debtors included below), state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, U.S. holders whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, persons who hold Claims or who will hold any consideration received pursuant to the Plan as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, ~~and~~ holders of Claims who are themselves in bankruptcy~~)~~, or persons that hold 10% or more of the stock of New Seadrill (including through certain attribution rules)). Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that Claims will be treated in accordance with their form for U.S. federal income tax purposes. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors and holders of Claims described below also may vary depending on the nature of any Restructuring Transactions that the Debtors engaged in.

This summary does not address the receipt, if any, of property by holders of Claims other than in their capacity as such (*e.g.*, this summary does not discuss the treatment of any commitment fee or similar arrangement or the receipt of any debt or equity interest pursuant to any backstop agreement, including the Investment Agreement (other than as expressly described below)). The treatment of the receipt of any such property may vary significantly from the treatment described herein, and Holders of Claims or Interests should consult their own tax advisors regarding any applicable consequences.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities) that are holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME AND BERMUDA TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.

### B.    Certain U.S. Federal Income Tax Consequences to the Debtors

As discussed immediately below, the Debtors do not anticipate that the Restructuring Transactions will result in any material U.S. federal income tax consequences to the Debtors.  This summary (a) does not address any determinations with respect to "earnings and profits" for U.S. tax purposes and (b) assumes that any intercompany obligation that is owed by a U.S. Entity (as defined below) to any entity outside of such U.S. Entity's U.S. federal consolidated tax group is not modified pursuant to the Plan.

### (i)    Cancellation of Debt Income

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") for U.S. federal income tax purposes, upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the sum of (A) the amount of cash paid, (B) the issue price of any new indebtedness of the debtor issued, and (C) the fair market value of any other consideration (including stock or warrants of the debtor or another entity) given in satisfaction of such indebtedness at the time of the exchange.

A very limited number of entities held directly or indirectly by the Debtors are treated as U.S. entities (or as disregarded entities of other U.S. entities) for U.S. tax purposes (the "U.S. Entities").  None of the U.S. Entities are the primary obligors on the debt that will be modified or discharged pursuant to the Plan, and the Debtors believe that none of obligors on the debt that will be modified pursuant to the Plan are subject to U.S. federal income tax.  Although certain of the U.S. Entities guarantee debt that is being modified or discharged pursuant to the Plan, the release or modification of a guarantee generally does not cause U.S. federal income tax consequences to the guarantor unless the guarantor is treated as a primary or co-obligor on the underlying debt instrument under a facts-and-circumstances analysis.  The Debtors do not believe that any U.S. Entity would be treated as a primary or co-obligor under these principles.  Accordingly, the Debtors (including the U.S. Entities) do not currently expect to realize significant COD Income for U.S. federal income tax purposes as a result of the Restructuring Transactions.

### (ii)    Limitation of NOL Carryforward and Other Tax Attributes

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its surviving net operating loss ("NOL") carryovers, capital loss carryovers, tax credit carryovers, and certain other tax attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Debtors allocable to periods before the Effective Date (collectively, the "Pre-Change Losses") that may be utilized to offset future taxable income generally is subject to an annual limitation.  The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the distribution of the New Seadrill Common Shares pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses (if any) will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

110

### (a)        General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs).

If a corporation (or affiliated group) has a net unrealized built-in gain at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then the section 382 limitation may be increased to the extent that the debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. If a corporation (or affiliated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or affiliated group's) net unrealized built-in gain or net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

Notwithstanding the rules described above, if post-ownership change, a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change (the "Business Continuity Requirement"), the annual limitation resulting from the ownership change is zero.

As discussed below, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (b)        Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when shareholders or so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies, the Business Continuity Requirement does not apply, although a different business continuation requirement may apply under the Treasury Regulations. If the 382(l)(5) Exception applies and the Debtors undergo another "ownership change" within two years after the Effective Date, then the Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second

special rule will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception because under the 382(l)(6) Exception, the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo an ownership change within two years without automatically triggering the elimination of its Pre-Change Losses.  If the 382(l)(6) Exception applies, the Business Continuity Requirement discussed above also applies.

The Debtors do not expect to have material U.S. NOLs or other tax attributes subject to the rules of sections 382 and 383 of the Tax Code (other than tax basis in assets) at the time of the Restructuring Transactions.  The Debtors have not determined the extent to which the Debtors' ability to claim depreciation deductions may be subject to limitation pursuant to the above rules.

### C.      Bermuda Tax Consequences to the Debtors

Certain of the Debtors, including Seadrill Limited, the Debtors' ultimate parent company, NADL, and Sevan, are Bermuda-incorporated entities.  Bermuda generally does not impose obligations under any corporate tax regime and, as a result, the Debtors do not anticipate any Bermuda tax consequences pursuant to the Plan.

### D.      Certain U.S. Federal Income Tax Consequences to the Holders of Certain Claims

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to holders of Claims who are U.S. Holders.  U.S. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

In general, the U.S. federal income tax treatment of Holders of Claims will depend, in part, on whether the receipt of consideration under the Plan qualifies as an exchange of stock or securities pursuant to a tax free reorganization or if, instead, the consideration under the Plan is treated as having been received in a fully taxable disposition.  Whether the receipt of consideration under the Plan qualifies for reorganization treatment will depend on, among other things, (a) whether the Claim being exchanged constitutes a "security" and (b) whether the Debtor against which a Claim is asserted is the same entity that is issuing the consideration under the Plan.

Neither the Tax Code nor the Treasury Regulations promulgated thereunder defines the term "security." Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  The Debtors have not yet made any determinations regarding the treatment of any particular Claim as a security under U.S. federal income tax law.

112

(i)     **U.S. Federal Income Tax Consequences to Holders of Credit Agreement Claims**

Pursuant to the Plan, except to the extent that a U.S. Holder of a Credit Agreement Claim[30] agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claims, each U.S. Holder of the Credit Agreement Claims will receive its pro rata share of participation in the Amended Credit Facility that corresponds to the Credit Facility under which such Credit Agreement Claim arose.

