3 January 2017

Jon Magne Asmyr, on behalf of a group of shareholders in Sevan Drilling LTD.

Seadrill Limited Claims Processing Center
c/o Prime Clerk LLC
830 3rd Avenue, 3rd Floor
New York, NY 10022

# Re good faith requirement. Chapter 11, case number 17-60079

*Request:*

As minority share holders of Sevan Drilling LTD, we would like to ask the court consider whether the good faith requirements are satisfied. If the requirements are not satisfied, the company should not be subject to a Chapter 11 process. The management should have considered other possible financial solutions that would have benefited all shareowners, not only the majority shareholder Seadrill.

1	INTRODUCTION

On 12 September 2017, Seadrill Limited (Seadrill) filed for bankruptcy protection under Chapter 11 of the US Bankruptcy Code, in form of a restructuring of Seadrill and its subsidiaries. The restructuring includes a restructuring support agreement and an investment agreement with the company's major creditors and interest holders (the Restructuring). The Chapter 11 process befare the bankruptcy court of Southern Texas (Chapter 11 Process) includes Seadrill's subsidiaries, amongst others Sevan, where Seadrill owns 50,1 % of the shares.

We are of the opinion that Seadrill and its representatives (including Seadrill's Directors, Seadrill's Baard Members in Sevan's board of directors, Seadrill personnel who have conducted the management of Sevan and Seadrill's advisors) have violated basic principles of equal treatment and impartiality of shareholders in Sevan. The violations relate among other things to actions and inter-group transactions taken in the history leading up to the Restructuring, and in relation to preparing and effecting the Restructuring.

We are of the opinion that Restructuring is unfair and incorrect towards the shareholders in Sevan. We believe the Revolving Credit Facility (RCF) entered into between Sevan and Seadrill does not represent a fair business transaction. The RCF is the basis for Seadrill's position as a secured creditor in the Restructuring process. We question if Seadrill actually has a valid position as a secured creditor in the Restructuring process (see section 3). Should Seadrill's position as a secured creditor in Sevan prove to be based on an illegal transaction that violate the Shareholders rights, it is questionable if Seadrill have any legal voting rights as a secured creditor in the Restructuring process.

On behalf of the Shareholders we have made information requests towards Sevans advisors in the Restructuring process, without receiving the information requested. We were offered some information on the condition that this would not be presented to this court. It is unfortunate, and in itself a violation of principles of equal treatment and impartiality that Sevan withholds relevant information from the Shareholders. It should also be in all parties' interest that the Shareholders legal evaluations are based on sufficient facts.

Since Sevan so far has chosen to withhold relevant information from us, we encourage the court to consider our assumptions and facts, and to ask Seadrill for further information if needed.

2       EQUAL TREATMENT

2.1     Overview

We argue that Seadrill, through the board of directors of Sevan controlled by Seadrill, violated principles of equal treatment and fair stock exchange practice.

Sevan and its corporate bodies and representatives are as a consequence of the listing of the Sevan shares on the Oslo Stock Exchange, obligated to comply with the Norwegian security trading act § 5-14:

"(1) lssuers of financial instruments admitted to trading on a Norwegian regulated market sha/1 treat the holders of their financial instruments on a non-discriminatory basis. lssuers must not subject the holders of the financial instruments to discriminatory treatment that is not objectively based in the issuer's and the holders' mutual interests.

(2) When trading in or issuing financial instruments or rights to such instruments, the issuer's governing bodies, officers or senior employees must not take measures that are liable to provide them, individual holders of financial instruments or third parties with any unreasonable advantage at the expense of other holders or the issuer. The same applies to the trading in or issuance of financial instruments or rights attached to such instruments within the group of which the issuer is apart."

Furthermore, as a company listed on the Oslo Stock Exchange, Sevan shall comply with the Norwegian Stock Exchange Regulation (Nw.: børsforskriften} requirement in§ 14: "lssuers of stock exchange listed financial instruments, members of the stock exchange and representatives sha/1 comply with principles of sound stock exchange practice" (our translation}.