The following discussion generally assumes that the amendments to each of the relevant underlying credit agreements will constitute a "significant modification" of each applicable credit agreement under Applicable U.S. Tax Law and, specifically, the rules under Treasury Regulations Section 1.1001-3. Whether the particular amendments being made to each underlying credit agreement constitute a "significant modification" will depend upon, among other things, the original maturity date, yield to maturity, and other aspects of each underlying credit agreement. The Debtors have not yet performed an analysis of each credit agreement to determine whether the contemplated modifications will constitute a "significant modification" of any particular credit agreement, and the Debtors will only make such a determination with respect to any particular credit agreement to the extent they are required to do so under Applicable U.S. Tax Law, including the rules related to original issue discount ("OID") reporting obligations.

(a)     **Treatment of a Holder of a Credit Agreement Claim if such Credit Agreement Claim is Treated as a Security and the Interest in the Applicable Amended Credit Facility Constitutes a Security of the Applicable Debtor**

If a Credit Agreement Claim is treated as a security and at least some of the consideration received in exchange for such Claim is also determined to be a "security" of the applicable Debtor, then the exchange of such Claims should be treated as a reorganization under the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID), and subject to the rules relating to market discount, a U.S. Holder of such a Claim should recognize gain (but not loss), to the extent of the lesser of (a) the amount of gain realized from the exchange (generally equal to the fair market value of all of the consideration (or issue price of debt instruments), including cash, received, minus the U.S. Holder's adjusted basis, if any, in the Claim) or (b) the cash and the fair market value (or issue price of debt instruments) of "other property" received that is not permitted to be received under sections 354 and 356 of the Tax Code without recognition of gain.

With respect to an Amended Credit Facility that is treated as a "security" of the applicable Debtor, such U.S. Holder should obtain a tax basis in such Amended Credit Facility, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or OID), and subject to the rules relating to market discount, equal to (a) the tax basis of the Claim surrendered, less (b) the cash received, plus (c) gain recognized (if any). The holding period for such Amended Credit Facility should include the holding period for the exchanged Claims.

With respect to an Amended Credit Facility that is not treated as a "security" of the applicable Debtor, U.S. Holders should obtain a tax basis in such Amended Credit Facility, other than any amounts treated as received in satisfaction of OID, and subject to the rules relating to market discount, equal to the

---

[30]   For the avoidance of doubt, this discussion regarding the tax treatment of Credit Agreement Claims applies to any pro rata participation in any amended facility received as a result of any guarantee held by a U.S. Holder.

property's fair market value (or issue price, in the case of debt instruments) as of the date such property is distributed to the U.S. Holder.  The holding period for any such Amended Credit Facility should begin on the day following the receipt of such Amended Credit Facility.

> **(b)    Treatment of a Holder of a Credit Agreement Claim if such Credit Agreement Claim is Determined Not to be a "Security" or None of the Consideration Received under the Plan Constitutes Stock or Securities of the Applicable Debtor**

If a Credit Agreement Claim is determined not to be a "security" or none of the consideration received by a U.S. Holder of such Claim is determined to be a stock or "security" of the applicable Debtor, then a U.S. Holder of such Claim will be treated as receiving its distributions under the Plan in a taxable exchange under section 1001 of the Tax Code.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID, if any), each U.S. Holder of a Credit Agreement Claim should recognize gain or loss in an amount equal to the difference, if any, between (i) the issue price of the Amended Credit Facility interest received, and (ii) the U.S. Holder's adjusted tax basis in its Credit Agreement Claim. Subject to the rules regarding market discount and accrued interest discussed below, any gain or loss recognized will generally be capital gain or loss and will generally be long-term capital gain or loss if the U.S. Holder has held the Claim for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations.

U.S. Holders of such Claims should obtain a tax basis in the debt instrument received, other than any such amounts treated as received in satisfaction of OID, equal to the debt's issue price (as discussed below) as of the date of the exchange.  The holding period for such debt instrument should begin on the day following the Effective Date.

> **(c)    Determination of Issue Price and OID with respect to Claims under Amended Credit Facilities**

As noted above, holders of Credit Agreement Claims will receive their pro rata share of participation in the Amended Credit Facilities, and the amount of gain or loss recognized by U.S. Holders of such Claims will be determined by the issue price of a U.S. Holder's pro rata share of the debt instrument received under the Amended Credit Facility.  The determination of "issue price" for purposes of this analysis will depend, in part, on whether the Credit Agreement Claims are traded on an established market for U.S. federal income tax purposes (or "publicly traded").  Under applicable Treasury Regulations, a debt instrument will not be treated as publicly traded if the outstanding stated principal amount of the issue that includes the debt instrument is $100 million or less on the relevant determination date.

The issue price of a debt instrument that is not traded on an established market, but that is issued in exchange for Claims against the Debtors that are publicly traded, would be the fair market value of the Claims that are publicly traded.  The issue price of a debt instrument that is neither publicly traded nor issued for Claims that are publicly traded would generally be its stated redemption price at maturity (provided that the interest rate on the debt instrument is equal to or exceeds the applicable federal rate published by the IRS).  Claims against the Debtors may be traded on an established market for these purposes even if no trades actually occur and there are merely firm or indicative quotes with respect to such Claims.

In the event the issue price of a Claim under an Amended Credit Facility is lower than its "stated redemption price at maturity" (i.e., the sum of all payments to be made on the debt instrument (other than "qualified stated interest"), including payments as a result of any interest that is "payable in kind") by more

than a statutory de minimis amount, it would be treated as issued with OID. Where debt instruments are treated as being issued with OID, a U.S. Holder of any such debt instrument will generally be required to include any OID in income over the term of such debt instrument in accordance with a constant yield-to-maturity method, regardless of whether the U.S. Holder is a cash or accrual method taxpayer, and regardless of whether and when such U.S. Holder received cash payments of interest on such debt instrument (other than cash attributable to qualified stated interest, which is includible in income in accordance with the U.S. Holder's normal method of tax accounting). Accordingly, a U.S. Holder could be treated as receiving income in advance of a corresponding receipt of cash. Any OID that a U.S. Holder includes in income will increase the tax basis of the U.S. Holder in its interest in such debt instrument. A U.S. Holder of an interest in such new debt instruments will not be separately taxable on any cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the pro rata shares of such debt instruments by the amount of such payments.