2.2     No independent legal or other advisors to secure the interests of minority shareholders of Sevan

Stock exchange reports for Seadrill and Sevan show that both companies have been represented by the same legal and other advisors when preparing and effecting the Restructuring. According to the same filings, Seadrill has been preparing and negotiating the restructuring plan for more than twelve months. There is a clear and obvious conflict of interest between Seadrill and Sevan in such negotiations, particularly for the minority shareholders of Sevan. Despite this, Seadrill as the majority shareholder and the board of directors of Sevan (which has been appointed by Seadrill), has not ensured that Sevan has been adequately represented by legal and other advisors throughout this process.

Given the clear conflict of interest between Seadrill as a majority shareholder in Sevan and the Shareholders and other minority shareholders in Sevan, same legal representation in the Restructuring process violates principles of equal treatment and fair stock exchange practice.

We are aware that the board of Sevan did appoint a conflict committee, but we have no indications that the board of Sevan did anything to secure the interests of the shareholders of the company.

The Restructuring is set up so that the shareholders of Sevan will receive no recovery through the new structure of the Seadrill group. The Shareholders' view is that the Restructuring is unfair and unreasonable for the shareholders of Sevan.

We believe that the Restructuring favors Seadrill and Seadrill's shareholders mainly through being secured creditors. In this respect we refer to sections below where we question if Seadrill actually has a valid legal position as a secured creditor in the Restructuring.

Further, we believe that the board of Sevan, which is controlled by Seadrill, has not safeguarded the best interests of the Sevan by accepting the Restructuring. As outlined below, the board of directors of Sevan should have taken action prior to the Chapter 11 filing to secure the assets of Sevan on behalf of all shareholders, e.g. by using other means of financing than the RCF.

2.3     Establishment of the Revolving Credit Facility Agreement (RCF) in October 2013

In October 2013, Sevan and Seadrill entered into a USD 100 million RCF. The interest on the loan was LIBOR + 5,5 %, in addition toa commitment fee of 2.2% per annum on the undrawn balance of the RCF. Seadrill and the Seadrill controlled management of Sevan, changed the terms of the RCF in December 2014, where the line of credit was increased to USD 300 million, a second lien against certain Sevan assets was provided as security, the interest is increased to LIBOR + 6 % and the commitment fee of the undrawn balance is increased to 2,4 %.

Sevan's other financing at that time was bank loans where the interest was LIBOR + 2,5 and 2,9 percent.

The RCF financing was thus by far the most expensive financing for Sevan. As demonstrated below the Seadrill controlled management of Sevan has drawn substantial amounts on the RCF in order to pay down Sevan's excising bank loans, thereby making Sevan's financing more expensive than needed, and in effect transferring the value of the extra costs of the financing to Seadrill, at the expense of the minority shareholders in Sevan. Furthermore, the RCF has secured Seadrill a preferred position in the Restructuring, at the expense of the minority shareholders in Sevan.

In our view the RCF was not needed and not in Sevan's interest. Sevan had other and cheaper financing available. Furthermore, the terms of the RCF are not made on arm's length principles. It is our view that Seadrill has used its position as a majority shareholder in Sevan to enter into the for Sevan unfavorable RCF in order to transfer value form Sevan to Seadrill, and to secure control over Sevan's assets, at the expense of the minority shareholders in Sevan.

Shortly after the establishment of the RCF - 1. January 2014 - Sevan had an equity of 683,7 million USD. Sevan had operating profits of 96,8 million USD in 2013.The RCF was unused and the company had bank loans of 1369,2 mill USD. In our view, these figures also demonstrate that Sevan had no commercial need for the expensive RCF from its majority shareholder Seadrill. And if there in fact was such a need, the company should not have totally cancelled the bond issue, that the former management planned (before Seadrill obtained the majority of the shares).