In general, interest (including OID, if any) received or accrued by U.S. Holders should be treated as foreign source interest ordinary income.

The above discussion is subject to the discussion of the CPDI rules discussed below.

### (d)  Contingent Payment Debt Instruments

In light of certain features of the Amended Credit Facilities, including (a) the cash sweep mechanism coupled with the fact that one or more of the Amended Credit Facilities may be deemed to be issued with OID for U.S. tax purposes if a particular Amended Credit Facility is subject to a "significant modification," [31] and (b) the effect of the amortization conversion election, it is possible that one or more of the Amended Credit Facilities could be treated as contingent payment debt instruments ("CPDIs") subject to the "noncontingent bond method" for accruing OID.

Under the noncontingent bond method, each U.S. Holder should be required to accrue OID on a constant yield to maturity basis based on the "comparable yield" of any debt instrument determined to be a CPDI, which generally is the rate at which the Debtors could issue a fixed rate debt instrument with terms and conditions similar to the applicable debt. U.S. Holders should accrue interest based on the comparable yield. U.S. Holders should not be required to separately include in income any additional amount for the interest payments actually received, except to the extent of positive or negative adjustments, as discussed below.

If, during any taxable year, the actual payments with respect to any CPDIs exceed the projected payments for that taxable year, U.S. Holders should incur a "net positive adjustment" under the contingent debt regulations equal to the amount of such excess. U.S. Holders should treat a net positive adjustment as additional interest income in that taxable year.

If, during any taxable year, the actual payments with respect to any CPDIs are less than the amount of projected payment for that taxable year, U.S. Holders may incur a "net negative adjustment" under the contingent debt regulations equal to the amount of such deficit. This net negative adjustment should (a) reduce a U.S. Holder's interest income on the relevant Amended Credit Facility for that taxable year, and (b) to the extent of any excess after application of (a), give rise to an ordinary loss to the extent of such U.S. Holder's interest income on the CPDIs during prior taxable years, reduced to the extent such interest was offset by prior net negative adjustments. Any net negative adjustment in excess of the amounts described

---

[31]  U.S. tax law is unclear on whether "pure" timing contingencies can cause a debt instrument to be subject to the CPDI rules. The Debtors will only take a position on that issue to the extent they determine that they are required to make a determination with respect to whether any particular Amended Credit Facility constitutes a CPDI.

in (a) and (b) should be carried forward as a negative adjustment to offset future interest income with respect to the relevant Amended Credit Facility or to reduce the amount realized on a sale, exchange, or repurchase of the CPDIs.  As a result of the rules described above, recipients of CPDIs may be required to include amounts in income prior to receipt of cash attributable to such income.

The Debtors have not yet determined whether any particular Amended Credit Facility will constitute a CPDI or determined the "comparable yield" or a schedule of projected payments.  The Debtors will only determine whether any particular Amended Credit Facility constitutes a CPDI, and will only determine the "comparable yield" or construct a schedule of projected payments, to the extent they determine they are required to do so under Applicable U.S. Tax Law.  In the event the Debtors do not make these determinations, each U.S. Holder would be required to independently make the relevant determinations.   In the event the Debtors determine that any Amended Credit Facility constitutes a CPDI and determines they are required to make determinations with respect to a schedule of projected payments, such information will be determined following the close of the Restructuring Transactions, and can be obtained by contacting the Reorganized Debtors at a contact address that will be determined at a later date.

The rules related to CPDIs are complex. U.S. Holders are encouraged to consult their own tax advisors, including with respect to whether any particular Amended Credit Facility constitutes a CPDI.

      **(ii)**        **U.S. Federal Income Tax Consequences to Holders of General Unsecured Claims Against Seadrill, NADL, and Sevan**

           **~~(a)~~**    **~~In General~~**

           **~~(b)~~(a)**    **~~The recoveries to be received by U.S. Holders of General Unsecured Claims against Seadrill, NADL, and Sevan will depend on whether certain Classes B3, D3, and F3, respectively, vote to accept the Plan.~~**

Pursuant to the Plan, except to the extent that a U.S. Holder of a General Unsecured Claim agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claims, ~~if the applicable class votes to accept the Plan,~~ a U.S. Holder of a General Unsecured Claim will receive (a) its pro rata share of ~~(a)~~ New Seadrill Common Shares, (b) ~~the~~Cash, and (c) certain Holders will receive Note Rights~~,~~ and ~~(c) the~~/or Equity Rights~~.~~, as applicable, while certain Holders that are not eligible to receive Note Rights and/or Equity Rights will receive additional Cash.[32,][33]

~~Pursuant to the Plan, except to the extent that a U.S. Holder of a General Unsecured Claim agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claims, if the applicable class does not vote to accept the Plan, a U.S. Holder of a General Unsecured~~

---

[32]   However, no Note Rights or Equity Rights shall be distributed to (x) any Initial Commitment Party solely with respect to Allowed General Unsecured Claims held by such party as of September 12, 2017, (y) any New Commitment Party solely with respect to Allowed General Unsecured Claims held by such party as of January 5, 2018, or (z) any Permitted Transferee solely with respect to such Allowed General Unsecured Claims referenced in the immediately preceding clauses (x) and (y).

[33]   ~~However, the Commitment Parties and any Permitted Transferee~~Certain Holders of ~~Company~~General Unsecured Claims~~/Interests held by a Commitment Party as of the Agreement Effective Date shall not~~ against Seadrill will receive ~~the~~100 percent of their pro rata share of Note Rights and/or Equity Rights~~ shall not~~, as applicable.  Certain Holders of General Unsecured Claims against NADL and Sevan  will receive  ~~the~~70 percent of their pro rata share of New Seadrill Common Shares and 70 percent of their pro rata share of Note Rights and/or Equity Rights~~.~~, as applicable.