2.4     Seadrill has used the RCF to in effect take commercial risks on the expense of the Shareholders and to take control over Sevan's assets on the expense of the Shareholders

In the summer and autumn of 2014, there were, in our view, two major developments for Sevan.

Firstly, the COSCO shipyard did not deliver the rig Sevan Developer on time. Therefore, Sevan was legally entitled to cancel the contract and get the advance payment of approximately 120 million USD refunded.

Secondly, the downturn in the oil sector started.

The Seadrill controlled management of Sevan, did however, chose not to cancel the contract with the COSCO shipyard and thus did not demand the advance payment of approximately 120 million USD refunded. Such a refund would have been a major financial contribution for Sevan, and could together with other measures mentioned in section 3 have provided sufficient financing for Sevan through the downturn in the oil sector.

Furthermore, the Seadrill controlled management of Sevan chose to use expensive RCF to pay down on the bank loans, instead of renegotiating the length of down-payments with Sevan's banks.

By these decisions the Seadrill controlled management of Sevan, in our view, took a commercial risk on the expense of the minority shareholders of Sevan. If the downturn in the oil sector proved to take long time, thereby forcing a restructuring process in Sevan, the minority shareholders would be at risk of being wiped out, while Seadrill, in addition to acquiring substantial value from Sevan through the very high interest according to the terms of the RCF, in its capacity of secured creditor due to the RCF, would be in a position to acquire control over Sevan's assets at the expense of the minority shareholders. In our view this is in fact demonstrated by Seadrill's restructuring plan through the Chapter 11 proceedings.


2.5     Seadrill's mismanagement of Sevan

2.5.1   The management agreement

After Seadrill acquired slightly over 50% ownership of Sevan, Seadrill took over the management of Sevan through a management agreement between Seadrill and Sevan. There has been no insight into Sevan's costs associated with the management agreement introduced by Seadrill.

More importantly, both Seadrill and Sevan are in the rig market. The companies are competitors in this market. Despite this very clear conflict of interest between Seadrill and Sevan, Seadrill used its position as majority shareholder in Sevan to take over the management of Sevan's operations and management of Sevan's rigs. In our view, this is a clear violation of the rights of the minority shareholders.


2.5.2   Prioritization of Seadrill rigs on the expense of Sevan rigs

The management agreement implies, inter alia, that Seadrill will market Sevan's rigs. After almost four years of marketing of Sevan's rigs, the Seadrill controlled management has only succeeded in receiving one small maintenance mission for Shell. During the same period, the same Seadrill controlled management has entered into contracts for tens of Seadrill rigs, 7-8 of these since Q2 17, according to Upstream and quarterly reports. In the Shareholders view, this difference can only be

explained by the Seadrill management actively prioritizing its own rigs at the expense of Sevan's rigs, which would be a clear violation of principles of equal treatment.

We also question two specific events relating to the Seadrill controlled management of the Sevan rig Sevan Driller:

In the fall of 2015 Upstream online and other media outlets reported that Sevan Driller was about to lose its contract with Petrobras. Upstream and other media claimed that Sevan Drillers contract was sacrificed in order for Seadrill's rig West Orion contract with Petrobras to be renewed.

During Sevan Drilling's 3rd quarter presentation on November 24, 2015, Sevan's CEO Scott McReakan received questions related to the Sevan Drillers contract period with Petrobras. McReakan replied that the contract ran until June 2016 and that they were working on finding solutions for the second half of 2016. He also said that "Petrobras has asked for same relief from their vendors," but that "For us it's got to be commercially make sense".

After the quarterly presentation, Sevan experienced a sharp fall in the share price, and within two months the share price fell to less than a third. The background for such a fall was not announced to the market until the 4th quarter presentation at the end of February 2016, where it was announced that Sevan Driller had lost the contract with Petrobras with effect from 1 December 2015. It was also made known that Petrobras had extended Seadrill's contract regarding the rig West Orion. In the view of the Shareholders, these events strongly suggest that Seadrill and the Seadrill controlled management of Sevan has prioritized Seadrill's interest on the expanse of Sevan's interest in its negotiations with Petrobras.