~~Claim will receive the Liquidation Recovery, which may be composed of New Seadrill Common Shares and/or Cash.~~

### ~~(c)~~(b)   U.S. Federal Income Tax Consequences to Holders of General Unsecured Claims against NADL and Sevan

Because none of the non-cash consideration being issued is being issued by NADL or Sevan, although the issue is not free from doubt, the exchange of the General Unsecured Claims against NADL and Sevan under the Plan will likely be treated as a taxable exchange under section 1001 of the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID, if any), each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (i) the fair market value of the consideration, including cash, received in exchange for such Claim; and (ii) such U.S. Holder's adjusted basis, if any, in such Claim.  Subject to the rules regarding market discount and accrued interest discussed below, any gain or loss recognized will generally be capital gain or loss and will generally be long-term capital gain or loss if the U.S. Holder has held the Claim for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations.

U.S. Holders of such Claims should obtain a tax basis in the non-cash consideration received, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or OID, if any), equal to such property's fair market value as of the date such property is distributed to the U.S. Holder. The holding period for any such non-cash consideration should begin on the day following the Effective Date.

### ~~(d)~~(c)   U.S. Federal Income Tax Consequences to Holders of General Unsecured Claims Against Seadrill

~~Pursuant to the Plan, except to the extent that a U.S. Holder of a General Unsecured Claim against Seadrill agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claims, if the applicable class votes to accept the Plan, a U.S. Holder of a General Unsecured Claim will receive its pro rata share of (a) New Seadrill Common Shares, (b) the Note Rights, and (c) the Equity Rights.~~[34]

#### (i)   Treatment if General Unsecured Claims are "Securities" of Seadrill and At Least Some of the Consideration Received Under the Plan Constitutes Stock or Securities of Seadrill

If a General Unsecured Claim against Seadrill is determined to be a "security" of Seadrill and at least some of the consideration received is also deemed to be a stock or a "security" of Seadrill, then the exchange of such Claims pursuant to the Plan should be treated as a reorganization under the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID), and subject to the rules relating to market discount, a U.S. Holder of such a Claim should recognize gain (but not loss), to the extent of the lesser of (a) the amount of gain realized from the exchange (generally equal to the fair market value of all of the consideration (or issue price of debt instruments), including cash, received, minus the U.S. Holder's adjusted basis, if any, in the Claim) or (b) the cash and the fair market

---

[34]   ~~However, the Commitment Parties and any Permitted Transferee of Company Claims/Interests held by a Commitment Party as of the Agreement Effective Date shall not receive the Note Rights and Equity Rights shall not receive the Note Rights and Equity Rights.~~

value (or issue price of debt instruments) of "other property" received that is not permitted to be received under sections 354 and 356 of the Tax Code without recognition of gain.

With respect to non-cash consideration that is treated as a "stock or security" of Seadrill, such U.S. Holder should obtain a tax basis in such property, other than any amounts treated as received in satisfaction of accrued but untaxed interest (or OID), and subject to the rules relating to market discount, equal to (a) the tax basis of the Claim surrendered, less (b) the cash received, plus (c) gain recognized (if any). The holding period for such non-cash consideration should include the holding period for the exchanged Claims.

With respect to non-cash consideration that is not treated as a "stock or security" of Seadrill, U.S. Holders should obtain a tax basis in such property, other than any amounts treated as received in satisfaction of OID, and subject to the rules relating to market discount, equal to the property's fair market value (or issue price, in the case of debt instruments) as of the date such property is distributed to the U.S. Holder. The holding period for any such property should begin on the day following the receipt of such property.

Because the New Seadrill Common Shares are, from a legal perspective, stock in a different entity than Seadrill, it is unclear whether any of the consideration received under the Plan will be treated as a "stock or security" of Seadrill.

        (ii)    **Treatment if General Unsecured Claims against Seadrill are Not "Securities" of Seadrill or None of the Consideration Received Under the Plan Constitutes Stock or Securities of Seadrill**

If a General Unsecured Claim against Seadrill is determined not to be a "security" of Seadrill or none of the consideration received by a U.S. Holder of such Claim is determined to be a stock or a "security" of Seadrill, then the exchange of such Claims pursuant to a Plan should be subject to the same treatment as the General Unsecured Claims against NADL and Sevan, as discussed above.

<del>(c)</del>(d)   **Exercise of the Note Rights and Equity Rights**

        (i)    **Nature of Rights**

The characterization of the Note Rights and the Equity Rights their subsequent exercise for U.S. federal income tax purposes—as simply the exercise of options to acquire the property that is subject to the Note Rights or Equity Rights or, alternatively, as an integrated transaction pursuant to which the applicable option consideration is acquired directly in partial satisfaction of a U.S. Holder's Claim—is uncertain. Although the issue is not free from doubt, unless otherwise noted this discussion assumes that the exchange of a Claim for the Note Rights and/or Equity Rights (along with the other consideration under the Plan) is a separately identifiable step from the exercise of such Note Rights and/or Equity Rights.

        (ii)    **Exercise of the Note Rights**

        (1)    **General Issues**

A U.S. Holder that elects to exercise the Note Rights should be treated as purchasing, in exchange for its Note Rights and the amount of cash funded by the U.S. Holder to exercise the Note Rights, the New Seadrill Common Shares and New Secured Notes it is entitled to purchase pursuant to the Note Rights. Such a purchase will generally be treated as the exercise of an option under general tax principles, and as

such a U.S. Holder should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises the Note Rights.

A U.S. Holder's holding period in the New Secured Notes received upon exercise of a Note Right generally should commence the day following the exercise date.

A U.S. Holder that does not exercise a Note Right may be entitled to claim a capital loss equal to the amount of tax basis allocated to the Note Right, subject to any limitations on such U.S. Holder's ability to utilize capital losses. Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of electing not to exercise the Note Right.