Furthermore, in the view of the Shareholders, postponing informing the market about the fact that Sevan Driller lost its contract with Petrobras with effect from 1. December 2015 may be a violation of managements duty to inform the market under Norwegian law (verdipapirhandelloven §§ 5-2 and 5-3).

At year-end 2016, the lndian oil company ONGC opened a tendering process where the Sevan rig Sevan Driller participated. According to information in our possession, Sevan Drilling was a bidder in this tender. However, the Seadrill controlled management chose to pull the Sevan rig Sevan Driller out of the tendering process with ONGC. lf the rig Sevan Drilling had not been pulled out of the tender, the rig would in our clients' view have been under contract with ONGC with a revenue equivalent to USD 46 million a year. We cannot see any justification for such a decision by the Seadrill controlled management of Sevan. We note that the same management at approximately the same time accepted USD 135,000-day rate contract for the Seadrill rig West Elara with Statoil, a day ratethat was only marginally above the tender day rate for Sevan Driller.

We thus have reason to suspect that the Seadrill controlled management of Sevan has contributed to weakening Sevan Drilling's position ahead of a pre-planned Chapter 11 process where minority shareholders in Sevan risk losing all their values.

3       REVOLVING CREDIT FACILITY AS THE BASIS FOR THE CHAPTER 11 PROCESS FOR SEVAN DRILLING

Seadrill has made Sevan Drilling dependent of Seadrill by issuing the RCF that, in our view, was not needed.

We believe that the RCF is the main reason that Seadrill has been able to force Sevan into the Restructuring where Seadrill has proposed that the shareholders of Sevan Drilling will get no recovery for their existing shares.

Furthermore, we believe that Sevan had other viable options to secure sufficient finance and liquidity, (such as share issue, bond issue, renegotiating the length of down-payments under existing bank loans, using Sevan's legal right to cancel the rig Sevan Developer with an approximately 120 million USD refund and ensuring operation contracts for Sevan rigs), but that Seadrill, through its management of Sevan chose to use the expensive RCF, thereby gaining control over Sevan's assets at the expense of the minority shareholders in Sevan.

By 30 July 2017, Sevan had an equity of 292,7 million USD (reduced from 683,7 million USD when the RCF was established). In the same period the RCF has increased from O to 245 million USD. The cumulated costs of the RCF has in this period been 78,2 million USD (transferred from Sevan to Seadrill), and Sevan's bank loans has been reduced from 1369,2 million USD to 868,1 million USD.

The Seadrill controlled management of Sevan Drilling has thus for more than 3,5 years used the expensive credit provided by the RCF and substantial parts of Sevan's equity for down-payments on Sevan's bank loans. At the same time the RCF has been an instrument to transfer value from Sevan to Seadrill and an instrument to secure Seadrill a preferred position in the Restructuring.


4       SUMMARY

We believe that Seadrill on several occasions has acted in a way that has damaged the assets and trading position of Sevan, by putting the interests of Seadrill befare the interest of Sevan.

We believe that there should be some compensation to the equity holders of Sevan, and that the proposed solution through the Restructuring is unfair and unreasonable to the shareholders of Sevan. The Shareholders are willing to discuss solutions with Seadrill and/or the majority shareholders of Seadrill.


Jon Magne Asmyr

3/1-18

Jon Magne Asmyr

PASS PASSPORT

NORGE NOREG NORWAY

Type: P
Landkode/Code of issuing State: NOR
Passnr./Passport No. 35890

Etternavn-Etternamn/Surname: ASMYR

Fødested-Fødestad/Place of birth: OSLO, NOR
Myndighet-Myndighet/Authority: ØSTFOLD POLITIDISTRIKT
Utstedt den-Utskrive den/Date of issue: 11 AUG 15
Gyldig t.o.m./Date of expiry: 11 AUG 25

Fødselsnr./Personal No. 8718