### (2)   Issue Price and OID of New Secured Notes

Upon the exercise of the Note Rights, a U.S. Holder will receive both New Seadrill Common Equity and New Secured Notes. The New Seadrill Common Equity and New Secured Notes should constitute an "investment unit" under Applicable U.S. Tax Law (and the Debtors have agreed that such treatment is appropriate in connection with the New Seadrill Common Equity and New Secured Notes being issued pursuant to the Investment Agreement to parties other than Holders of Claims) (the "Note Rights Investment Unit"). Accordingly, the issue price of the New Secured Notes will depend on the issue price of the Note Rights Investment Unit. Because the Note Rights Investment Unit is identical to the investment unit being received by other parties to the Investment Agreement (the "Other Investment Agreement Investment Units"), although the issue is not free from doubt, the Debtors will report that the issue price of the Note Rights Investment Unit is identical to the issue price of the Other Investment Agreement Investment Units. Under Applicable U.S. Tax Law, because the Other Investment Agreement Investment Units are being issued solely for a set amount of cash, the issue price of each Other Investment Agreement Investment Unit will be equal to the amount of cash paid to acquire the Other Investment Agreement Investment Unit. That issue price will then be allocated between the New Seadrill Common Equity and New Secured Notes based on their respective fair market values, with the amount allocated to the New Secured Notes determining the issue price of the New Secured Notes. The Debtors expect that this will result in the New Secured Notes being issued with a substantial amount of OID (in addition to OID related to the "payment in kind" feature of the New Secured Notes). OID with respect to the New Secured Notes will generally be subject to the same rules discussed in the context of Credit Agreement Claims, above.

The above discussion is subject to the discussion of the CPDI rules, below.

### (3)   Tax Basis in New Seadrill Common Shares and New Secured Notes

Although not free from doubt, a U.S. Holder's aggregate tax basis in the New Seadrill Common Shares and New Secured Notes received should equal the sum of (i) the amount of cash paid by the U.S. Holder to exercise its Note Rights plus (ii) such U.S. Holder's tax basis in its Note Rights immediately before the option is exercised. In connection with this determination, although not free from doubt, after allocating the issue price of the Note Rights Investment Unit, as described above, a U.S. Holder should further allocate such U.S. Holder's tax basis in its Note Rights immediately before its exercise among the New Seadrill Common Shares and New Secured Notes in accordance with their respective fair market values.

A U.S. Holder's holding period for the New Seadrill Common Shares received on the Effective Date pursuant to the exercise of the Equity Rights should begin on the day following the Effective Date.

The determination of a U.S. Holder's aggregate tax basis in the New Seadrill Common Shares and New Secured Notes is subject to uncertainty, and U.S. Holders should consult their own tax advisors regarding such allocation.

### (4) Possible Treatment as Contingent Payment Debt Instruments

There is a possibility that the restrictions on the ability of NSNCo to elect to pay the "PIK" portion of the New Secured Notes' interest in cash may cause the New Secured Notes to be treated as CPDIs subject to the "noncontingent bond method" for accruing OID.  In the event the New Secured Notes are treated as CPDIs, the same rules discussed in the context of Credit Agreement Claims, above, should apply.

The Debtors have not yet determined whether the New Secured Notes will constitute a CPDI or determined the "comparable yield" or a schedule of projected payments.  The Debtors will only determine whether the New Secured Notes constitute CPDIs, and will only determine the "comparable yield" or construct a schedule of projected payments, to the extent they determine they are required to do so under Applicable U.S. Tax Law.  In the event the Debtors do not make these determinations, each U.S. Holder would be required to independently make the relevant determinations.  In the event the Debtors determine that the New Secured Notes constitute CPDIs and determine they are required to make determinations with respect to a schedule of projected payments, such information will be determined following the close of the Restructuring Transactions, and can be obtained by contacting the Reorganized Debtors at a contact address that will be determined at a later date. Although not free from doubt, in light of the Debtors' current view of the likelihood that the "PIK" portion of the New Secured Notes' interest would be paid in cash, the Debtors are currently of the view that the New Secured Notes would not constitute CPDIs.  However, no guarantee can be made that the Debtors' view regarding the likelihood that the "PIK" portion of the New Secured Notes' interest would be paid in cash will not change prior to the Effective Date.

The rules related to CPDIs are complex. U.S. Holders are encouraged to consult their own tax advisors, including with respect to whether the New Secured Notes constitute CPDIs.

### (iii) Exercise of the Equity Rights

A U.S. Holder that elects to exercise the Equity Rights will be treated as purchasing, in exchange for its Equity Rights and the amount of cash funded by the U.S. Holder to exercise the Equity Rights, the New Seadrill Common Shares it is entitled to purchase pursuant to the Equity Rights.  Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a U.S. Holder should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises the Equity Rights.  A U.S. Holder's aggregate tax basis in the New Seadrill Common Shares will equal the sum of (i) the amount of cash paid by the U.S. Holder to exercise its Equity Rights plus such U.S. Holder's tax basis in its Equity Rights immediately before the option is exercised.  A U.S. Holder's holding period for the New Seadrill Common Shares received on the Effective Date pursuant to the exercise of the Equity Rights should begin on the day following the Effective Date.

A U.S. Holder that elects not to exercise the Equity Rights may be entitled to claim a capital loss equal to the amount of tax basis allocated to the Equity Rights, subject to any limitations on such U.S. Holder's ability to utilize capital losses.  Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of electing not to exercise the Equity Rights.

(iii)     **Bond Premium**

If a U.S. Holder's initial tax basis in its interest in an Amended Credit Facility or New Secured Notes exceeds the stated redemption price at maturity of such interest in such Amended Credit Facility or New Secured Notes, such U.S. Holder will be treated as acquiring the Amended Credit Facility or New Secured Notes with "bond premium."  Such U.S. Holder generally may elect to amortize the premium over the remaining term of the Amended Credit Facility or New Secured Notes on a constant yield method as an offset to interest when includible in income under such U.S. Holder's regular accounting method.  If a U.S. Holder does not elect to amortize the premium, that premium will decrease the gain or increase the loss such U.S. Holder would otherwise recognize on disposition of the Claim under such Amended Credit Facility or New Secured Notes.

### (iv)     U.S. Federal Income Tax Consequences to Holders of Seadrill Limited 510(b) Claims.

Pursuant to the Plan, except to the extent that a U.S. Holder of a Seadrill Limited 510(b) Claim agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claim, a U.S. Holder of a Seadrill Limited 510(b) Claim will receive its pro rata share of New Seadrill Common Shares.

The U.S. federal income tax treatment of any recovery associated with a Seadrill Limited 510(b) Claim is uncertain and may depend, in part, on the precise nature of any such Claim and whether such Claim involves claims for lost income or gain, on one hand, or the loss of a capital asset, on the other hand. U.S. Holders should consult with their own tax advisors regarding these issues.  One potentially likely treatment, to the extent any Seadrill Limited 510(b) Claim relates to stock in Seadrill Limited that continues to be owned by such U.S. Holder, is that any recovery on account of any such Seadrill Limited 510(b) Claim would be subject to the same treatment as recoveries on account of Interests in Seadrill Limited, as discussed below.

### (v)     U.S. Federal Income Tax Consequences to Holders of Interests in Seadrill Limited.

Pursuant to the Plan, except to the extent that a U.S. Holder of an Interest in Seadrill Limited agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claim, a U.S. Holder of an Interest in Seadrill Limited will receive its pro rata share of New Seadrill Common Shares.

Because the New Seadrill Common Shares are, from a legal perspective, stock in a different entity than Seadrill Limited, the U.S. federal income tax treatment of the receipt of New Seadrill Common Shares by any U.S. Holder of an Interest in Seadrill Limited is uncertain.

If New Seadrill was treated as the same entity as Seadrill Limited for U.S. federal income tax purposes, then the receipt of the New Seadrill Common Shares should not give rise to any gain or loss, a U.S. Holder should re-allocate its tax basis in its existing Interests in Seadrill Limited to the New Seadrill Common Shares received pursuant to the Plan, and the U.S. Holder's holding period in the New Seadrill Common Shares should generally include the U.S. Holder's holding period in their Interests in Seadrill Limited.

If New Seadrill is not treated as the same entity as Seadrill Limited for U.S. federal income tax purposes, then the exchange of the Interests in Seadrill Limited under the Plan will likely be treated as a taxable exchange under section 1001 of the Tax Code.  In such case, each U.S. Holder of an Interest in

121

Seadrill Limited should recognize gain or loss equal to the difference between (i) the fair market value of the New Seadrill Common Shares received and (ii) such U.S. Holder's adjusted basis, if any, in its Interests in Seadrill Limited.  Any gain or loss recognized will generally be capital gain or loss and will generally be long-term capital gain or loss if the U.S. Holder has held the Interests for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations.[35]

U.S. Holders of such Interests should obtain a tax basis in the New Seadrill Common Shares received equal to such property's fair market value as of the date such property is distributed to the U.S. Holder.  The holding period for any such New Seadrill Common Shares should begin on the day following the Effective Date.

### (vi)      U.S. Federal Income Tax Consequences to Claims against the Newbuild Debtors and Seadrill UK Ltd.

Pursuant to the Plan, except to the extent that a U.S. Holder of a Claim against the Newbuild Debtors or Seadrill UK Ltd. agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claim, a U.S. Holder of such a Claim shall receive its pro rata share of Cash.

The exchange of such Claims under the Plan should treated as a taxable exchange under section 1001 of the Tax Code.  In such case, each U.S. Holder of such a Claim should recognize gain or loss equal to the difference between (i) the amount of Cash received and (ii) such U.S. Holder's adjusted basis, if any, in its Claim.  Any gain or loss recognized will generally be capital gain or loss and will generally be long-term capital gain or loss if the U.S. Holder has held the Interests for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations.

### (vii)     Bond Premium

If a U.S. Holder's initial tax basis in its interest in an Amended Credit Facility or New Secured Notes exceeds the stated redemption price at maturity of such interest in such Amended Credit Facility or New Secured Notes, such U.S. Holder will be treated as acquiring the Amended Credit Facility or New Secured Notes with "bond premium."  Such U.S. Holder generally may elect to amortize the premium over the remaining term of the Amended Credit Facility or New Secured Notes on a constant yield method as an offset to interest when includible in income under such U.S. Holder's regular accounting method.  If a U.S. Holder does not elect to amortize the premium, that premium will decrease the gain or increase the loss such U.S. Holder would otherwise recognize on disposition of the Claim under such Amended Credit Facility or New Secured Notes.

### (iv)(viii)         Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with

---

[35]   This discussion assumes that *either* (a) Seadrill Limited was not a PFIC (as defined below) at any time when a U.S. Holder held its Interests, *or* (b) if Seadrill Limited was a PFIC at any point while a U.S. Holder held its Interests, that New Seadrill will be a PFIC.  See the discussion below regarding PFIC status for information regarding the Debtors' historic position regarding their status as a PFIC.  No assurance can be made that New Seadrill will or will not be a PFIC.

"market discount" if it is acquired other than on original issue and if its holder's initial tax basis in the debt instrument is less than (a) the stated redemption price at maturity or (b) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the stated redemption price at maturity multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued using a constant-yield basis).

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### (v)(ix)  Accrued Interest and OID

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but untaxed interest (or OID) on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income.  Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest previously was included in the U.S. holder's gross income but was not paid in full by the Debtors.

The tax basis of any non-cash consideration determined to be received in satisfaction of accrued but untaxed interest (or OID, if any) should generally equal the fair market value of such non-cash consideration.  The holding period for any such non-cash consideration should begin on the day following the Effective Date.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to holders of Claims in each Class will be allocated first to the principal amount of Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. However, certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the holder should be allocated in some way other than as provided in the Plan.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### (vi)(x)  U.S. Federal Income Tax Consequences to Holders of Owning and Disposing of Interests in Amended Credit Facilities and New Secured Notes

As noted above, in general, interest (including OID, if any) received or accrued by U.S. Holders with respect to Amended Credit Facilities and New Secured Notes should be treated as foreign source ordinary income.

Subject to the discussion of CPDIs immediately below, unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of interest in the Amended Credit Facilities or New Secured Notes.  Such capital gain will be long-term capital gain if at the time of the sale, redemption, or other taxable disposition, the U.S. Holder held the debt for more than one year.  Long-term capital gains of an individual taxpayer are generally taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations.

To the extent any Amended Credit Facility or the New Secured Notes constitute CPDIs, different rules apply.  In such case, upon disposition, the U.S. Holder should recognize gain or loss upon the sale, exchange, or maturity of such debt in an amount equal to the difference, if any, between the consideration received in exchange therefor and its adjusted basis therein.  In general, a U.S. Holder's adjusted basis should be its initial basis (determined pursuant to the rules discussed above), increased by the amount of interest it previously accrued with respect to such CPDIs (in accordance with the comparable yield and the projected payment schedule thereof), decreased by any interest payments that have been made, and increased or decreased by the amount of any positive or negative adjustment, respectively, that it is required to make.  Any recognized gain should be ordinary interest income (rather than capital gain), and any recognized loss should be ordinary loss to the extent of interest a U.S. Holder included as income in the current or previous taxable years in respect of such CPDIs, and thereafter, capital loss.

If a U.S. Holder's adjusted basis in the CPDIs it receives is different than the issue price of the CPDI (e.g., the U.S. Holder receives the CPDIs in a transaction that is a tax free reorganization, as discussed above), such U.S. Holder must allocate any difference between the adjusted issue price and its basis to daily portions of interest or projected payments over the remaining term of the CPDI.  If the U.S. Holder's basis is higher than the adjusted issue price of the CPDI, the amount of the difference allocated to a daily portion of interest or to a projected payment should be treated as a negative adjustment on the date the daily portion accrues or the payment is made.  On the date of the adjustment, a U.S. Holder's adjusted basis in the CPDI should be reduced by the amount the U.S. Holder treats as a negative adjustment.  If the U.S. Holder's basis is less than the adjusted issue price of the CPDI, the amount of the difference allocated to a daily portion of interest or to a projected payment should be treated as a positive adjustment on the date the daily portion accrues or the payment is made.  On the date of the adjustment, a U.S. Holder's adjusted basis in the debt instrument should be increased by the amount it treats as a positive adjustment.

The rules related to CPDIs are complex, and U.S. Holders are encouraged to consult their own tax advisors.

### (vii)(xi) U.S. Federal Income Tax Consequences to Holders of Owning and Disposing of New Seadrill Common Shares

Subject to the discussion regarding the passive foreign investment company ("PFIC") rules below, distributions, if any, made by New Seadrill out of current or accumulated earnings and profits (as determined for U.S. federal income tax purposes and including any taxes withheld from such distribution) with respect to the New Seadrill Common Shares, should generally be taxable to a U.S. Holder as foreign source ordinary dividend income.  Distributions in excess of current and accumulated earnings and profits should be treated as a non-taxable return of capital to the extent of a U.S. Holder's basis in the New Seadrill Common Shares and thereafter as capital gain.  New Seadrill does not intend to determine its earnings and profits on the basis of U.S. federal income tax principles and, as a result, U.S. Holders should expect to treat all distributions on the New Seadrill Common Shares as dividends.

Dividends paid on the New Seadrill Common Shares should not be eligible for the dividends received deduction generally allowed to U.S. corporations with respect to dividends paid by other U.S. corporations or lower rates of dividend taxation allowed to non-corporate U.S. Holders.  For non-corporate

124

U.S. Holders, distributions taxed as dividends may be taxable as either (a) ordinary income, or (b) if certain conditions are satisfied, "qualified dividend income." In order for dividends to be treated as "qualified dividend income," (a) the New Seadrill Common Shares must be readily tradable on an established securities market in the United States (such as the NYSE; if the New Seadrill Common Shares are only traded "over the counter," even if it is a "listed" over the counter market such as OTC Pink, it is unclear whether this standard would be satisfied); (b) New Seadrill is not a PFIC; (c) the non-corporate U.S. Holder has owned the New Seadrill stock for more than 60 days in the 121-day period beginning 60 days before the date on which the common stock becomes ex-dividend; and (d) the non-corporate U.S. Holder is not under an obligation to make related payments with respect to positions in substantially similar or related property. There is no assurance that dividends will be treated as qualified dividend income in the hands of any particular U.S. Holder.

Special rules may apply to any "extraordinary dividend," generally, a dividend paid by New Seadrill in an amount which is equal to or in excess of 10% of a shareholder's adjusted tax basis (or fair market value in certain circumstances) in a share of New Seadrill Common Shares. If New Seadrill pays an "extraordinary dividend" that is treated as "qualified dividend income," then any loss derived by a non-corporate U.S. Holder from the sale or exchange of such common stock will be treated as long-term capital loss to the extent of such dividend, while a corporate U.S. Holder may have a reduction in the tax basis of the applicable New Seadrill Common Shares.

A special set of U.S. federal income tax rules apply to ownership interests (or options to acquire ownership interests) in a PFIC. A non-U.S. corporation is a PFIC in any taxable year in which, after taking into account certain look-through rules, either (i) at least 75% of its gross income is passive income or (ii) at least 50% of the average value (in each case determined on a quarterly basis) of its assets is attributable to assets that produce or are held to produce passive income. In making this determination, the non-U.S. corporation is treated as earning its proportionate share of any income and owning its proportionate share of any assets of a subsidiary corporation in which it owns, directly or indirectly, a 25% or greater interest, by value. Passive income generally includes, but is not limited to, dividends, interest, rents, royalties, and capital gains. If New Seadrill is a PFIC at any time during which a U.S. Holder owns the New Seadrill Common Shares, the U.S. Holder would be subject to additional U.S. information return filing requirements and the potentially materially adverse rules discussed below. Seadrill has previously disclosed, in connection with 20-F filings, that it intended to take the position, based on then-current and then-anticipated valuation of assets, including goodwill, and the composition (at the time) of income and assets, that Seadrill would not be treated as a PFIC for the tax year at issue or in the foreseeable future. No assurance can be given that the position taken by Seadrill in the past would continue to apply in the future or apply in the first instance to New Seadrill, nor would the IRS be bound by such determination. The Debtors have not made a determination as to whether New Seadrill ever will be a PFIC on the Effective Date or at any point thereafter. Therefore, U.S. Holders are urged to consult their own tax advisors regarding the classification of New Seadrill as a PFIC and any attendant U.S. federal income tax consequences.

If New Seadrill is classified as a PFIC for any taxable year during which a U.S. Holder owns the New Seadrill Common Shares, the PFIC rules may alter the tax consequences of owning the New Seadrill Common Shares with respect to gains from the sale or other disposition of, and "excess distributions" with respect to, the New Seadrill Common Shares. Under the "default PFIC regime," in general, an "excess distribution" is any distribution to a U.S. Holder that is greater than 125% of the average annual distributions received by the U.S. Holder (including return of capital distributions) during the three preceding taxable years or, if shorter, a U.S. Holder's holding period. If New Seadrill is classified as a PFIC for any taxable year during which a U.S. Holder owns the New Seadrill Common Shares, gains from the sale or other disposition of, and "excess distributions" with respect to, the New Seadrill Common Shares should be allocated ratably over a U.S. Holder's entire holding period and taxed at the highest ordinary income tax rate in effect for each such taxable year (subject to certain exceptions). Moreover, interest

should be charged retroactively at the rate applicable to underpayments of tax (with respect to each such tax year's ratable allocation) through the date of gains from the sale or other disposition of, and "excess distributions" with respect to, the New Seadrill Common Shares.

New Seadrill ~~does~~may not ~~intend to~~ prepare or provide the information that would enable a U.S. Holder to make a "qualified electing fund" election. U.S. Holders should consult with their own tax advisors with respect to whether the unfavorable PFIC rules may be avoidable by electing to mark the New Seadrill Common Shares to market.

The rules relating to PFICs are extremely complex and U.S. Holders are urged to consult their own tax advisors to determine the consequences of owning New Seadrill Common Shares in the event that New Seadrill is treated as a PFIC during any taxable year during which a U.S. Holder will own the New Seadrill Common Shares.

The above discussion assumes New Seadrill is not treated as a controlled foreign corporation (a "CFC") under Applicable U.S. Tax Law, but no assurance can be made in that regard~~.~~ with respect to any Holder. U.S. Holders are urged to consult their own tax advisors on the consequences of New Seadrill being treated as a CFC~~.~~ with respect to any Holder.

### ~~(viii)~~(xii)     Limitation on Use of Capital Losses

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### ~~(ix)~~(xiii)     Medicare Tax on Net Investment Income

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, interest, dividends and gains from the sale or other disposition of capital assets. U.S. holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of consideration received pursuant to the Plan.

### (xiv)     Certain Tax Reform Implications for U.S. Persons That Produce Certain Financial Statements

Recently-enacted U.S. tax reform legislation provides that accrual method U.S. Holders that prepare "applicable financial statements" (as defined in Section 451 of the Tax Code) generally would be required to include certain items of income (potentially including OID, market discount, and premium) no later than the time such amounts are reflected on the relevant financial statement.  This could result in an acceleration of income recognition for income items differing from the above descriptions.  U.S. Holders should consult their tax advisors regarding the potential impact of these provisions.

**E.    Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims**

Because the issuers of consideration under the Plan are not U.S. entities, there generally should not be any U.S. federal income tax consequences to non-U.S. Holders with respect to the exchange of Claims under the Plan or the ownership or disposition of consideration received pursuant to the Plan.

**F.    Information Reporting and Back-up Withholding**

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will also comply with all applicable reporting requirements of the Tax Code.  In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan, as well as future payments made with respect to consideration received under the Plan.  The Debtors do not expect distributions or payments to holders of Claims under the Plan to be subject to material withholding under the Tax Code.

Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**G.    FATCA**

A 30% withholding tax may be imposed on the payments of interest and dividends on the consideration received pursuant to the Plan, and after December 31, 2018, on the payments of gross proceeds from the sale or other disposition of Exchange Consideration that are made to a U.S. Holder or to certain foreign financial institutions, investment funds, and other non-U.S. persons receiving payments on a U.S. Holder's behalf if such U.S. Holder or such persons fail to comply with certain information reporting requirements ("FATCA Withholding").  Amounts that a U.S. Holder receives could be subject to FATCA Withholding if such U.S. Holder holds the consideration received under the Plan through another person (e.g., a foreign bank or broker) that is subject to FATCA Withholding because it fails to comply with these requirements (even if such Holder would not otherwise have been subject to withholding).  Holders should consult their own tax advisors regarding FATCA Withholding.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S., OR NON-INCOME TAX LAW, AND OF ANY CHANGE IN APPLICABLE U.S. TAX LAW**.

## XIV.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:   ~~December 15, 2017~~February 25, 2018          SEADRILL LIMITED
                                                          on behalf of itself and all other Debtors

                                                          /s/
                                                          _____
                                                          Mark Morris
                                                          Chief Financial Officer
                                                          Seadrill Management Limited

**Exhibit A**

**Plan of Reorganization**

**Exhibit ~~B~~B1**

**Restructuring Support Agreement**

**Exhibit B2**

**Amendment to the Restructuring Support Agreement**

**Exhibit B3**

**Amendment to the Investment Agreement**

**Exhibit C**

**Corporate Organization Chart**

**Exhibit D**

**Disclosure Statement Order**

**[TO COME]**

**Exhibit E1**

**Equity Rights Offering Procedures**

**<u>Exhibit E2</u>**

**Notes Rights Offering Procedures**

**Exhibit F**

**Liquidation Analysis**

**<u>Exhibit G</u>**

**Financial Projections**

## **Exhibit H**

**Valuation Analysis**

## <u>Certificate of Service</u>

I certify that on February 26, 2018, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Matthew D. Cavenaugh
Matthew D. Cavenaugh